**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Proposed Liaison Counsel for Plaintiff S/M Merger Arbitrage, L.P.*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| S/M MERGER ARBITRAGE, L.P., individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>EMISPHERE TECHNOLOGIES, INC., MARK H. RACHESKY, MICHAEL WEISER, TIMOTHY ROTHWELL, TIMOTHY MCINERNEY and HOWARD DRAFT,<br><br>　　　Defendants. | CASE NO:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

967252.1

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................3

II.     JURISDICTION AND VENUE ..................................................................13

III.    THE PARTIES ...................................................................................14

        A.      Plaintiff ................................................................................14

        B.      Defendants ............................................................................15

IV.     BACKGROUND ...................................................................................19

        A.      Defendant Rachesky Controlled Emisphere ......................................19

        B.      The Emisphere-Novo Nordisk Royalty Agreements ...........................22

        C.      The Emisphere-Novo Nordisk Intellectual Property Dispute
                Arises ..................................................................................24

        D.      Novo Nordisk and Emisphere Initiate Merger Negotiations ..............26

        E.      Emisphere's Internal Financial Projections Are Adjusted
                Downward at the Behest of Defendants Weiser and Rothwell..........31

        F.      Defendant Rachesky and the MHR Entities Negotiate an
                Enormous Payout Under the Merger.................................................36

        G.      The Lucrative Tax Deal Between Rachesky and Novo Nordisk ........38

        H.      Defendants Lock Up the Shareholder Vote in Favor of the
                Merger ..................................................................................40

        I.      Defendants Issue the Materially False and Misleading Proxy...........42

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS OF MATERIAL FACT......................42

VI.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .........50

VII.    LOSS CAUSATION ..............................................................................52

VIII.   CLASS ACTION ALLEGATIONS.............................................................53

i

IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........55

X.    PRESUMPTION OF RELIANCE ................................................55

COUNT I For Violations Of Section 10(b) Of The Exchange Act And Rule
      10b-5 (Against All Defendants) ....................................................57

COUNT II  For Violations Of Section 20(a) Of The Exchange Act (Against
      the Director Defendants) ..............................................................59

XI.   PRAYER FOR RELIEF ...........................................................62

XII.  JURY TRIAL DEMAND ..........................................................62

967252.1

S/M Merger Arbitrage, L.P. ("Plaintiff"), by and through its undersigned counsel, brings this federal securities class action on behalf of a class (the "Class") consisting of itself and other investors that sold shares of the publicly traded common stock of Emisphere Technologies, Inc. ("Emisphere" or the "Company") from November 6, 2020, the announcement date of the merger ("Merger") between Emisphere and Novo Nordisk A/S ("Novo Nordisk" or "Novo"), through the close of the Merger on December 8, 2020, (the "Class Period"), including investors who sold their shares of Emisphere common stock into the Merger on December 8, 2020, and were damaged as a result of Defendants' wrongdoing alleged herein.

The subject securities claims are brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), against (i) Emisphere, (ii) Emisphere's controlling shareholder and member of the Company's Board of Directors (the "Board") Mark H. Rachesky ("Rachesky"), (iii) Emisphere's Co-Chief Executive Officers and Board members Michael Weiser and Timothy Rothwell (together with Defendant Rachesky, the "Director Defendants"), and (iv) Emisphere Special Committee members Timothy McInerney and Howard Draft (the "Special Committee Defendants" and together with Emisphere and the Director Defendants, the "Defendants").

Plaintiff's claims are based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information

1

and belief is based on, among other things, the independent investigation of its

undersigned counsel. This investigation included, but was not limited to, a review

and analysis of:

(i) The court filings and rulings in *In re Emisphere Technologies, Inc. Stockholders Litigation*, C.A. No. 2021-0025-NAC (Del. Ch.), pending in the Court of Chancery of the State of Delaware (the "Chancery Court Action");[1]

(ii) Emisphere's Definitive Proxy Statement ("Proxy") issued and distributed to Emisphere shareholders on November 16, 2020 in connection with the Merger;

(iii) Media reports concerning Emisphere and its business operations, financial results and the Merger;

(iv) Data reflecting the price of Emisphere's common stock; and

(v) Other public material and data concerning the Company and the other Defendants.

Plaintiff's counsel's investigation into the factual allegations contained herein

is ongoing, and many of the relevant facts are known only by Defendants, or are

exclusively within Defendants' custody or control. Plaintiff believes that substantial

additional evidentiary support will exist for the allegations set forth herein after a

reasonable opportunity for discovery.

---

[1] Certain documents referenced herein are cited in the Chancery Court Action. These references are to internal Emisphere documents produced to plaintiffs in the Chancery Court Action pursuant to a books and records demand under 8 Del. C. § 220   All emphasis herein is added unless otherwise noted.

967252.1

## I.    INTRODUCTION

1.    This action arises out of Defendants' fraudulent efforts to artificially depress the price of Emisphere's common stock during the Class Period in order to ensure that the $1.8 billion Merger with Novo Nordisk would be consummated and Defendant Rachesky, together with the other Director Defendants, would receive lucrative payouts resulting from the transaction.  To implement that scheme, Defendants made a series of materially false and misleading statements and omissions of material facts in the Proxy and other public statements concerning the Merger that served to deflate Emisphere's stock price and justify the inadequate per share consideration offered to Company shareholders under the Merger.

2.    The claims herein are brought on behalf of Emisphere shareholders who sold their stock after the Merger was first announced through the close of the Merger on December 8, 2020, including shareholders who sold their Emisphere stock into the Merger.  The Class Period starts on November 6, 2020, when Defendants announced the Merger and issued materially false information concerning the transaction.    As detailed herein, Defendants made additional material misrepresentations concerning the Merger in the Proxy and other public statements during the Class Period.

3.    The Merger arose in the context of a longstanding business relationship between Emisphere and Novo Nordisk in which Emisphere licensed its patented

967252.1

SNAC drug delivery technology (defined below) to Novo under a royalty agreement executed between the companies in 2008 (the "Emisphere-Novo Royalty Agreement" or "Royalty Agreement"). Emisphere's SNAC technology was its primary asset. Under the Emisphere-Novo Royalty Agreement, Novo Nordisk was permitted to use Emisphere's SNAC technology as a delivery mechanism for the oral medication Rybelsus, a "wonder drug" approved by the FDA for the treatment of type 2 diabetes. In return, Novo Nordisk agreed to make both milestone and royalty payments to Emisphere that were tied to Rybelsus's net product sales.

4.    The Emisphere-Novo Royalty Agreement was amended several times over the course of the next ten years to include a broader class of oral drug treatments that were being developed by Novo Nordisk. Under one such amendment dated December 8, 2016, Defendant Rachesky, as Emisphere's controlling shareholder, obtained the right to receive a direct royalty stream of 0.5% of Novo Nordisk's net sales of Rybelsus and other products that used the SNAC technology.

5.    Emisphere also had the right to terminate the Royalty Agreement if Novo Nordisk materially breached its provisions. In April 2019, an intellectual property dispute arose between Emisphere and Novo Nordisk regarding Emisphere's SNAC technology. Emisphere alleged that Novo had breached the Royalty Agreement by disclosing confidential information concerning SNAC in a scientific journal. Novo Nordisk disputed this claim and countered that it had "sole

4

inventorship" of the SNAC technology under a prior amendment to the Emisphere-Novo Royalty Agreement. Novo further threatened to reduce the royalty rate for Emisphere given Novo's "sole inventorship" claim. The companies continued to press their respective positions on the intellectual property dispute during the fall of 2019.

6.      In November 2019, Novo Nordisk initiated discussions on a potential acquisition of Emisphere. This outreach was made in the midst of the companies' intellectual property dispute and was undoubtedly initiated in reaction to the dispute and its implications for the royalties payable under the Emisphere-Novo Royalty Agreement. Emisphere agreed to discuss a possible acquisition by Novo Nordisk on the condition that such negotiations include consideration of the intellectual property dispute.

7.      Emisphere and Novo Nordisk engaged in merger negotiations throughout 2020. Novo made several different acquisition proposals between February and August, which culminated in Novo's "best and final" offer on August 24, 2020. After ultimately agreeing on terms, Emisphere and Novo Nordisk executed a merger agreement on November 5, 2020 (the "Merger Agreement"). Under the Merger Agreement, Novo Nordisk agreed to pay $1.35 billion to Emisphere's shareholders in exchange for their Emisphere common stock.

967252.1

8.     Concurrently with the Merger Agreement, Novo Nordisk also entered into an agreement with the investment funds controlled by Defendant Rachesky to acquire his 0.5% royalty stream (the "MHR Purchase Agreement").  Defendant Rachesky was paid $450 million for Novo's acquisition of his royalty allocation. All told, Novo Nordisk agreed to pay $1.8 billion to acquire both Emisphere and Defendant Rachesky's royalty stream.  Defendants Rothwell and Weiser were also provided lucrative payouts under the Merger, including restricted stock unit ("RSU") and unvested stock option packages valued at over $8 million each.

9.     Emisphere announced the Merger in a press release on November 6, 2020 and subsequently issued the Proxy to the Company's shareholders on November 16, 2020.  Both the November 6 press release and the Proxy touted the Merger as a positive transaction for Emisphere's public shareholders.  Defendants estimated that Emisphere's shareholders would receive $7.82 per share of Company common stock exchanged in the Merger (shareholders ultimately received $7.83 per share (the "Merger Consideration")), which purportedly represented a significant premium for shareholders.  The Merger closed on December 8, 2020, and in a press release that day Defendants stated the transaction represented substantial value for Emisphere's shareholders.  Plaintiff and other Class members sold their Emisphere common stock into the Merger and received $7.83 per share in Merger Consideration.

10.     Defendants' Class Period statements concerning the Merger wholly omitted highly material information about the transaction.  Specifically, Defendants characterized the Merger as being "fair to and in the best interests of" Company shareholders based on discounted financial projections (the "Management Projections") that, among other things (i) assumed a decrease in Rybelsus-related royalty payments from Novo to Emisphere beginning in 2027, (ii) wholly ignored the lucrative impact of the intellectual property dispute between Novo and Emisphere that was integral to the initial Merger negotiations and implicated significant royalty payments to the Company, and (iii) discounted the possibility of success ("PoS") for FDA approval of the expanded use of Rybelsus to treat obesity and non-alcoholic fatty liver disease ("NASH").  The disclosed Management Projections were in line with the $1.8 billion in total Merger Consideration (*i.e.*, $1.35 billion to Emisphere shareholders and $450 million to Defendant Rachesky and his investment funds), and supported both the Merger Consideration and the Director Defendants' exorbitant personal compensation under the transaction.

11.     Yet, Defendants' representations about the fairness of the Merger wholly failed to disclose that throughout Merger negotiations, Defendants Rothwell and Weiser coordinated with Jefferies LLC ("Jefferies"), the financial advisor to the Emisphere Board's Special Committee (the "Special Committee"), to adjust the

Company's financial projections downward in order to support a fairness evaluation of the deal.

12.     Defendants' Class Period statements made no mention of the fact that from June through August 2020, Rothwell and Weiser repeatedly communicated with Jefferies, which represented the Special Committee and not these conflicted senior executives, to deflate Emisphere's financial projections to be more consistent with Novo's acquisition proposals.  In fact, in late July 2020, Defendants Rothwell and Weiser asked Jefferies to target an overall net present value ("NPV") for Emisphere of $2 billion in its financial models.  Rothwell and Weiser later sought additional adjustments to Jefferies' financial assumptions in order to further lower the Company's NPV and more closely align it with the "best and final" $1.8 billion acquisition price offered by Novo Nordisk in August 2020.

13.     Defendants also entirely omitted any reference to two separate sets of internal Emisphere financial projections (the "Eagle 1" and "Eagle 2" Projections) that, unlike the Management Projections (i) assumed a decrease in Novo Nordisk royalty payments would occur in 2034, not 2027, (ii) accounted for the intellectual property dispute between Novo and Emisphere that implicated substantial royalty revenue for Emisphere, and (iii) assumed FDA approval of Rybelsus to treat both obesity and NASH, thereby increasing overall sales revenue and royalty payments to Emisphere.

8

14.    There was a material difference between the unadulterated Eagle 1 and 2 internal financial projections and the manipulated Management Projections disclosed to shareholders.  As publicly revealed for the first time in Vice Chancellor Nathan A. Cook's August 2, 2023 bench decision denying Defendants' motions to dismiss a state law breach of fiduciary duty of disclosure claim in the Delaware Chancery Action, the Eagle 1 and Eagle 2 Projections showed Emisphere NPVs of **$2.673 billion and $2.935 billion**, respectively.  *See In re Emisphere Technologies, Inc. Stockholders Litigation*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 12-13).  These NPVs were a far cry from the downwardly adjusted Management Projections disclosed in the Proxy, which projected Emisphere revenues of $1.31 billion from 2020 to 2039, as well as unlevered free cash flows of $963.8 million, and EBIT of $1.18 billion for this same period.  Jefferies' Discounted Cash Flow ("DCF") analysis presented in the Proxy stated an implied enterprise value reference range for Emisphere of $643 million to $676 million.

15.    Defendants' Class Period statements also wholly omitted any reference to the intellectual property dispute between Emisphere and Novo Nordisk, or its crucial role in Emisphere's internal valuations and in the initial price negotiations between the companies.  As noted above, the intellectual property dispute served as a basis for initiating Merger negotiations between Emisphere and Novo Nordisk. Emisphere viewed the dispute as a key driver in the Company's overall valuation

9

given its entitlement to substantial royalty payments for Novo's use of Emisphere's SNAC technology.

16.    Unbeknownst to Emisphere's public shareholders, between April and mid-August 2020, the Company continued to press the merits of the dispute with Novo as leverage to obtain higher merger consideration.  This included concrete steps taken by Emisphere and its outside counsel at Williams & Connolly LLP to prepare for patent infringement litigation against Novo Nordisk.  Emisphere's management also internally determined there was a "high likelihood" of success in the intellectual property dispute, and acknowledged it would have a positive impact on the Company's royalty revenues.  Despite this, Defendants ultimately abandoned the intellectual property dispute as a point of leverage in Merger negotiations once Novo Nordisk made its "best and final" offer of $1.8 billion in total Merger Consideration.

17.    Instead, the Director Defendants chose to advance a quick sale to Novo Nordisk to secure their enormous change-in-control compensation rather than extract additional value for shareholders through the intellectual property dispute. The abandonment of the intellectual property dispute and its positive impact on Emisphere's valuation also served to substantiate the lower Management Projections presented to shareholders.  Unlike the Eagle 1 and Eagle 2 Projections, the Management Projections *did not even consider* the intellectual property dispute or

attribute any value to it. This, notwithstanding the Company's acknowledgment that the dispute implicated a key value driver for Emisphere – Novo royalty revenues.

18.    Vice Chancellor Cook found the intellectual property dispute to be material information that was not disclosed to Emisphere stockholders. Specifically, in his bench ruling sustaining the fiduciary duty of disclosure claim against Defendants, VC Cook held "it is reasonably conceivable that knowledge of the IP Dispute was *material to the stockholder's decision*" to accept Merger Consideration. *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 43-44). He further elaborated that because the duty of disclosure claim "pled that [D]efendants knew that the IP Dispute was one of Emisphere's key value drivers, [] it is reasonably conceivable that stockholders would find information regarding this matter substantially important in analyzing Novo Nordisk's acquisition offer." *Id.* at 44. Accordingly, VC Cook held it was "reasonably conceivable *that the proxy contained materially misleading disclosures*." *Id.*

19.    Defendants' Class Period statements further failed to disclose that Defendant Rachesky insisted on structuring his $450 million allocation of the Merger Consideration in a manner that provided him with substantial personal tax benefits unique to him. As noted above, this outsize allocation was paid to Defendant Rachesky for the 0.5% in royalties he received under the amended Emisphere-Novo Royalty Agreement. Rachesky demanded a complex transaction

11

structure for Novo's concurrent acquisition of this royalty stream in order to ensure that he could claim substantially lower long-term capital gains tax on his $450 million allocation.  He struck this deal at the expense of negotiating for higher total Merger consideration to Emisphere's other shareholders.  None of these details on Defendant Rachesky's motivation behind the transaction structure, or its negative impact on minority shareholders was disclosed.

20.    In sustaining the duty of disclosure claim against Defendants, VC Cook credited the inference that Rachesky, as Emisphere's controlling shareholder, "was willing to accept less total [Merger] consideration in exchange for Novo Nordisk's agreement to this unique tax structuring, *to the detriment of the minority stockholders*."  *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 31).  The Vice Chancellor further inferred that Emisphere's deal negotiators, including Defendants Rothwell and Weiser, favored Merger terms that "accrued solely to [Rachesky and his investment entities] given their status as [Emisphere] controllers."  *Id*. at 32.  VC Cook therefore concluded it was "reasonably conceivable that the proposed tax structure was a component of these negotiations and that *it was included to the detriment of a higher transaction price*."  *Id*.  Defendants' positive public statements about the Merger were completely devoid of this material information about the transaction.

21.    Together, Defendants' material misstatements and omissions of material facts artificially depressed the Company's stock price during the Class Period.  Defendants used this artificial stock price deflation to falsely assert that the Merger Consideration was "fair" to Emisphere shareholders and was the best way to maximize shareholder value when in fact, it did not reflect the true and accurate financial position of the Company.  In return, Rachesky and the Director Defendants ensured their receipt of highly lucrative personal payouts under the Merger.

22.    Defendants' material misrepresentations caused the price of Emisphere stock to fall as low as $7.50 per common share on November 10, 2020.  As a result of Defendants' wrongdoing, Class members, including Plaintiff, have suffered substantial financial losses by selling Emisphere common stock at artificially deflated prices during the Class Period, including by selling their Emisphere shares into the Merger on December 8, 2020 for the inadequate Merger Consideration of $7.83 per share.

23.    Plaintiff and the Class are entitled to recover from Defendants the damages incurred as a result of Defendants' materially false and misleading statements and omissions of material facts.

## II.    JURISDICTION AND VENUE

24.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78(t)(a), and the rules and regulations

promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 2401.10b-5. This

Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§

1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.    Venue is proper in this District under Section 27 of the Exchange Act,

15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, Emisphere was

headquartered in this District, and many of the acts and conduct that constitute the

violations of law complained of herein occurred in this District, including the

dissemination of false and misleading statements in and from this District.

26.    In connection with the acts alleged in this complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications and the

facilities of the national securities markets.

## III.    THE PARTIES

### A.    Plaintiff

27.    S/M Merger Arbitrage, LP ("S/M Merger Arbitrage") is a private hedge

fund operated by SM Investors.  S/M Merger Arbitrage's principal place of business

is located at 509 Madison Avenue, New York, N.Y.  As set forth in the attached

certification, S/M Merger Arbitrage sold Emisphere stock during the Class Period

and was damaged thereby.

**B.    Defendants**

**Emisphere**

28.    Emisphere is a Delaware corporation with its principal place of business located at 4 Becker Farm Road, Roseland, New Jersey. Emisphere is a pharmaceutical and drug delivery company that develops proprietary technologies for oral formulations of therapeutic agents. Emisphere collaborated with Novo Nordisk on the oral delivery of the Type 2 diabetes drug Rybelsus using Emisphere's proprietary SNAC drug delivery technology. At the time of the Merger, Emisphere was controlled by Defendant Rachesky, his investment advisory firm MHR Fund Management LLC ("MHR LLC") and MHR LLC's affiliated investment funds (defined further below). During the Class Period, Emisphere common stock traded on the Over-the-Counter Bulletin Board ("OTCBB") maintained by the Financial Industry Regulatory Authority under the stock symbol "EMIS." As of the announcement of the Merger on November 6, 2020, Emisphere had approximately 170.9 million fully diluted shares of common stock outstanding.

**The Director Defendants**

29.    Defendant Mark H. Rachesky is the founder and President of MHR LLC and held a controlling interest in a series of investment funds that had significant holdings in Emisphere stock. Rachesky was appointed by MHR LLC to the Emisphere Board in September 2005. At the time the Merger closed, Rachesky and his investment funds owned approximately 70% of Emisphere's outstanding

15

common stock through their ownership of convertible Emisphere debt, as well as Emisphere stock warrants and options.  Upon information and belief, Rachesky reviewed and approved Emisphere's Proxy and press releases during the Class Period which contained materially false and misleading statements, as detailed herein.

30.    Defendant Michael Weiser was appointed by MHR LLC to the Emisphere Board in September 2005.  In March 2020, Weiser was named Co-CEO of Emisphere.  At the time the Merger was announced, Defendant Weiser held Emisphere RSUs with an estimated value of approximately $7.8 million, and unvested Emisphere stock options with an estimated value of $235,866.  As detailed below, Weiser and Defendant Rothwell worked with Jefferies to adjust Emisphere's financial projections downward in connection with the Merger.  Upon information and belief, Weiser also worked on drafting and disseminating the Proxy, and reviewed and approved Emisphere's Class Period press releases that contained materially false and misleading statements concerning the Merger.

31.    Defendant Timothy Rothwell was appointed to the Emisphere Board on November 5, 2009, and became Chairman of the Board in 2012.  In March 2020, Rothwell was named Co-CEO of Emisphere with Defendant Weiser.  At the time the Merger was announced, Rothwell held Emisphere RSUs with an estimated value of approximately $7.8 million, and unvested Emisphere stock options with an

16

estimated value of $235,866. As detailed below, Defendant Rothwell and Weiser worked with Jefferies to adjust Emisphere's financial projections downward in connection with the Merger. Defendant Rothwell signed the Proxy and upon information and belief, he reviewed and approved Emisphere's Class Period press releases that contained materially false and misleading statements concerning the Merger.

32. Defendant Timothy McInerney was elected to the Emisphere Board on March 1, 2012. McInerney was appointed to the Special Committee of the Emisphere Board on March 17, 2020, which was nominally formed to evaluate the Merger with Novo Nordisk. Defendant Rachesky controlled McInerney's appointment to the Emisphere Board through his control over a majority of the Emisphere stock that voted for directors at the time of his appointment.

33. Defendant Howard Draft was appointed to the Emisphere Board in 2019, and was appointed to the Special Committee on March 17, 2020.

### C.    Relevant Non-Parties

34. Non-party Novo Nordisk is a Danish company with its principal executive offices located at Novo Allé 1, DK-2880, Bagsvaerd, Denmark. Novo Nordisk is a global healthcare company focused on diabetes care and treatment, including the manufacturing of insulin and GLP-1 receptor agonists. Novo Nordisk

17

also develops treatments for obesity, hemophilia, NASH, and cardiovascular disease, among other chronic conditions.

35.    MHR LLC is a New York based investment advisor founded by Defendant Rachesky in 1996. MHR LLC has approximately $5 billion of assets under management for a series of private investment funds, including the Delaware limited partnerships MHR Capital Partners (100) LP, MHR Institutional Partners II LP, and MHR Institutional Partners IIA LP (collectively, the "MHR Funds"). Each MHR Fund was a beneficial owner of Emisphere securities during the Class Period.

36.    MHR Capital Partners Master Account LP ("Master Account") is a limited partnership organized in Anguilla, British West Indies. Defendant Rachesky was the founder and ultimate controller of MHR LLC, the MHR Funds, and Master Account (collectively, the "MHR Entities"). Master Account and each of the MHR Funds entered into the MHR Purchase Agreement with Novo Nordisk on November 5, 2020, in connection with the Merger. As detailed further below, the MHR Purchase Agreement was executed concurrently with the Merger Agreement and governed Novo Nordisk's acquisition of the 0.5% royalty stream payable to Defendant Rachesky and the MHR Entities in exchange for $450 million.

18

## IV. BACKGROUND

### A. Defendant Rachesky Controlled Emisphere

37. Defendant Rachesky exercised control over Emisphere during the Class Period through a series of stock purchases and lending arrangements with the Company that provided him with significant Emisphere convertible debt holdings, as well as Emisphere warrants and stock options.

38. In March 2005, Defendant Rachesky made his initial investment in Emisphere by purchasing 3.25 million shares of the Company. After this investment, Rachesky and the MHR Entities entered into a loan agreement with Emisphere on September 26, 2005, that further substantiated his control over the Company.

39. Under this agreement, Defendant Rachesky and the MHR Entities loaned Emisphere $15 million for a seven-year term at 11% interest. The loan agreement gave Rachesky the option to convert monthly interest payments into Emisphere common stock at $3.78 per share. It also allowed Defendant Rachesky to be appointed to the Emisphere Board and gave him the right to designate another director. Rachesky chose Defendant Weiser to join him on the Emisphere Board in 2005. Under the terms of the loan agreement, Defendants Rachesky and Weiser could not be removed from Emisphere's Board unless at least 85% of Emisphere's outstanding shares entitled to vote on directors chose to remove them. This

effectively made the removal of Rachesky and Weiser from the Board impossible given that Rachesky and the MHR entities owned 17.47% of Emisphere's outstanding common stock after their initial loan closed in September 2005.

40.    Over the next several years, Defendant Rachesky and the MHR Entities made additional loans to Emisphere that further solidified Rachesky's control over the Company.  In July 2010, Rachesky made a $600,000 loan to Emisphere in exchange for promissory notes from the Company.  In August 2010, Rachesky made a $6.5 million investment in a private placement of Emisphere warrants that gave him the right to purchase 2.6 million shares of Emisphere common stock for $1.01 per share.  Rachesky invested in another private placement of Emisphere warrants in June 2011 that entitled him to purchase another 3 million Emisphere shares for $1.09 per share.  Following these investments in Emisphere warrants, Defendant Rachesky had a 47.6% effective ownership interest in the Company.

41.    Defendant Rachesky and the MHR Entities were the controlling stockholders of Emisphere by the middle of 2012.  As of March 1, 2012, Rachesky and the MHR Entities owned 18,483,663 shares of Emisphere common stock out of approximately 32 million shares outstanding.  This significant stock ownership did not account for the almost 21 million Emisphere shares issuable to Defendant Rachesky and the MHR entities under the convertible notes, warrants, and stock options they held in the Company.  Rachesky also controlled Emisphere's five

member Board together with his Board appointees, Defendant Weiser and John D. Harkey who was appointed to the Emisphere Board in 2006.

42.    In the fall of 2012, Emisphere announced that it had defaulted on the convertible notes exchanged for Rachesky's $15 million loan made in 2005, and on the promissory notes Rachesky received in exchange for the $600,000 loan he made to the Company in 2010.  Rachesky increased the interest rates payable on both the convertible notes and the promissory notes as a result of Emisphere's default.  On October 17, 2012, Rachesky and the MHR Entities loaned Emisphere an additional $1.4 million in exchange for another promissory note from the Company.

43.    In 2013, Defendant Rachesky and Emisphere entered into a restructuring agreement on all of the Company's outstanding debt to Rachesky and the MHR Entities.  This restructuring agreement consolidated the loans and promissory notes in exchange for an interest rate increase to 13% and a re-pricing of the convertible notes held by Rachesky.  This significantly lowered the price at which Defendant Rachesky could convert his notes into Emisphere common stock and increased his effective ownership of the Company to 63.7% of Emisphere's fully diluted stock.

44.    Defendant Rachesky and the MHR Entities' convertible note holdings in Emisphere continued to increase from 2015 through 2019.  By April 29, 2019, Rachesky and the MHR Entities held over 63 million convertible notes in

21

967252.1

Emisphere, which effectively gave them a 71.1% ownership interest in the Company. By the time the Novo Nordisk Merger was announced on November 6, 2020, Defendant Rachesky and the MHR Entities held convertible debt in the Company that entitled them to over 77 million shares of Emisphere common stock, thereby further solidifying Rachesky's control over the Company.

### B. The Emisphere-Novo Nordisk Royalty Agreements

45. On June 21, 2008, Emisphere and Novo Nordisk entered into the Royalty Agreement in connection with the development of oral formulations of Novo's type 2 diabetes drugs. This partnership allowed Novo Nordisk to use Emisphere's proprietary Eligen® drug delivery technology, including the drug carrier known as monosodium N-[8-(2-hydroxybenzolyl) amino] caprylate ("SNAC"). Novo Nordisk used Emisphere's SNAC carrier for the oral administration of Rybelsus, Novo's blockbuster type 2 diabetes drug. Rybelsus was approved for type 2 diabetes management in the United States and the European Union in 2019 and 2020, respectively.

46. Under the Royalty Agreement, Emisphere had the right to receive royalty payments from Novo Nordisk for its products that used Emisphere's SNAC technology. The Royalty Agreement provided a minimum of $87 million in milestone payments to Emisphere upon the completion of certain events in the development and approval of Novo drugs that used the SNAC carrier technology.

The agreement also provided for royalty payments to Emisphere of up to 3% of Novo Nordisk's annual net sales on products that used SNAC, including Rybelsus.

47.    The Emisphere-Novo Nordisk Royalty Agreement was expanded on October 14, 2015, to include a broader group of Novo drug treatments.  Under this new agreement, Emisphere worked to develop oral formulations for Novo Nordisk's investigative drug treatments that addressed metabolic disorders, including diabetes and obesity.  The agreement provided Emisphere with an upfront license fee of $5 million, and up to $82.5 million in milestone and royalty payments tied to net sales of Novo's products that used Emisphere's Eligen® technology.  Emisphere was also eligible to receive up to $62.5 million in milestone payments on each additional Novo drug for which Emisphere granted exclusive licensing of its carrier technology, and up to $20 million in milestone payments for each additional non-exclusively licensed drug.  In addition, Emisphere was entitled to royalty payments on the sale of each commercialized Novo Nordisk product that used Emisphere's carrier technology.

48.    Emisphere had the right to terminate the revised royalty agreement if Novo Nordisk materially breached the agreement and failed to cure its breach within a specified time period.

49.    Novo Nordisk made a $10 million milestone payment to Emisphere in October 2019 following the FDA's approval of Rybelsus to treat type 2 diabetes.

Novo also began making royalty payments to Emisphere in the first quarter of 2020, once Novo started selling Rybelsus in the U.S. market.  In addition, Emisphere received a one-time milestone payment of $10 million following the European Union's market authorization of Rybelsus on April 6, 2020.  Given the large market for Rybelsus in both the U.S. and Europe, the anticipated future royalty stream for Emisphere was substantial.

50.    The Emisphere-Novo Nordisk Royalty Agreement was amended again on December 8, 2016.  The amendment was tied to the significant loan agreements that Defendant Rachesky and the MHR Entities had entered into with Novo Nordisk to date.  Under this amendment, Defendant Rachesky agreed to forgive $7 million in debt on the first commercial sale of a Novo Nordisk product covered by the Royalty Agreement in exchange for a royalty that was directly payable to Rachesky and the MHR Entities (the "MHR Royalty Agreement").  Specifically, the MHR Royalty Agreement provided that Novo Nordisk would pay Rachesky and the MHR Entities royalties equal to 0.5% of net sales for Rybelsus and any other licensed Novo product covered by the Royalty Agreement (the "MHR Royalties").

**C.    The Emisphere-Novo Nordisk Intellectual Property Dispute Arises**

51.    Emisphere notified Novo Nordisk in April 2019, that it believed Novo was in breach of the Royalty Agreement.  Emisphere claimed that Novo Nordisk had disclosed confidential information concerning SNAC and how it operated in an

article published in the Science Translational Medicine journal (the "STM Article"). Emisphere asserted that the STM Article violated sections 11.1 (Confidentiality) and 11.4 (Publication) of the Emisphere-Novo Nordisk Royalty Agreement.

52.     In a series of letters between Defendant Rothwell and Novo Nordisk's Chief Legal Officer, Lars Jørgensen, in May and June 2019, Novo Nordisk denied any breach of the royalty agreement.  Novo Nordisk reiterated its stance during a telephone call between Defendant Rothwell and Novo Nordisk's Chief Financial Officer, Karsten Knudsen, on or about July 10, 2019.  In an email sent later that same day, Mr. Knudsen suggested that Novo Nordisk intended to assert "sole inventorship" of the delivery technology disclosed in the SMT Article.  Section 3.5(c) of the Emisphere-Novo Nordisk Royalty Agreement allowed Novo to reduce royalty rates to Emisphere by 50% if Novo Nordisk could claim "sole inventorship" over the SNAC delivery technology addressed in the SMT Article.

53.     Notwithstanding Novo Nordisk's position, Defendant Weiser sent a letter to Novo on September 16, 2019, providing notice of a material breach of the Emisphere-Novo Royalty Agreement.  As a remedy for the asserted breach, Defendant Weiser proposed an "upward adjustment" of the royalty rate payable under Section 3.5 of the Royalty Agreement and demanded that Novo Nordisk cure the breach within 60 days.

967252.1

54.    On October 2, 2019, Novo Nordisk's Senior Vice President and General Counsel Global and Legal Patents, Tomas Haagen, sent a letter to Defendant Weiser denying any breach of the Emisphere-Novo Royalty Agreement.    Mr. Haagen argued that Emisphere's former CEO, Alan Rubino, had approved prior public articles that disclosed the confidential information in the SMT Article, and that the information in the SMT Article only involved Novo Nordisk discoveries. He further indicated that Emisphere could provide Novo Nordisk with an assessment of damages suffered as a result of the alleged breach, and proposed that Emisphere apply for patent protection over the allegedly confidential information disclosed in the SMT Article.    Mr. Haagen reiterated these proposals in a follow-up email on October 18, 2019 and further proposed a litigation standstill between Novo Nordisk and Emisphere.

55.    In a letter dated October 21, 2019, Emisphere's counsel at Quinn Emanuel Urquhart & Sullivan, LLP disputed Mr. Haagen's contentions regarding the SMT Article and Royalty Agreement.    Nonetheless, Emisphere agreed to a litigation standstill with Novo Nordisk, which was extended several times during Merger negotiations between the two companies.

**D.    Novo Nordisk and Emisphere Initiate Merger Negotiations**

56.    On November 15, 2019, Mr. Knudsen requested a meeting with Defendant Rothwell to discuss a potential merger.    Emisphere eventually agreed to

26

meet on February 20, 2020, but demanded that the SNAC-related intellectual property dispute be a part of any transaction negotiations. At this meeting, Mr. Knudsen made an initial offer to acquire Emisphere and the MHR Royalties payable to Defendant Rachesky and the MHR Entities for $950 million (the "February 20 Proposal").

57. Shortly after Novo Nordisk's initial acquisition offer, Defendants Weiser and Rothwell were appointed as Co-CEO's of Emisphere on March 11, 2020. In addition to lucrative base compensation packages for their new positions, Weiser and Rothwell also received one million RSUs each. These RSUs would accelerate and provide Weiser and Rothwell $7.8 million each upon a change-in-control of Emisphere. The lucrative payouts under the RSUs incentivized Defendants Weiser and Rothwell to promote a quick sale of Emisphere.

58. On March 17, 2020, Emisphere's Board established the Special Committee to "identify, evaluate and negotiate" a potential transaction with Novo Nordisk. The Emisphere Board acknowledged that a Special Committee was necessary given that negotiations with Novo Nordisk would involve the MHR Royalty Agreement that directly benefitted Defendant Rachesky and the MHR Entities. Defendants McInerney and Draft were appointed as the only two members of the Emisphere Special Committee.

59.     According to the Proxy, the Special Committee was empowered by the Board to evaluate and negotiate any transaction with Novo Nordisk, as well as any alternative transaction, and to make a recommendation to the Board about whether to accept such transaction proposal(s).  The Emisphere Board further decided that consummation of any transaction with Novo Nordisk or others required the recommendation of the Special Committee, and approval by a majority of the Emisphere voting stock not owned or controlled by the MHR Entities or Novo Nordisk (the "Unaffiliated Vote Condition").

60.     Despite the Special Committee's purported authority over merger negotiations, Defendants McInerney and Draft did not directly communicate with representatives of Novo Nordisk concerning the transaction.   In addition, Emisphere's self-interested Co-CEOs were heavily involved throughout the sale process.  Defendants Weiser and Rothwell, both of whom stood to gain lucrative compensation packages in a Novo Nordisk transaction, engaged in most of the negotiations with Novo.  Defendant Weiser was also present at almost all Special Committee meetings during the sale process.   Defendant Rachesky was also involved in Special Committee deliberations and was engaged in direct negotiations with Novo.

61.     The February 20 Proposal by Novo Nordisk to acquire Emisphere and the MHR Royalties was rejected by Defendants on April 13, 2020.

967252.1

62.    During the ongoing merger negotiations in the spring and summer of 2020, Emisphere and Novo Nordisk continued to engage in discussions concerning the intellectual property dispute that had been triggered by the SMT Article.  In a series of emails and telephone calls between March 2020 and July 2020 among Emisphere, Novo Nordisk and their respective counsel, the parties disputed whether they should be considered co-inventors of certain patents for drug carrier technology, including SNAC and its use in Novo Nordisk's Rybelsus product.

63.    This ongoing intellectual property dispute was material to Emisphere's valuation given the royalties payable under the Emisphere-Novo Nordisk Royalty Agreement.  This in turn had implications for the Merger negotiations between Emisphere and Novo Nordisk.  For example, in an April 19, 2020 internal Company email with talking points for a call with Novo, Defendant Weiser characterized the "inventorship issues" and the Company's related "royalty rights" surrounding the intellectual property dispute as "key value drivers to Emisphere."

64.    Moreover, on July 22, 2020, Defendant Weiser reported to the Special Committee about a conversation he had with Novo's CFO, Karsten Knudsen, in which Weiser stated that Emisphere was prepared to initiate litigation concerning the intellectual property rights surrounding Rybelsus unless Novo proposed a higher valuation for a Emisphere acquisition.  This communication followed Novo Nordisk's July 17, 2020 proposal to acquire Emisphere and the MHR Royalties for

$1.125 billion in cash, plus contingent value rights worth $300 million based on net sales milestones of Rybelsus (the "July 17 Proposal"). The Special Committee rejected the July 17 Proposal as providing inadequate consideration for Emisphere.

65.    Emisphere continued to press the intellectual property dispute in order to exert additional leverage and extract higher merger consideration from Novo Nordisk. On July 24, 2020, Emisphere's patent counsel at Williams & Connolly LLP emailed Tomas Haagen at Novo to inform him that Emisphere had filed two provisional patents on November 13, 2019 concerning the Company's intellectual property referenced in the SMT Article, and was prosecuting a third patent related to Emisphere's SNAC technology.

66.    At a meeting on August 17, 2020, the Emisphere Board was also provided and discussed an outline of proposed patent infringement claims against Novo Nordisk that the Company was prepared to file in the United States District Court for the Southern District of New York if Emisphere and Novo could not reach a settlement of the intellectual property dispute. The Company was clearly prepared to pursue the intellectual property dispute and use it as a basis to extract higher consideration in merger negotiations.

67.    Defendants also understood that the intellectual property dispute and the revenue streams it implicated were material to Emisphere's overall valuation. Emisphere's Director of Finance, Philip Nikolayuk, had internally expressed a "high

30

likelihood" that Emisphere would prevail in a litigation concerning the intellectual property dispute, and that the Company's SNAC-related royalties would extend until 2031 or beyond if that occurred.  This view was seconded by Emisphere's outside counsel at Williams & Connolly who had taken concrete steps to prepare for such a litigation.  Despite this internal recognition, Defendants ultimately used financial projections that assigned no value to the intellectual property dispute and entirely omitted any reference to the dispute during the Class Period.

### E. Emisphere's Internal Financial Projections Are Adjusted Downward at the Behest of Defendants Weiser and Rothwell

68.    In their public statements concerning the Merger, Defendants failed to disclose that Emisphere's financial projections were adjusted downward during negotiations in order to rationalize the final Merger Consideration offered by Novo Nordisk.

69.    In connection with its initial February 2020 Proposal to acquire Emisphere and the MHR Royalties for $950 million, Novo Nordisk prepared financial projections for Emisphere titled the "Project Emily" projections. Emisphere's internal financial projections were initially higher than Novo Nordisk's "Project Emily" projections.

70.    In May 2020, the Special Committee was provided with four separate internal Emisphere "Project Eagle" financial projections: (i) the Evercore Projections (Evercore, Inc. was Novo Nordisk's financial advisor on the Merger and

31

these financial projections were based on Novo's "Project Emily" projections); (ii) the Eagle Projections; (iii) the Eagle 1 Projections; and the (iv) Eagle 2 Projections. The Emisphere net present values ("NPVs") calculated under these projections were $950 million (Evercore Projections), $1.332 billion (Eagle), $2.673 billion (Eagle 1), and $2.93 billion (Eagle 2).

71.    The Evercore and Eagle Projections assumed there would be a June 2027 step-down in Emisphere's royalty rate to 1% under the Emisphere-Novo Nordisk Royalty Agreement.  The Eagle 1 and Eagle 2 Projections assumed that a 1% step-down in Emisphere's royalty rate would not occur until May 2034.  The Eagle 1 and 2 Projections also assumed that Rybelsus would receive FDA approval for the treatment of both obesity and NASH, as well as a favorable ruling for Emisphere in its SNAC-related intellectual property dispute with Novo Nordisk. Given these differences, the Eagle 1 and 2 Projections included higher revenues and royalties for Emisphere and NPVs for the Company that were far greater than the ultimate acquisition price of $1.8 billion.

72.    Following Novo Nordisk's July 17 Proposal to acquire Emisphere and the MHR Royalties for $1.125 billion in cash, plus contingent value rights worth $300 million, Defendants Weiser and Rothwell worked with Jefferies to further revise Emisphere's financial projections.  Emails between Defendant Weiser and Jefferies on July 25, 2020, included projections that assumed royalty payments to

967252.1

Emisphere until 2027, 2031 and 2034.  But even Jefferies' revised projections that reflected the later 2034 royalty step-down date still had lower NPVs than the previously calculated Eagle 1 and Eagle 2 projections.

73.    Defendant Weiser further requested that Jefferies provide "low, medium and high forecast models" for Emisphere.  In its analysis, Jefferies was asked to apply cumulative Rybelsus sales scenarios of $100 billion, $150 billion, and $200 billion.  Despite this range of cumulative sales assumptions, the NPVs for each royalty step-down date (*i.e.*, 2027, 2031, and 2034) were once again less than the NPVs in the Eagle 1 and Eagle 2 Emisphere projections.

74.    Between July 27-28, 2020, Defendants Weiser and Rothwell exchanged emails with Jefferies that included further revisions to the Emisphere financial projections.  In the email exchanges, Weiser and Rothwell asked Jeffries to assess the impact of the generic entry of Rybelsus into the market.  Following input from Weiser and Rothwell concerning the royalty step-down dates and a targeted NPV of $3 billion (which Weiser and Rothwell later asked to be reduced to a $2 billion NPV), Jefferies again provided royalty assumptions that were significantly lower than the Eagle 1 and Eagle 2 Projections.

75.    Despite Defendants Weiser's and Rothwell's efforts to modify Emisphere's financial projections downward to be more consistent with Novo Nordisk's July 17 Proposal, on July 29, 2020, the Special Committee rejected the

967252.1

July 17 Proposal as inadequate. Nonetheless, the Special Committee informed Novo Nordisk that it was prepared to continue negotiations on an acquisition of Emisphere.

76. On August 13 and August 21, 2020, Defendant Rothwell had discussions with Novo's Chief Legal Officer, Lars Jørgensen, regarding Novo Nordisk's acquisition proposal. At the same time, Defendants Weiser and Rothwell continued to work with Jefferies to further adjust Emisphere's financial projections.

77. On August 21, 2020, Mr. Jørgensen communicated to Defendant Rothwell that Novo Nordisk's "best and final" offer was an all-cash bid to acquire Emisphere and the MHR Royalties for $1.8 billion. Novo Nordisk reiterated this "best and final" offer in a written proposal to Emisphere on August 24, 2020 (the "August 24 Proposal").

78. Following the August 24 Proposal, Defendants Weiser and Rothwell worked with Jefferies to further adjust Emisphere's financial projections to be more consistent with the "best and final" $1.8 billion acquisition price offered by Novo Nordisk. These ultimately became the Emisphere Management Projections that were disclosed in the Proxy.

79. The Management Projections assumed a royalty step-down date of 2027, rather than 2034. The Management Projections also assumed lower peak Rybelsus sales percentages for diabetes, obesity and NASH than the Eagle 1 and Eagle 2 Projections, and underestimated the possibility of success ("PoS") for FDA

967252.1

approval of Rybelsus to treat obesity and NASH.  The Management Projections did not attribute any revenue for FDA approved Rybelsus treatment of obesity until 2024, despite Novo's announcement that it was soon initiating Phase III obesity trials for Rybelsus and the market is twice as large as that for type 2 diabetes.

80.    In addition, after Defendants received the August 24 Proposal, they stopped considering or incorporating the Emisphere-Novo Nordisk intellectual property dispute and its projected positive impact on Emisphere's valuation into Merger negotiations.  This occurred despite the fact that as late as August 17, 2020, Emisphere and its outside counsel were preparing to affirmatively bring suit in the Southern District of New York to protect the Company's patent rights, and that prior projections had ascribed value to the intellectual property dispute.  In contrast, the Management Projections assumed Emisphere would suffer a complete loss in any intellectual property litigation with Novo, as opposed to a victory or even a settlement, and that a full royalty rate step-down would occur in 2027 as a result.

81.    The Proxy only disclosed the Management Projections with their limited assumptions that valued Emisphere below the other internal Company projections.  The Proxy did not disclose the Eagle 1 and Eagle 2 Projections for the Company, which had Emisphere NPVs of $2.673 billion and $2.935 billion, respectively – far greater than the $1.8 billion in total Merger Consideration offered by Novo Nordisk.  Nor did the Proxy disclose any information concerning the

Emisphere-Novo Nordisk intellectual property dispute, and its projected positive impact on Emisphere's valuation.    The Proxy also concealed the fact that the Management Projections were the result of Defendants Weiser's and Rothwell's concerted effort to revise Emisphere's valuation downward to justify the $1.8 billion in Merger Consideration offered by Novo Nordisk.

### F.    Defendant Rachesky and the MHR Entities Negotiate an Enormous Payout Under the Merger

82.    During the course of their Merger negotiations with Novo Nordisk, the Special Committee simultaneously negotiated with Defendant Rachesky on how much of the Merger Consideration would be allocated to Rachesky and the MHR Entities for their interest in the MHR Royalties.

83.    Emisphere communicated to Novo Nordisk that this allocation of the $1.8 billion in total Merger Consideration offered under the August 24 Proposal was critical to Emisphere's determination of whether the August 24 Proposal was fair to Company stockholders.

84.    From August 2020 through October 2020, Defendant Rachesky and the Special Committee negotiated how much of the $1.8 billion in Merger Consideration would be allocated to Rachesky and the MHR Entities for Novo's concurrent acquisition of the MHR Royalties (*i.e.*, the 0.5% of net sales for Rybelsus and any other licensed Novo product covered by the Royalty Agreement).

85.     On August 21, 2020, Defendant Rachesky initially proposed that he and the MHR Entities would receive $531 million of the $1.8 billion in Merger Consideration for the MHR Royalties, which represented 29.5% of the total Merger Consideration.  On August 27, 2020, the Special Committee responded with a proposed payment of $357 million to Rachesky and the MHR Entities for the MHR Royalties.  This allocation represented 19.8% of the total Merger Consideration.

86.     On September 28, 2020, Defendant Rachesky made a counterproposal to the Special Committee regarding the MHR Royalties.  He proposed an allocation of $486 million for the MHR Royalties out of the $1.8 billion in total Merger Consideration offered by Novo Nordisk.  This represented 27% of the total Merger Consideration offered by Novo Nordisk.

87.     On October 9, 2020, the Special Committee made a counterproposal of a $414 million allocation to Defendant Rachesky and the MHR Entities for the MHR Royalties.  This represented 23% of the $1.8 billion in Merger Consideration offered by Novo Nordisk under the August 24 Proposal.

88.     On October 21, 2020, Defendant Rachesky proposed an allocation of $450 million for the MHR Royalties, representing 25% of the total Merger Consideration offered by Novo Nordisk under the August 24 Proposal.  Later the same day, the Special Committee agreed to this lucrative allocation for Defendant Rachesky and the MHR Entities.

89.    As noted above, Defendants abandoned the Eagle 1 and Eagle 2 Projections in its evaluation of the August 24 Proposal in favor of the Management Projections that were more consistent with Novo Nordisk's $1.8 billion acquisition price and the $450 million allocation to Defendant Rachesky and the MHR Entities.

**G.    The Lucrative Tax Deal Between Rachesky and Novo Nordisk**

90.    At the same time that Emisphere and Novo Nordisk were negotiating the total Merger Consideration, and Defendant Rachesky and the Special Committee were negotiating the MHR Royalty allocation, Rachesky was negotiating a separate side deal with Novo Nordisk that would solely benefit him and his personal financial interests to the detriment of Emisphere's unaffiliated minority shareholders.

91.    Once Novo Nordisk made its "best and final" offer of $1.8 billion in the August 24 Proposal, Defendant Rachesky initiated negotiations with Novo Nordisk to ensure that he received favorable tax treatment for his MHR Royalty allocation.

92.    Soon after Novo Nordisk's August 24 Proposal, Janet Yeung, an officer at MHR, emailed Defendant Rothwell a set of "talking points regarding MHR's structuring requirements" for Novo's acquisition of the MHR Royalties.  As part of these "structuring requirements," the email proposed that the rights to the MHR Royalties would be purchased by a separate Novo Nordisk entity, the "Royalty Acquiror," that would remain in existence for at least a year after the Merger closed.

During that period, Novo Nordisk would continue to pay the Royalty Acquiror the 0.5% royalty fee owed to Defendant Rachesky and the MHR Entities under the MHR Royalty Agreement.

93.     This structuring requirement was intended to provide Defendant Rachesky with significant tax savings on the $450 million allocation payable to him and the MHR Entities for Novo Nordisk's acquisition of the MHR Royalties. Because Novo Nordisk would continue to pay the MHR Royalties to a separate Novo entity for at least a year, the MHR Royalties would be subject to long-term capital gains tax, which was lower than ordinary income tax.

94.     The transaction structure sought by Defendant Rachesky was memorialized in the MHR Purchase Agreement between Novo Nordisk and MHR that governed the sale of the MHR Royalties.  The transaction structure allowed for a significant reduction in the applicable tax rate for the $450 million allocation payable to Defendant Rachesky and the MHR Entities for their MHR Royalties. Through the transaction structure, Defendant Rachesky was able to reduce his tax liability on the $450 million allocation from a maximum rate of 40.8% for ordinary income to a maximum rate of 23.8% for long-term capital gains on the sale of the MHR Royalties.  This represented tens of millions in tax savings for Defendant Rachesky and the MHR Entities.

967252.1

95.    Defendant Rachesky was incentivized to require this transaction structure at the expense of negotiating for higher total consideration because it locked-in significant tax savings for him.  Defendants Weiser and Rothwell were also incentivized to accept this structure rather than negotiate for higher consideration given their enormous RSU packages worth $7.8 million each upon a change-in-control of the Company and Defendant Rachesky's status as Emisphere's controlling shareholder.

### H.    Defendants Lock Up the Shareholder Vote in Favor of the Merger

96.    Once Defendant Rachesky secured the enormous $450 million allocation for the MHR Royalties and the transaction structure that supported his preferred tax treatment for the allocation, he and the other Defendants took steps to ensure the Emisphere shareholder vote in favor of the Merger.

97.    At the insistence of Novo Nordisk, Defendant Rachesky and the Special Committee agreed to forego the Unaffiliated Vote Condition that required any acquisition be approved by a majority of Emisphere voting stock not owned or controlled by the MHR Entities.  The Special Committee agreed to this despite the Emisphere Board resolutions that required the Unaffiliated Vote Condition for any potential transaction involving Emisphere.

98.    As of December 31, 2019, Defendant Rachesky and the MHR Entities held approximately 48% of Emisphere's outstanding common stock.  Through their

substantial loans to the Company as detailed above, Defendant Rachesky and the MHR Entities also held enough convertible notes to ensure a majority vote of Emisphere common stock in favor of the Merger. Yet, Rachesky and the MHR Entities needed to first convert certain of these notes into voting common stock in order to reach this majority vote for the Merger.

99.    Rather than do so, Defendants agreed to accelerate the vesting of the one million RSU's that had been granted to Defendants Weiser and Rothwell, respectively, in March 2020. This allowed for these RSUs to be converted into Emisphere common stock before the November 13, 2020 record date (the "Record Date") for eligibility to vote on the Novo Nordisk Merger. With these steps, Defendants held approximately 50.5% of Emisphere's outstanding common stock before the Record Date.

100.    To further ensure that the Merger would be approved by stockholders and that Defendants would reap the enormous personal financial benefits from the transaction, Emisphere, Novo Nordisk, the MHR Entities and the Director Defendants entered into support agreements on November 5, 2020 (the "Support Agreements"). Under the Support Agreements, the MHR Entities and the Director Defendants agreed to vote the 50.5% of the outstanding Emisphere common stock they collectively held in favor of the Merger. This guaranteed that the Merger would be approved without the involvement of any additional Emisphere stockholders.

967252.1

I.    **Defendants Issue the Materially False and Misleading Proxy**

101.    Defendants issued the Emisphere Proxy on November 16, 2020.  The Proxy, as well as Defendants' other public statements during the Class Period, misrepresented and omitted material information concerning the Merger as detailed below.

102.    On December 8, 2020, the Novo Nordisk Merger was approved and the transaction closed on the same day.  Under the Merger Agreement, Novo Nordisk paid $1.35 billion to acquire Emisphere.  Under the MHR Purchase Agreement, Novo Nordisk also paid $450 million to Defendant Rachesky and the MHR Entities to acquire the MHR Royalties, making the total Merger price $1.8 billion. Emisphere shareholders received $7.83 per share in Merger Consideration in exchange for their Emisphere shares.

V.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT**

103.    The Class Period begins on November 6, 2020, when Defendants first announced the Emisphere-Novo Nordisk Merger, making material misrepresentations and omissions of material facts concerning the transaction.

104.    On November 6, 2020, Emisphere issued a press release titled "Novo Nordisk to Acquire Emisphere Technologies for $1.35 Billion."  The press release touted the Meger by stating that the estimated Merger consideration of $7.82 per Emisphere share represented "a premium of approximately 17% over the volume-

42

weighted average share price for the five trading days ending November 5, 2020."
In describing the acquisition of the MHR Royalties by Novo Nordisk, the press
release also stated that "Novo Nordisk entered into an agreement to acquire the
related royalty stream obligations owed to affiliates of MHR Fund Management
LLC ('MHR') for $450 million.  The acquisition of this royalty stream and the
merger with Emisphere will occur simultaneously."

105.    Defendant Rothwell further praised the Merger by stating in the press
release that:

> "'After a thorough analysis of strategic alternatives, the
> Emisphere Board and the Special Committee unanimously
> determined that a combination with Novo Nordisk is the
> **best way to maximize value for our stockholders**.'"

106.    The statements referenced in ¶¶ 104-05 above were false and
misleading when made because they failed to disclose material facts concerning the
Merger, which were known to or recklessly disregarded by Defendants, including
that: (i) Defendant Rachesky manipulated the sale process to ensure he received
enormous financial benefits from the Merger, including his insistence on a
transaction structure that supported significant personal tax savings on the $450
million allocation for the MHR Royalties; (ii) Defendants Rothwell and Weiser
worked to adjust Emisphere's financial projections downward to justify the Merger
Consideration paid to Emisphere shareholders; (iii) Emisphere had consistently
modeled internal financial projections, including the Eagle 1 and Eagle 2

43

Projections, demonstrating significantly higher valuations for the Company than the financial projections presented to Emisphere shareholders; and (iv) Emisphere had been engaged in an extensive intellectual property dispute with Novo Nordisk that was integral to the initial Merger negotiations and implicated significant royalty payments to the Company – a key driver of Emisphere's overall financial results – yet, Defendants failed to account for its projected positive impact on Emisphere's valuation. Moreover, the purported premium of "17%" was materially misleading because Emisphere's stock price was artificially deflated during the Class Period by Defendants' wrongdoing as detailed herein, which skewed the premium percentage afforded to Emisphere stockholders.

107. Emisphere issued the Proxy detailing the Merger and the background of the transaction on November 16, 2020. The Proxy was signed by Defendant Rothwell as Chairman of the Board and Co-CEO of Emisphere. The Emisphere Board also delegated the preparation of the Proxy to the Company's officers.

108. The Proxy contained material misrepresentations concerning the Board and Special Committee's reasons for recommending the Merger. The first page of the Proxy represented that "the Emisphere board, acting upon the unanimous recommendation of the Special Committee, (i) determined that the merger agreement and the transactions contemplated thereby are ***fair to and in the best interests of Emisphere stockholders***. . ." In a section of the Proxy titled

44

"Emisphere's Reasons for the Merger; Recommendation of the Special Committee; Approval of the Emisphere Board," the Proxy stated that the Special Committee viewed the Merger to be the "Best Alternative to Maximizing Shareholder Value." The section further asserted that the Merger was more favorable than any alternative transactions or than Emisphere remaining as a stand-alone entity given "the Special Committee's assessment of Emisphere's business, assets and prospects, its competitive position and historical and *projected financial performance*, and the nature of the industry in which Emisphere operates[.]"

109.   These statements were materially false and misleading given their wholesale omission of any reference to, or detail regarding, the more favorable Eagle 1 and 2 Projections for Emisphere that supported a higher valuation for the Company than the Merger Consideration offered by Novo Nordisk.  These statements also wholly omitted that Defendants Rothwell and Weiser worked with Jefferies to adjust Emisphere's financial projections downward to justify the Merger Consideration. Nor did these statements reference the SNAC-related intellectual property dispute between Emisphere and Novo, or Defendants' failure to leverage the dispute and its projected favorable impact on Emisphere's financials to obtain higher consideration during Merger negotiations with Novo.

110.   Defendants made further material misrepresentations and omissions of material facts in the Proxy concerning Emisphere's financial projections that were

967252.1

used to justify the purported fairness of the Merger Consideration offered to shareholders.  The Proxy contained a section titled "Certain Unaudited Prospective Financial Information," that included a description of the Emisphere Management Projections, including that:

> in connection with Emisphere's evaluation of the merger, Emisphere management prepared certain unaudited prospective financial information with respect to Emisphere for calendar years 2020 through 2039 on a stand-alone basis, assuming Emisphere would continue as an independent company, and without giving effect to the merger, which was provided by Emisphere management to the Special Committee and to the Special Committee's financial advisor, Jefferies, and approved by the Special Committee for Jefferies' use and reliance in connection with Jefferies' financial analyses and opinion to the Special Committee as described in this document under "—Opinion of the Special Committee's Financial Advisor.". . .We refer to this information collectively as the "prospective financial information."

111. In a section titled "Opinion of the Special Committee's Financial Advisor," the Proxy included additional statements concerning the Emisphere Management Projections and their use by Jefferies in preparing its fairness opinion on the Merger.  This included the assertion that Jefferies was advised as follows:

> the financial forecasts and estimates relating to Emisphere that Jefferies was directed to utilize for purposes of its analyses and opinion were reasonably prepared on bases *reflecting the best currently available estimates and good faith judgments of Emisphere management* as to, and *were an appropriate basis upon which to evaluate, the future financial performance of Emisphere* and the other matters covered thereby.

46

112.   The Proxy further included the Management Projections as follows:

**Summary of the Prospective Financial Information—Emisphere Stand-Alone**
*(in millions)*

| | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E | 2038E | 2039E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 16.0 | 96.8 | 92.9 | 125.9 | 153.3 | 165.6 | 175.8 | 135.6 | 39.2 | 41.4 | 43.6 | 46.0 | 48.5 | 51.2 | 54.1 | 10.4 | 5.0 | 4.4 | 4.0 | 3.7 |
| EBIT[1] | 9.4 | 90.0 | 85.9 | 118.7 | 145.9 | 158.0 | 167.9 | 127.5 | 30.9 | 32.8 | 34.7 | 36.9 | 39.1 | 41.5 | 44.1 | 8.5 | 4.1 | 3.6 | 3.3 | 3.0 |
| Unlevered free cash flow[2] | 0.0 | 77.0 | 77.0 | 110.6 | 111.1 | 115.5 | 123.4 | 105.5 | 47.0 | 24.1 | 25.5 | 27.1 | 28.7 | 30.5 | 32.4 | 16.5 | 4.3 | 2.8 | 2.5 | 2.3 |

(1) EBIT is a non-GAAP financial measure defined as earnings before interest and taxes.
(2) Unlevered free cash flow is a non-GAAP financial measure defined as EBIT less taxes and less changes in net working capital.

113.   The financial projection statements referenced in ¶¶ 110-12 above were materially false and misleading when made because they failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including that: (i) Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders; (ii) Emisphere had consistently modeled internal financial projections, including the Eagle 1 and Eagle 2 Projections, demonstrating NPVs for Emisphere that were far greater than $1.8 billion and supported higher merger consideration for shareholders; and (iii) the Management Projections did not account for and omitted any facts concerning the SNAC-related intellectual property dispute between Emisphere and Novo Nordisk, or to Defendants' failure to account for its projected positive impact on Emisphere's stated valuation.

114.   The Proxy also included material misrepresentations concerning the MHR Purchase Agreement and the transaction which it governed.  A section of the

Proxy titled "Structure of the Transaction," purported to describe the transaction

under which Defendant Rachesky and the MHR Entities would receive the $450

million allocation for Novo Nordisk's purchase of the MHR Royalties as follows:

> Subject to the terms and conditions of the MHR purchase agreement, at
> the closing of the MHR purchase agreement, (i) the MHR royalty
> parties have agreed to sell, transfer, assign and deliver to the NNAS
> royalty party, and the NNAS royalty party has agreed to purchase from
> the MHR royalty parties, all of the right, title and interest of the MHR
> royalty parties in, to and under the purchased assets and (ii) the MHR
> royalty parties have agreed to assign to the NNAS royalty party, and
> the NNAS royalty party has agreed to assume from the MHR royalty
> parties, certain liabilities associated with the purchased assets.

115.    The Proxy also made a general reference to tax issues in connection

with the MHR Purchase Agreement in a section titled "Withholding," which stated

that:

> Each of the parties shall be entitled to deduct and withhold from
> amounts payable pursuant to the MHR purchase agreement such
> amounts as it is required to deduct and withhold with respect to the
> making of such payment under any provision of federal, state, local or
> foreign tax law.

116.    These descriptions of the MHR Royalty acquisition were materially

false and misleading when made because they wholly omitted material facts

concerning the transaction, which were known to or recklessly disregarded by

Defendants, including that (i) Defendant Rachesky insisted the transaction be

structured to allow him to claim long-term capital gains on the $450 million

allocation for the MHR Royalties; (ii) Defendant Rachesky reaped millions in

savings on his personal tax liability given this transaction structure; and (iii) Defendants consented to this transaction structure at the behest of Defendant Rachesky and at the expense of negotiating for higher consideration in the Merger given Rachesky and the MHR Entities' status as controlling shareholders of Emisphere.

117.    Emisphere announced in a press release on December 8, 2020 that the Merger had closed.  In praising the Merger, Defendant Rothwell stated in the press release that "[w]e are very pleased to reach today's milestone and know Novo Nordisk will guide Emisphere into a promising new era.  *The Emisphere Board of Directors and its Special Committee are confident that this transaction has delivered substantial value to our stockholders*."

118.    The above statement was false and misleading when made because it failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including: (i) that Defendant Rachesky manipulated the sale process to ensure he received enormous financial benefits from the Merger, including his insistence on a transaction structure that supported significant personal tax savings on the $450 million allocation for the MHR Royalties; (ii) that Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders; (iii) Emisphere had consistently modeled internal financial

projections, including the Eagle 1 and Eagle 2 Projections, demonstrating NPVs for Emisphere that were far greater than $1.8 billion and supported higher merger consideration for shareholders; and (iv) Emisphere had been engaged in an extensive intellectual property dispute with Novo Nordisk that was integral to the initial Merger negotiations and implicated significant royalty payments to the Company – a key driver of Emisphere's overall financial results – yet, Defendants failed to account for its projected positive impact on Emisphere's valuation.

## VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

119.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Emisphere during the Class Period and detailed in Section III above were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.  The allegations detailing Defendants' fraudulent scheme in Section II above are incorporated in this Section by reference and provide evidence of Defendants' scienter.

120.   In their roles as Co-CEO's of Emisphere during the Class Period, Defendants Weiser and Rothwell directly participated in the management of Emisphere's operations and, because of their positions at Emisphere, were involved

in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Emisphere's press releases and Proxy in connection with the Merger. Because of their positions and access to material, non-public information, Defendants Weiser and Rothwell knew that the true facts had not been disclosed to and were being concealed from investors, and that the statements alleged herein were materially false and/or misleading when made and/or omitted material facts.

121. Defendants Weiser and Rothwell systematically worked with Jefferies to adjust Emisphere's financial projections to be in line with the $1.8 billion acquisition price offered by Novo Nordisk. In doing so, they knowingly or recklessly disregarded the Eagle 1 and Eagle 2 Projections for the Company, which included NPVs for Emisphere that were greater than $1.8 billion. They also knowingly or recklessly abandoned the SNAC-related intellectual property dispute between Emisphere and Novo Nordisk during Merger negotiations with Novo, thereby failing to leverage the dispute and its projected favorable impact on Emisphere's financials during such negotiations. Defendants McInerney and Draft, who comprised the Special Committee, knowingly or recklessly allowed the conflicted Director Defendants Rachesky, Weiser and Rothwell to run the sale process and negotiate directly with Novo Nordisk representatives on the Merger.

967252.1

122.    Defendant Rachesky knowingly manipulated the sale process to ensure he received enormous financial benefits from the Merger, including his insistence on a transaction structure that supported significant personal tax savings on the $450 million allocation for the MHR Royalties.

123.    Emisphere acted with scienter because the scienter of its Co-CEO's Weiser and Rothwell is imputed to the Company that Defendants Weiser and Rothwell spoke on behalf of and controlled.    Defendants Weiser and Rothwell each made and caused to be made materially false statements and omissions that misled investors, as detailed herein.

## VII.    LOSS CAUSATION

124.    During the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements as set forth above artificially depressed the price of Emisphere's common stock below the price at which Emisphere common stock would have traded absent those material misrepresentations and omissions.

125.    Had the market known the full truth about Emisphere's financial and business prospects, Emisphere's stock price would have been trading at higher prices during the Class Period reflecting the Company's true financial performance and expected growth in royalty revenue.

126.    Defendants' materially false and misleading statements and omissions of material fact operated as a fraud or deceit on Plaintiff and the Class, and induced Plaintiff and the Class to sell Emisphere shares at prices that were below the actual value of those securities, including by selling their share into the Merger for the inadequate Merger Consideration, and thereby caused damage to Plaintiff and the Class.  As a result of their sales of Emisphere's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## VIII.  CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Emisphere common stock during the Class Period.  Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Emisphere, and their families and affiliates.

128.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of the Record Date on November 13, 2020, Emisphere had 86,182,000 shares of common stock issued and outstanding.  Upon information and belief, there are thousands of members of the Class.

967252.1

129.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

i.      Whether Defendants violated the Exchange Act;

ii.     Whether Defendants misrepresented material facts;

iii.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

iv.     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

v.      Whether the price of Emisphere common stock was artificially deflated during the Class Period;

vi.     Whether Defendants' conduct caused the members of the Class to sustain damages; and

vii.    The extent of damage sustained by Class members and the appropriate measure of damages.

130.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

131.   Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

132.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

133.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged false or misleading statements pled in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

134.    To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Emisphere and the other Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.

## X.    PRESUMPTION OF RELIANCE

135.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that

967252.1

Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose information regarding Emisphere's business and financial projections, among other things, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

136.    In the alternative, Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Emisphere securities was open, efficient, and well developed for the following reasons, among others:

i.      Emisphere stock met the requirements for listing, and was listed and actively traded at the time of the Merger on the Over-the-Counter Bulletin Board ("OTCBB"), an efficient and automated market for over-the-counter securities provided by the Financial Industry Regulatory Authority during the Class Period;

ii.     The price of Emisphere common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

iii.    Emisphere publicly communicated with investors via established market communication mechanisms, including through the dissemination of press releases on the national circuits of major newswire services; and

iv.     Emisphere stock had an average weekly trading volume of 5.18% during the Class Period and a closing bid-ask spread of $0.01 - $0.02, both of which reflect an efficient market.

967252.1

137.   As a result of the foregoing, the market for Emisphere securities promptly digested current information regarding Emisphere from all publicly available sources and reflected such information in the price of Emisphere stock. Under these circumstances, all sellers of Emisphere common stock during the Class Period suffered similar injury through their sale of Emisphere common stock at artificially deflated prices, and the presumption of reliance applies.

138.   Accordingly, Plaintiff and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Emisphere securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## COUNT I
### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
### (Against All Defendants)

139.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

140.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Emisphere securities at artificially deflated prices.

967252.1

141.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Emisphere securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

142.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information about the Company's financial well-being, operations, and prospects, as well as material information concerning the Merger and the MHR Purchase Agreement.

143.   During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to falsely

misrepresent Emisphere's true financial condition and material information regarding the Merger and the MHR Purchase Agreement from the investing public and to support the artificially low prices of the Company's securities.

145.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

146.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violations Of Section 20(a) Of The Exchange Act
### (Against the Director Defendants)

147.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

148.   During the Class Period, Defendants Weiser and Rothwell acted as controlling persons of Emisphere within the meaning of Section 20(a) of the Exchange Act.

149.   By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Emisphere's day-to-day operations during the Class Period, Defendants Weiser and Rothwell had the power to, and did, control and influence the decision making of the Company and the conduct of Emisphere's

967252.1

business, including the wrongful conduct complained of herein.  Defendants Weiser and Rothwell were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiff alleges to be materially false and misleading.   Moreover, Defendants Weiser and Rothwell had a duty to disseminate accurate and truthful information regarding Emisphere's operations, and to correct any previously issued statements that had become untrue so that the market price of Emisphere securities would be based upon truthful and accurate information.

150.   In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Weiser and Rothwell had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations alleged herein.  Defendants Weiser and Rothwell were also directly involved in providing and approving the false financial projections disseminated by Emisphere during the Class Period.  Further, as detailed above, Defendants Weiser and Rothwell had direct involvement in the presentation and/or manipulation of financial projections included within the Company's Proxy. As a result of the foregoing, these Defendants, as a group and individually, were controlling persons of Emisphere within the meaning of Section 20(a) of the Exchange Act.

151.   Defendant Rachesky also exercised control over Emisphere as a director and controlling shareholder of the Company during the Class Period. Defendant Rachesky used his significant stock ownership in the Company to control the sale process with Novo Nordisk, including to directly negotiate with Novo on the Merger, to negotiate a $450 million allocation for himself and the MHR Entities for Novo's concurrent acquisition of the MHR Royalties, and to require a transaction structure for Novo's acquisition of the MHR Royalties that ensured favorable personal tax treatment on this lucrative allocation.  Upon information and belief, Defendant Rachesky also reviewed and approved Emisphere's Proxy and press releases during the Class Period which contained materially false and misleading statements, as detailed herein.

152.   As a direct and proximate cause of the Director Defendants' wrongful conduct as set forth herein, Plaintiff and other members of the Class suffered damages in connection with their sales of Emisphere securities during the Class Period.

153.   By virtue of their positions as controlling persons of Emisphere and as a result of their own aforementioned conduct, the Director Defendants, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

967252.1

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows: (i) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; (ii) awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; (iii) awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; (iv) awarding rescissory damages; and (v) awarding such equitable/injunctive or further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated:
October 4, 2023

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

By: */s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Proposed Liaison Counsel for Plaintiff S/M Merger Arbitrage, L.P.*

62

967252.1

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci
Jonathan H. Beemer (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
Fax: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
*Attorneys for Plaintiff S/M Merger Arbitrage, L.P.*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I hereby certify that the following statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

### LITE DEPALMA GREENBERG & AFANADOR, LLC

Dated:
October 4, 2023

By: */s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com
*Proposed Liaison Counsel for Plaintiff S/M Merger Arbitrage, L.P.*

### ENTWISTLE & CAPPUCCI LLP

Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci
Jonathan H. Beemer (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
Fax: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
*Attorneys for Plaintiff S/M Merger Arbitrage, L.P.*

64

967252.1

## CERTIFICATION

I, Salvatore Muoio, on behalf of S. Muoio & Co. LLC, hereby certify, as to the claims asserted under the federal securities laws in the Class Action Complaint (the "Complaint"), that:

1.    I am the Managing Member of S. Muoio & Co. LLC, the general partner and investment advisor of SM Merger/Arbitrage, L.P., and have the authority to execute this certification on its behalf. I have reviewed the Complaint to be filed in this action and have authorized its filing by counsel.

2.    SM Merger/Arbitrage, L.P. did not acquire any of the securities that are the subject of this action at the direction of its counsel, or in order to participate in this action or any other litigation under the federal securities laws.

3.    SM Merger/Arbitrage, L.P. is willing to serve as a lead plaintiff in this action and recognizes its duty as such to act on behalf of class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

4.    SM Merger/Arbitrage, L.P. will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

5.    SM Merger/Arbitrage, L.P. has not served or sought to serve as a representative party for a class in any action filed under the federal securities laws within the three-year period prior to the date of this Certification, except in: *Sayce v. Forescout Technologies, Inc.*, No. 3:20-cv-00076-SI (N. D. Cal. Sept. 28, 2020) (where S. Muoio & Co. LLC sought to serve as a class representative) and *In re Bristol-Myers Squibb Company CVR Securities Litigation*, No. 1:21-cv-08255-JMF (S.D.N.Y. Dec. 6, 2021) (where SM Merger/Arbitrage, L.P. sought to serve as a class representative).

6.    SM Merger/Arbitrage, L.P.'s transactions during the relevant period in Emisphere Technologies, Inc. securities that are the subject of this action are reflected in Schedule A hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of September 2023

SM Merger/Arbitrage, L.P.
By: Salvatore Muoio
Managing Member of S. Muoio & Co. LLC, the general partner and investment advisor of SM Merger/Arbitrage, L.P.

2

**Schedule A**

**Transactions November 6, 2020 - December 8, 2020 (Close of Merger)**
**Emisphere Technologies, Inc. Common Stock (CUSIP: 291345106)**

| Plaintiff | Account | Trade Date | Transaction Type | Shares | Price | Transaction Total | Note |
|---|---|---|---|---|---|---|---|
| SM Merger/Arbitrage, L.P. | 43300206 | 11/6/2020 | Purchase | 36,306 | $ 7.6287 | $ 276,966.69 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/9/2020 | Purchase | 13,694 | $ 7.5757 | $ 103,742.05 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/16/2020 | Purchase | 30,000 | $ 7.6453 | $ 229,360.00 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/17/2020 | Purchase | 4,495 | $ 7.6372 | $ 34,329.33 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 12/8/2020 | Sale - Close of Merger | 84,495 | $ 7.8300 | $ 661,595.85 | At stated Merger consideration of $7.83 per share |