**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Emisphere Technologies, Inc. Securities Litigation | Civil Action No.: 2:23-cv-20898 (SDW) (AME) |
| | <u>JURY TRIAL DEMANDED</u> |
| | **FILED UNDER SEAL** |

## AMENDED CLASS ACTION COMPLAINT FOR
## <u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

989735.1

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................. 3

II.   JURISDICTION AND VENUE .................................................. 10

III.  THE PARTIES ................................................................... 10

    A.    Lead Plaintiffs .......................................................... 10

    B.    Defendants ............................................................... 12

        1.    Emisphere ........................................................ 12

        2.    The Director and Special Committee Defendants ............ 12

        3.    The MHR Defendants ........................................... 15

    C.    Relevant Non-Parties ................................................... 18

IV.   BACKGROUND ................................................................. 19

    A.    Defendant Rachesky Controlled Emisphere ......................... 19

    B.    The Royalty Agreement Provides Substantial Revenues to
        Emisphere and Protects It Against Unauthorized Intellectual
        Property Disclosures By Novo ........................................ 23

    C.    The Royalty Agreement is Amended But Still Provides
        Emisphere With a Significant Royalty Stream ...................... 25

    D.    Defendant Rachesky Uses His Control Over Emisphere to
        Extract a Portion of Emisphere's Royalty Stream .................. 27

    E.    Emisphere Notifies Novo of Its Unauthorized Disclosure of
        Emisphere's Intellectual Property ................................... 29

    F.    Novo Nordisk and Emisphere Initiate Merger Negotiations in
        Response to Their IP Dispute ......................................... 34

    G.    The Undisclosed IP Dispute Continues To Be a Critical
        Component of Merger Negotiations and a "Key Value Driver"
        for Emisphere ........................................................... 38

989735.1

H.    Emisphere's Financial Projections Are Adjusted Downward at the Behest of Defendants Weiser and Rothwell Without Shareholder Knowledge ..............................................................47

I.    Defendants Drop the IP Dispute After Novo Makes Its "Best and Final" Offer......................................................................64

J.    Defendant Rachesky and the MHR Defendants Negotiate an Enormous Payout Under the Merger to the Detriment of Public Shareholders ....................................................................66

K.    Defendant Rachesky Insists on a Lucrative Tax Deal With Novo That Further Diminishes The Consideration Paid to Emisphere Shareholders .......................................................70

L.    Defendants Relinquish the Unaffiliated Vote Condition in Favor of the Merger....................................................................76

M.    Defendants Issue the Materially False and Misleading Proxy............78

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT......................79

VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..........90

VII.    LOSS CAUSATION ...............................................................102

VIII.    CLASS ACTION ALLEGATIONS............................................103

IX.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ......105

X.    PRESUMPTION OF RELIANCE ..............................................106

COUNT I For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5(a)-(c) (Against All Defendants) ......................................................108

COUNT II  For Violations of Section 20(a) Of The Exchange Act (Against the Individual Defendants and MHR Defendants) ....................................110

XI.    PRAYER FOR RELIEF ........................................................113

XII.    JURY TRIAL DEMAND .......................................................113

Lead Plaintiffs,[1] by and through their undersigned counsel, bring this federal securities class action (the "Action") on behalf of a class (the "Class") consisting of themselves and other investors that sold shares of the publicly traded common stock of Emisphere Technologies, Inc. ("Emisphere" or the "Company") from November 6, 2020, the announcement date of the merger ("Merger") of Emisphere and Novo Nordisk A/S ("Novo Nordisk" or "Novo"), through the closing of the Merger on December 8, 2020, including investors that sold their shares of Emisphere common stock into the Merger on December 8, 2020, and were damaged as a result of Defendants' wrongdoing alleged herein (the "Class Period").

The subject securities claims are brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), against (i) Emisphere, (ii) Emisphere's controlling shareholder and member of the Company's Board of Directors (the "Board"), Mark H. Rachesky ("Rachesky") and his affiliated investment entities (the "MHR Defendants" defined further below), (iii) Emisphere's Co-Chief Executive Officers and Board members Michael Weiser ("Weiser") and Timothy Rothwell ("Rothwell"), as well as Board member John Harkey (together with Defendant

---

[1] As detailed further below, Lead Plaintiffs are: (i) SM Merger/Arbitrage, L.P., (ii) Associated Capital Group, Inc., (iii) ODS Capital LLC, (iv) the Hilary L. Shane Revocable Trust and (v) Hilary L. Shane.

1

Rachesky, the "Director Defendants") and (iv) Emisphere Board and Special

Committee members Timothy McInerney and Howard Draft (the "Special

Committee Defendants" and together with Emisphere, the Director Defendants, and

the MHR Defendants, the "Defendants").

Lead Plaintiffs' claims are based upon personal knowledge as to themselves

and their own acts and upon information and belief as to all other matters. Lead

Plaintiffs' information and belief is based on, among other things, the independent

investigation of its undersigned counsel. This investigation included, but was not

limited to, a review and analysis of:

(i)    Internal Emisphere documents and other materials produced to Lead Plaintiffs pursuant to a challenge to confidential treatment filed under Delaware Chancery Rule 5.1 in the case captioned *In re Emisphere Technologies, Inc. Stockholders Litigation*, C.A. No. 2021-0025-NAC (Del. Ch.) (the "Delaware Chancery Court Action"), and a confidentiality agreement executed among Lead Plaintiffs and Defendants;

(ii)    Emisphere's public statements concerning the Merger made during the Class Period, including in the Definitive Proxy Statement ("Proxy") issued and distributed to Emisphere shareholders on November 16, 2020 in connection with the Merger;

(iii)    Media reports concerning Emisphere and its business operations, financial results and the Merger;

(iv)    Data reflecting the price of Emisphere's common stock;

(v)    Consultation with financial experts;

(vi)    The documents cited in Vice Chancellor Nathan A. Cook's decision of August 2, 2023 on certain Defendants' partial

2

motions to dismiss in the Delaware Chancery Court Action that were subsequently obtained by Lead Plaintiffs pursuant to Delaware Chancery Rule 5.1; and

(vii)    Other public material and data concerning the Company and the other Defendants.

The investigation of Lead Plaintiffs' counsel into the factual allegations contained herein is ongoing, and many of the relevant facts are known only by Defendants, or are exclusively within Defendants' custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This Action arises out of Defendants' fraudulent scheme to artificially deflate the price of Emisphere common stock during the Class Period in order to ensure that the $1.8 billion Merger with Novo Nordisk would be consummated and Defendants Rachesky, Weiser and Rothwell would receive enormous personal payouts from the transaction. Unbeknownst to public shareholders, the $1.8 billion Merger price was as much as *$1.135 billion less* than the net present value ("NPV") of Emisphere as calculated by Jefferies LLC ("Jefferies"), the financial advisor to the Emisphere Special Committee, and reported privately to Defendants during Merger negotiations. Jefferies calculated the NPV of Emisphere based upon two separate sets of financial projections (the "Case 2A" and "Case 2B" projections) that were never disclosed to public investors.

3

2.      Instead, Defendants repeatedly mischaracterized the Merger as being "***fair to and in the best interests of***" Company shareholders based in part on lower financial projections (the "Management Projections") that purportedly "***were an appropriate basis upon which to evaluate, the future financial performance of Emisphere***."[2]  The Management Projections were aligned with Novo Nordisk's $1.8 billion acquisition price and were used by Defendants to justify the undervalued $7.83 per share in Merger consideration (the "Merger Consideration") provided to Emisphere shareholders under the transaction.  But Defendants' representations about the purported fairness of the Merger misstated and omitted material facts about the transaction and the negotiations that resulted in the deal.

3.      Prior to the Merger, Emisphere was a commercial stage pharmaceutical and drug delivery company controlled by Defendant Rachesky.  Emisphere's primary asset was a drug delivery technology used in Novo Nordisk's "wonder drug" for Type 2 diabetes marketed under the name Rybelsus—which is expected to generate billions in revenue over the next decade.  Emisphere was party to a royalty agreement with Novo Nordisk (the "Royalty Agreement") that entitled Emisphere to certain royalty payments, including up to 3% of Novo Nordisk's net worldwide sales of drugs using Emisphere's drug delivery technology (the "Royalty Stream"). In December 2016, Defendant Rachesky used his control of Emisphere to extract

---

[2] All emphasis herein is added unless otherwise noted.

4

0.5% of the total 3% Royalty Stream, which was payable directly to him and his affiliated investment entities (the "MHR Royalties").

4.      In 2019, Novo and Emisphere became embroiled in a patent dispute (the "IP Dispute" or "Dispute") that would have a dramatic impact on the valuation of Emisphere's Royalty Stream.  Thereafter, Novo offered to purchase Emisphere, and the parties began negotiations over the consideration Novo would pay for the Company.   Throughout those negotiations, Defendants explicitly noted that Emisphere's revenue rights under the Royalty Agreement were a "***major value driver***[] in any potential deal that deserve[d] special attention in [the companies' Merger] discussions."   Emisphere's management also internally determined Emisphere had a "***high likelihood***" of success in the IP Dispute and acknowledged it would have a positive impact on the value of the Emisphere's Royalty Stream.

5.      Because Jefferies' Case 2A and 2B projections accounted for Emisphere's revenue rights under the Royalty Agreement, at issue in the IP Dispute, there was a material difference between the undisclosed Case 2A and 2B projections and the substantially lower Management Projections contained in the Proxy.  The undisclosed Case 2A and 2B projections showed Emisphere NPVs of ***$2.673 billion and $2.935 billion***, respectively, as opposed to the total Merger price of $1.8 billion.

6.      Although the IP Dispute drastically affected Emisphere's projected NPV, Defendants dropped the Dispute completely after Novo made its "best and

5

final" offer of $1.8 billion—which was well below Emisphere's true value— so that Rachesky and the other Director Defendants could secure their enormous change-in-control compensation packages and other consideration, rather than extract additional value for Emisphere's public shareholders. This consideration included Rachesky's substantial allocation of the $1.8 billion Merger price for Novo's acquisition of his MHR Royalties, to the detriment of the public shareholders. Despite its materiality to the valuation of the Company, the existence of the IP Dispute was *never disclosed to investors*, let alone its impact on Emisphere's true value.

7.     The Case 2A and 2B projections were material to investors as was the existence of the IP Dispute, and both clearly should have been disclosed during the Class Period. Indeed, in addressing similar disclosure allegations in the Delaware Chancery Action, Vice Chancellor Cook agreed that "it is reasonably conceivable that knowledge of the IP Dispute was *material to the stockholder's decision*" to accept the Merger Consideration as Lead Plaintiffs allege herein. *See In re Emisphere Technologies, Inc. Stockholders Litigation*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 43-44).[3] The Vice Chancellor further found that because the duty of disclosure claim "pled that [D]efendants knew that the IP Dispute was one of Emisphere's key value drivers, [] it is reasonably conceivable

---

[3] *See* Exhibit A to the April 22, 2024 Declaration of Joseph J. DePalma.

that ***stockholders would find information regarding this matter substantially important in analyzing Novo Nordisk's acquisition offer***." *Id.* Accordingly, Vice Chancellor Cook held it was "reasonably conceivable ***that the proxy contained materially misleading disclosures***." *Id.*

8.     Defendants' Class Period representations touting the Merger further failed to disclose that Defendant Rachesky insisted on structuring his personal allocation of the overall $1.8 billion Merger price to the detriment of Emisphere's minority shareholders.  In December 2016, Defendant Rachesky used his control of Emisphere to extract 0.5% of the total 3% Royalty Stream, which was payable directly to him and his affiliated investment entities (the "MHR Royalties").

9.     Concurrently with execution of the Emisphere-Novo merger agreement (the "Merger Agreement"), Novo Nordisk entered into an agreement with Rachesky to acquire his 0.5% portion of the total 3% Royalty Stream (the "MHR Purchase Agreement").  Pursuant to the MHR Purchase Agreement, Defendant Rachesky was allocated $450 million of the total $1.8 billion Merger price in exchange for Novo's acquisition of his 0.5% in MHR Royalties.  The remaining $1.35 billion went to Emisphere's shareholders in exchange for their Emisphere common stock.

10.     Undisclosed to Emisphere's minority shareholders, Defendant Rachesky privately demanded during Merger negotiations a complex transaction structure for Novo's concurrent acquisition of his MHR Royalties to ensure he could

7

claim a substantially lower long-term capital gains tax on his $450 million allocation (*i.e.*, a maximum federal capital gains tax rate of 23.8% as opposed to a personal income tax rate as high as 40.8%). Rachesky was further incentivized to lock-in this favorable tax treatment before a potential long-term capital gains tax rate increase to 39.6% under then-presidential candidate Joseph Biden's proposed tax plan. By decreasing his tax burden through this transaction structure, Defendant Rachesky increased the overall effective value of his $450 million allocation to approximately $526.6 million (based on a $76 million long-term federal capital gains tax benefit).

11.     Rachesky struck this tax deal at the expense of negotiating for higher total Merger consideration for the benefit of Emisphere's unaffiliated shareholders. Indeed, Defendant Rachesky stopped making demands for an increase in Novo Nordisk's Merger price once his $450 million allocation and tax-related transaction structure was agreed to with Novo. None of these details on Defendant Rachesky's motivation behind the transaction structure, or its negative impact on minority shareholders was disclosed in Defendants' positive Class Period statements about the Merger.

12.     In addressing the disclosure claims against Defendants based upon the same facts pled herein, Vice Chancellor Cook agreed that Rachesky, as Emisphere's controlling shareholder, "was willing to accept ***less total [Merger] consideration in exchange for Novo Nordisk's agreement to this unique tax structuring***, ***to the***

***detriment of the minority stockholders***." *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 31). Based upon similar facts pled herein, Vice Chancellor Cook concluded it was "reasonably conceivable that ***the proposed tax structure was a component of these negotiations and that it was included to the detriment of a higher transaction price***." *Id*. at 32.

13.     Collectively, Defendants' materially false and misleading statements and omissions of material facts concerning the Merger artificially deflated the Company's stock price during the Class Period, causing the price of Emisphere common stock to fall as low as $7.50 per share on November 10, 2020.

14.     As a result of Defendants' wrongdoing, Lead Plaintiffs and other Class members have suffered substantial financial losses by selling Emisphere common stock at artificially deflated prices during the Class Period, including by selling their Emisphere shares into the Merger on December 8, 2020 for the inadequate Merger Consideration of $7.83 per share. Lead Plaintiffs and other Class members were also deprived of their right to dissent and seek appraisal of the fair value of their Emisphere common stock instead of accepting the Merger Consideration.

15.     Lead Plaintiffs and the Class are entitled to recover from Defendants the damages incurred as a result of Defendants' materially false and misleading statements and omissions of material facts.

989735.1

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78(t)(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5(a)-(c), 17 C.F.R. § 2401.10b-5(a)-(c).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, Emisphere was headquartered in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District during the Class Period.

18.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    THE PARTIES

### A.    Lead Plaintiffs

19.    SM Merger/Arbitrage, LP ("SM Merger/Arbitrage") is a private hedge fund overseen by its investment manager, S. Muoio & Co. LLC.    SM

10

Merger/Arbitrage's principal place of business is located at 509 Madison Avenue, New York, NY.

20.    Associated Capital Group, Inc. ("Associated Capital") is a private hedge fund overseen by its investment manager, S. Muoio & Co. LLC. Associated Capital's principal place of business is located at 191 Mason Street, Greenwich, CT.

21.    ODS Capital LLC ("ODS Capital") is a Florida limited liability company based in Jupiter, Florida that runs a family office managed by Hilary L. Shane as the owner and managing member of ODS Capital.

22.    The Hilary L. Shane Revocable Trust (the "HLS Trust") is based in Jupiter, Florida. Hilary L. Shane is the Trustee of the HLS Trust, which she formed to manage her assets and investments.

23.    Hilary L. Shane is a resident of Jupiter, Florida who serves as the Trustee of the HLS Trust, and as the Owner and Managing Member of ODS Capital.

24.    Collectively, SM Merger/Arbitrage, Associated Capital, ODS Capital, the HLS Trust, and Hilary L. Shane are Lead Plaintiffs in this Action. As set forth in their previously filed certifications in this Action (ECF No. 5-2), Lead Plaintiffs sold Emisphere stock during the Class Period and were damaged thereby.

989735.1

**B.    Defendants**

**1.    Emisphere**

25.    Emisphere is a Delaware corporation with its principal place of business located at 4 Becker Farm Road, Roseland, NJ.    Emisphere is a pharmaceutical and drug delivery company that develops proprietary technologies for oral formulations of therapeutic agents.    Emisphere collaborated with Novo Nordisk on the oral delivery of the Type 2 diabetes drug Rybelsus using Emisphere's proprietary SNAC drug delivery technology (defined below).    At the time of the Merger, Emisphere was controlled by Defendant Rachesky and the affiliated MHR Defendants (defined further below).    During the Class Period, Emisphere common stock traded on the Over-the-Counter Bulletin Board ("OTCBB") maintained by the Financial Industry Regulatory Authority under the stock symbol "EMIS."    As of the announcement of the Merger on November 6, 2020, Emisphere had approximately 170.9 million fully diluted shares of common stock outstanding.

**2.    The Director and Special Committee Defendants**

26.    Defendant Mark H. Rachesky is the founder and President of MHR Fund Management LLC and held a controlling interest in the MHR Defendants (defined below), a series of affiliated investment funds that had significant holdings in Emisphere stock.    Rachesky was appointed by MHR Fund Management LLC to the Emisphere Board in October 2005.    At the time the Merger closed, Rachesky and

989735.1

his investment funds owned approximately 70% of Emisphere's outstanding common stock through their ownership of convertible Emisphere debt, as well as Emisphere stock warrants and options.   As a Board member and controlling shareholder, Rachesky approved Emisphere's Proxy and press releases during the Class Period which contained materially false and misleading statements, as detailed herein.

27.    Defendant Michael Weiser was appointed by MHR Fund Management LLC to the Emisphere Board in 2005 along with Rachesky.  In March 2020, Weiser was named Co-CEO of Emisphere.   At the time the Merger was announced, Defendant Weiser held Emisphere restricted stock units ("RSUs") with an estimated value of approximately $7.8 million, and unvested Emisphere stock options with an estimated value of $235,866.  As detailed below, Weiser and Defendant Rothwell worked with Jefferies to adjust Emisphere's financial projections downward in connection with the Merger.  As a Board member and Co-CEO of Emisphere, Weiser authorized the issuance of the Proxy, and Emisphere's Class Period press releases that contained materially false and misleading statements concerning the Merger.

28.    Defendant Timothy Rothwell was appointed to the Emisphere Board on November 5, 2009, and became Chairman of the Board in 2012.  In March 2020, Rothwell was named Co-CEO of Emisphere along with Defendant Weiser.  At the time the Merger was announced, Rothwell held Emisphere RSUs with an estimated

13

value of approximately $7.8 million, and unvested Emisphere stock options with an estimated value of $235,866.  As detailed below, Defendant Rothwell and Weiser worked with Jefferies to adjust Emisphere's financial projections downward in connection with the Merger.  Defendant Rothwell signed the Proxy and authorized its issuance as a Board member and Co-CEO of Emisphere.  He further made materially false and misleading statements concerning the Merger in Emisphere's Class Period press releases detailed below.

29.    John Harkey was appointed to the Emisphere Board in 2006.  Harkey was a business associate and friend of Defendant Rachesky, and served as an investment advisor to Rachesky's MHR investment entities.  As an Emisphere Board member, Defendant Harkey authorized the issuance of the Proxy.

30.    Defendant Timothy McInerney was elected to the Emisphere Board on March 1, 2012.  McInerney was appointed to the Special Committee of the Emisphere Board on March 17, 2020, which was nominally formed to evaluate the Merger with Novo Nordisk.  Defendant Rachesky controlled McInerney's appointment to the Emisphere Board through his control over a majority of the Emisphere stock that voted for directors at the time of his election.  As an Emisphere Board member, Defendant McInerney authorized the issuance of the Proxy.

31.    Defendant Howard Draft was appointed to the Emisphere Board in 2019, and was appointed to the Special Committee on March 17, 2020.  Defendant

14

Rachesky controlled a majority of the Emisphere Board at the time of Draft's appointment.  As an Emisphere Board member, Defendant Draft authorized the issuance of the Proxy.

32.    The Director Defendants and Special Committee Defendants are collectively referred to herein as the "Individual Defendants" and, together with Emisphere and the MHR Defendants (defined below), the "Defendants."

### 3.    The MHR Defendants

33.    MHR Fund Management LLC ("MHR LLC") is a Delaware private equity investment manager founded by Defendant Rachesky in 1996 with a principal place of business located at 1345 Avenue of the Americas, New York, NY.  MHR LLC has over $5 billion in assets under management for the series of private equity investment funds listed below. MHR LLC has an investment management agreement with MHR Master Account, MHR 100, MHR II LP, and MHR IIA LP (all defined below) that gives MHR LLC the power to vote and dispose of the securities held for the account of each of these entities.

34.    MHR Holdings, LLC ("MHR Holdings") is a Delaware limited liability company with a principal place of business located at 1345 Avenue of the Americas, New York, NY.  MHR Holdings is the managing member of MHR LLC and controls MHR LLC's investment activities.  Defendant Rachesky had a 75% ownership interest in MHR Holdings.

989735.1

35.     MHR Capital Partners Master Account LP ("MHR Master Account") is a limited partnership organized in Anguilla, British West Indies with a principal place of business located at 40 West 57th Street, New York, NY.

36.     MHR Capital Partners (100) LP ("MHR 100") is a Delaware limited partnership with a principal place of business located at 1345 Avenue of the Americas, New York, NY.   MHR 100 was a beneficial owner of Emisphere securities during the Class Period and was also a lender to Emisphere.

37.     MHR Institutional Partners II LP ("MHR II LP") is a Delaware limited partnership with a principal place of business located at 1345 Avenue of the Americas, New York, NY.   MHR II LP was a beneficial owner of Emisphere securities during the Class Period and was also a lender to Emisphere.

38.     MHR Institutional Partners IIA LP ("MHR IIA LP") is a Delaware limited partnership with a principal place of business located at 1345 Avenue of the Americas, New York, NY.   MHR IIA LP was a beneficial owner of Emisphere securities during the Class Period and was also a lender to Emisphere.

39.     MHR Advisors LLC ("MHR Advisors") is a Delaware limited liability company and general partner of MHR Master Account and MHR 100 with a principal place of business located at 590 Madison Avenue, New York, NY.

40.     MHRC LLC ("MHRC") is a Delaware limited liability company and general partner of MHR Advisors with a principal place of business located at 40 West 57th Street, New York, NY.

41.     MHR Institutional Advisors II LLC ("MHR II") is a Delaware limited liability company and general partner of MHR II LP and MHR IIA LP with a principal place of business located at 40 West 57th Street, New York, NY.

42.     MHRC II LLC ("MHRC II") is a Delaware limited liability company and managing member of MHR II with a principal place of business located at 40 West 57th Street, New York, NY.

43.     Defendant Rachesky was the founder and ultimate controller of MHR LLC, MHR Holdings, MHR Master Account, MHR 100, MHR II LP, MHR IIA LP, MHR Advisors, MHRC, MHR II and MHR II LLC, which are collectively referred to herein as the "MHR Defendants."

44.     On November 5, 2020, MHR Master Account, MHR 100, MHR II LP, and MHR IIA LP entered into the MHR Purchase Agreement with Novo Nordisk in connection with the Merger.   As detailed further below, the MHR Purchase Agreement was executed concurrently with the Merger Agreement and governed Novo Nordisk's acquisition of the 0.5% royalty stream payable to Defendant Rachesky, MHR 100, MHR II LP, and MHR IIA LP in exchange for an allocation of $450 million of the total $1.8 billion Merger price.

989735.1

45.     Defendant Rachesky and the MHR Defendants acted collectively to exercise control over Emisphere, including in connection with the sale process and the material misstatements issued by Emisphere and the Individual Defendants during the Class Period.

### C.     Relevant Non-Parties

46.     Non-party Novo Nordisk is a Danish company with its principal executive offices located at Novo Allé 1, DK-2880, Bagsvaerd, Denmark.  Novo Nordisk is a global healthcare company focused on diabetes care and treatment, including the manufacturing of insulin and GLP-1 receptor agonists, a class of medications used to treat Type 2 diabetes.  Novo Nordisk also develops treatments for obesity, hemophilia, non-alcoholic fatty liver disease ("NASH"), and cardiovascular disease, among other chronic conditions.

47.     Jefferies is a Delaware limited liability company with a principal place of business located at 520 Madison Avenue, New York, N.Y. that served as the financial advisor to the Special Committee of Emisphere's Board in connection with the Merger.  Jefferies issued a fairness opinion on the Merger, dated November 5, 2020 (the "Fairness Opinion"), which was incorporated into the Proxy.

48.     Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") is a law firm with offices located at 7 World Trade Center, New York, NY and in other cities

18

989735.1

in the United States and abroad. WilmerHale served as the legal advisor to the Special Committee of Emisphere's Board in connection with the Merger.

49. Williams & Connolly LLP is a law firm with an office located at 680 Maine Avenue SW, Washington, DC that served as Emisphere's outside counsel in connection with the IP Dispute between Emisphere and Novo Nordisk addressed herein.

50. Quinn Emanuel Urquhart & Sullivan, LLP is a law firm with offices located at 51 Madison Avenue, New York, NY and in other cities in the United States and abroad that served as Emisphere's outside counsel in connection with the IP Dispute between Emisphere and Novo Nordisk addressed herein.

51. Evercore Group L.L.C. ("Evercore") is a Delaware limited liability company with a principal place of business located 55 East 52nd Street, New York, NY that served as Novo Nordisk's financial advisor in connection with the Merger.

## IV.    BACKGROUND

### A.    Defendant Rachesky Controlled Emisphere

52. Defendant Rachesky exercised control over Emisphere during the Class Period through a series of stock purchases and lending arrangements with the Company that provided him with significant Emisphere stock and convertible debt holdings, as well as Emisphere warrants and stock options.

53.     In March 2005, Defendant Rachesky made his initial investment in Emisphere by purchasing 3.25 million shares of the Company.   After this investment, Rachesky and MHR IIA entered into a loan agreement with Emisphere on September 26, 2005, that allowed Rachesky to gain control over the Company.

54.     Under this agreement, Defendant Rachesky loaned Emisphere $15 million for a seven-year term at 11% interest.  The loan agreement gave Rachesky the option to convert monthly interest payments into Emisphere common stock at $3.78 per share.  It also allowed Defendant Rachesky to be appointed to the Emisphere Board and gave him the right to designate another director.  Rachesky chose Defendant Weiser to join him on the Emisphere Board in 2005.  Under the terms of the loan agreement, Defendants Rachesky and Weiser could not be removed from Emisphere's Board unless at least 85% of Emisphere's outstanding shares entitled to vote on directors chose to remove them.  This provision effectively made the removal of Rachesky and Weiser from the Board impossible given that Rachesky and certain of the MHR Defendants owned 17.47% of Emisphere's outstanding common stock after their initial loan closed in September 2005.

55.     Over the next several years, Defendant Rachesky made additional loans to Emisphere that further solidified his control over the Company.  In July 2010, Rachesky made a $525,000 loan to Emisphere in exchange for promissory notes from the Company.  In August 2010, Rachesky made a $6.5 million investment in a

989735.1

private placement of Emisphere warrants that gave him the right to purchase 2.6 million shares of Emisphere common stock for $1.01 per share. Rachesky invested in another private placement of Emisphere warrants in June 2011 that entitled him to purchase another 3 million Emisphere shares for $1.09 per share. Following these investments in Emisphere warrants, Defendant Rachesky had a 47.6% effective ownership interest in the Company.

56.    Defendant Rachesky and the MHR Defendants were the controlling stockholders of Emisphere by the middle of 2012. As of March 1, 2012, Rachesky and certain of the MHR Defendants owned 18,483,663 shares of Emisphere common stock out of approximately 32 million shares outstanding. This significant stock ownership did not account for the almost 21 million Emisphere shares issuable to Defendant Rachesky and certain of the MHR Defendants under the convertible notes, warrants, and stock options they held in the Company. Rachesky also controlled Emisphere's five member Board together with his Board appointees, Defendant Weiser and John D. Harkey who was appointed to the Emisphere Board in 2006.

57.    In September 2012, Emisphere defaulted on the convertible notes exchanged for Rachesky's $15 million loan made in 2005, and on the promissory notes Rachesky received in exchange for the loan he made to the Company in 2010. Rachesky increased the interest rates payable on both the convertible notes and the

21

promissory notes as a result.  On October 17, 2012, Rachesky and certain of the MHR Defendants loaned Emisphere an additional $1.4 million in exchange for another promissory note from the Company.

58.    In April 2013, Defendant Rachesky and Emisphere entered into a restructuring agreement on all of the Company's outstanding debt to Rachesky and the MHR Defendants.  This restructuring agreement consolidated the Emisphere loans and promissory notes in exchange for an interest rate increase to 13% and a re-pricing of the convertible notes held by Rachesky and certain of the MHR Defendants.  This significantly lowered the price at which Defendant Rachesky could convert his notes into Emisphere common stock and increased his effective ownership of the Company to 63.7% of Emisphere's fully diluted stock.

59.    Defendant Rachesky and the MHR Defendants' convertible note holdings in Emisphere continued to increase from 2015 through 2019.  By the time the Novo Nordisk Merger was announced on November 6, 2020, Defendant Rachesky and certain of the MHR Defendants held convertible debt in the Company that entitled them to over 77 million shares of Emisphere common stock upon conversion, representing approximately 70.3% the Company's outstanding equity on a fully diluted basis and thereby further solidifying Rachesky's control over the Company.

989735.1

**B.      The Royalty Agreement Provides Substantial Revenues to Emisphere and Protects It Against Unauthorized Intellectual Property Disclosures By Novo**

60.      On June 21, 2008, Emisphere and Novo Nordisk entered into the Royalty Agreement in connection with the development of oral formulations of Novo's Type 2 diabetes drugs.  This partnership allowed Novo Nordisk to use Emisphere's proprietary Eligen® drug delivery technology, including the drug carrier known as monosodium N-[8-(2-hydroxybenzolyl) amino] caprylate ("SNAC").  Novo Nordisk used Emisphere's SNAC carrier for the oral administration of Rybelsus, Novo's blockbuster Type 2 diabetes drug.  Rybelsus was approved for Type 2 diabetes management in the United States and the European Union in 2019 and 2020, respectively, events that permitted Emisphere and Rachesky and the MHR Defendants to begin receiving milestone payments and royalties.

61.      Under Section 3 of the Royalty Agreement, Emisphere had the right to receive royalty and milestone payments from Novo Nordisk for its products that used Emisphere's SNAC technology.  Novo was required to pay Emisphere an upfront "license fee" of $10 million within ten days of the Royalty Agreement's effective date.  The Royalty Agreement further provided for milestone payments to Emisphere of up to $37 million upon the occurrence of a "Development and Commercialization Event ('D&C Event')."

23

62.    These enumerated D&C events included Phase 1-3 clinical trials of Novo products using Emisphere's drug carrier technology, and the approval of such products by the FDA and the European Medicines Evaluation Agency ("EMEA"). The Royalty Agreement also provided for up to $40 million in additional milestone payments to Emisphere tied to Novo Nordisk's net sales of a licensed product that used Emisphere's drug delivery technology.  All told, Emisphere was entitled to up to $87 million in milestone payments from Novo Nordisk under the Royalty Agreement.

63.    Significantly, the Royalty Agreement also set forth royalty payments to Emisphere ranging from 3% to 6%, depending on Novo Nordisk's net sales of licensed products that used Emisphere's SNAC technology in each country or territory (ranging from under $375 million (3% royalties) to over $1 billion in such net sales (6% royalties)).

64.    The Royalty Agreement also contained strict prohibitions against the disclosure of confidential proprietary information concerning the products licensed under the Agreement (Section 11.1 – Confidentiality).  This included a prohibition against Novo's or Emisphere's publication of any material containing the other party's confidential information without first giving that party an opportunity to review, comment on and propose modifications "for purposes of removing Confidential Information" from the publication (Section 11.4 – Publications).

989735.1

65.     Emisphere had the right to terminate the Royalty Agreement if Novo Nordisk materially breached the Agreement and failed to (i) cure its breach or (ii) present a plan to cure such breach that was acceptable to Emisphere within 60 days of Emisphere providing written notice of the breach (Section 12.5 – Termination for Material Breach).  In addition, Section 12.6 of the Royalty Agreement (Effect of Termination) explicitly provided that upon a termination of the Agreement by Emisphere for a material breach pursuant to Section 12.5, "the licenses granted by Emisphere under [the Royalty Agreement] shall ***automatically terminate and revert back to Emisphere*** . . ."  These provisions gave Emisphere significant contractual leverage to reclaim its drug carrier technology in the event of a material breach of the Royalty Agreement by Novo Nordisk.

### C.     The Royalty Agreement is Amended But Still Provides Emisphere With a Significant Royalty Stream

66.     The Royalty Agreement was amended on April 26, 2013 as part of the debt restructuring agreement between Emisphere, Defendant Rachesky and the MHR Defendants ("Amendment No. 2").  Amendment No. 2 provided for a $10 million milestone pre-payment to Emisphere for the Phase 2 and 3 clinical trials of Novo products using Emisphere's drug carrier technology.  This pre-payment was required "irrespective of whether either of such milestones is ever achieved by Novo Nordisk."

67.     Amendment No. 2 to the Royalty Agreement also revised the royalty rate payable to Emisphere.  Rather than the range of royalty percentages set forth in the original Royalty Agreement (*see supra* ¶ 63), the amendment provided for a uniform 3% royalty rate on all net sales of Novo Nordisk products that used Emisphere's SNAC technology.

68.     The Royalty Agreement was amended again on October 13, 2015, to include a broader group of Novo drug treatments ("Amendment No. 3").  Under this amendment, Emisphere worked to develop oral formulations for Novo Nordisk's investigative drug treatments that addressed metabolic disorders, including diabetes and obesity.  The amendment provided Emisphere with additional milestone payments tied to net sales of Novo products that used Emisphere's drug carrier technology.  Amendment No. 3 did not change Emisphere's entitlement to a 3% royalty payment on the sale of each commercialized Novo Nordisk product that used Emisphere's drug carrier technology, including Rybelsus.

69.     Amendment No. 3 also contained a provision (amended Section 3.5(c) that lowered Emisphere's royalty rate from 3% to 1% of all net sales of a licensed product in a given country when the relevant patents for such product "***ha[ve] been solely invented by Novo Nordisk***."  This change was made as consideration for the additional milestone pre-payments noted above.

70.     Pursuant to these Royalty Agreement amendments, Novo Nordisk made a $10 million milestone payment to Emisphere in October 2019 following the FDA's approval of Rybelsus to treat Type 2 diabetes.  Novo also began making royalty payments to Emisphere in the first quarter of 2020, once Novo started selling Rybelsus in the U.S. market.  In addition, Emisphere received a one-time milestone payment of $10 million following the EMEA's market authorization of Rybelsus on April 6, 2020.

71.     Given the large market for Rybelsus in both the U.S. and Europe, the anticipated future royalty stream for Emisphere was substantial.  Under the term provision of the Royalty Agreement (Section 12.1), Novo was required to pay Emisphere royalties for Rybelsus sales in the U.S. until at least 2029 given that Novo made its first U.S. commercial sale in the third quarter of 2019.  Estimates from both market analysts and from Jefferies forecast that Rybelsus would exceed $10 billion in annual sales beginning in 2024 through 2036, thereby resulting in substantial royalty payments to Emisphere during this period.

**D.      Defendant Rachesky Uses His Control Over Emisphere to Extract a Portion of Emisphere's Royalty Stream**

72.     On December 8, 2016, the Royalty Agreement was amended yet again ("Amendment No. 4" or the "MHR Royalty Agreement").  Amendment No. 4 added Defendant Rachesky's investment funds, *i.e.*, MHR Master Account, MHR 100, MHR II LP and MHR IIA LP as parties to the Royalty Agreement.  The amendment

also revised the 3% royalty rate payable to Emisphere by allocating 2.5% to Emisphere on all net sales of Novo Nordisk's licensed products that used Emisphere's drug delivery technology, including Rybelsus. Defendant Rachesky's MHR Master Account, MHR 100, MHR II LP and MHR IIA LP were together allocated the remaining 0.5% on such net sales by Novo Nordisk (the "MHR Royalties").

73.     Concurrently with execution of Amendment No. 4., Emisphere and certain of the MHR Defendants entered into a separate agreement, dated December 8, 2016 (the "Emisphere Loan Forgiveness Agreement"). The Emisphere Loan Forgiveness Agreement was tied to the significant loan agreements that Defendant Rachesky had entered into with Emisphere to date. *See supra* IV.A. Under the Emisphere Loan Forgiveness Agreement, Defendant Rachesky agreed to forgive $7 million of Emisphere's debt upon the first commercial sale of a Novo Nordisk product covered by the Royalty Agreement in exchange for the MHR Royalties payable to Rachesky and his investment funds under the MHR Royalty Agreement. Specifically, as noted above, the MHR Royalty Agreement provided that Novo Nordisk would pay Defendant Rachesky and his investment funds royalties equal to 0.5% of net sales for Rybelsus and any other licensed Novo product covered by the Royalty Agreement between Emisphere and Novo Nordisk.

989735.1

74.     Amendment No. 4 further revised the royalty rate for net sales of licensed products that used patents invented by Novo Nordisk alone.  Specifically, Section 3.5(c) of the Royalty Agreement was amended to allocate 0.5% of net sales on such products to Emisphere and 0.5% of net sales to Rachesky and the MHR Defendants, for a total of 1%, when the relevant patents for such products "*ha[ve] been solely invented by Novo Nordisk*."

75.     Thus, Rachesky and the MHR Defendants were entitled to 0.5% of the net sales *regardless* of whether Novo Nordisk claimed sole inventorship and the Royalty Stream stepped-down.  Emisphere, on the other hand, was entitled to 2.5% of net sales when Emisphere was credited with inventorship, but only 0.5% of net sales when Novo Nordisk claimed sole inventorship.  Accordingly, of the full 3% royalty payable when Emisphere was credited with inventorship, Emisphere received 83.3% and Rachesky received 16.7%.  And, when Novo Nordisk claimed sole inventorship, Rachesky and Emisphere split the royalty payment 50-50.

76.     This royalty step-down provision would have a material impact on Emisphere's valuation under the Merger when an IP Dispute between the companies commenced in 2019.  *See infra* IV.E & G.

**E.    Emisphere Notifies Novo of Its Unauthorized Disclosure of Emisphere's Intellectual Property**

77.     Emisphere notified Novo Nordisk in April 2019, that it believed Novo had materially breached the Royalty Agreement.  Specifically, Emisphere claimed

that Novo Nordisk had disclosed confidential information concerning the SNAC technology and how it operated in an article published in the Science Translational Medicine journal (the "STM Article"). Emisphere asserted that the STM Article violated Sections 11.1 (Confidentiality) and 11.4 (Publications) of the Royalty Agreement. *See supra* ¶ 64.

78.    Emisphere viewed the STM Article's disclosure of proprietary information concerning SNAC to be a significant threat to the Company's ongoing financial prospects. After the STM Article was published, Defendant Rothwell expressed these concerns in telephone and email communications with Novo Nordisk's Chief Executive Officer, Lars Jørgensen. Rothwell specifically alerted Mr. Jørgensen that "confidential information relating to SNAC alone remains exclusively Emisphere's property." He further warned that the disclosed proprietary information concerning SNAC represented "***significant commercial value*** both to Emisphere and potential competitors who are trying to use SNAC in conjunction with other peptides." Given Novo's alleged violation of the confidentiality provisions of the Royalty Agreement, Defendant Rothwell also asserted that "a traditional 'cure' is impossible as the referenced information is now available to the public and cannot be undone."

79.    In a subsequent series of emails and letters between Defendant Rothwell and Mr. Jørgensen in May and June 2019, Novo Nordisk denied any breach

30

of the Royalty Agreement.    On May 10, 2019, Mr. Jørgensen responded to Emisphere's contention that the STM Article violated the confidentiality provisions of the Royalty Agreement.    Mr. Jørgensen's principal arguments were that the SNAC-related information in the STM Article had been previously disclosed in publications and regulatory approvals that Emisphere consented to, and that the disclosures were insufficient to allow competitors to apply the SNAC technology to other drug therapies.

80.    Defendant Rothwell disputed both assertions in a letter to Mr. Jørgensen on June 6, 2019.    Rothwell's letter asserted that the STM Article's disclosures had broad application for competitors and could be used in a wide range of drug formulations.    Specifically, Rothwell noted that that the "[STM] Article Itself Teaches that Its Disclosures Are Broadly Applicable."    He further noted the STM Article itself acknowledged that "the findings reconceptualize the tenets of peptide absorption after oral administration *and establish a new generalized strategy* for successful delivery of therapeutic peptides via the oral route" (emphasis added). Rothwell also wrote that the STM Article stated Emisphere's findings "represent a *paradigm shift in our fundamental understanding of peptide absorption* . . . and a clinically transformative advancement for treatment possibilities for diabetes and/or other chronic diseases by transforming injectable therapies to tablet-based oral medicines" (emphasis added).

31

81.    In response, Novo Nordisk reiterated its stance during a telephone call between Defendant Rothwell and Novo Nordisk's Chief Financial Officer, Karsten Knudsen, on or about July 10, 2019.  In an email sent later that same day, Mr. Knudsen acknowledged that Emisphere owned the intellectual property "arising from work performed under the license agreement solely related to SNAC[,]" but argued Novo owned the intellectual property "relating to formulations of semaglutide with SNAC[,]" such as Rybelsus.  Mr. Knudsen email suggested that Novo Nordisk intended to assert "sole inventorship" of the delivery technology disclosed in the STM Article, *i.e.*, "formulations of semaglutide with SNAC."

82.    As noted above, Section 3.5(c) of the Royalty Agreement allowed Novo to reduce total royalty rates to Emisphere from 2.5% to 0.5% if Novo Nordisk could claim "sole inventorship" over the drug delivery technology addressed in the STM Article, while leaving the MHR Royalties of 0.5% intact.  This step-down in royalty rate would obviously represent a significant reduction in royalties to Emisphere, and by extension a reduction in the overall valuation of the Company.

83.    Notwithstanding Novo Nordisk's position, Defendant Weiser sent a letter to Novo on September 16, 2019, providing notice of a material breach of the Royalty Agreement.  As a remedy for the asserted breach, Defendant Weiser proposed an "upward adjustment of the royalty rate payable under Section 3.5 of the Royalty Agreement" and demanded that Novo Nordisk cure the breach within 60

days as set forth in Section 12.5 of the Royalty Agreement governing material breaches of the Agreement.

84.    On October 2, 2019, Novo Nordisk's Senior Vice President and Group General Counsel Global, Tomas Haagen, sent a letter to Defendant Weiser denying any breach by Novo of the Royalty Agreement.  Among other things, Mr. Haagen argued that the STM Article only addressed Novo Nordisk discoveries.

85.    Despite this dispute, Mr. Haagen indicated that Emisphere could provide Novo Nordisk with an assessment of damages suffered as a result of the alleged breach, and proposed that Emisphere apply for patent protection over the allegedly confidential information disclosed in the STM Article, a process in which Novo would cooperate.  Mr. Haagen reiterated these proposals in a follow-up email on October 18, 2019 that included a "plan for cure" under Section 12.5 of the Royalty Agreement and further proposed a litigation standstill between Novo Nordisk and Emisphere.

86.    In a letter dated October 21, 2019, Emisphere's outside counsel at Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") disputed Mr. Haagen's contentions regarding the STM Article and Royalty Agreement. Nonetheless, Emisphere agreed to a litigation standstill with Novo Nordisk on November 14, 2019, which was extended several times during the Merger negotiations between the two companies.

989735.1

**F.    Novo Nordisk and Emisphere Initiate Merger Negotiations in Response to Their IP Dispute**

87.    The IP Dispute served to initiate merger discussions between Novo Nordisk and Emisphere.  On November 15, 2019, one day after execution of the litigation standstill agreement, Mr. Knudsen (Novo's CFO) requested a meeting with Defendant Rothwell to discuss a potential merger.  The next day, Mr. Haagen, spoke to Andrew Berdon, a Quinn Emanuel attorney representing Emisphere, about scheduling "a face to face meeting to discuss a potential acquisition of Emisphere by Novo Nordisk."

88.    Emisphere eventually agreed to meet on February 20, 2020, but demanded that the SNAC-related IP Dispute be a part of any transaction negotiations.  The meeting occurred at the New York offices of Emisphere's outside intellectual property counsel at Quinn Emanuel.  Attendees included Defendant Weiser, Andrew Berdon of Quinn Emanual, Defendant McInerney, Board member John Harkey, Messrs. Haagen and Knudsen of Novo Nordisk, and a representative of Evercore, Novo's financial advisor on the Merger.  At this meeting, Mr. Knudsen made an initial offer to acquire Emisphere, as well as the MHR Royalties payable to Defendant Rachesky and the MHR Defendants for $950 million (the "February 20 Proposal").  Defendant Weiser also discussed "the inventorship issue" at the February 20 meeting with the senior Novo Nordisk executives.

989735.1

89.     Following their meeting, Mr. Knudsen sent Defendant Rothwell a non-binding offer letter on February 20, 2020.  The offer letter specified that "Novo Nordisk is prepared to offer US $950 million on a cash and debt free basis for 100% ownership of [Emisphere] and for the settlement and termination of the [MHR Royalties]."  Novo Nordisk also provided Emisphere with a document titled "Project Emily" containing Novo's "Key Modelling Assumptions and Considerations" and Emisphere royalty rate projections for Novo's Rybelsus sales. *See infra* ¶¶ 120-121.

90.     Shortly after Novo Nordisk's initial acquisition offer, Defendants Weiser and Rothwell were appointed as Co-CEO's of Emisphere in March 2020.  Both Weiser and Rothwell were previously appointed to the Emisphere Board by Defendant Rachesky, and had extensive prior business and philanthropic connections with him.   Defendants Weiser and Rothwell took their Co-CEO positions just after Novo Nordisk's initial acquisition offer on February 20, and despite the fact that both were the members of an Emisphere subcommittee established in September 2019 to find a new CEO for the Company.

91.     Defendants Weiser and Rothwell were both rewarded handsomely for their new Co-CEO appointments.   In addition to lucrative base compensation packages for their new positions, Weiser and Rothwell also each received one million RSUs from Emisphere.  Significantly, these RSUs would accelerate and provide Weiser and Rothwell $7.8 million each upon a change-in-control of

Emisphere and were a multiple over their base salaries. Defendants Weiser and Rothwell also held unvested stock options at the time of the Merger that would fully vest under a transaction with Novo Nordisk to extent the stock options were "in the money" at the time of such transaction. The personal compensation Defendants Weiser and Rothwell received as a result of the Merger is set forth below:

| Defendant | RSU Payments | Unvested Stock Option Payments | Total Stock-Based Compensation Under Merger |
|---|---|---|---|
| Rothwell | $7,820,000 | $235,866 | $8,055,866 |
| Weiser | $7,820,000 | $235,866 | $8,055,866 |

These lucrative payouts through the RSUs and unvested stock options incentivized Defendants Weiser and Rothwell to promote a sale of Emisphere.

92.    Additionally, given the Director Defendants' conflicted interests, the Emisphere Board further decided that consummation of any transaction with Novo Nordisk or others required the recommendation of the Special Committee, and approval by a majority of the Emisphere voting stock not owned or controlled by the MHR Defendants or Novo Nordisk (the "Unaffiliated Vote Condition").

93.    On March 17, 2020, Emisphere's Board established the Special Committee to "identify, evaluate and negotiate" a potential transaction with Novo

Nordisk. The Emisphere Board acknowledged that a Special Committee was necessary given that negotiations with Novo Nordisk would involve the MHR Royalty Agreement that directly benefitted Defendant Rachesky and the MHR Defendants, and the other Director Defendants also possessed unique financial interests. Accordingly, Defendants McInerney and Draft were appointed as the only two members of the Emisphere Special Committee.

94. The Emisphere Board's March 17, 2020 written resolutions establishing the Special Committee "authorized and empowered" it with broad oversight of all transaction negotiations. This included, among other things, the authority to "[f]ormulate, establish, oversee, *control and direct* a process for the evaluation and negotiation of any Potential Transaction." The Board resolutions further empowered the Special Committee to "*negotiate the terms and conditions* of a Potential Transaction with Novo Nordisk (and any related agreements or documents, *including but not limited to the total consideration* to be paid by Novo Nordisk in connection therewith)."

95. This grant of authority and responsibilities to the Special Committee was reiterated in the Proxy. According to the Proxy, the Special Committee was empowered by the Board to "evaluate and negotiate" any transaction with Novo Nordisk, as well as any alternative transaction, and to "make recommendations" to the Board about whether to accept such transaction proposal(s).

989735.1

96.     Despite the Special Committee's purported authority over Merger negotiations, Emisphere's self-interested Co-CEOs were directly involved in those negotiations throughout the entire sale process.  Defendants Weiser and Rothwell engaged in most of the negotiations with Novo Nordisk, yet both stood to gain the lucrative compensation packages in a Novo transaction noted above.  Defendant Weiser was also present at almost all Special Committee meetings during the sale process.  Defendant Rachesky, who also was clearly conflicted, was likewise involved in the Special Committee's deliberations and engaged in direct negotiations with Novo Nordisk representatives as detailed below.

### G.     The Undisclosed IP Dispute Continues To Be a Critical Component of Merger Negotiations and a "Key Value Driver" for Emisphere

97.     During the ongoing Merger negotiations in the spring and summer of 2020, Emisphere and Novo Nordisk continued to engage in discussions concerning the IP Dispute that had been triggered by the STM Article.  During this period, the dispute evolved to focus on whether Emisphere and Novo Nordisk were "co-inventors" of certain patents, rather than a focus on the disclosures in the STM Article alone.

98.     In a series of emails and telephone calls between March 2020 and July 2020 among Emisphere, Novo Nordisk and their respective counsel, the parties disputed whether they should be considered "co-inventors" of certain patents for drug carrier technologies, including SNAC and its use in Novo's Rybelsus product.

38

As noted, the co-inventorship issue had major ramifications on the aggregate amount of royalties owed to Emisphere under the Royalty Agreement and hence, on Emisphere's net present valuation.

99.    In an email from Novo Nordisk's CFO Karsten Knudsen to Defendant Weiser dated March 9, 2020, Novo disputed Emisphere's co-inventorship claim. Mr. Knudsen's email stated that "we can find no basis for your claim that an Emisphere employee should have been a co-inventor on Novo Nordisk patents." Mr. Knudsen further listed three U.S. patent numbers for which Emisphere asserted co-inventorship and noted that they concerned "claim compositions specific to the compound semaglutide" and "a method for treating diabetes and/or obesity." As noted above, Mr. Knudsen previously stated to Emisphere that Novo Nordisk owned the intellectual property of "formulations of semaglutide with SNAC" such as Rybelsus, as opposed to the intellectual property "solely related to SNAC[,]" which Novo conceded was owned by Emisphere.

100.    Andrew Berdon, one of Emisphere's intellectual property attorneys at Quinn Emanuel, challenged Novo's position in an email response to Mr. Knudsen on March 16, 2020.  Mr. Berdon's email stated that:

> Candidly, I am puzzled by [your response], given the lack of any explanation of your conclusion and our investigation and review of contemporaneous documents reflecting Emisphere's research and its collaboration with Novo Nordisk.  What information and documents from [Novo's investigation] led you to conclude that the solid oral compositions, amounts of SNAC, and disintegration rates used and

989735.1

claimed in the patents. . .were conceived solely by Novo scientists, without any contribution by Emisphere scientists?

Mr. Berdon also requested that Novo Nordisk provide the information and documents Novo reviewed to reach its conclusion on the co-inventorship issue "so we may understand and consider your position."

101.    On March 17, 2020, Mr. Knudsen responded by reiterating Novo's position that it had not infringed on any Emisphere patents.  His email refused to provide Emisphere with any documentary support for Novo's stance and simply reasserted that:

> As stated in our e-mail of 9 March, we have found no evidence to support a claim that Emisphere has contributed in any significant way to the inventions in the claims of these patents, and we are not prepared to engage in lengthy discovery discussions trying to prove the negative.

Mr. Knudsen further encouraged Defendant Weiser to carefully consider Novo Nordisk's February 20 Proposal to acquire Emisphere and the MHR Royalties for $950 million, which Novo "believe[d] would be attractive to Emisphere taking into account the fundamental valuation of the company."

102.    The Emisphere Special Committee remained apprised of the status of the IP Dispute given its direct impact on the Company's valuation in the context of broader Merger discussions with Novo Nordisk.  At a meeting on April 8, 2020, the Special Committee was provided with "***proposed negotiation guidelines***" ***concerning "the ongoing intellectual property dispute*** " between the companies.

Upon considering those negotiation guidelines, Defendants determined to reject Novo's February 20 Proposal on April 13, 2020.

103.   On April 16, 2020, David Berl, one of Emisphere's patent attorneys at Williams & Connolly LLP ("Williams & Connolly"), emailed Mr. Knudsen to dispute Novo Nordisk's claims.  Mr. Berl stated that Emisphere:

> [W]ent above and beyond its contractual obligations to provide Novo with broad access to its expertise and experience regarding carrier technology in general and SNAC in particular.   That partnership between Emisphere and Novo, including Emisphere's invention of formulations containing SNAC and semaglutide with desirable bioavailability and dissolution properties resulted in the Rybelsus product that Novo has brought to its patients . . . [a]s noted in my previous email, contemporaneous documents, ***including those drafted by Novo's own employees who participated in the partnership, recognize the contributions that Emisphere made to the inventions disclosed and claimed in the patents***.

Mr. Haagen responded to Mr. Berl in an email the next day and stated that Novo Nordisk was "prepared to have a video meeting with you to discuss the co-inventorship issue."

104.   Defendants continued to emphasize the importance of the IP Dispute in the initial merger negotiations with Novo Nordisk given its material impact on Emisphere's valuation and the royalties payable under the Royalty Agreement.

105.  For example, in an April 19, 2020 internal Company email with "FINAL Talking Points" for a transaction-related call with Novo, "after consultation

with the SC [*i.e.*, the Special Committee] and Tim Rothwell[,]" Defendant Weiser

wrote:

- "There is **universal conviction** on the part of Emisphere and its directors" that [Novo's February 20 Proposal] "**significantly undervalues the company, including the future royalty revenues from Novo**."

- "there are **two major value drivers** in any potential deal that deserve special attention in our discussions:
  - 1) **Emisphere's IP rights** and
  - 2) the revenue model for Rybelsus"

Accordingly, Weiser's talking points emphasized that the parties' "priority should

be to share perspectives and factual information about these two topics" during

Merger-related negotiations.

106.    Weiser's talking points for Novo also stated that Emisphere had "spent

considerable time and resources examining these issues and **view them as extremely**

**serious**."  He reiterated that the "inventorship issues" and the Company's related

"royalty rights" surrounding the IP Dispute were "**key value drivers to Emisphere**."

He further wrote that Emisphere would pursue the IP Dispute and that Company

counsel was "prepared to make a detailed presentation laying out our views as to

inventorship issues, **and the ensuing implications for our royalty rights**."

107.    Defendant Weiser and the Special Committee Defendants also

involved Jefferies in an effort to value the SNAC-related IP Dispute with Novo

Nordisk.  During an April 22, 2020 Special Committee meeting, Weiser told

989735.1

Jefferies it should contact Emisphere's intellectual property counsel David Berl at Williams & Connolly "to understand [Emisphere's] positions with respect to its co-inventorship claims against Novo Nordisk and the potential impact of such claims on [Emisphere's] valuation."  Weiser then instructed Jefferies to communicate with Novo's financial advisor on the transaction, Evercore, to "discuss the valuation model underlying the valuation proposed by Novo Nordisk" in its February 20 Proposal to acquire Emisphere.

108.   On April 21, 2020, Mr. Berl provided Mr. Haagen of Novo with a proposed meeting presentation and supporting materials in order to substantiate Emisphere's "co-inventor" position.   Mr. Berl's April 21 email also made a reciprocal documentary request to Mr. Haagen to support Novo Nordisk's position in the IP Dispute.  Specifically, Mr. Berl stated:

> We assume that, per Karsten [Knudsen's] conversation with Michael Weiser earlier this week, you will likewise share the documents and information referenced in your email to Michael of March 9, that led you to conclude that you could find ***no basis for a claim that an Emisphere employee should have been a coinventor***.

109.   In a response email on April 29, 2020, Mr. Haagen agreed to an extension of the litigation standstill between Emisphere and Novo Nordisk "up to and including May 31, 2020," but refused to provide any documentary support for Novo's assertion that co-inventorship was unwarranted on the relevant patents.  His email stated that "[w]e do not see it as incumbent on NN [Novo Nordisk] to prove

989735.1

that the inventorship with respect to these patents . . . is correct."  Mr. Hagen further stated that while "we remain willing to review and discuss the basis for Emisphere's claim for co-inventorship, it will fall upon Emisphere to document the merits of these new claims."

110.   On June 1, 2020, Defendant Weiser sent an email to Novo's CFO, Karsten Knudsen, and its General Counsel, Tomas Haagen, memorializing the parties' agreement on another standstill extension to allow for further discussions concerning the parties' IP Dispute.  In an implicit acknowledgment of the substantial monetary value of Emisphere's intellectual property rights at issue, Defendant Weiser also set forth the terms of a tolling agreement between Novo and Emisphere that would extend through June 15, 2020.

111.   Weiser noted that the tolling agreement applied to potential claims Emisphere or Novo Nordisk might have "arising out of or relating in any way" to the amended and restated 2008 Development and License Agreement between them, and "*to the publications* [*i.e.*, the STM Article] *that have been the subject of the parties' correspondence*" concerning the IP Dispute.

112.   The Special Committee was further updated on the status of the IP Dispute between Emisphere and Novo Nordisk at meetings on June 3 and June 5, 2020.  At the June 3 meeting, Defendant Weiser "review[ed] the status of the IP Dispute," and reported on a May 29, 2020 call he had with Novo to discuss the

989735.1

dispute.  At the June 5, 2020 Special Committee meeting, Mr. Berl at Williams & Connolly also "reviewed the status of the IP Dispute," and provided his "assessment of the merits of [Emisphere's] positions" on the dispute.  Defendants' Class Period statements to investors entirely omitted that the IP Dispute was repeatedly discussed by the Special Committee at its meetings, or that the dispute *even existed*.

113.    Novo Nordisk made a proposal on July 17, 2020 to acquire Emisphere and the MHR Royalties for $1.125 billion in cash, plus contingent value rights ("CVRs") worth $300 million based on net sales milestones of Rybelsus (the "July 17 Proposal").  Under the July 17 Proposal, the milestone payments to Emisphere would expire on December 31, 2031 if Novo's Rybelsus sales did not reach $8-10 billion in cumulative net sales by that date.  Notably, Novo's offer letter also recognized that the IP Dispute was a material component of the Merger negotiations and had direct bearing on the Merger Consideration for Emisphere's public shareholders.

114.    Specifically, Novo stated in its formal offer letter of July 20, 2020 that it viewed the July 17 Proposal to be "highly attractive to Emisphere's shareholders . . . as [t]he Upfront Payment [$1.125 billion in cash] *de-risks the IP position*, both in terms of the SNAC technology and other potential future challenges."

115.    Defendants rejected the July 17 Proposal as inadequate specifically because it undervalued Emisphere's strong position in the IP Dispute.  Indeed, on

July 22, 2020, Defendant Weiser reported to the Special Committee about a conversation he had with Novo's CFO, Karsten Knudsen, in which Weiser stated that Emisphere was prepared to initiate litigation concerning the intellectual property rights surrounding Rybelsus unless Novo proposed a higher valuation for an Emisphere acquisition.

116.   Emisphere continued to press the IP Dispute in order to exert additional leverage and extract higher merger consideration from Novo Nordisk.  On July 24, 2020, Dan Berl, Emisphere's patent counsel at Williams & Connolly, emailed Tomas Haagen at Novo to inform him that Emisphere had filed two provisional patents on November 13, 2019 concerning the Company's intellectual property referenced in the STM Article, and was pursuing a third patent related to Emisphere's SNAC technology.

117.   At a meeting on August 17, 2020, the Emisphere Board was also provided with and discussed an outline of Emisphere's proposed patent infringement claims against Novo Nordisk, as well as an outline of the claims in a proposed complaint that the Company was prepared to file in the United States District Court for the Southern District of New York "in the event the parties were unable to reach a settlement" of the IP Dispute.  At this point in time, the Company was prepared to pursue the intellectual property claims through litigation and use the dispute as a basis to extract higher consideration in merger negotiations.

989735.1

118.   Defendants plainly understood that the IP Dispute and the revenue streams it implicated were material to Emisphere's overall valuation.  Moreover, Emisphere's Director of Finance, Philip Nikolayuk, internally acknowledged the "**high likelihood**" that Emisphere would prevail in a litigation concerning the IP Dispute, and that the Company's SNAC-related royalties of 2.5% "**would be extended until something like 2031 or beyond**" if that occurred.  This view was seconded by Emisphere's outside counsel at Williams & Connolly who had taken concrete steps to prepare for litigation against Novo.   Despite this internal recognition, Defendants ultimately used financial projections that assigned no value to the IP Dispute, and **entirely omitted** any reference to the Dispute and its clear impact on Merger negotiations during the Class Period.

**H.    Emisphere's Financial Projections Are Adjusted Downward at the Behest of Defendants Weiser and Rothwell Without Shareholder Knowledge**

119.   Defendants Weiser and Rothwell manipulated Jefferies' valuation for Emisphere to ensure that a Novo Nordisk deal would close and the Director Defendants would reap their enormous change-in-control benefits.  This information was never disclosed to Emisphere's public shareholders.

120.   In connection with its initial February 2020 Proposal to acquire Emisphere and the MHR Royalties for $950 million, Novo Nordisk prepared financial projections for Emisphere titled the "Project Emily" projections.  Novo

also provided a document to Emisphere titled "Project Emily" "Rybelsus Sales Curve February 2020," that set forth Novo's "Key Modelling Assumptions and Considerations" for the Rybelsus royalty rates payable under the Royalty Agreement.  The document stated that a "3% royalty rate applied to Rybelsus sales till mid-2027; 1% royalty rate applied to Rybelsus sales from mid-2027 to 2039."

121.  Novo Nordisk's "Project Emily" projections were based on analyst estimates and other external sources, rather than internal analysis by Novo or its financial advisors at Evercore.  As stated in its "Key Modelling Assumptions and Considerations," Novo's Rybelsus sales estimates for 2020 through 2025, were based on the "[m]edian of Rybelsus sales estimates from 15 brokers covering Novo Nordisk."  Novo's Rybelsus sales estimates from "2026 onwards" were "extrapolated using [the] implied annual growth rate from [the] EvaluatePharma database."  This database was generated by Evaluate Ltd., a market research firm focused on the pharmaceutical industry.

122.  Emisphere's internal financial projections were initially higher than these "Project Emily" projections from Novo Nordisk.  In May 2020, the Special Committee was provided with separate Emisphere financial projections from Jefferies.  In presentation slides titled "Project Eagle," Jefferies set forth: (i) the "Evercore Case" projections (as noted above, Evercore was Novo Nordisk's financial advisor on the Merger and these financial projections were based on

989735.1

Novo's "Project Emily" projections); (ii) the "Previous Case 2" projections; (iii) the "Case 1" projections; (iv) the "Case 2A" projections; and (v) the "Case 2B" projections. The Emisphere net present values ("NPVs") calculated under these May 2020 projections were as follows:

| Emisphere "Project Eagle" Financial Projections | Emisphere Net Present Value (NPV) |
|---|---|
| Evercore Case | $950 million |
| Case 1 | $1.332 billion |
| Previous Case 2 | $2.077 billion |
| Case 2A | $2.673 billion |
| Case 2B | $2.935 billion |

Plainly, Jefferies' Case 2A and 2B projections had Emisphere NPVs that were far greater than Novo Nordisk's ultimate acquisition price of $1.8 billion.

123.   Jefferies included various "Key Valuation Metrics" to quantify the Emisphere NPVs under the projections. These included (i) "Peak Sales" of Rybelsus, (ii) "Cumulative Royalties" payable to Emisphere from 2020 to 2039 for such Rybelsus sales, (iii) the net present value of Emisphere's royalties ("Royalty

49

NPV"), (iv) adjustments for Emisphere's operating expenses and working capital, and (v) the value of Emisphere's net operating losses.

124.    Jefferies' "Project Eagle" presentation also included a line item titled "Royalty Step Down Timing" for Rybelsus royalties payable to Emisphere.  Under this line item, the Evercore and Case 1 projections reflected a "June – 2027" step-down in Emisphere's royalty rate under the Royalty Agreement.  The Case 2A and 2B projections reflected that a step-down in Emisphere's royalty rate would not occur until "May – 2034" – nearly seven years later than in the Evercore and Case 1 projections:

| Emisphere "Project Eagle" Financial Projections | Royalty Step-Down Dates |
|---|---|
| Evercore Case | June 2027 |
| Case 2A | May 2034 |
| Case 2B | May 2034 |

The Case 2A and 2B projections also assumed that Rybelsus would receive FDA approval for the treatment of both obesity and NASH, as well as a favorable ruling for Emisphere in its SNAC-related IP Dispute with Novo Nordisk.

125.    The Case 2A and 2B projections included higher cumulative and peak sales of Rybelsus and consequently, higher royalties for Emisphere than the

Evercore Case projections. The Case 2A and 2B Projections also included a comparison of these valuation metrics, which is set forth below:

| Emisphere "Project Eagle" Financial Projections | Cumulative Rybelsus Sales Revenue (2020-2039) | "Peak" Rybelsus Sales Revenue | Emisphere's Cumulative Rybelsus Royalties (2020-2039) |
|---|---|---|---|
| Evercore Case | $85.378 billion | $7.026 billion | $1.313 billion |
| Case 2A | $206.947 billion | $15.690 billion | $5.112 billion |
| Case 2B | $231.472 billion | $17.685 billion | $5.703 billion |

***Thus, with the 2034 royalty step-down accounted for in the Case 2A and Case 2B projections there were additional Emisphere royalty revenues of between $3.79 to $4.39 billion***.

126.    Jefferies circulated another "Project Eagle" presentation to Defendant Weiser on July 1, 2020 in response to their discussions on Emisphere's valuation. Jacopo Dragoni at Jefferies' Healthcare Investment Banking division sent Weiser this June 2020 "Project Eagle" deck in a July 1 email with the subject line "Project Eagle – Latest Model Overview." Mr. Dragoni wrote that "[p]er your discussion with Dung [Nguyen, a Jefferies Managing Director], please see attached the latest model summary deck." He further noted for Weiser that "the **detailed (Case 2A/2B)**

51

**pages are both showing a 2034 royalty switch date**" (emphasis in original).  This 2034 royalty rate step-down date was consistent with Jefferies' May 2020 "Project Eagle" presentation, and as noted above, resulted in contributing to an additional approximately $4 billion to Emisphere's valuation.

127.   The June 2020 model contained the same Emisphere NPVs as reflected in the May 2020 "Project Eagle" presentation, *i.e.*, (i) Evercore Case ($950 million); (ii) Case 1 ($1.332 billion); (iii) Previous Case 2 ($2.077 billion); (iv) Case 2A ($2.673 billion ); and (v) Case 2B ($2.935 billion).  *See supra* ¶ 122.  The June 2020 model also contained the same cumulative Rybelsus sales revenue figures for 2020 to 2039, *i.e.*, (i) Evercore Case ($85.378 billion); (ii) Case 2A ($206.947 billion); and (iii) Case 2B ($231.472 billion).  *See supra* ¶ 125.  The cumulative Rybelsus royalties for Emisphere from 2020 to 2039 were also the same, *i.e.*, (i) Evercore Case ($1.313 billion); (ii) Case 2A ($5.112 billion); and (iii) Case 2B ($5.703 billion).  *Id*.

128.   Following Novo Nordisk's July 17 Proposal to acquire Emisphere and the MHR Royalties for $1.125 billion in cash, plus CVRs (contingent value rights) worth $300 million (*see supra* ¶ 113), Defendants Weiser and Rothwell worked with Jefferies to revise the above Emisphere financial projections detailed in the May and June 2020 "Project Eagle" presentation materials downward.

129.   On July 25, 2020 James Wiltshire at Jefferies emailed Defendant Weiser regarding the "Eagle – Royalty Analysis."   Mr. Wiltshire provided

projections in response to a discussion with Defendant Weiser that reflected a 3% Rybelsus royalty payment to Emisphere until 2027, 2031 and 2034. The analysis further reflected a 1% Rybelsus royalty after the respective royalty step-downs in 2027, 2031 and 2034. Upon information and belief, this was the first time a 2031 royalty step-down date had been proposed. Each of these royalty scenarios were based on projected "peak" Rybelsus sales revenue of approximately $7 billion and cumulative Rybelsus sales of approximately $85 billion. As Mr. Wiltshire stated in his email, these sales figures "use[ed] the initial Novo revenue forecast" found in the Evercore Case projections, following Mr. Wilshire's discussion with Defendant Weiser.

130. Under this analysis, Emisphere's NPVs were considerably lower than the NPVs in the previously calculated Case 2A and Case 2B projections. Using a 25% tax rate and a 6% discount rate,[4] the Emisphere NPVs for each royalty step-down date were as follows: (i) $659 million (2027 royalty step-down); (ii) $888 million (2031 royalty step-down); and (iii) $1.004 billion (2034 royalty step-down).

131. In response to this analysis, Defendant Weiser requested that Jefferies provide "low, medium and high forecast models" for cumulative Rybelsus sales. Jefferies applied cumulative Rybelsus sales scenarios of $100 billion (low), $150

---

[4] The discount rate is the interest rate used in a discounted cash flow ("DCF") valuation analysis to determine the present value of a company's future cash flows.

billion (medium), and $200 billion (high), resulting in the following figures that were

emailed to Weiser on July 26:

**From:** Charlie Niehaus <cniehaus1@jefferies.com>
**Sent:** Sunday, July 26, 2020 1:44 PM
**To:** Michael Weiser <​███████████>; James Wiltshire <jwiltshire@jefferies.com>
**Cc:** Kevin Sheridan <ksheridan@jefferies.com>; Dung Nguyen <dnguyen@jefferies.com>; Jacopo Dragoni <jdragoni@jefferies.com>
**Subject:** RE: Eagle - Royalty Analysis

Michael,

Please see below for the additional analysis, running at $100bn, $150bn, and $200bn cumulative sales.

**$100bn Cumulative Sales:**
- **3% royalty to 2027, 1% thereafter**
- Cumulative royalties: $1,538m
- NPV at 25% tax rate, 6% discount rate: $726m
- **3% royalty to 2031, 1% thereafter**

54

- Cumulative royalties: $2,306m
- NPV at 25% tax rate, 6% discount rate: $1,049m
- **3% royalty to 2034, 1% thereafter**
- Cumulative royalties: $2,545m
- NPV at 25% tax rate, 6% discount rate: $1,133m

**$150bn Cumulative Sales:**
- **3% royalty to 2027, 1% thereafter**
- Cumulative royalties: $2,307m
- NPV at 25% tax rate, 6% discount rate: $1,088m
- **3% royalty to 2031, 1% thereafter**
- Cumulative royalties: $3,459m
- NPV at 25% tax rate, 6% discount rate: $1,573m
- **3% royalty to 2034, 1% thereafter**
- Cumulative royalties: $3,818m
- NPV at 25% tax rate, 6% discount rate: $1,699m

**$200bn Cumulative Sales:**
- **3% royalty to 2027, 1% thereafter**
- Cumulative royalties: $3,076m
- NPV at 25% tax rate, 6% discount rate: $1,451m
- **3% royalty to 2031, 1% thereafter**
- Cumulative royalties: $4,612m
- NPV at 25% tax rate, 6% discount rate: $2,098m
- **3% royalty to 2034, 1% thereafter**
- Cumulative royalties: $5,090m
- NPV at 25% tax rate, 6% discount rate: $2,266m

Let us know if you have any questions.

Best,
Charlie

Charlie Niehaus
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
T: +1 212.284.4617
C: +1 650.823.5215
cniehaus1@jefferies.com

The Emisphere NPVs resulting from these "low, medium and high forecast models" ranged from $726 million to $2.26 billion. Thus, following Defendant Weiser's request, the adjusted NPVs for each royalty step-down date (*i.e.*, 2027, 2031, and 2034) were lower than the NPVs in the Case 2A and Case 2B projections for Emisphere – even when using the higher cumulative Rybelsus sales figures.

132. Defendant Weiser forwarded Jefferies' analysis to Defendant Rothwell later in the day on July 26. Weiser's email explained that the 25% tax rate used in Jefferies' analysis was "a typical blended US rate (21% federal + state/local)." He

989735.1

further explained that the 6% discount rate used by Jefferies "represents the cost of capital from Novo's perspective and is in-line with other large cap pharmaceutical companies." Defendant Rothwell responded minutes later and expressed skepticism with the sales numbers Jefferies used in its NPV analysis, stating "I am not sure where Jefferies got their cumulative sales numbers but we need to justify them. ***The 150 and 200 [billion] seem a bit hard to justify*** . . ." This, despite the fact that Jefferies' Case 2A and 2B projections had modeled cumulative Rybelsus sales revenues of over $200 billion.

133.   Between July 27-28, 2020, Defendants Weiser and Rothwell exchanged emails with Jefferies that included further revisions to the Emisphere financial projections. In the email exchanges, Weiser and Rothwell asked Jefferies to assess the impact of the generic entry of Rybelsus into the market.

134.   In a July 27, 2020 email from James Wiltshire at Jefferies to Defendant Weiser, Jefferies provided an analysis titled "Eagle – Generic Impact." This analysis evaluated the impact of the market entry of generic versions of Rybelsus in 2030 and 2031 after the Rybelsus patent(s) expired. The "Eagle – Generic Impact" analysis used peak Rybelsus sales scenarios of $7-$10 billion with "85% generic erosion" and targeted an Emisphere NPV of $3 billion:

989735.1

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Monday, July 27, 2020 2:45 PM
**To:** Michael Weiser <████████████
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** Eagle - Generic Impact

Michael,

As follow up to the call please see below for the implied generic impact at different peak sales levels. We've shown the impact for two cases, one assuming 4 years of lost exclusivity and one assuming 2.4 years (exact time between 2031 and 2034 patents).

**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**
- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(12.6% = $3b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(11.0% = $3b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(9.8% = $3b)*
- $10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(8.8% = $3b)*

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**
- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(21.2% = $3b)*

- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(18.6% = $3b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(16.5% = $3b)*
- $10.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $20.2b sales at risk *(14.8% = $3b)*

Thanks,

Jimmy

James P. Wiltshire
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
Tel: +1 646.805.5484
Cell: +1 646.769.8830
jwiltshire@jefferies.com

135.    Shortly after this email was sent, Jefferies revised the "Generic Impact" models at the request of Defendants Rothwell and Weiser to calculate Novo Nordisk's sales of Rybelsus that were "at risk" when the relevant patent(s) expired and generic version of the drug entered the market:

989735.1

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Monday, July 27, 2020 3:11 PM
**To:** Michael Weiser <███████████>; Timothy Rothwell <███████████>
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** RE: Eagle - Generic Impact

Thanks, revised with percentages relative to $2 billion below…

**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**

- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(8.4% = $2b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(7.4% = $2b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(6.5% = $2b)*
- $10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(5.9% = $2b)*

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**

- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(14.1% = $2b)*
- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(12.4% = $2b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(11.0% = $2b)*
- $10.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $20.2b sales at risk *(9.9% = $2b)*

136.  These models done at the request of Defendants Weiser and Rothwell used earlier generic entry dates for Rybelsus than the Case 2A and 2B projections (*i.e.*, 2030-2031 v. 2034).

137.  Jefferies revised the models yet again at the request of Defendants Weiser and Rothwell.  The 2030 and 2031 "Generic Entry" calculations remained the same, but were now under a heading titled "Litigation Premium," presumably to account for the IP Dispute between Emisphere and Novo Nordisk.  The analysis also added a section titled "Revenue Performance" that assumed peak Rybelsus sales of

$10-$11.5 billion and resulted in a Emisphere NPV of approximately $1.3 to $1.5 billion:

**I) Litigation Premium**

**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**

- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(8.4% = $2b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(7.4% = $2b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(6.5% = $2b)*
- **$10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(5.9% = $2b)***

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**

- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(14.1% = $2b)*
- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(12.4% = $2b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(11.0% = $2b)*
- **$10.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $20.2b sales at risk *(9.9% = $2b)***

**II) Revenue Performance**

- Assumes $10b peak sales
  - 7 years to peak
  - Royalty to 2031
  - 3% royalty to 2031
  - ~20% peak penetration
  - **~$1.3b of NPV**
  - Increase to $1.5b of NPV with ~$11.5b peak sales,
    - (or potentially attribute incremental $200m to other products / technology value?)

This revised analysis used "peak sales" for Rybelsus that were far lower than the "peak sales" in the Case 2A and 2B projections (*i.e.*, $10-$11.5 billion v. $15.6 billion (Case 2A) and $17.6 billion (Case 2B)). *See supra* ¶ 125. This analysis also resulted in an Emisphere NPV of $1.3-$1.5 billion that was more aligned with the acquisition price under Novo Nordisk's July 17 Proposal (*i.e.*, $1.125 billion in cash, plus CVRs (contingent value rights) worth $300 million).

59

138.   In response, Defendant Rothwell asked Jefferies to calculate cumulative royalties payable to Emisphere, applying a royalty rate step-down from 3% to 1% in 2031, and a royalty rate step-down from 3% to 1% in 2034.   Both calculations used $10 billion in peak Rybelsus sales and resulted in "cumulative royalties" to Emisphere as follows:

At $10b peak sales:

- o   3% to 2031, 1% to 2034: ***$2,618m cumulative royalties***

- o   3% to 2034: ***$2,944 cumulative royalties***

Under this analysis, the cumulative royalties payable to Emisphere were considerably lower than the cumulative royalties calculated under the Case 2A (*i.e.*, $5.112 billion) and Case 2B projections (*i.e.*, $5.703 billion).  *See supra* ¶ 125.

139.   On July 28, 2020, Defendant Weiser sent another email to James Wiltshire and others at Jefferies with further directions adjusting the Emisphere projections to be in line with Novo's then-current offer.  Weiser stated that he "would like to focus on [] two 'buckets' with my edits and simplifications," *i.e.*, "**Bucket A (NPV of Royalty Stream**" and "**Bucket B (Litigation Premium)**."  With respect to "**Bucket A**," Weiser's email posed the following question to Jefferies in all capitals with respect to Emisphere's applicable royalty rate following generic forms of Rybelsus entering the market after 2031:  "WHAT HAPPENS TO THE NPV IF WE RAISE THE ROYALTY TO 2% FROM 2031 TO 2034 (SPLIT THE

DIFFERENCE BETWEEN 1% TO 3%).”  Weiser provided no contractual or other basis for the application of this 2% royalty rate.  Nonetheless, Mr. Wiltshire responded that “[a]dding a 2% royalty from 2031 to 2034 would increase the NPV to *just under $1.5 billion*”:

From: James Wiltshire <jwiltshire@jefferies.com>
To:       Michael Weiser <▮▮▮▮▮▮>; Timothy Rothwell <▮▮▮▮▮▮▮▮>
Cc:       Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
Sent:     Tue, 28 Jul 2020 12:28:53 -0400
Subject:  RE: Eagle - Generic Impact

Adding a 2% royalty from 2031 to 2034 would increase the NPV to just under $1.5b.

James P. Wiltshire
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
Tel: +1 646.805.5484
Cell: +1 646.769.8830
jwiltshire@jefferies.com

**From:** Michael Weiser <▮▮▮▮▮▮>
**Sent:** Tuesday, July 28, 2020 12:07 PM
**To:** James Wiltshire <jwiltshire@jefferies.com>; Timothy Rothwell <▮▮▮▮▮▮▮▮>
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** RE: Eagle - Generic Impact

I would like to focus on these two "buckets" with my edits and simplifications.  I am free to discuss.

**Bucket A (NPV of Royalty Stream)**
- Assumes $10b peak sales
  ○ 7 years to peak
  ○ 3% royalty to 2031
  ○ ~20% peak penetration

- $1.3b of NPV
  ○ If we attribute incremental $200m to other pipeline products / technology value / SNAC and other carriers / NOL's

- TOTAL: 1.5b of NPV

QUESTION: WHAT HAPPENS TO THE NPV IF WE RAISE THE ROYALTY TO 2% FROM 2031 TO 2034. (SPLIT THE DIFFERENCE BETWEEN 1% AND 3%)

**Bucket B (Litigation Premium)**
- Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)
  ○ $10.0b peak sales
  ○ 2.4 years of exclusivity lost
  ○ 85% generic erosion = $20.2b sales at risk
  ○ *9.9% = $2b*

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Monday, July 27, 2020 7:03 PM
**To:** Timothy Rothwell <▮▮▮▮▮▮>; Michael Weiser <▮▮▮▮▮▮▮▮>
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** RE: Eagle - Generic Impact

Tim, Michael – please see the revised below per your conversation with Dung…

Litigation Premium
Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)
- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b at risk *(8.4% = $2b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(7.4% = $2b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(6.5% = $2b)*
- **$10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk** *(5.9% = $2b)*

Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)
- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(14.1% = $2b)*
- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(12.4% = $2b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(11.0% = $2b)*

CONFIDENTIAL                                                          EMN-220-001769

61

989735.1

This was once again more in line with the $1.425 billion purchase price for Emisphere offered under Novo's July 17 Proposal.

140.  Despite Defendants Weiser's and Rothwell's efforts to modify Emisphere's financial projections downward to be more consistent with Novo Nordisk's July 17 Proposal, on July 29, 2020, the Special Committee rejected the July 17 Proposal.  Nonetheless, the Special Committee informed Novo Nordisk that it was prepared to continue negotiations on an acquisition of Emisphere.

141.  On August 13 and August 21, 2020, Defendant Rothwell had discussions with Novo's CEO, Lars Jørgensen, regarding Novo Nordisk's July 17 Proposal.  At the same time, Defendants Weiser and Rothwell continued to work with Jefferies to try to further adjust Emisphere's financial projections.

142.  Defendants Weiser and Rothwell exchanged emails with Jefferies on August 13, 2020 reflecting additional modifications to Emisphere's NPV.  James Wiltshire initiated this email exchange with a "new draft scenario and implied NPV" following a discussion he had with Weiser and Rothwell:

989735.1

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Thursday, August 13, 2020 1:28 PM
**To:** Timothy Rothwell ▮▮▮▮▮▮▮▮▮▮▮ Michael Weiser▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>; Jacopo Dragoni <jdragoni@jefferies.com>; Charlie Niehaus <cniehaus1@jefferies.com>
**Subject:** Eagle - Discussion Points

Tim, Michael,

As discussed please see below for the new draft scenario and implied NPV. Let us know your thoughts.

- 3% royalty to 2031, then 2% to 2034
- **Peak sales: ~$15b**
- Cumulative sales (through 2034): ~$150b
- **Royalty NPV (25% tax rate, 6% discount rate): ~$2.0b**
- Cumulative sales reached:
  - $40b: Q1 2026
  - $50b: Q4 2026
  - $60b: Q4 2027

Regards,

Jimmy

James P. Wiltshire
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
Tel: +1 646.805.5484
Cell: +1 646.769.8830
jwiltshire@jefferies.com

143.  Defendant Weiser responded shortly thereafter and suggested that Jefferies' use of $15b in peak Rybelsus sales was too high.  He also directed Jefferies to lower its quarterly cumulative Rybelsus sales figures by $10 billion for each of Q1 2026, Q4 2026, and Q4 2027.  This would result in a decrease of the cumulative Rybelsus sales figures for these quarters totaling $30 billion (*i.e.*, $150 billion to $120 billion).  These efforts by Defendants Weiser and Rothwell to adjust the Emisphere sales figures were not disclosed to shareholders.

989735.1

**From:** Michael Weiser
**Sent:** Thursday, August 13, 2020 1:42 PM
**To:** James Wiltshire <jwiltshire@jefferies.com>; Timothy Rothwell
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>; Jacopo Dragoni <jdragoni@jefferies.com>; Charlie Niehaus <cniehaus1@jefferies.com>
**Subject:** RE: Eagle - Discussion Points

[External Message]

**Peak sales: ~$15b????**

**I thought we used 10b**

**Change the gates to 30b, 40b, 50b**

**MW**

## I.    Defendants Drop the IP Dispute After Novo Makes Its "Best and Final" Offer

144.    On August 21, 2020, Mr. Jørgensen communicated to Defendant Rothwell that Novo Nordisk's purported "best and final" offer was an all-cash bid to acquire Emisphere and the MHR Royalties for $1.8 billion.

145.    Novo Nordisk reiterated its purported "best and final" offer in a written proposal to Emisphere on August 24, 2020 (the "August 24 Proposal").  Its offer letter stated that "Novo Nordisk is prepared to pay US$1.8 billion on a cash and debt free basis for 100% ownership of Emisphere and for the settlement and termination of royalty payments to MHR Fund Management LLC ('**MHR**')" (emphasis in original).

146.    The letter further stated that the revised offer was subject to, among other things, "receipt of a customary undertaking from all major shareholders, including MHR to support the [Merger], including an agreement by MHR to deliver a written consent approving the merger with respect to all Company shares held by

989735.1

MHR on a fully diluted basis[.]"  Novo Nordisk was therefore requiring Defendant Rachesky to commit his Emisphere shares in support of a merger, with which Rachesky gladly complied in exchange for the favorable tax structure he demanded for Novo's acquisition of the MHR Royalties.  *See infra* IV.K.

147.  Following the August 24 Proposal, Defendants used Emisphere financial projections (the "Management Projections") that were consistent with the $1.8 billion acquisition price offered by Novo Nordisk.  Certain components of Emisphere's Management Projections were the ***only projections disclosed to shareholders during the Class Period***.  *See infra* ¶ 196.

148.  The Management Projections used a royalty step-down date of August 2027, rather than 2034.  The Management Projections also assumed lower peak Rybelsus sales percentages for diabetes, obesity and NASH than the Case 2A and Case 2B projections, and discounted the possibility of success ("PoS") for FDA approval of Rybelsus to treat obesity and NASH.  The Management Projections did not attribute *any revenue* for FDA approved Rybelsus treatment of obesity until 2024, despite Novo's announcement that it was soon initiating Phase III obesity trials for Rybelsus, and that this market is twice as large as that for Type 2 diabetes.

149.  Notably, after Defendants received the August 24 Proposal, they stopped considering or incorporating the Emisphere-Novo Nordisk IP Dispute and its projected positive impact on Emisphere's valuation in Merger negotiations.  This

989735.1

occurred despite the fact that as late as August 17, 2020, Emisphere and its outside counsel were prepared to affirmatively bring suit in the Southern District of New York to protect the Company's patent rights. In contrast, the Management Projections did not account for the IP Dispute and assumed that a full royalty rate step-down would occur in 2027.

### J. Defendant Rachesky and the MHR Defendants Negotiate an Enormous Payout Under the Merger to the Detriment of Public Shareholders

150. During the course of their Merger negotiations with Novo Nordisk, the Special Committee simultaneously negotiated with Defendant Rachesky regarding how much of the Merger Consideration would be allocated to Rachesky and the MHR Defendants for their interest in the MHR Royalties.

151. Emisphere communicated to Novo Nordisk that the allocation of the $1.8 billion in total Merger Consideration offered under the August 24 Proposal was critical to Emisphere's determination of whether the August 24 Proposal was fair to Company stockholders. Indeed, the Special Committee acknowledged at its meeting on August 26, 2020, that its determination of whether the August 24 Proposal was "in the best interest of Emisphere and its stockholders would ultimately depend on the amount of the aggregate consideration that would be allocated to the acquisition of Emisphere," as opposed to the acquisition of the MHR Royalties.

989735.1

152.    From August 2020 through October 2020, Defendant Rachesky and the Special Committee negotiated how much of the $1.8 billion in Merger Consideration would be allocated to Rachesky and the MHR Defendants for Novo's concurrent acquisition of the MHR Royalties (*i.e.*, the 0.5% of net sales for Rybelsus and any other licensed Novo product covered by the Royalty Agreement).

153.    As detailed in the minutes of the Special Committee's August 23, 2020 meeting, the Special Committee received on August 21, 2020, "a memorandum from MHR proposing (among other things) that, on or before August 24, 2020 . . . the Committee and MHR come to an agreement regarding the allocation of the proceeds of any transaction with Novo Nordisk between [Emisphere's] capital stock, on the one hand, and MHR's direct royalty interest in *Rybelsus*, on the other hand . . ." (emphasis in original).

154.    Defendant Rachesky proposed to the Special Committee that the allocation of the total Merger Consideration for acquisition of the MHR Royalties should be based on the relative future cash flows to Emisphere and the MHR Defendants under the (i) Royalty Agreement and (ii) MHR Royalty Agreement. Based on Rachesky's methodology, the Special Committee determined that he and the MHR Defendants were proposing $531 million of the $1.8 billion in Merger Consideration for the MHR Royalties, which represented 29.5% of the total Merger Consideration.

989735.1

155.   On August 27, 2020, the Special Committee responded with a proposed payment of $357 million to Rachesky and the MHR Defendants for the MHR Royalties.  This allocation represented 19.8% of the total Merger Consideration.

156.   On September 28, 2020, Defendant Rachesky made a counterproposal to the Special Committee regarding the MHR Royalties.  He proposed an allocation of $486 million for the MHR Royalties out of the $1.8 billion in total Merger Consideration offered by Novo Nordisk.  This represented 27% of the total Merger Consideration from Novo Nordisk.

157.   On October 9, 2020, the Special Committee made a counterproposal of a $414 million allocation to Defendant Rachesky and the MHR Defendants for the MHR Royalties.  This represented 23% of the $1.8 billion in Merger Consideration offered by Novo Nordisk under the August 24 Proposal.

158.   On October 21, 2020, Defendant Rachesky proposed an allocation of $450 million for the MHR Royalties, representing 25% of the total Merger Consideration offered by Novo Nordisk under the August 24 Proposal.  Later that day, the Special Committee agreed to this lucrative allocation for Defendant Rachesky and the MHR Defendants.  Notably, Defendant Rachesky ***stopped making any demands for an increase in the overall Merger Consideration*** for Emisphere shareholders once his $450 million allocation and the unique tax structure surrounding it were agreed to.

68

159.    As noted above, Defendants also abandoned the Case 2A and Case 2B projections and any valuation of the IP Dispute in its assessment of the August 24 Proposal.  Instead, they used the Management Projections that were more consistent with Novo Nordisk's $1.8 billion acquisition price and the $450 million allocation to Defendant Rachesky and the MHR Defendants.

160.    Defendants' failure to disclose or value the IP Dispute had a direct and detrimental impact on the consideration paid to Emisphere's public shareholders under the Merger.  As detailed above, the Royalty Agreement provided for an overall reduction in royalties payable to Emisphere from 3% to 1% of all net sales of a Novo licensed product in a given country when the relevant patents for such product "*ha[ve] been solely invented by Novo Nordisk*."  *See supra* ¶ 69.  The MHR Royalty Agreement further provided that Defendant Rachesky and the MHR Defendants were entitled to 0.5% of the overall royalty stream irrespective of when or if Emisphere's royalty interest was stepped down.  *See supra* ¶ 75.

161.    Emisphere understood that pursuing and prevailing on the IP Dispute would maintain the overall 3% royalty rate (*i.e.*, 2.5% to Emisphere and 0.5% to Rachesky) until at least 2031 or beyond.  *See supra* ¶ 118.  Instead of assigning any value to the IP Dispute, Defendants accepted the position that the overall royalty stream would drop from 3% to 1% in 2027, of which 0.5% was payable to Defendant Rachesky and the MHR Defendants.  This allowed Defendants to justify the $450

989735.1

million allocation to Rachesky, which resulted in less overall consideration to Emisphere's unaffiliated public shareholders.

**K.    Defendant Rachesky Insists on a Lucrative Tax Deal With Novo That Further Diminishes The Consideration Paid to Emisphere Shareholders**

162.    At the same time that Emisphere and Novo Nordisk were negotiating the total Merger Consideration, and Defendant Rachesky and the Special Committee were negotiating the MHR Royalty allocation, Rachesky was negotiating a separate side deal with Novo Nordisk that would solely benefit him and his personal financial interests to the detriment of Emisphere's unaffiliated public shareholders.

163.    Once Novo Nordisk made its purported "best and final" offer of $1.8 billion in the August 24 Proposal, Defendant Rachesky initiated negotiations with Novo Nordisk to ensure he received favorable tax treatment for his $450 million MHR Royalty allocation.   Rachesky's efforts to structure his sale of the MHR Royalties to reap significant personal tax benefits to the detriment of Emisphere's public stockholders were never disclosed during the Class Period.

164.    Following Novo Nordisk's August 24 Proposal, Janet Yeung, an officer of the MHR Defendants, emailed Defendant Rothwell a set of talking points regarding MHR's required "structural elements" for Novo's acquisition of the MHR Royalties.   As part of these "structural elements," Ms. Yeung's August 24, 2020 email stated "MHR would [] require that any acquisition of its 50 basis points royalty

fee be effected in a certain manner." As set forth in Ms. Yeung's email, the transaction structure that Defendant Rachesky required for Novo's acquisition of his 0.5% royalty stream was as follows:

1. ***MHR's rights to the royalty fee would be purchased by a Novo entity (the "Royalty Acquiror")*** that is neither Novo Nordisk AS, the current licensee under the License Agreement with Emisphere, nor the Novo entity that would be party to the proposed merger agreement with Emisphere;

2. The Royalty Acquiror would be an entity with positive net worth and that has been in existence for at least a year; and

3. Novo would agree to keep the Royalty Acquiror in ***existence for at least a year after the closing***, and likewise would agree that Novo Nordisk AS ***would continue to pay the Royalty Acquiror the 0.5% royalty fee for at least a one year period following closing of any acquisition from MHR.***

165.   Thus, Defendant Rachesky demanded that the rights to the MHR Royalties would be purchased by a separate Novo Nordisk entity, the "Royalty Acquiror," that would remain in existence for at least a year after the Merger closed. During that period, Novo Nordisk would continue to pay the Royalty Acquiror the 0.5% royalty fee owed to Defendant Rachesky and the MHR Defendants under the MHR Royalty Agreement.

166.   The following morning, Defendant Rothwell emailed Novo Nordisk's CEO Lars Jørgensen with a verbatim recitation of the required transaction structure set forth in Ms. Yeung's August 24 email. Rothwell's August 25, 2020 email explained that "as a follow up to Karsten's [Novo CFO Karsten Knudsen] revised

71

[August 24] offer, I wanted to draw your attention to an important matter which relates to MHR and *certain structural elements that they require*."

167.  Mr. Jørgensen responded later that day and agreed that Novo Nordisk "will evaluate" the tax-related transaction structure Defendant Rachesky demanded for Novo's acquisition of his royalty stream.  Defendant Rothwell dutifully forwarded these emails to Defendant Rachesky and Ms. Yeung stating "[m]message delivered.. Tim R" to assure Rachesky that his tax savings deal structure was faithfully presented to Novo.

168.  Unbeknownst to Emisphere's public shareholders, the Special Committee and Novo Nordisk continued to negotiate the terms of Defendant Rachesky's personal tax deal for his $450 million MHR Royalty allocation.  As noted in the minutes of the Special Committee meeting on September 2, 2020, in connection with Novo's August 24 Proposal, "representatives of Novo Nordisk and representatives of MHR have discussed *the tax structure being requested by MHR in the proposed transaction* and expressed a willingness to accommodate such request, subject to further analysis."

169.  This structuring requirement was intended to provide Defendant Rachesky with significant tax savings on the $450 million allocation payable to him and the MHR Defendants for the MHR Royalties.  Because Novo Nordisk would continue to pay the MHR Royalties to a separate Novo entity for at least a year, the

989735.1

MHR Royalties would more likely be subject to a maximum long-term capital gains tax rate of only 23.8%. That is because under the structure, the MHR Royalties would be deemed to be sold or exchanged after a year – a prerequisite to long-term capital gains treatment. In contrast, a direct and immediate payment for the MHR Royalties from Novo Nordisk to Rachesky would more likely be treated as a royalty advance or a termination-of-royalty payment subject to a much higher maximum personal income tax rate of 40.8%.

170. Novo Nordisk was clearly amenable to Defendant Rachesky's tax structure for the MHR Royalties since it was not conditioned on additional merger consideration and resulted in (i) Rachesky's willingness to accept Novo's $1.8 billion "best and final" offer for the acquisition of Emisphere, and (ii) Defendants' willingness to forego the Unaffiliated Vote Condition on the Merger. *See infra* IV.L. Vice Chancellor Cook came to the same conclusion in assessing this tax transaction. Specifically, he found "it is reasonably conceivable that Rachesky caused Emisphere to ***accept a lower overall price*** to obtain Novo Nordisk's agreement to Rachesky's desired tax structuring for the sale of the Rachesky Royalty Stream." *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 34-35).

171. The transaction structure demanded by Defendant Rachesky was ultimately agreed to and memorialized in the MHR Purchase Agreement and an Assignment and Assumption Agreement between Novo Nordisk and certain of the

989735.1

MHR Defendants that together governed the sale of the MHR Royalties. The structure allowed for a significant reduction in the applicable tax rate for the $450 million allocation payable to Defendant Rachesky and the MHR Defendants for their MHR Royalties.

172. Through the transaction structure, Defendant Rachesky was able to reduce his federal tax liability on the $450 million allocation from a maximum rate of 40.8% for ordinary income to a maximum rate of 23.8% for long-term capital gains on the sale of his MHR Royalties. This represented tens of millions in tax savings for Defendant Rachesky and the MHR Defendants. By decreasing his tax burden, Defendant Rachesky increased the effective value of his $450 million allocation to approximately $526.6 million (based on a $76 million long-term capital gains tax benefit). Defendants' Class Period statements concerning Rachesky's $450 million allocation were materially misleading because they did not disclose this increase in effective value.

173. Defendant Rachesky was incentivized to require this transaction structure at the expense of negotiating for higher total consideration given his significant personal tax savings. He was also concerned about the potential negative tax consequences of then-presidential candidate Joseph Biden's proposed increase of the federal long-term capital gains tax to 39.6% on annual income of over $1 million, as well as potential changes to the tax treatment of carried interest for fund

989735.1

managers.  For example, in an email from Defendant Rachesky to MHR LLC's Chief Financial Officer prior to the 2020 presidential election, Rachesky wrote "I think MHR will be hurt by the Biden tax changes.  How much should we be worried?"  In another email to Defendant Weiser, Rachesky sent an article addressing Mr. Biden's proposed changes to the capital-gains tax and asked: "Have you seen this?  We need to discuss."

174.    Given this concern, Defendant Rachesky had a vested interest to lock-in the Merger with Novo Nordisk and his $450 million allocation for the MHR Royalties at the then-current long-term capital gains tax rate, rather than seek higher merger consideration for Emisphere shareholders and run the risk of a much higher tax rate.  In fact, Defendant Rachesky stopped demanding any increase in the overall Merger Consideration from Novo Nordisk once his tax deal was agreed to.

175.    In evaluating the same Rachesky tax structure, Vice Chancellor Cook held it was reasonable to conclude that "Rachesky was willing to accept **less total transaction consideration** in exchange for Novo Nordisk's agreement to this unique tax structuring, **to the detriment of the minority stockholders**."  *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 31).

176.    Defendants Weiser and Rothwell were also incentivized to accept this structure rather than negotiate for higher consideration given their enormous RSU packages worth $7.8 million each upon a change-in-control of the Company, and

989735.1

given Defendant Rachesky's status as Emisphere's controlling shareholder. *See supra* ¶ 91.

177.  As Vice Chancellor Cook found in reviewing the same facts, "it is reasonable to infer that Emisphere's negotiators favored obtaining the options that accrued solely to [Rachesky and the MHR Defendants] ***given their status as controllers***.  Thus, it is reasonably conceivable that the proposed transaction structure was a component of these negotiations and that it was included ***to the detriment of a higher transaction price***." *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 32).

### L.    Defendants Relinquish the Unaffiliated Vote Condition in Favor of the Merger

178.  Once Defendant Rachesky secured the enormous $450 million allocation for the MHR Royalties and the transaction structure that supported his preferred tax treatment, he and the other Defendants took steps to ensure the Emisphere shareholder vote would be in favor of the Merger as Novo required.

179.  Without any additional consideration from Novo, Defendant Rachesky and the Special Committee agreed to forego the Unaffiliated Vote Condition that required any acquisition be approved by a majority of Emisphere voting stock not owned or controlled by the MHR Defendants.  They agreed to this despite the Emisphere Board resolutions that required the Unaffiliated Vote Condition for any potential transaction involving Emisphere.

989735.1

180.  The decision to waive the Unaffiliated Vote Condition directly contradicted the March 17, 2020 Board Resolutions that explicitly acknowledged it was in the "best interests of the Company and its stockholders" and specifically mandated that "the consummation of any Potential Transaction [with Novo Nordisk or others] shall be subject to the *non-waivable* condition that the Potential Transaction receive the approval of the Special Committee and the Unaffiliated Vote" of Emisphere's public shareholders.

181.  As of December 31, 2019, Defendant Rachesky and the MHR Defendants held approximately 48% of Emisphere's outstanding common stock. Through their substantial loans to the Company as detailed above (*see supra* IV.A), Defendant Rachesky and the MHR Defendants also held enough convertible Emisphere notes to ensure a majority vote of Emisphere common stock in favor of the Merger.  Yet, Rachesky and the MHR Defendants needed to first convert certain of these notes into voting common stock in order to reach a majority vote for the Merger.

182.  Rather than do so, Defendants accelerated the vesting of the one million RSU's that had been granted to Defendants Weiser and Rothwell, respectively, in March 2020.  This allowed for these RSUs to be converted into Emisphere common stock before the November 13, 2020 record date (the "Record Date") for eligibility to vote on the Novo Nordisk Merger.  With these steps, Defendants conveniently

989735.1

held approximately 50.5% of Emisphere's outstanding common stock before the Record Date.

183.    To further ensure that the Merger would be approved and that Defendants would reap the enormous personal financial benefits from the transaction closing, Emisphere, Novo Nordisk, certain of the MHR Defendants and the Director Defendants entered into support agreements on November 5, 2020 (the "Support Agreements").   Under the Support Agreements, the MHR Defendants and the Director Defendants agreed to vote their 50.5% of the outstanding Emisphere common stock they collectively held in favor of the Merger.

## M.    Defendants Issue the Materially False and Misleading Proxy

184.    Defendants issued the Emisphere Proxy on November 16, 2020.  The Proxy, as well as Defendants' other public statements during the Class Period, misrepresented and omitted material information concerning the Merger as detailed below.

185.    Among other things, the Proxy only disclosed certain components of the Management Projections (*i.e.*, revenue, EBIT, and unlevered free cash flows) with their limited assumptions that valued Emisphere below the other internal Company projections.   The Proxy did not disclose the Case 2A and Case 2B projections for the Company, which had Emisphere NPVs of $2.673 billion and $2.935 billion, respectively – far greater than the $1.8 billion in total Merger

989735.1

Consideration offered by Novo Nordisk.  Nor did the Proxy disclose any information concerning the Emisphere-Novo Nordisk IP Dispute, and its projected positive impact on Emisphere's valuation.  The Proxy also plainly concealed the fact that the Management Projections were the result of Defendants Weiser's and Rothwell's concerted effort to revise Emisphere's valuation downward to justify the $1.8 billion in Merger Consideration offered by Novo Nordisk.

186.   On December 8, 2020, the Novo Nordisk Merger was approved and the transaction closed on the same day.  Under the Merger Agreement, Novo Nordisk paid $1.35 billion to acquire Emisphere.  Under the MHR Purchase Agreement, Novo Nordisk also paid $450 million to Defendant Rachesky and the MHR Defendants to acquire the MHR Royalties, making the total Merger price $1.8 billion.  Emisphere shareholders received $7.83 per share in Merger Consideration in exchange for their Emisphere shares.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

187.   The Class Period begins on November 6, 2020, when Defendants first announced the Emisphere-Novo Nordisk Merger, making material misrepresentations and omissions of  material facts concerning the transaction.

188.   On November 6, 2020, Emisphere issued a press release titled "Novo Nordisk to Acquire Emisphere Technologies for $1.35 Billion."  The press release touted the Meger by stating that the estimated Merger consideration of $7.82 per

Emisphere share represented "a premium of approximately 17% over the volume-weighted average share price for the five trading days ending November 5, 2020." In describing the acquisition of the MHR Royalties by Novo Nordisk, the press release also stated that "Novo Nordisk entered into an agreement to acquire the related royalty stream obligations owed to affiliates of MHR Fund Management LLC ('MHR') for $450 million. The acquisition of this royalty stream and the merger with Emisphere will occur simultaneously."

189. Defendant Rothwell further praised the Merger by stating in the press release that:

> "'After a thorough analysis of strategic alternatives, the Emisphere Board and the Special Committee unanimously determined that a combination with Novo Nordisk is the *best way to maximize value for our stockholders*.'"

190. The statements referenced in ¶¶ 188-189 above were false and misleading when made because they failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including that: (i) Defendant Rachesky manipulated the sale process to ensure he received enormous financial benefits from the Merger, including his insistence on a transaction structure that supported significant personal tax savings on the $450 million allocation for the MHR Royalties to the detriment of a higher transaction price for unaffiliated public shareholders; (ii) Emisphere had modeled internal financial projections, including the Case 2A and Case 2B projections, demonstrating

989735.1

significantly higher valuations for the Company than the $1.35 billion acquisition price presented to Emisphere shareholders; (iii) Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders; and (iv) Emisphere had been engaged in an extensive IP Dispute with Novo Nordisk that was integral to the initial Merger negotiations and implicated significant royalty payments to the Company – a key driver of Emisphere's overall financial results – yet, Defendants failed to account for its projected positive impact on Emisphere's valuation or use it as a basis to extract higher consideration for Emisphere shareholders.  Moreover, the purported premium of "17%" was materially misleading because Emisphere's stock price was artificially deflated during the Class Period by Defendants' wrongdoing as detailed herein, which overstated the premium percentage supposedly afforded to Emisphere stockholders.

191.   Emisphere issued the Proxy detailing the Merger and the background of the transaction on November 16, 2020.  The Proxy was issued by order of the Emisphere Board of Directors and signed by Defendant Rothwell as Chairman of the Board and Co-CEO of Emisphere.  The Emisphere Board also delegated the preparation of the Proxy to the Company's officers.

192.   The Proxy contained material misrepresentations concerning the Board and Special Committee's reasons for recommending the Merger.  The first page of

989735.1

the Proxy represented that "the Emisphere board, acting upon the unanimous recommendation of the Special Committee, (i) determined that the merger agreement and the transactions contemplated thereby are ***fair to and in the best interests of Emisphere stockholders***. . ." The Proxy further stated that the Special Committee recommended the Merger given, among other things, "the Special Committee's assessment of Emisphere's business, assets and prospects, its competitive position and historical and ***projected financial performance***, and the nature of the industry in which Emisphere operates[.]"

193. These statements were materially false and misleading given their wholesale omission of any reference to, or detail regarding, the more favorable Case 2A and 2B projections for Emisphere that supported a higher valuation for the Company than the Merger Consideration offered by Novo Nordisk. These statements also wholly omitted that Defendants Rothwell and Weiser worked with Jefferies to adjust Emisphere's financial projections downward to justify the Merger Consideration. Nor did these statements reference the critical IP Dispute between Emisphere and Novo, or Defendants' failure to leverage the dispute and its projected favorable impact on Emisphere's financials to obtain higher consideration during Merger negotiations with Novo. In fact, Defendants made no mention of the IP Dispute ***whatsoever*** during the Class Period.

989735.1

194. Defendants made further material misrepresentations and omissions of material facts in the Proxy concerning Emisphere's financial projections that were used to justify the purported fairness of the Merger Consideration offered to shareholders. The Proxy contained a section titled "Certain Unaudited Prospective Financial Information," that included a description of the Emisphere Management Projections, including that:

> in connection with Emisphere's evaluation of the merger, Emisphere management prepared certain unaudited prospective financial information with respect to Emisphere for calendar years 2020 through 2039 on a stand-alone basis, assuming Emisphere would continue as an independent company, and without giving effect to the merger, **which was provided by Emisphere management to the Special Committee and to the Special Committee's financial advisor, Jefferies, and approved by the Special Committee for Jefferies' use and reliance in connection with Jefferies' financial analyses and opinion to the Special Committee as described in this document under** "—Opinion of the Special Committee's Financial Advisor.". . .We refer to this information collectively as the "prospective financial information."

195. In a section titled "Opinion of the Special Committee's Financial Advisor," the Proxy included additional statements concerning the Emisphere Management Projections and their use by Jefferies in preparing its Fairness Opinion on the Merger. This included the assertion that Jefferies was advised as follows:

> the financial forecasts and estimates relating to Emisphere that Jefferies was directed to utilize for purposes of its analyses and opinion were reasonably prepared on bases **reflecting the best currently available estimates and good**

989735.1

*faith judgments of Emisphere management* as to, and *were an appropriate basis upon which to evaluate, the future financial performance of Emisphere* and the other matters covered thereby.

196.  The Proxy only included the following Management Projections:

**Summary of the Prospective Financial Information—Emisphere Stand-Alone**
*(in millions)*

| | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E | 2038E | 2039E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 16.0 | 96.8 | 92.9 | 125.9 | 153.3 | 165.6 | 175.8 | 135.6 | 39.2 | 41.4 | 43.6 | 46.0 | 48.5 | 51.2 | 54.1 | 10.4 | 5.0 | 4.4 | 4.0 | 3.7 |
| EBIT[1] | 9.4 | 90.0 | 85.9 | 118.7 | 145.9 | 158.0 | 167.9 | 127.5 | 30.9 | 32.8 | 34.7 | 36.9 | 39.1 | 41.5 | 44.1 | 8.5 | 4.1 | 3.6 | 3.3 | 3.0 |
| Unlevered free cash flow[2] | 0.0 | 77.0 | 77.0 | 110.6 | 111.1 | 115.5 | 123.4 | 105.5 | 47.0 | 24.1 | 25.5 | 27.1 | 28.7 | 30.5 | 32.4 | 16.5 | 4.3 | 2.8 | 2.5 | 2.3 |

(1) EBIT is a non-GAAP financial measure defined as earnings before interest and taxes.
(2) Unlevered free cash flow is a non-GAAP financial measure defined as EBIT less taxes and less changes in net working capital.

197.  The financial projection statements referenced in ¶¶ 194-196 above were materially false and misleading when made because they failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including that: (i) Emisphere financial projections had been modeled, including the Case 2A and Case 2B projections, that demonstrated NPVs for Emisphere that were far greater than $1.8 billion and supported higher merger consideration for shareholders; (ii) Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders; and (iii) the Management Projections did not account for and omitted any facts concerning the SNAC-related IP Dispute between Emisphere and Novo Nordisk, or to Defendants' failure to account for its

989735.1

projected positive impact on Emisphere's stated valuation or use it as a basis to extract higher consideration for Emisphere shareholders.

198.    The Proxy also included material misrepresentations concerning the MHR Purchase Agreement and the transaction which it governed.  A section of the Proxy titled "Structure of the Transaction," purported to describe the transaction under which Defendant Rachesky and the MHR Defendants would receive the $450 million allocation for Novo Nordisk's purchase of the MHR Royalties as follows:

> Subject to the terms and conditions of the MHR purchase agreement, at the closing of the MHR purchase agreement, (i) the MHR royalty parties have agreed to sell, transfer, assign and deliver to the NNAS royalty party, and the NNAS royalty party has agreed to purchase from the MHR royalty parties, all of the right, title and interest of the MHR royalty parties in, to and under the purchased assets and (ii) the MHR royalty parties have agreed to assign to the NNAS royalty party, and the NNAS royalty party has agreed to assume from the MHR royalty parties, certain liabilities associated with the purchased assets.

199.    The Proxy also made a general reference to tax issues in connection with the MHR Purchase Agreement in a section titled "Withholding," which stated that:

> Each of the parties shall be entitled to deduct and withhold from amounts payable pursuant to the MHR purchase agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign tax law.

200.    These descriptions of the MHR Royalty acquisition in ¶¶ 198-199 were materially false and misleading when made because they wholly omitted material

facts concerning the transaction, which were known to or recklessly disregarded by Defendants, including that (i) Defendant Rachesky insisted the transaction be structured to allow him to claim long-term capital gains on the $450 million allocation for the MHR Royalties; (ii) Defendant Rachesky reaped millions in savings on his personal tax liability given this transaction structure; (iii) Defendant Rachesky stopped making demands for higher consideration to Emisphere shareholders once his tax structure was agreed upon with Novo, and (iii) Defendants consented to this transaction structure at the behest of Defendant Rachesky and at the expense of negotiating for higher consideration in the Merger given Rachesky and the MHR Defendants' status as controlling shareholders of Emisphere.

201.  The Proxy's "Background of the Merger" section further omitted any details about Defendant Rachesky's insistence on a transaction structure for Novo's acquisition of the MHR Royalties for his personal tax benefit and to the detriment of higher merger consideration to Emisphere's unaffiliated public shareholders.

202.  In referencing Novo Nordisk's August 24 Proposal the Proxy stated:

> On August 24, 2020, Novo Nordisk sent to Emisphere a further revised non-binding written proposal regarding a potential transaction (which we refer to as the "August 24 proposal"). Under the August 24, 2020 proposal, Novo Nordisk would acquire Emisphere on a cash-free and debt-free basis and would acquire the MHR parties' [Defendant Rachesky and the MHR Defendants] interest in the MHR Royalty Agreement for aggregate cash consideration of $1.8 billion.

On August 25, 2020, at the request of the Special Committee, ***Mr. Rothwell communicated to Novo Nordisk that the Special Committee was considering the August 24 proposal***.

203.   The statements in ¶ 202 were materially false and misleading when made because they wholly omitted that on August 24, 2020, just after Novo Nordisk's August 24 Proposal was received, Janet Yeung, an officer at MHR, emailed Defendant Rothwell the transaction structure Defendant Rachesky required for personal tax purposes before he would agree to sell the MHR Royalties to Novo Nordisk.   They further omitted that on August 25, 2020, Defendant Rothwell emailed Novo Nordisk's CEO a verbatim copy of the tax-related transaction structure demanded by Defendant Rachesky.   Accordingly, Emisphere shareholders were entirely unaware that in his sale of the MHR Royalties to Novo Nordisk, Defendant Rachesky was requiring a personal tax benefit that was included to the detriment of a higher transaction price.

204.   The Proxy made further misstatements about the Merger negotiations and Defendant Rachesky's efforts to obtain significant personal tax benefits on his $450 million allocation in lieu of seeking higher Merger consideration for Emisphere's unaffiliated shareholders.   In describing a Special Committee meeting on September 3, 2020, that Proxy stated:

> On September 2, 2020, the Special Committee held a telephonic meeting at which representatives of WilmerHale [legal advisor to the Special Committee] were present.   At this meeting, the Special Committee further discussed the August 24 proposal ***and***

***communications between representatives of Emisphere and Novo Nordisk since receipt*** [sic] ***the August 24 proposal.***

205.   The statement in ¶ 204 was materially false and misleading because it made no reference to the fact that Defendant Rachesky and Novo Nordisk were at this time negotiating a transaction structure for Rachesky's $450 million MHR Royalty allocation to provide him with significant personal tax benefits to the ultimate detriment of a higher merger price for Emisphere's unaffiliated shareholders under Novo's August 24 Proposal.  Nor did it disclose that Novo was receptive to this tax structure to benefit Defendant Rachesky.  The statement entirely omitted, as reflected in the September 2 Special Committee meeting minutes, that in connection with Novo's August 24 Proposal, "representatives of Novo Nordisk and representatives of MHR have discussed ***the tax structure being requested by MHR in the proposed transaction*** and expressed a willingness to accommodate such request, subject to further analysis."  Emisphere shareholders were completely in the dark about Defendant Rachesky's tax deal with Novo and how it would negatively impact their per share consideration under an Emisphere-Novo merger.

206.   Emisphere announced in a press release on December 8, 2020 that the Merger had closed.  In praising the Merger, Defendant Rothwell stated in the press release that "[w]e are very pleased to reach today's milestone and know Novo Nordisk will guide Emisphere into a promising new era.  ***The Emisphere Board of***

***Directors and its Special Committee are confident that this transaction has delivered substantial value to our stockholders*."**

207.   The statement in ¶ 206 was false and misleading when made because it failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including: (i) that Defendant Rachesky manipulated the sale process to ensure he received enormous financial benefits from the Merger, including his insistence on a transaction structure that supported significant personal tax savings on the $450 million allocation for the MHR Royalties to the detriment of higher consideration for Emisphere's unaffiliated public shareholders; (ii) Emisphere financial projections had been modeled, including the Case 2A and Case 2B projections, that demonstrated NPVs for Emisphere that were far greater than $1.8 billion and supported higher Merger consideration for shareholders; (iii) that Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders; and (iv) Emisphere had been engaged in an extensive IP Dispute with Novo Nordisk that was integral to the initial Merger negotiations and implicated significant royalty payments to the Company – a key driver of Emisphere's overall financial results – yet, Defendants failed to account for its projected positive impact on Emisphere's valuation or use it as a basis to extract higher consideration for Emisphere shareholders.

989735.1

## VI.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

208.  As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Emisphere during the Class Period and detailed in Section V above were materially false and misleading.

209.  In their roles as Co-CEO's of Emisphere during the Class Period, Defendants Weiser and Rothwell directly participated in the management of Emisphere's operations and, because of their positions at Emisphere, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Emisphere's press releases and Proxy in connection with the Merger.  The Proxy was in fact signed by Defendant Rothwell as Chairman of the Board and Co-CEO of Emisphere and authorized by the Board.

210.  Additionally, as members of Emisphere's Board of Directors responsible for issuing the Proxy, each of Defendants Rachesky, Weiser, Rothwell, McInerney, and Draft also were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements contained therein and likewise possessed the power and authority to control the contents of Emisphere's Proxy in connection with the Merger.  Thus, all Defendants knowingly

90

989735.1

and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

211.   The allegations detailing Defendants' fraudulent scheme in Section IV above are incorporated in this Section by reference and provide evidence of Defendants' scienter.  In addition to those facts set forth above, the facts summarized below, viewed collectively, give rise to a strong inference that Defendants acted knowingly, or severely recklessly, when they concealed from the market the following material facts:  (i) that the IP Dispute existed, Defendants considered it a "key value driver" as it extended the amount of time during which the Company would continue to receive its 2.5% royalty stream by multiple years, and valuation of the IP Dispute was a primary focus of Merger price negotiations between Novo Nordisk and Emisphere; (ii) that resolution of the IP Dispute significantly implicated the valuation of the Company and thus the amount of consideration Emisphere's shareholders should receive in the Merger; and (iii) the existence and content of projected valuations, including the Case 2A and 2B projections, attributing substantial monetary value to Emisphere from the IP Dispute.

212.   ***Defendants recognized the significance of the IP Dispute and its substantial impact on the valuation of the Company.***  According to numerous internal documents, all Defendants – and particularly Defendants Weiser and Rothwell – not only were aware of the existence of the IP Dispute prior to the start

of the Class Period, but also clearly understood that Emisphere's intellectual property rights were a "major value driver[]" that "deserve[d] special attention" in the valuation of the Company.

213.   For instance, the Individual Defendants received the March 2020 email exchange between Weiser and Novo Nordisk discussing the IP Dispute and specifically whether the intellectual property at issue "w[as] conceived solely by Novo scientists, without any contribution from Emisphere's scientist" or not. Additionally, Defendants Weiser, Rothwell, McInerny, and Draft each were copied on, and had personally participated in drafting, an April 19, 2020 email with "FINAL Talking Points for my [*i.e.*, Weiser's] call with Novo" declaring that Emisphere considered the IP Dispute to be a "***major value driver[] in any potential deal that deserve[s] special attention***" throughout Merger negotiations with Novo Nordisk. That same email further explained there was "***universal conviction on the part of Emisphere and its directors*** around th[e] view" that Emisphere's February 20 Proposal "undervalue[ed] the company, including future royalty revenue from Novo," and that "future royalty revenues from Novo" was a "***key value driver[] to Emisphere***[.]"   In the email, these Defendants also explicitly acknowledged the materiality of the IP Dispute, stating:   "***We have spent considerable time and resources examining these [IP] issues and view them as extremely serious***."

92

989735.1

214. However, rather than disclosing the existence, seriousness, and monetary significance of the IP Dispute so that investors could sufficiently weigh all available options, Defendants abandoned the IP Dispute during the Merger negotiations and knowingly, or recklessly, concealed the true facts about the IP Dispute from investors, which is probative of scienter.

215. *Defendants knew that the Merger Consideration was remarkably lower than other contemporaneous Company valuations.* Before the Class Period commenced, each of the Individual Defendants personally was aware of projected valuations of Emisphere significantly in excess of the $1.8 billion Merger price and knew or recklessly disregarded that those higher projections were concealed from the market.

216. Indeed, Defendants Weiser, Rothwell, McInerny and Draft each were provided with and reviewed Jefferies' Case 2A and 2B projections of the Company at various times before the Class Period began and knew that those valuations were substantially higher than the eventual Merger Consideration because, among other things, they attributed monetary value to the IP Dispute and the extension of the 2.5% Royalty Stream to 2034.

217. In May 2020, for example, Rothwell and Weiser provided the Special Committee projections that included four separate valuation cases: the Evercore Case (based on projections that Novo Nordisk had created), Case 1, Case 2A, and

989735.1

Case 2B.  Internal documents show that the Evercore Case and Case 1 projections assumed a royalty step-down from 3% to 1% in June 2027, and Cases 2A and 2B assumed the step-down would occur in May 2034, *allowing Emisphere to benefit from a 2.5%, rather than a 0.5%, royalty stream for nearly seven additional years*. Accordingly, the Case 2A and 2B projections resulted in NPVs for Emisphere of $2.673 billion, $2.935 billion, respectively, which were dramatically higher than the $950 million and $1.332 billion valuations under the Evercore and Case 1 projections, as well as the $1.8 billion Merger price.

218.  Then, on July 1, 2020, Weiser received the June 2020 Project Eagle deck and an explanation from Jefferies that the 2A and 2B projections "both show[ed] a 2034 royalty switch date."  Weiser forwarded the summary to Rothwell, directing him to "[l]ook at page 3 [that set forth the detailed presentation of the Case 2A and 2B projections] for the easiest summary."  Like the valuations provided to the Special Committee in May 2020, the June 2020 Project Eagle valuations projected NPVs of $2.673 billion and $2.935 billion for the Case 2A and 2B projections, respectively.  In the end, Novo Nordisk's final offer of $1.8 billion was between *$870 million to $1.135 billion less* than the Case 2A and 2B valuations, respectively.

219.  In addition to the Jefferies valuations, internal documents further demonstrate that Defendants, and particularly Rachesky, valued the Company

989735.1

significantly in excess of the ultimate Merger price. For example, Defendants McInerney, Draft and Weiser were informed during the Special Committee meeting held on July 29, 2020 that Defendant Rachesky and the MHR Defendants "would be prepared to consider supporting a possible transaction *with a transaction value of at least $3.5 billion*." That McInerney, Draft and Weiser took this valuation seriously is evidenced by the fact that they determined this proposal should be conveyed to Novo Nordisk. After Novo Nordisk rejected the $3.5 billion offer, Defendants McInerney, Draft and Rothwell learned during the Special Committee meeting held on August 17, 2020 that Defendant Rachesky and the MHR Defendants "would support a transaction *with a transaction value of at least $2.5 billion*" and again determined that this $2.5 billion proposal should be conveyed to Novo Nordisk. Defendants decided instead to pursue a transaction that benefitted them personally at the expense of unaffiliated public shareholders.

220. Despite each having received and reviewed projected valuations for Emisphere that vastly exceeded the eventual $1.8 billion Merger price, Defendants knowingly or recklessly failed to disclose to investors the existence of those significantly higher projections, let alone attempted to explain why those markedly higher valuations were disregarded during the Merger negotiations.

221. *Defendants Weisner and Rothwell personally directed Jefferies to lower its projections.* Internal documents obtained to date clearly show that

95

Defendants Weiser and Rothwell were directly involved in the Merger negotiations despite their acknowledged conflicts, and instructed Jefferies to adjust Emisphere's financial projections downward so they would be more in line with Novo Nordisk's offers.  Indeed, Jefferies and Weiser exchanged emails on July 25, 2020 discussing three different projection scenarios, generating NPV outputs of (1) $659 million for a 2027 step-down; (2) $888 million for a 2031 step-down; and (3) $1.004 billion for a 2034 step-down.   When Jefferies subsequently provided royalty scenarios reflecting $100, $150 and $200 billion in cumulative sales, Rothwell instructed Jefferies to employ the smallest possible scenario, claiming—without support—that "[t]he 150 and 200 seem a bit hard to justify."  In addition, as the likely Merger price became clearer, Weiser and Rothwell interjected "Generic Erosion" assumptions into valuation analyses that assumed earlier patent loss for Rybelsus, causing the valuations to be adjusted downward.

222.   In August 2020, Weiser and Rothwell again caused the projected NPVs to be further reduced.  First, Weiser and Rothwell lowered the expected royalties in the out years and cut both peak sales and cumulative sales of Rybelsus, which resulted in standalone values of $1.137 billion under the "current tax system" and $824 million under "Biden's current plan."  Second, on August 13, 2020, Jefferies sent Weiser and Rothwell an email reflecting their discussions of a new draft scenario assuming a "3% royalty to 2031, then 2% to 2034," peak sales of "~$15b,"

and cumulative sales through 2034 of "~$150b," resulting in a "Royalty NPV" of "~$2.0b." Weiser immediately questioned Jefferies' use of peak sales of $15 billion, and directed Jefferies to assume peak sales of $10 billion instead and to lower the "Cumulative sales reached" assumptions by $10 billion as well.

223.   The efforts by Defendants Weisner and Rothwell to dramatically lower the projected valuation of their own Company is highly probative of scienter.

224.   ***Defendants' intentional structuring of the Merger as a freeze out transaction is highly probative of scienter.*** Defendants' about-face regarding the need for minority shareholders to approve the Merger is further evidence of scienter. On March 17, 2020, soon after Novo Nordisk's original offer, Emisphere's Board created a Special Committee to negotiate the deal in recognition of the fact that Defendants Rachesky, Weiser and Rothwell each had unique financial interests which could motivate them to negotiate a Merger price that benefited them to the detriment of Emisphere's minority shareholders and therefore were conflicted. Nevertheless, Defendants McInerney and Draft, who comprised the Special Committee, knowingly or recklessly allowed Defendants Rachesky, Weiser and Rothwell to run the sale process and negotiate directly with Novo Nordisk representatives over the Merger price and terms.

225.   Furthermore, to account for the Defendants' self-interest, during the same meeting the Board resolved that any transaction must be subject to "the non-

97

waivable condition" that the Merger receive approval from the "Unaffiliated Vote," *i.e.*, "approval by a majority of the voting power of the Company, or the tender of a majority of the shares of the company, in each case not owned or controlled by [Rachesky or the MHR Defendants]."   As the Merger negotiations proceeded, however, the Individual Defendants agreed to abandon the previously mandatory Unaffiliated Vote Condition without explanation and for zero additional consideration.

226.   Rather than give minority shareholders control over whether the Merger should be consummated, Defendants did the exact opposite.   Indeed, explicitly for the purpose of ensuring that Defendants Rachesky, Weiser and Rothwell controlled a ***majority*** of the outstanding voting shares of the Company, the Board, including each of the Individual Defendants, accelerated the vesting of one million RSUs previously granted to each of Rothwell and Weiser, thereby providing Rachesky, Weiser and Rothwell with a majority of the Company's voting shares necessary to effectuate the Merger.

227.   Defendants' intentional freeze out of minority shareholders was finalized on November 5, 2020, when Defendants Rachesky, Weiser and Rothwell executed the Support Agreements requiring them to vote their 50.5% of the outstanding common stock in favor of the Merger and guaranteeing that the deal would be approved.   The fact that the Defendants intentionally structured the

transaction in a way that precluded minority shareholders from preventing its closing indicates that the Defendants knew or recklessly disregarded that the Company was being materially undervalued and is highly probative of scienter.

228. ***Defendants Rachesky, Weiser, and Rothwell were incentivized to conceal material facts about the true valuation of the Company and to ensure a quick closing.*** Rachesky was motivated to close the Novo Nordisk deal as quickly as possible, even if that meant leaving money on the table. The Meger negotiations coincided with the 2020 presidential race. The Democratic candidate—then Vice-President Biden—promised that after the election he would increase the federal tax rate on long-term capital gains to 39.6%, almost double the 20% rate in force at the time of the Merger. Because Rachesky was focused on monetizing his investment in the near term to avoid paying 39.6% in long-term capital gains, he was incentivized to accept an offer from Novo Nordisk even if it undervalued Emisphere so he could close the deal before a potential regime change and a change in the tax structure.

229. Indeed, Emisphere's primary leverage over Novo Nordisk during the Merger negotiations was the IP Dispute. But pushing harder on the IP Dispute would take time and would certainly push the deal into the new presidential regime and could threaten the deal altogether. Using the Case 2A and 2B projections—which incorporated the value of the IP Dispute—but applying a 39.6% tax rate, Rachesky

would have potentially walked away with a net profit of $1.17 billion to $1.18 billion. If the deal closed quickly at the $1.8 billion Merger price prior to any tax changes, Rachesky would walk away with $1.11 billion. Rachesky preferred to close the deal and get his money rather than take the time to push for increased Merger consideration.

230. Significantly, Rachesky also possessed ulterior motives regarding the timing of the Company's step-down in royalty rates from 3% to 1% at the heart of the IP Dispute. Although pushing the IP Dispute would have extended the Company's right to receive 3% royalties and thus would have increased the overall Merger consideration, doing so also would have resulted in Rachesky personally receiving a substantially lower allocation for the MHR Royalties. Indeed, Rachesky was entitled to 0.5% of the royalty stream at all times irrespective of when the step-down from 3% to 1% went into effect for the Company. However, as long as Emisphere's royalty stream payment remained at 3%, Rachesky's 0.5% royalty interest entitled him to only 16.7% of the total royalty payment.

231. By contrast, once Emisphere's royalty payment stepped down to 1%, Rachesky's 0.5% royalty interest would entitle him to receive 50% of the total royalty payment. Under Emisphere's position in the IP Dispute, the 3% royalty stream would remain until 2034—meaning Rachesky was only entitled to 16.7% of the total payment for the next fourteen years. However, under Novo Nordisk's

position that the step-down occurred in 2027, Rachesky would receive 16.7% of the royalty payment for seven years, but would receive *50*% of the payment for the next seven years thereafter.  Accordingly, continuing to press the IP Dispute actually would have hurt Rachesky's chances of obtaining his desired 25% allocation. Rachesky was therefore motivated to drop the IP Dispute even though doing so resulted in a lower Merger price and push for a quick closing without further negotiation.

232.  It was Rachesky's claim that he was entitled to *half* of the royalty proceeds from 2027 onward, that allowed the Special Committee to justify the allocation of 25% of the Merger consideration, or $450 million, to him personally.

233.  Defendants Rothwell and Weiser also had their own self-interested reasons to favor the Merger over Emisphere remaining independent.  When Novo Nordisk first proposed entering into a potential transaction with Emisphere, they were merely outside directors.  Only after the proposal did they halt the search for a new CEO and step in themselves as Co-CEOs, receiving a million RSUs each. Unless they remained Co-CEOs for over four years–which they did not intend to do– the only way they would obtain their multi-million dollar payouts for those RSUs was if they saw to it that the Company was sold.  That is exactly what they did.

234.  ***Emisphere is legally responsible for the conduct of the Individual Defendants.***  Emisphere acted with scienter because the scienter of its Co-CEO's,

989735.1

Weiser and Rothwell, and its Board of Directors, including Defendants Rachesky, McInerney and Draft, is imputed to the Company that the individual Defendants spoke on behalf of and controlled.  The Individual Defendants each made and caused to be made materially false statements and omissions that misled investors, as detailed herein.

## VII.  LOSS CAUSATION

235.   During the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements as set forth above artificially depressed the price of Emisphere's common stock below the price at which Emisphere common stock would have traded absent those material misrepresentations and omissions.

236.   Had the market known the full truth about Emisphere's financial and business prospects, Emisphere's stock price would have been trading at higher prices during the Class Period reflecting the Company's true financial performance and expected growth in royalty revenue.

237.   Defendants' materially false and misleading statements and omissions of material fact operated as a fraud or deceit on Lead Plaintiffs and the Class, and induced Lead Plaintiffs and the Class to sell Emisphere shares at prices that were below the actual value of those securities, including by selling their shares into the

Merger for the inadequate Merger Consideration, and thereby caused damage to Lead Plaintiffs and the Class.  As a result of their sales of Emisphere's common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

238.   By exchanging their Emisphere common stock during the Class Period, including in the Merger, based on Defendants' material misstatements and omissions, Lead Plaintiffs and other members of the Class were deprived of their right to dissent and seek appraisal of the fair value of their Emisphere common stock under Section 262 of the Delaware General Corporation Law, among other relief, and were damaged thereby.

## VIII.  CLASS ACTION ALLEGATIONS

239.   Lead Plaintiffs bring this Action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Emisphere common stock during the Class Period.  Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Emisphere, and their families and affiliates.

240.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of the Record Date on November 13, 2020, Emisphere had 86,182,000 shares of common stock issued and

outstanding.  Upon information and belief, there are thousands of members of the Class.

241.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

i.      Whether Defendants violated the Exchange Act;

ii.     Whether Defendants misrepresented material facts;

iii.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

iv.     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

v.      Whether the price of Emisphere common stock was artificially deflated during the Class Period;

vi.     Whether Defendants' conduct caused the members of the Class to sustain damages; and

vii.    The extent of damage sustained by Class members and the appropriate measure of damages.

242.   Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

243.   Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

989735.1

244.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

245.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged false or misleading statements pled in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

246.  To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Emisphere and the other Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.

989735.1

## X.    PRESUMPTION OF RELIANCE

247.    Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose, and the omission of which rendered their Class Period statements materially misleading.  Because this action involves Defendants' failure to disclose information regarding Emisphere's business and financial projections, among other things, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

248.    In the alternative, Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Emisphere securities was open, efficient, and well developed for the following reasons, among others:

   i.    Emisphere stock met the requirements for listing, and was listed and actively traded at the time of the Merger on the Over-the-Counter Bulletin Board ("OTCBB"), an efficient and automated market for over-the-counter securities provided by the Financial Industry Regulatory Authority during the Class Period;

ii.      The price of Emisphere common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

iii.      Emisphere publicly communicated with investors via established market communication mechanisms, including through the dissemination of press releases on the national circuits of major newswire services; and

iv.      Emisphere stock had an average weekly trading volume of 5.18% during the Class Period and a closing bid-ask spread of $0.01 - $0.02, both of which reflect an efficient market.

249.   As a result of the foregoing, the market for Emisphere securities promptly digested current information regarding Emisphere from all publicly available sources and reflected such information in the price of Emisphere stock. Under these circumstances, all sellers of Emisphere common stock during the Class Period suffered similar injury through their sale of Emisphere common stock at artificially deflated prices, and the presumption of reliance applies.

250.   Accordingly, Lead Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Emisphere securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

989735.1

## COUNT I
### For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5(a)-(c)
### (Against All Defendants)

251.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

252.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to sell Emisphere securities at artificially deflated prices.

253.   Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Emisphere securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

254.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information

about the Company's financial well-being, operations, and prospects, as well as material information concerning the Merger and the MHR Purchase Agreement.

255.  During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

256.  Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to falsely misrepresent Emisphere's true financial condition and material information regarding the Merger and the MHR Purchase Agreement from the investing public and to support the artificially low prices of the Company's securities.

257.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

258.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

## COUNT II
## For Violations of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants and MHR Defendants)

259.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

260.   During the Class Period, Defendants Weiser and Rothwell acted as controlling persons of Emisphere within the meaning of Section 20(a) of the Exchange Act.

261.   By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Emisphere's day-to-day operations during the Class Period, Defendants Weiser and Rothwell had the power to, and did, control and influence the decision making of the Company and the conduct of Emisphere's business, including the wrongful conduct complained of herein.  Defendants Weiser and Rothwell were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Lead Plaintiffs allege to be materially false and misleading.  Moreover, Defendants Weiser and Rothwell had a duty to disseminate accurate and truthful information regarding Emisphere's operations, and to correct any previously issued statements that had become untrue so that the market price of Emisphere securities would be based upon truthful and accurate information.

262.   In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Weiser and Rothwell had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations alleged herein.  Defendants Weiser and Rothwell were also directly involved in providing and approving the false financial projections disseminated by Emisphere during the Class Period.  Further, as detailed above, Defendants Weiser and Rothwell had direct involvement in the presentation and/or manipulation of financial projections included within the Company's Proxy. Defendant Harkey also exercised control over Emisphere through his involvement in Merger negotiations and his authorization of the Proxy containing material misstatements and omissions of material facts.  As a result of the foregoing, these Defendants, as a group and individually, were controlling persons of Emisphere within the meaning of Section 20(a) of the Exchange Act.

263.   Defendant Rachesky and the MHR Defendants also exercised control over Emisphere as a director (Rachesky) and controlling shareholders of the Company during the Class Period.  Defendant Rachesky used his significant stock ownership in the Company to control the sale process with Novo Nordisk, including to directly negotiate with Novo on the Merger, to negotiate a $450 million allocation for himself and the MHR Defendants for Novo's concurrent acquisition of the MHR

Royalties, and to require a transaction structure for Novo's acquisition of the MHR Royalties that ensured favorable personal tax treatment on this lucrative allocation. As a member of the Board, Defendant Rachesky also authorized Emisphere's Proxy and press releases during the Class Period which contained materially false and misleading statements, as detailed herein.

264.    The Special Committee Defendants exercised control over Emisphere as Board members who were authorized to engage in Merger negotiations with Novo Nordisk and its representatives, and empowered to make recommendations to the Board about the Merger. The Special Committee Defendants further exercised control over Emisphere by recommending the Merger to the Board and authorizing Emisphere's Proxy and press releases during the Class Period which contained materially false and misleading statements, as detailed herein.

265.    As a direct and proximate cause of the Individual Defendants' wrongful conduct as set forth herein, Lead Plaintiffs and other members of the Class suffered damages in connection with their sales of Emisphere securities during the Class Period.

266.    By virtue of their positions as controlling persons of Emisphere and as a result of their own aforementioned conduct, the Individual Defendants and the MHR Defendants, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

989735.1

## XI.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows: (i) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; (ii) awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; (iii) awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this Action, including attorneys' fees and expert fees; (iv) awarding rescissory damages; and (v) awarding such equitable/injunctive or further relief as the Court may deem just and proper.

## XII.    JURY TRIAL DEMAND

Lead Plaintiffs demand a trial by jury.

Dated:  April 22, 2024    **LITE DEPALMA GREENBERG & AFANADOR, LLC**

By: */s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*

989735.1

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci
Jonathan H. Beemer (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.:  (212) 894-7200
Fax:  (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com

**SAXENA WHITE P.A.**
David J. Schwartz (*pro hac vice* forthcoming)
Marco A. Dueñas (*pro hac vice* forthcoming)
Sara DiLeo (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.:  (914) 437-8551
Fax:  (888) 631-3611
dschwartz@saxenawhite.com
mduenas@saxenawhite.com
sdileo@saxaenwhite.com
jlamet@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

989735.1