**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re Emisphere Technologies, Inc. Securities Litigation | Civil Action No.: 2:23-cv-20898 (SDW) (AME)<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

TABLE OF CONTENTS


I. INTRODUCTION .......... 3

II. JURISDICTION AND VENUE .......... 10

III. THE PARTIES .......... 10

A. Plaintiffs .......... 10

B. Defendants .......... 11

1. Emisphere .......... 11

2. Defendant Rachesky and the MHR Defendants .......... 12

3. The Director Defendants .......... 15

4. The Special Committee Defendants .......... 17

C. Relevant Non-Parties .......... 19

IV. BACKGROUND .......... 20

A. The Royalty Agreement Protects Emisphere Against Unauthorized Intellectual Property Disclosures By Novo .......... 20

B. Defendant Rachesky Uses His Control Over Emisphere to Extract a Portion of Emisphere's Royalty Stream .......... 21

C. Emisphere Notifies Novo of Its Unauthorized Disclosure of Emisphere's Intellectual Property .......... 22

D. Novo Nordisk and Emisphere Initiate Merger Negotiations in Response to Their IP Dispute .......... 29

E. Defendants Rothwell and Weiser are Appointed Co-CEOs Despite Their Conflicts .......... 31

F. The Undisclosed IP Dispute Continues To Be a Critical Component of Merger Negotiations and a "Key Value Driver" for Emisphere .......... 34

G. Emisphere's Financial Projections Are Adjusted Downward at the Behest of Defendants Weiser and Rothwell Without Shareholder Knowledge .......... 45

H. Novo Makes its "Best and Final" Offer and Defendants Use Management Projections that Do Not Account for the IP Dispute .......... 59

I. Defendant Rachesky and the MHR Defendants Negotiate an Overvalued Payout to the Detriment of Public Shareholders ... 62

J. Defendant Rachesky Insists on a Lucrative Tax Deal With Novo And Abandons Seeking Additional Consideration Paid to Emisphere Shareholders ... 68

K. Defendants Relinquish the Unaffiliated Vote Condition in Favor of the Merger ... 73

L. Defendants Issue the Materially False and Misleading Proxy ... 75

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ... 76

A. False and Misleading Statements or Omissions of Material Facts in the November 6, 2020 Merger Press Release ... 76

B. False and Misleading Statements or Omissions of Material Facts in the November 16, 2020 Definitive Proxy ... 78

1. False and Misleading Statements or Omissions of Material Facts Concerning the Fairness of the Merger ... 79

2. False and Misleading Statements or Omissions of Material Facts Concerning the Company's Financial Projections ... 81

3. False and Misleading Statements or Omissions Concerning the Diverted Royalty Allocation ... 84

4. False and Misleading Statements Concerning the MHR Purchase Agreement ... 86

5. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee's Independence ... 89

6. Material Omissions Concerning the Emisphere Co-CEO Conflicts ... 91

VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ... 92

A. Defendants Concealed the Existence of the IP Dispute Despite Knowing it Had a Substantial Impact on Emisphere's Valuation ... 93

B. Defendants Knew the Merger Consideration Was Considerably Lower than Other Contemporaneous Company Valuations ... 95

C. Defendants Weisner and Rothwell Personally Directed Jefferies to Lower its Emisphere Financial Projections ... 98

D. Rachesky and the Special Committee Defendants Knew Jefferies' Valuation of the Diverted Royalties Was Far Lower than $450 Million .............. 99

E. Defendants Rachesky, Weiser, and Rothwell Were Incentivized to Conceal Material Facts About Emisphere's True Valuation to Ensure a Quick Closing .............................................................................................. 100

F. Defendant McInerney Was Incentivized to Approve the Unfair Merger and Rachesky Allocation .................................................................................. 102

G. Defendants' Intentional Structuring of the Merger as a Freeze Out Transaction is Highly Probative of Scienter ...................................................... 103

H. Defendants Were Motivated to Misstate and Omit Material Facts to Avoid an Injunction of the Merger .................................................................... 105

I. The Knowing or Reckless Conduct of the Individual Defendants is Imputed to Emisphere .............................................................................................. 106

VII. LOSS CAUSATION .............................................................................................. 106

VIII. CLASS ACTION ALLEGATIONS ........................................................................ 108

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .......................... 110

X. PRESUMPTION OF RELIANCE ........................................................................... 110

COUNT I For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5(a)-(c) (Against All Defendants) ............................................................................... 112

COUNT II For Violations of Section 20(a) Of The Exchange Act (Against the Individual Defendants and MHR Defendants) ................................................................... 114

XI. PRAYER FOR RELIEF .......................................................................................... 116

XII. JURY TRIAL DEMAND ....................................................................................... 117

Court-appointed Lead Plaintiffs, SM Merger/Arbitrage, LP, Associated Capital Group, Inc. ODS Capital LLC, The Hilary L. Shane Revocable Trust, Hilary L. Shane ("Lead Plaintiffs") and additional Plaintiff Dann Griffiths ("Mr. Griffiths," and together with Lead Plaintiffs, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action (the "Action") on behalf of a class (the "Class") consisting of themselves and other investors that sold shares of the publicly traded common stock of Emisphere Technologies, Inc. ("Emisphere" or the "Company") from November 6, 2020, the announcement date of the merger ("Merger") of Emisphere and Novo Nordisk A/S ("Novo Nordisk" or "Novo"), through the closing of the Merger on December 8, 2020, including investors that sold their shares of Emisphere common stock into the Merger on December 8, 2020, and were damaged as a result of Defendants' wrongdoing alleged herein (the "Class Period").

The subject securities claims are brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c) against (i) Emisphere, (ii) Emisphere's controlling shareholder and member of the Company's Board of Directors (the "Board"), Mark H. Rachesky and his affiliated investment entities (the "MHR Defendants" defined further below), (iii) Emisphere's Co-Chief Executive Officers and Board members Michael Weiser and Timothy Rothwell, as well as Board member John Harkey (together with Defendant Rachesky, the "Director Defendants") and (iv) Emisphere Board and Special Committee members Timothy McInerney and Howard Draft (the "Special Committee Defendants" and together with Emisphere, the Director Defendants, and the MHR Defendants, the "Defendants").

Plaintiffs' claims are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of:

(i) Internal Emisphere documents and other discovery materials produced to Lead Plaintiffs pursuant to challenges to confidential treatment filed under Delaware Chancery Rule 5.1 in the case captioned *In re Emisphere Technologies, Inc. Stockholders Litigation*, C.A. No. 2021-0025-NAC (Del. Ch.) (the "Delaware Chancery Court Action"), and confidentiality agreements executed among Lead Plaintiffs and Defendants;

(ii) Emisphere's public statements concerning the Merger made during the Class Period, including in the Proxy Statement ("Proxy") issued and distributed to Emisphere shareholders on November 16, 2020 in connection with the Merger;

(iii) Media reports concerning Emisphere and its business operations, financial results and the Merger;

(iv) Data reflecting the price of Emisphere's common stock;

(v) Consultation with financial experts;

(vi) The documents cited in Vice Chancellor Nathan A. Cook's decision of August 2, 2023 regarding certain Defendants' partial motions to dismiss in the Delaware Chancery Court Action that were subsequently obtained by Lead Plaintiffs pursuant to Delaware Chancery Rule 5.1; and

(vii) Other public material and data concerning the Company and the other Defendants.

The investigation of Plaintiffs' counsel into the factual allegations contained herein is ongoing, and many of the relevant facts are known only by Defendants, or are exclusively within Defendants' custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I. INTRODUCTION

1. This securities class action seeks compensation for the economic injury to Emisphere's unaffiliated shareholders caused by Defendants' false statements and concealment of material facts concerning Novo Nordisk's acquisition of Emisphere at a price of $7.83 per share (the "Merger Consideration"). Defendants' material misstatements and omissions were part of a fraudulent scheme to artificially deflate the price of Emisphere common stock during the Class Period in order to ensure the $1.8 billion Merger would be consummated and enormous personal payouts would be received by Emisphere's 70% controlling shareholder and Board member Mark Rachesky, as well as the Company's Co-CEO's Michael Weiser and Timothey Rothwell.

2. During the Class Period, Emisphere's unaffiliated shareholders sold their Company common stock and exchanged their shares in the Merger while being deprived of a fully informed vote on the transaction given at least the following misstatements and omissions of material facts by Defendants:

- Emisphere and the Individual Defendants repeatedly characterized the Merger as being "***fair to and in the best interests of***"[1] Company shareholders based in part on financial projections (the "Management Projections") that purportedly "***were an appropriate basis upon which to evaluate, the future financial performance of Emisphere***";

- The Board and Special Committee had unanimously determined the Merger was the "***best way to maximize value for our stockholders***" given, among other things, "the Special Committee's assessment of Emisphere's . . . historical and ***projected financial performance***";

- That the Management Projections presented in the Proxy were "***the best currently available estimates and good faith judgments of Emisphere management*** . . .";

- Defendant Rachesky's $450 million personal allocation of the $1.8 billion Merger price "***was fair, in light of the relative value[] of the MHR royalty parties' royalty interest***. . ."; and

[1] All emphasis herein is added unless otherwise noted.

- The Special Committee was "comprised ***entirely of independent and disinterested members of the Emisphere board***" who did "not have material interests in the merger different from, or in addition to, those of Emisphere and its stockholders generally."

Defendants had no good faith basis to believe any of these statements were true given undisclosed material facts that wholly contradicted their assertions about the Merger.

3. *First*, the Special Committee's financial advisors at Jefferies L.L.C. ("Jefferies") calculated undisclosed Emisphere net present values ("NPVs") that were as much as ***$1.135 billion greater*** than the $1.8 billion Merger price. Jefferies calculated these Emisphere NPVs based upon two separate sets of financial projections (the "Case 2A" and "Case 2B" projections) that were concealed from public investors, but reported privately to Defendants and showed Emisphere NPVs of ***$2.673 billion and $2.935 billion***, respectively. The material difference in these Company valuations wholly contradicted Defendants' assertion that the Merger was "fair" and that the lower Management Projections cited in the Proxy were the "best currently available estimates" of Emisphere's financial performance.

4. *Second*, Emisphere and Novo Nordisk had been embroiled in an undisclosed patent dispute since 2019 that materially impacted Emisphere's valuation. The dispute involved Novo's unauthorized publication of Emisphere's drug delivery technology, as well as a dispute concerning Emisphere's co-inventorship of three drug patents used in Rybelsus—Novo's "wonder drug" for Type 2 diabetes that is expected to generate billions in revenue over the next decade (together, the "IP Dispute" or "Dispute"). Unbeknownst to shareholders, Novo offered to "settle" the IP Dispute by purchasing Emisphere, given the Dispute's dramatic impact on the royalties payable by Novo to Emisphere for its drug carriers (the "Royalty Stream"). Indeed, Defendants explicitly noted that Emisphere's intellectual property rights at issue in the IP Dispute were a "***major value driver***[] in any potential deal that deserve[d] special attention in [the companies' Merger] discussions."

5. Defendants strongly believed they would prevail on the undisclosed IP Dispute, which would result in higher royalty rates for Emisphere through 2031 and possibly 2034—equating to billions in additional proceeds for the Company. This message was conveyed to Novo by Defendant Rothwell during the course of Merger negotiations. In a July 2020 call to discuss the IP Dispute with Novo' Chief Executive Officer, Rothwell stated he "***believe[d] strongly that we are right***" on the IP Dispute given his "expertise in th[e] area" as a patent lawyer. Rothwell further stated that "it is clear to me that we have a good chance to prevail on" Emisphere's patent claims against Novo, "which will entitle us to ***additional royalties through 2031 at the very least***. . . ." Emisphere management also internally determined the Company had a "***high likelihood***" of success in the IP Dispute that would extend the higher Royalty Stream to Emisphere "***until something like 2031 or beyond***."

6. Understanding the importance of the IP Dispute to Emisphere's valuation and the Merger negotiations, Defendants took concrete, yet undisclosed, steps to protect Emisphere's intellectual property rights. This included (i) the retention of three prominent law firms to pursue the IP Dispute on Emisphere's behalf, (ii) execution of a legal fee-sharing agreement between Emisphere and Defendant Rachesky to cover outside counsel costs in connection with the IP Dispute, (iii) numerous meetings and communications between Defendants' outside counsel and senior Novo management to communicate the strength of Defendants' position in the IP Dispute, (iv) the execution and repeated extension of a tolling agreement between Defendants and Novo to allow time for a negotiated resolution of the IP Dispute through a merger, and (v) the drafting of a formal complaint by Emisphere's outside counsel, that was "***ready to be filed at a moment's notice***" as Defendant Rothwell warned Novo's CEO.

7. Despite taking these actions to pursue the IP Dispute for over a year and expressly recognizing that the Dispute implicated significant additional royalty revenue for Emisphere, Defendants authorized publication of the Proxy that made no reference to the IP Dispute whatsoever, let alone its material impact on Emisphere's true value. This glaring omission of the IP Dispute prevented Emisphere's unaffiliated shareholders from understanding its importance to Merger negotiations and how the Company was valued in such negotiations.

8. *Third*, Defendants' statements about the Management Projections were false and misleading because they omitted the material fact that they were manipulated downward by Emisphere's Co-CEOs to make them more closely aligned with Novo's Merger price—and in a manner inconsistent with Emisphere's position in the IP Dispute. Undisclosed internal Company documents reflect that in July and August 2020, Weiser and Rothwell directed Jefferies to lower core elements of Emisphere's revenue stream to yield an artificially deflated valuation of the Company. These manipulations by Weiser and Rothwell collectively ***cut over $1.13 billion*** off of Emisphere's NPV from the Case 2A and 2B projections. Weiser and Rothwell were motivated to do so in order to ensure the Merger would close and they would receive lucrative change-in-control benefits valued at over $8 million each. None of Weiser and Rothwell's manipulations were disclosed to unaffiliated Emisphere shareholders.

9. Instead, the Management Projections presented in the Proxy assigned no value to the IP Dispute and had Emisphere's higher royalty rate only extending to 2027. This was reflected in a set of "Management Forecasts" confirmed by Defendant Rothwell in October 2020 that defined Emisphere's royalty rate as "***2.5% through August 30, 2027, 0.5% thereafter***." In contrast, the undisclosed Case 2A and 2B projections accounted for the IP Dispute and the resulting extension of Emisphere's 2.5% Royalty Stream through 2034.

10. *Fourth*, in a series of undisclosed presentations sent to and discussed with the Special Committee Defendants in August 2020, Jefferies calculated a $223 million NPV for the Novo royalties paid to Defendant Rachesky and the MHR Defendants under an earlier self-interested transaction to divert a portion of the Company's Royalty Stream to themselves (the "Diverted Royalties" or "Diverted Royalty"). Defendant Rachesky was ultimately paid $450 million for the Diverted Royalties, ***or $227 million more*** than the NPV Jefferies had determined it was worth. This substantial overpayment directly diminished the per share Merger Consideration paid to Emisphere shareholders because Rachesky's $450 million allocation came out of the $1.8 billion Merger price. Neither Jefferies' valuation of the Diverted Royalties, nor the fact that Defendant Rachesky was overpaid for the Diverted Royalties was ever disclosed to unaffiliated shareholders.

11. *Fifth*, Defendants failed to disclose that Defendant Rachesky insisted on a transaction structure for the $450 million allocation that was also detrimental to Emisphere's unaffiliated shareholders. Unbeknownst to these shareholders, Rachesky privately demanded a complex transaction structure for Novo's concurrent acquisition of the Diverted Royalties to ensure he could claim a substantially lower long-term capital gains tax on the $450 million allocation (*i.e.*, a maximum federal capital gains tax rate of 23.8% as opposed to a personal income tax rate as high as 40.8%). By decreasing his tax burden through this transaction structure, Rachesky further increased the overall effective value of the $450 million allocation to approximately $526.6 million (based on a $76 million long-term federal capital gains tax benefit).

12. Rachesky struck this tax deal at the expense of negotiating higher total Merger Consideration for the benefit of Emisphere's minority shareholders. Indeed, Defendant Rachesky stopped making demands for an increase in Novo's Merger price once the $450 million allocation

and tax-related transaction structure was agreed to with Novo. None of these details on Defendant Rachesky's motivation behind the transaction structure, or its negative impact on minority shareholders was disclosed in Defendants' positive statements about the Merger.

13. Unaffiliated shareholders ultimately received only $405 million under the Merger (*i.e.*, $1.8 billion - $450 Diverted Royalty allocation = $1.35 billion x 30% of Emisphere held by unaffiliated shareholders = $405 million). Based on Jefferies' unadulterated Case 2A and 2B valuations, unaffiliated shareholders should have received as much as $801 million and $880 million under the Merger (*i.e.*, Case 2A ($2.673 billion x 30% = $801 million) and Case 2B ($2.935 billion x 30% = $880 million). In total, the failure to disclose Jefferies' higher Company valuations, meant the Class was unaware it was giving up as much as $396 million to $475 million in value they would have received had Novo's Merger price been consistent with Jefferies' higher NPV valuations (*i.e.*, Case 2A ($801 million - $405 million = $396 million) and Case 2B ($880 million - $405 million = $475 million).

14. In contrast, Rachesky and the MHR Defendants received $1.395 billion under the Merger as 70% shareholders of Emisphere ($450 million Diverted Royalty allocation + $945 million (70% x $1.35 billion paid to all shareholders = $945 million)). Under the Merger as structured, it is now clear that Emisphere's shareholders paid Rachesky and the MHR Defendants at least $227 million more than they should have based on Jefferies' undisclosed valuation of $223 million for the Diverted Royalties. The result was that unbeknownst to unaffiliated shareholders, Rachesky and the MHR Defendants ultimately received $303 million more in Diverted Royalty and tax benefits than they should have (*i.e.*, the $227 million overpayment for the Diverted Royalties + $76 million tax benefit). Of this amount, $227 million was deducted from the $1.8 billion Merger price and paid to Rachesky and the MHR Defendants to the detriment of the Class.

Thus, while Rachesky and the MHR Defendants may have taken less per share than Emisphere's actual value based on Jefferies' Case 2A and 2B NPVs, they received an enhanced immediate payout on the Diverted Royalties to the detriment of Plaintiffs and the Class.

15. *Finally*, the two-member Special Committee was not "independent" or "disinterested" as Defendants represented. In fact, the Special Committee Chairman, Defendant McInerney, was severely conflicted given his extensive personal and business ties to Defendants Weiser and Rachesky—Emisphere's Co-CEO and controlling shareholder, respectively.

16. This included McInerney's undisclosed efforts to obtain substantial investments from both Weiser and Rachesky in a separate biopharmaceutical company co-founded by McInerney, Corino Therapeutics, Inc., ("Corino") ***at the same time*** he was deciding whether to approve the Merger that would result in the overvalued $450 million allocation to Rachesky and over $8 million in change-in-control compensation to Weiser. The disabling conflict presented by this apparent *quid pro quo* for McInerney was never disclosed to unaffiliated shareholders.

17. Collectively, Defendants' materially false and misleading statements and omissions of material facts concerning the Merger artificially deflated the Company's stock price during the Class Period, causing the price of Emisphere common stock to fall as low as $7.50 per share on November 10, 2020. As a result of Defendants' wrongdoing, Plaintiffs and other Class members have suffered substantial financial losses by selling Emisphere common stock at artificially deflated prices during the Class Period, including by selling their Emisphere shares into the Merger on December 8, 2020 for the inadequate Merger Consideration of $7.83 per share. Plaintiffs and other Class members were also deprived of their right to dissent and seek appraisal of the fair value of their Emisphere common stock instead of selling their shares at artificially deflated prices and accepting the undervalued Merger Consideration.

18. Through this Class Action, Plaintiffs and the Class seek to hold Defendants liable for their material misrepresentations and omissions of material facts and to recover damages for the harm unaffiliated stockholders incurred as a result thereof.

## II. JURISDICTION AND VENUE

19. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). At all relevant times, Emisphere was headquartered in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District during the Class Period.

21. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. THE PARTIES

### A. Plaintiffs

22. SM Merger/Arbitrage, LP ("SM Merger/Arbitrage") is a private hedge fund overseen by its investment manager, S. Muoio & Co. LLC. SM Merger/Arbitrage's principal place of business is located at 509 Madison Avenue, New York, NY.

23. Associated Capital Group, Inc. ("Associated Capital") is a private hedge fund overseen by its investment manager, S. Muoio & Co. LLC. Associated Capital's principal place of business is located at 191 Mason Street, Greenwich, CT.

24. ODS Capital LLC ("ODS Capital") is a Florida limited liability company based in Jupiter, Florida that runs a family office managed by Hilary L. Shane as the owner and managing member of ODS Capital.

25. The Hilary L. Shane Revocable Trust (the "HLS Trust") is based in Jupiter, Florida. Hilary L. Shane is the Trustee of the HLS Trust, which she formed to manage her assets and investments.

26. Hilary L. Shane is a resident of Jupiter, Florida who serves as the Trustee of the HLS Trust, and as the Owner and Managing Member of ODS Capital.

27. Dann Griffiths is a resident of Zambia and was an individual shareholder of Emisphere. Mr. Griffiths sold a significant amount of Emisphere shares during the Class Period and suffered damages as a result of the misconduct alleged herein.

28. Collectively, SM Merger/Arbitrage, Associated Capital, ODS Capital, the HLS Trust, Hilary L. Shane, and Dann Griffiths are Plaintiffs in this Action. As set forth in the attached certifications, Plaintiffs sold Emisphere stock during the Class Period and were damaged thereby.

**B. Defendants**

**1. Emisphere**

29. Emisphere is a Delaware corporation with its principal place of business located at 4 Becker Farm Road, Roseland, NJ. Emisphere is a pharmaceutical and drug delivery company that develops proprietary technologies for oral formulations of therapeutic agents. Emisphere collaborated with Novo Nordisk on the oral delivery of the Type 2 diabetes drug Rybelsus using Emisphere's proprietary SNAC drug delivery technology (defined below). At the time of the Merger, Emisphere was controlled by Defendant Rachesky and the affiliated MHR Defendants (defined further below). During the Class Period, Emisphere common stock traded on the Over-the-Counter Bulletin Board maintained by the Financial Industry Regulatory Authority under the

stock symbol "EMIS." Emisphere continues to exist as a wholly owned subsidiary of Novo Nordisk. As of the announcement of the Merger on November 6, 2020, Emisphere had approximately 170.9 million fully diluted shares of common stock outstanding. Emisphere issued the Class Period press release and Proxy containing the materially false and misleading statements alleged herein.

**2. Defendant Rachesky and the MHR Defendants**

30. Defendant Mark H. Rachesky is the founder and President of MHR Fund Management LLC and held a controlling interest in the MHR Defendants (defined below), a series of affiliated investment funds that held Emisphere common stock at the time of the Merger. Rachesky was appointed by MHR Fund Management LLC to the Emisphere Board in October 2005. At the time the Merger closed, Rachesky and his investment funds owned approximately 70% of Emisphere's outstanding common stock. As a Board member and controlling shareholder, Rachesky ordered and approved Emisphere's Proxy and press release during the Class Period, which contained materially false and misleading statements, as detailed herein.

31. Defendant Rachesky was a self-interested party to the Merger. In December 2016, Rachesky, as the Company's controlling shareholder, changed the Company's initial royalty agreement with Novo Nordisk in a wholly self-interested transaction to extract a 0.5% royalty interest on all net sales of Novo's licensed products that used Emisphere's drug delivery technology, including Rybelsus (defined above as the "Diverted Royalties"). Emisphere was allocated 2.5% of such sales by Novo. This change allowed Rachesky to allocate a portion of Emisphere's Royalty Stream directly to himself and the MHR Defendants. Novo purchased both Emisphere's 2.5% royalty interest and Rachesky's 0.5% royalty interest under the Merger.

32. Defendant Rachesky was motivated to cash out his controlling stock holdings in Emisphere, as well as the Diverted Royalties, on a present basis. The immediate and up-front

payment he received under the Merger was more important to Rachesky than realizing the maximum available net present value for unaffiliated shareholders. Defendant Rachesky accomplished this by negotiating a much higher payment for the Diverted Royalties for himself (*i.e.*, $450 million, plus an additional tax benefit of approximately $76 million on the Diverted Royalty allocation v. $223 million under Jefferies' NPV for the Diverted Royalties).

33. Rachesky founded and controlled each of the MHR Defendants listed below. MHR Fund Management LLC ("MHR LLC") is a Delaware private equity investment manager founded by Defendant Rachesky in 1996 with a principal place of business located at 1345 Avenue of the Americas, New York, NY. MHR LLC has over $5 billion in assets under management for the series of private equity investment funds listed below. MHR LLC has an investment management agreement with MHR Master Account, MHR 100, MHR II LP, and MHR IIA LP (all defined below) that gives MHR LLC the power to vote and dispose of the securities held for the account of each of these entities.

34. MHR Holdings, LLC ("MHR Holdings") is a Delaware limited liability company with a principal place of business located at 1345 Avenue of the Americas, New York, NY. MHR Holdings is the managing member of MHR LLC and controls MHR LLC's investment activities. Defendant Rachesky had a 75% ownership interest in MHR Holdings at the time of the Merger.

35. MHR Capital Partners Master Account LP ("MHR Master Account") is a limited partnership organized in Anguilla, British West Indies with a principal place of business located at 40 West 57th Street, New York, NY.

36. MHR Capital Partners (100) LP ("MHR 100") is a Delaware limited partnership with a principal place of business located at 1345 Avenue of the Americas, New York, NY. MHR

100 was a beneficial owner of Emisphere securities during the Class Period and was also a lender to Emisphere.

37. MHR Institutional Partners II LP ("MHR II LP") is a Delaware limited partnership with a principal place of business located at 1345 Avenue of the Americas, New York, NY. MHR II LP was a beneficial owner of Emisphere securities during the Class Period and was also a lender to Emisphere.

38. MHR Institutional Partners IIA LP ("MHR IIA LP") is a Delaware limited partnership with a principal place of business located at 1345 Avenue of the Americas, New York, NY. MHR IIA LP was a beneficial owner of Emisphere securities during the Class Period and was also a lender to Emisphere.

39. MHR Advisors LLC ("MHR Advisors") is a Delaware limited liability company and general partner of MHR Master Account and MHR 100 with a principal place of business located at 590 Madison Avenue, New York, NY.

40. MHRC LLC ("MHRC") is a Delaware limited liability company and general partner of MHR Advisors with a principal place of business located at 40 West 57th Street, New York, NY.

41. MHR Institutional Advisors II LLC ("MHR II") is a Delaware limited liability company and general partner of MHR II LP and MHR IIA LP with a principal place of business located at 40 West 57th Street, New York, NY.

42. MHRC II LLC ("MHRC II") is a Delaware limited liability company and managing member of MHR II with a principal place of business located at 40 West 57th Street, New York, NY. Defendants MHR LLC, MHR Holdings, MHR Master Account, MHR 100, MHR II LP,

MHR IIA LP, MHR Advisors, MHRC, MHR II and MHRC II are collectively referred to herein as the "MHR Defendants."

43. Defendant Rachesky and the MHR Defendants acted collectively to exercise control over Emisphere, including in connection with the sale process and the material misstatements issued by Emisphere and the Individual Defendants (defined below) during the Class Period.

### 3. The Director Defendants

44. Defendant Michael Weiser was appointed by MHR Fund Management LLC to the Emisphere Board in 2005 along with Rachesky. In March 2020, Weiser was named Co-CEO of Emisphere. At the time the Merger was announced, Defendant Weiser held Emisphere restricted stock units ("RSUs") with an estimated value of approximately $7.8 million, and unvested Emisphere stock options with an estimated value of $235,866. As detailed below, Weiser and Defendant Rothwell worked with Jefferies to adjust Emisphere's financial projections downward in connection with the Merger. As a Board member and Co-CEO of Emisphere, Weiser also authorized and ordered the issuance of the Proxy and press release that contained materially false and misleading statements concerning the Merger.

45. Defendant Weiser was a conflicted member of the Board given his extensive personal and business connections with Defendant Rachesky. Since 2006, Weiser and Rachesky have had an ongoing investment partnership in the biotechnology investment company Actin Biomed LLC, ("Actin"). As Rachesky testified in the Delaware Chancery Action, he made "seven to fifteen [] investments in Actin . . . over time as the company needed money for different investments we made." *In re Emisphere Stockholders Litigation*, C.A. No. 2021-0025-JRS (Del. Ch.) (Nov. 13, 2024 Rachesky Depo. Tr. at 16:12-17:3). Rachesky estimated that through the

MHR Defendants, he invested a total of $40 million in Actin and realized a 4x return on his Actin investment over time. *Id*. at 17:8-21.

46. The Actin investment partnership between Rachesky and Weiser is a continuing one, with Rachesky testifying that they "talk all the time about what investments to make, how to make the investments we made better." *Id*. at 19:8-18. Accordingly, Defendants Rachesky and Weiser were actively investing together in Actin while the Emisphere-Novo Merger negotiations were in process. Rachesky indicated that his Actin investment partnership with Weiser led to him appointing Weiser to Emisphere's Board in 2005. *Id*. at 20:23-22:4.

47. Aside from their active business engagements together, Defendants Weiser and Rachesky have a close personal friendship. Weiser testified in the Delaware Chancery Action that he and Rachesky routinely socialize together, including attending the wedding and bat mitzvah of Rachesky's daughter, the bar mitzvah of Rachesky's son, Rachesky's 65th birthday celebration, the funeral of Rachesky's mother, and periodically attending professional sports games together. *Id*. (Sept. 26, 2024 Weiser Depo. Tr. at 87-90). At his deposition in the Delaware Chancery Action, Defendant Rachesky confirmed these close social interactions with Weiser. *Id*. (Nov. 13, 2024 Rachesky Depo. Tr. at 23:2-3).

48. Defendant Timothy Rothwell was appointed to the Emisphere Board on November 5, 2009, and became Board Chairman in 2012. In March 2020, Rothwell was named Co-CEO of Emisphere along with Defendant Weiser. At the time the Merger was announced, Rothwell held Emisphere RSUs with an estimated value of approximately $7.8 million, and unvested Emisphere stock options with an estimated value of $235,866. Defendant Rothwell and Weiser worked with Jefferies to adjust Emisphere's financial projections downward in connection with the Merger. Defendant Rothwell signed the Proxy and authorized its issuance as a Board member and Co-CEO

of Emisphere. He also made materially false and misleading statements concerning the Merger in Emisphere's November 6, 2020 press release as detailed below.

49. John Harkey was appointed to the Emisphere Board by Defendant Rachesky in 2006. Harkey was a business associate and friend of Defendant Rachesky, and served as an investment advisor to Rachesky's MHR investment entities. Harkey attended Stanford Business School with Defendant Rachesky and they have remained close personal friends since meeting there in 1985. Aside from Emisphere, Harkey was nominated by Rachesky to sit on the board of directors of Loral Space & Communications, Inc., Leap Wireless International, Inc. and Lions Gate Entertainment. Rachesky has also invested in Cracken LLP, a law firm that Defendant Harkey has an ownership interest in. As an Emisphere Board member, Defendant Harkey authorized and ordered the issuance of the Proxy. Defendant Harkey, together with Defendants Rachesky, Weiser and Rothwell are defined herein as the "Director Defendants."

**4. The Special Committee Defendants**

50. Defendant Timothy McInerney was elected to the Emisphere Board on March 1, 2012. McInerney was appointed Chairman of the Special Committee of the Emisphere Board on March 17, 2020, which was nominally formed to evaluate the Merger with Novo Nordisk. Defendant Rachesky controlled McInerney's appointment to the Emisphere Board through his control over a majority of the Emisphere stock that voted for directors at the time of his election.

51. Defendant McInerney was not an "independent and disinterested" member of the Special Committee as stated in Emisphere's November 6, 2020 press release and Proxy. Defendant McInerney had a personal and business relationship for over 20 years with Emisphere's Co-CEO, Defendant Weiser. McInerney also solicited multi-million dollar investments from Weiser and Rachesky in a biopharmaceutical company that McInerney co-founded, Corino, ***at the***

***same time*** McInerney was evaluating the Emisphere-Novo Merger and the overvalued $450 allocation paid to Rachesky for the Diverted Royalties.

52. For example, in an email between Defendants Weiser and McInerney with the subject "Corino Sub docs" sent on July 24, 2020, Weiser assured McInerney that he would speak to Rachesky that day or over the weekend to discuss Rachesky's possible investment in Corino. Later, on December 4, 2020, Defendant McInerney exchanged emails with another investor in Corino, Peter Barber, and provided him with an ***update*** on McInerney's investment solicitation of Defendant Rachesky. McInerney told Barber that he "[s]poke with Rachesky yesterday, he is willing to put $$ into both this round and the RTO [reverse take-over] subject to his lawyer's consent." In his deposition testimony taken in the Delaware Chancery Court Action, Defendant Rachesky acknowledged that his statements were meant to specifically lead McInerney to believe that an investment were forthcoming even though Rachesky had no such intention of actually providing Corino with cash. Thus, Rachesky wanted McInerney to believe that Rachesky would invest in Corino while McInerney was evaluating the Merger and Rachesky's allocation for the Diverted Royalties.

53. Because McInerney knew that both Weiser and Rachesky stood to receive enormous financial windfalls under the Merger, he was incentivized to recommend and approve the transaction so that Rachesky and Weiser would, in turn, invest millions in Corino. None of McInerney's conflicts were disclosed to Emisphere shareholders. As an Emisphere Board member, Defendant McInerney authorized and ordered the issuance of the Proxy.

54. Defendant Howard Draft was appointed to the Emisphere Board on October 3, 2019, and was appointed to the Special Committee on March 17, 2020. Defendant Rachesky

controlled a majority of the Emisphere Board at the time of Draft's appointment. As an Emisphere Board member, Defendant Draft authorized and ordered the issuance of the Proxy.

55. Defendants McInerney and Draft are defined herein as the "Special Committee Defendants." Among other things, the Special Committee Defendants recommended that the Board approve the Merger, opined that it was the "*[b]est alternative for [m]aximizing [s]tockholder [v]alue*" (emphasis in original) given Emisphere's "***projected financial performance***," and that the $450 million allocation paid to Defendant Rachesky was "fair." The Special Committee Defendants caused those material misstatements to be included in the Proxy despite knowing omitted facts contradicting each assertion.

56. The Director Defendants and Special Committee Defendants are collectively referred to herein as the "Individual Defendants" and, together with Emisphere and the MHR Defendants, the "Defendants."

**C. Relevant Non-Parties**

57. Non-party Novo Nordisk is a Danish company with its principal executive offices located at Novo Allé 1, DK-2880, Bagsvaerd, Denmark. Novo Nordisk is a global healthcare company focused on diabetes care and treatment, including the manufacturing of insulin and GLP-1 receptor agonists, a class of medications used to treat Type 2 diabetes. Novo Nordisk also develops treatments for obesity, hemophilia, non-alcoholic fatty liver disease ("NASH"), and cardiovascular disease, among other chronic conditions.

58. Jefferies is a Delaware limited liability company with a principal place of business located at 520 Madison Avenue, New York, N.Y. that served as the financial advisor to the Special Committee of Emisphere's Board in connection with the Merger. Jefferies issued a fairness opinion on the Merger (the "Fairness Opinion"), which was incorporated into the Proxy.

## IV. BACKGROUND

### A. The Royalty Agreement Protects Emisphere Against Unauthorized Intellectual Property Disclosures By Novo

59. On June 21, 2008, Emisphere and Novo Nordisk entered into a Development and License Agreement (the "Royalty Agreement") in connection with the development of oral formulations of Novo's Type 2 diabetes drugs. This partnership allowed Novo to use Emisphere's proprietary Eligen® drug delivery technology, including the drug carrier known as monosodium N-[8-(2-hydroxybenzolyl) amino] caprylate ("SNAC"). Novo used Emisphere's SNAC drug carrier for the oral administration of Rybelsus, Novo's blockbuster Type 2 diabetes drug. Rybelsus was approved for Type 2 diabetes management in the United States and European Union in 2019 and 2020, respectively. Under the Royalty Agreement, this entitled Emisphere to receive milestone payments and a 3% royalty on Novo's net sales of products that used SNAC.

60. The Royalty Agreement also contained strict prohibitions against the disclosure of confidential proprietary information concerning the products licensed under it (Section 11.1 – Confidentiality). This included a prohibition against Novo's or Emisphere's publication of any material containing the other party's confidential information without first giving that party an opportunity to review, comment on and propose modifications "for purposes of removing Confidential Information" from the publication (Section 11.4 – Publications).

61. Emisphere had the right to terminate the Royalty Agreement if Novo materially breached the Agreement and failed to (i) cure its breach or (ii) present a plan to cure such breach that was acceptable to Emisphere within 60 days of Emisphere providing written notice of the breach (Section 12.5 – Termination for Material Breach). In addition, Section 12.6 of the Royalty Agreement (Effect of Termination) explicitly provided that upon a termination of the Agreement by Emisphere for a material breach pursuant to Section 12.5, "the licenses granted by Emisphere

under [the Royalty Agreement] shall ***automatically terminate and revert back to Emisphere*** . . ." These provisions gave Emisphere significant contractual leverage to reclaim its drug carrier technology in the event of a material breach of the Royalty Agreement by Novo Nordisk.

**B. Defendant Rachesky Uses His Control Over Emisphere to Extract a Portion of Emisphere's Royalty Stream**

62. On December 8, 2016, the Royalty Agreement was amended at the direction of Defendant Rachesky and the MHR Defendants in a wholly self-interest transaction to extract a portion of the Emisphere Royalty Stream for their benefit (the "Diverted Royalty Agreement"). Certain of Defendant Rachesky's investment funds, *i.e.*, MHR Master Account, MHR 100, MHR II LP and MHR IIA LP were parties to the Diverted Royalty Agreement. The amendment also revised the 3% royalty rate payable to Emisphere by allocating 2.5% to Emisphere on all net sales of Novo's licensed products that used Emisphere's drug delivery technology, including Rybelsus. Defendant Rachesky's MHR Master Account, MHR 100, MHR II LP and MHR IIA LP were together allocated the remaining 0.5% on such net sales by Novo Nordisk (defined above as the "Diverted Royalties").

63. The Diverted Royalty Agreement further revised the royalty rate for net sales of licensed products that used patents invented by Novo Nordisk alone. Specifically, Section 3.5(c) of the Royalty Agreement was amended to allocate 0.5% of net sales on such products to Emisphere and 0.5% of net sales to Rachesky and the MHR Defendants, for a total of 1%, when the relevant patents for such products "***ha[ve] been solely invented by Novo Nordisk***."

64. Thus, Rachesky and the MHR Defendants would receive 0.5% of the net sales ***regardless*** of whether Novo Nordisk claimed sole inventorship and the Royalty Stream stepped-down. Emisphere, on the other hand, would receive 2.5% of net sales when Emisphere was credited with inventorship, but only 0.5% of net sales when Novo Nordisk claimed sole

inventorship. Accordingly, of the full 3% royalty payable when Emisphere was credited with inventorship, Emisphere received 83.3% and Rachesky received 16.7%. And, when Novo Nordisk claimed sole inventorship, Rachesky and Emisphere split the royalty payment 50-50. This royalty step-down provision would have a material impact on Emisphere's valuation under the Merger when the IP Dispute between the companies arose in 2018.

### C. Emisphere Notifies Novo of Its Unauthorized Disclosure of Emisphere's Intellectual Property

65. In November 2018, Emisphere became aware of an article published by Novo Nordisk in the Science Translational Medicine journal (the "STM Article") that contained unauthorized disclosures of Emisphere's SNAC drug carrier technology. On November 20, 2018, Defendant Weiser forwarded the STM Article to Emisphere's then-CEO Alan Rubino and Defendant Rothwell, stating that he was "VERY CONCERNED" about the article's disclosure of Emisphere's SNAC-related intellectual property. Weiser further stated that "SNAC belongs to EMIS shareholders. It was NOT sold to NOVO," and that his review of the STM Article "suggests that there is potentially patentable subject matter on SNAC contained in this publication which has now been placed in the public domain without the boards consent."

66. In his email, Weiser also asked Rubino a series of questions about the article and Emisphere's patents in an effort to respond to Novo's apparent breach of the confidentiality provisions in the Royalty Agreement. On November 27, 2018, Defendant Weiser emailed Messrs. Rubino and Rothwell to follow-up on the intellectual property issues raised by the STM Article, stating "[t]his is not going to go away." Weiser further informed Rubino and Rothwell that "MHR [*i.e.*, Defendant Rachesky] is aware and they are NOT happy." Reiterating his prior conclusions about the STM Article, Defendant Weiser also stated that "I still ***strongly believe*** that there is patentable material in this publication on SNAC alone."

67. Novo initially acknowledged fault for the unauthorized disclosure of Emisphere's intellectual property in the STM Article. In a March 11, 2019 email, a Novo representative admitted to Emisphere that it "discovered . . . that Novo Nordisk in one instance [] failed to get your input to one publication in Science Translational Medicine." In other communications with Emisphere, Novo apologized for the STM Article, stating it was "very sorry to hear about the mistake we did by not sending the [STM] manuscript to Emisphere for approval." Novo further apologized "for not having secured the agreed pre-approval from Emisphere as we recognize this is an obligation under our agreement. . ." These admissions by Novo supported Emisphere's position and strengthened the Company's claim in the IP Dispute.

68. In response, Emisphere notified Novo Nordisk in April 2019 that it believed Novo had materially breached the Royalty Agreement. Specifically, on April 26, 2019, Defendant Rothwell sent a detailed email to Novo Nordisk's Chief Executive Officer, Lars Jørgensen setting forth the precise scientific bases for Emisphere's conclusion that Novo had disclosed confidential information concerning the SNAC technology and how it operated. Demonstrating the gravity of the issue, Defendant Rothwell informed Novo's CEO that the "***issue has risen to the Board level at Emisphere***, and we believe that is the appropriate venue for engagement on our end."

69. Defendant Rothwell's April 26 email further asserted that:

> [t]he unauthorized disclosure of Emisphere Confidential Information relating to SNAC's method of action has ***significant economic implications***. Among other things, the technical discoveries concerning SNAC disclosed in the [STM] article may have formed the basis for new Intellectual Property or other commercial opportunities that could have allowed Emisphere shareholders to continue to extend and reap the benefits of the discovery of SNAC and related compounds.

Rothwell concluded by reserving all rights and asked for dates to schedule a "senior-level meeting between our organizations to discuss options for a path forward." Tellingly, Defendant Rothwell's email included the signature block of Andrew Berdon, an intellectual property partner at the law

firm of Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel") who represented Emisphere in connection with the IP Dispute. Mr. Berdon likely helped draft the email to Mr. Jørgensen and his early engagement demonstrated that Emisphere was preparing to litigate Novo's intellectual property breach from the STM Article. Quinn Emanuel would later be formally retained by the Board.

70. As reflected in Defendant Rothwell's April 26 email, Emisphere viewed the STM Article's disclosure of proprietary information concerning SNAC to be a significant threat to the ongoing financial prospects of the Company and its shareholders. Emisphere viewed the STM Article as violating Sections 11.1 (Confidentiality) and 11.4 (Publications) of the Royalty Agreement. *See supra* ¶ 60.

71. Defendant Rothwell reiterated his concerns about the STM Article in subsequent telephone and email communications with Novo's CEO. Once again, Rothwell specifically alerted Mr. Jørgensen that "confidential information relating to SNAC alone remains exclusively Emisphere's property." He again warned that the disclosed proprietary information concerning SNAC represented "***significant commercial value*** both to Emisphere and potential competitors who are trying to use SNAC in conjunction with other peptides." Given Novo's violation of the confidentiality provisions of the Royalty Agreement, Defendant Rothwell also asserted that "a traditional 'cure' is impossible as the referenced information is now available to the public and cannot be undone."

72. In a subsequent series of emails and letters between Defendant Rothwell and Mr. Jørgensen in May and June 2019, Novo Nordisk denied any breach of the Royalty Agreement. On May 10, 2019, Mr. Jørgensen responded to Emisphere's contention that the STM Article violated the confidentiality provisions of the Royalty Agreement. Mr. Jørgensen's principal arguments

were that the SNAC-related information in the STM Article had been previously disclosed in publications and regulatory approvals that Emisphere consented to, and that the disclosures were insufficient to allow competitors to apply the SNAC technology to other drug therapies.

73. Defendant Rothwell disputed both assertions in a letter to Mr. Jørgensen on June 6, 2019. Rothwell's letter asserted that the STM Article's disclosures had broad application for competitors and could be used in a wide range of drug formulations. Specifically, Rothwell noted that that the "[STM] Article Itself Teaches that Its Disclosures Are Broadly Applicable." He further noted the STM Article acknowledged that "the findings reconceptualize the tenets of peptide absorption after oral administration ***and establish a new generalized strategy*** for successful delivery of therapeutic peptides via the oral route." Rothwell also wrote that the STM Article stated Emisphere's findings "represent a ***paradigm shift in our fundamental understanding of peptide absorption*** . . . and a clinically transformative advancement for treatment possibilities for diabetes and/or other chronic diseases by transforming injectable therapies to tablet-based oral medicines."

74. In response to the escalation of the IP Dispute with Novo Nordisk, the Emisphere Board held a meeting on June 18, 2019 to address the formal retention of outside counsel to protect the Company's interests. All of the Individual Defendants were present with the exception of Defendant Draft, who was not on the Board at this time. Also present was Andrew Berdon of Quinn Emanuel, as well as Janet Yeung who was in-house counsel for the MHR Defendants.

75. As Board Chairman, Defendant Rothwell asked Mr. Berdon to make a presentation to the Board about Novo Nordisk's potential breach of the confidentiality provisions in the Royalty Agreement. The minutes of the June 18 meeting reflect that the Board also discussed retaining the law firm of Morgan Lewis & Bockius LLP ("Morgan Lewis") "in connection with a review of the

Company's intellectual property portfolio." Demonstrating the significance of the IP Dispute on Emisphere's financials, the Board decided at the meeting, through formal resolutions, to approve:

- The retention of Quinn Emanuel to represent Emisphere "in connection with the dispute with Novo Nordisk";
- The retention of Morgan Lewis to represent Emisphere in connection with its overall intellectual property matters, including a review of the Company's IP portfolio; and
- The establishment of an "ad hoc special committee [] of the Board, consisting of Messrs. Rothwell and Weiser, for the purpose of manag[ing] all matters regarding, or relating or incidental to, the dispute with Novo Nordisk," including "filing a lawsuit or arbitration claim" concerning the IP Dispute.

Defendants were preparing for formal litigation with Novo and engaged additional outside counsel at Morgan Lewis to ensure Emisphere's other intellectual property rights were fully protected.

76. Novo Nordisk subsequently reiterated its stance on the IP Dispute during a telephone call between Defendant Rothwell and Novo Nordisk's Chief Financial Officer, Karsten Knudsen, on or about July 10, 2019. In an email sent later that same day, Mr. Knudsen acknowledged that Emisphere owned the intellectual property "arising from work performed under the license agreement solely related to SNAC[,]" but argued Novo owned the intellectual property "relating to formulations of semaglutide with SNAC[,]" such as Rybelsus. Mr. Knudsen's email suggested that Novo Nordisk intended to assert "sole inventorship" of the delivery technology disclosed in the STM Article, *i.e.*, "formulations of semaglutide with SNAC."

77. As noted above, Section 3.5(c) of the Royalty Agreement allowed Novo to reduce total royalty rates to Emisphere from 2.5% to 0.5% if Novo Nordisk could claim "sole inventorship" over the drug delivery technology addressed in the STM Article, while leaving the Diverted Royalties of 0.5% to Rachesky and the MHR Defendants intact. This step-down in royalty rate would obviously represent a significant reduction in royalties to Emisphere, and by extension a reduction in the overall valuation of the Company.

78. During the week of September 2, 2019, Defendant Rothwell spoke with Novo's CEO Lars Jørgensen about a revised royalty rate based on the IP Dispute. Although Jørgensen rejected any discussion on a revised royalty rate, he did indicate Novo Nordisk's desire to "settle" the IP Dispute by acquiring Emisphere.

79. In an email sent by Defendant Rothwell to Mr. Jørgensen on September 10, 2019, Rothwell stated that "Emisphere is willing to discuss a resolution along the lines that you proposed – one that would involve the purchase of Emisphere itself or its SNAC assets and intellectual property," provided the companies could agree on an accurate valuation for Emisphere. Rothwell further informed Mr. Jørgensen that "[i]n the interim, Emisphere will be transmitting a notice of breach to preserve its rights while we pursue these discussions" on a transaction. As evidenced by these communications between Rothwell and Novo's CEO, the IP Dispute was so material that it served as the impetus for the Merger, yet was never disclosed by Defendants.

80. Defendant Weiser sent a letter to Novo on September 16, 2019, providing notice of a material breach of the Royalty Agreement. As a remedy for the asserted breach, Defendant Weiser renewed a proposed "upward adjustment of the royalty rate payable under Section 3.5 of the Royalty Agreement" and demanded that Novo Nordisk cure the breach within 60 days as set forth in Section 12.5 of the Royalty Agreement governing material breaches of the Agreement.

81. On October 2, 2019, Novo Nordisk's Senior Vice President and Group General Counsel Global, Tomas Haagen, sent a letter to Defendant Weiser denying any breach by Novo of the Royalty Agreement. Among other things, Mr. Haagen argued that the STM Article only addressed Novo Nordisk discoveries.

82. Despite this dispute, Mr. Haagen indicated that Emisphere could provide Novo Nordisk with an assessment of damages suffered as a result of the alleged breach, and proposed

that Emisphere apply for patent protection over the allegedly confidential information disclosed in the STM Article, a process in which Novo said it would cooperate.

83. Recognizing that the IP Dispute with Novo was heading toward formal litigation, the Emisphere Board met on October 3, 2019 to address a legal fee-sharing arrangement with Rachesky and the MHR Defendants. At this meeting, the Director Defendants and Defendant McInerney unanimously approved a fee-sharing agreement with Rachesky and the MHR Defendants under which, "Emisphere would be responsible for 83% and MHR would be responsible for 17% of the costs incurred including legal fees payable to Quinn Emanuel." The division was based on their respective share of the 3% royalty interest payable by Novo under the Royalty Agreement (*i.e.*, 2.5% payable to Emisphere and a constant 0.5% royalty rate to Rachesky and the MHR Defendants, *see supra* ¶¶ 63-64). This undisclosed legal fee-sharing agreement underscores how Defendants truly valued the Diverted Royalties extracted by Rachesky and the MHR Defendants.

84. On October 18, 2019, Novo's General Counsel, Tomas Haagen, reiterated his proposals to address the IP Dispute with Emisphere in a follow-up email that included a "plan for cure" under Section 12.5 of the Royalty Agreement. He further proposed a litigation standstill between Novo Nordisk and Emisphere.

85. In a letter dated October 21, 2019, Emisphere's outside counsel at Quinn Emanuel disputed Mr. Haagen's contentions regarding the STM Article and Royalty Agreement. Nonetheless, Emisphere agreed to a litigation standstill with Novo Nordisk on November 14, 2019, which was extended several times during the Merger negotiations between the two companies.

### D. Novo Nordisk and Emisphere Initiate Merger Negotiations in Response to Their IP Dispute

86. The IP Dispute served to initiate merger discussions between Novo Nordisk and Emisphere. On November 15, 2019, one day after execution of the litigation standstill agreement, Mr. Knudsen (Novo's CFO) requested a meeting with Defendant Rothwell to discuss a potential merger. The next day, Mr. Haagen, spoke to Andrew Berdon, the Quinn Emanuel attorney representing Emisphere, about scheduling "a face to face meeting to discuss a potential acquisition of Emisphere by Novo Nordisk."

87. Emisphere eventually agreed to meet on February 20, 2020, but demanded that the SNAC-related IP Dispute be a part of any transaction negotiations. The meeting occurred at the New York offices of Emisphere's outside intellectual property counsel at Quinn Emanuel. Attendees included Defendant Weiser, Andrew Berdon of Quinn Emanual, Defendant McInerney, Board member John Harkey, Messrs. Haagen and Knudsen of Novo Nordisk, and a representative of Evercore Group L.L.C. ("Evercore"), Novo's financial advisor on the Merger. At this meeting, Mr. Knudsen made an initial offer to acquire Emisphere, as well as the Diverted Royalties to be paid to Defendant Rachesky and the MHR Defendants for $950 million (the "February 20 Proposal"). Defendant Weiser also discussed "the inventorship issue" at the February 20 meeting with the senior Novo Nordisk executives.

88. Following their meeting, Mr. Knudsen sent Defendant Rothwell a non-binding offer letter on February 20, 2020. The offer letter specified that "Novo Nordisk is prepared to offer US $950 million on a cash and debt free basis for 100% ownership of [Emisphere] and for the settlement and termination of the [Diverted Royalties]." Novo Nordisk also provided Emisphere with a document titled "Project Emily" containing Novo's "Key Modelling Assumptions and Considerations" and Emisphere royalty rate projections for Novo's Rybelsus

sales. Novo's modelling assumed Emisphere's 3% royalty rate would only apply until 2027, as opposed to 2031 or 2034. *See infra* ¶ 139.

89. On February 24, 2020, the Board held a telephonic meeting with all of the Individual Defendants present to discuss Novo Nordisk's February 20 Proposal to acquire Emisphere for $950 million. At the meeting, Defendant Weiser updated the Board on the "status of the negotiations with Novo Nordisk in connection with the pending dispute with Novo over Rebelsus [sic]." This included an update on the February 20 meeting at Quinn Emanuel. Reflecting the fact that Novo's February 20 Proposal was an effort to settle the IP Dispute, the Board minutes stated that Weiser "further advised the Board on the initial ***settlement proposal*** made by Novo in connection with the dispute." The Board decided to establish the Special Committee at this meeting.

90. The Board formally approved the formation of the Special Committee at a meeting on March 4, 2020 with all Individual Defendants present. At the meeting, the Board unanimously approved the selection of Defendants McInerney and Draft to the Special Committee, with McInerney serving as Chairman. On March 17, 2020, the Board approved and adopted formal resolutions establishing the Special Committee. The Board acknowledged that a Special Committee was necessary given that negotiations with Novo Nordisk would involve the Diverted Royalty Agreement that directly benefitted Defendant Rachesky and the MHR Defendants. As noted above, McInerney's appointment as Chairman of the two-member Special Committee was highly problematic given his extensive personal and business ties to Defendants Weiser and Rachesky (*see supra* Section III.B.4).

91. Additionally, the Emisphere Board decided that consummation of any transaction with Novo Nordisk or others required approval by a majority of the Emisphere voting stock not

owned or controlled by the MHR Defendants or Novo Nordisk (the "Unaffiliated Vote Condition").

### E. Defendants Rothwell and Weiser are Appointed Co-CEOs Despite Their Conflicts

92. Less than three weeks after Novo's initial acquisition offer on February 20, 2020, Defendants Weiser and Rothwell were appointed as Emisphere's Co-CEO's at an Emisphere Board meeting on March 11, 2020. Defendants Harkey, McInerney, Rachesky and Draft were present at the meeting. Like his extensive connections to McInerney, Weiser had close personal and business ties to Defendant Rachesky that made him a conflicted executive of the Company (*see supra* Section III.B.3).

93. Defendants Weiser and Rothwell took their Co-CEO positions despite the fact that both were members of an Emisphere subcommittee established in September 2019 to find a new CEO for the Company. Their appointment was a *fait accompli* given their close ties to Defendant Rachesky, who controlled both the Emisphere Board and the lucrative compensation awarded to Weiser and Rothwell for their short-lived term as Company executives. In fact, Defendants Weiser and Rothwell were in discussions with Rachesky and the MHR Defendants on their lucrative Co-CEO compensation even before being appointed.

94. On August 8, 2019, counsel at the law firm of Kelley Drye & Warren LLP sent Defendant Rothwell and Janet Yeung, in-house counsel for the MHR Defendants, a copy of the separation agreement for Emisphere's out-going CEO, Alan Rubino. Later that day, Defendant Rothwell forwarded Mr. Rubino's separation agreement to Defendant Weiser stating "I think we are done on this one." Reflecting their expected appointment as Co-CEOs and Defendant Rachesky's control over their executive compensation, Rothwell also asked Weiser "[h]ow is Tim M[cInerney] doing with our new compensation. ***I think you and I need to talk to Mark***

***[Rachesky] about this***." Defendants Rothwell and Weiser plainly understood that Rachesky controlled the purse-strings for their Co-CEO compensation.

95. Defendants Weiser and Rothwell were both rewarded handsomely by Rachesky and the remainder of the Board for their new Co-CEO appointments. In addition to lucrative base compensation packages for their new positions, Weiser and Rothwell also each received one million RSUs from Emisphere pursuant to an "RSU Agreement" with the Company. The terms of their RSU Agreement were negotiated with Janet Yeung of the MHR Defendants among others—further demonstrating Rothwell and Weiser's conflicted relationship with Rachesky and the MHR Defendants.

96. For example, on February 18, 2020, Ms. Yeung received a draft of the RSU Agreement from counsel at Lowenstein Sandler LLP with a message that the RSU vesting terms "closely follow the structure in the summary that was passed along to us." This presumably referenced the RSU compensation structure provided by Ms. Yeung at the direction of Rachesky and the MHR Defendants. Ms. Yeung remained on this email chain with Defendants Rothwell and Weiser and was invited to join discussions with Lowenstein on their RSU compensation.

97. Significantly, the RSUs would accelerate and provide Weiser and Rothwell $7.8 million each upon a change-in-control of Emisphere and were a multiple over their base salaries. Defendants Weiser and Rothwell also held unvested stock options at the time of the Merger that would fully vest under a transaction with Novo Nordisk to extent the stock options were "in the money" at the time of such transaction.

98. The personal compensation Defendants Weiser and Rothwell received as a result of the Merger is set forth below:

| Defendant | RSU Payments | Unvested Stock Option Payments | Total Stock-Based Compensation Under Merger |
|---|---|---|---|
| Rothwell | $7,820,000 | $235,866 | $8,055,866 |
| Weiser | $7,820,000 | $235,866 | $8,055,866 |

These lucrative payouts through the RSUs and unvested stock options were paid out after only a year-and-a-half of work as Co-CEOs and clearly incentivized Defendants Weiser and Rothwell to promote a sale of Emisphere.

99. In fact, both Weiser and Rothwell always anticipated that Novo would acquire Emisphere and took steps to ensure this outcome. As far back as 2017, Defendants Rothwell and Weiser rejected the prospect of obtaining third-party financing for Emisphere in favor of a future sale to Novo.

100. For example, in an August 29, 2017 email to Defendant Rothwell, Emisphere's then-CEO, Alan Rubino, proposed a potential buy-out of the Company's Novo royalty stream by Toronto-based private equity firm DRI Capital. Rubino's email attached a formal presentation from DRI and told Rothwell that he had "discussed the possibility of [DRI] making an offer to monetize the royalty stream of the Novo deal." In response, Rothwell rejected the idea given his and Weiser's ultimate objective to sell Emisphere to Novo. Reflecting their position, Rothwell reminded Mr. Rubino about his "conversation today with Michael [Weiser] when he said ***we will all become rich when Novo buys us***." Their early plan to enrich themselves came to fruition once Rothwell and Weiser were appointed Co-CEOs and worked to ensure a sale to Novo.

**F. The Undisclosed IP Dispute Continues To Be a Critical Component of Merger Negotiations and a "Key Value Driver" for Emisphere**

101. During the ongoing Merger negotiations from late winter through the summer of 2020, Emisphere and Novo Nordisk continued to engage in discussions concerning the IP Dispute that was triggered by the STM Article. During this period, the IP Dispute evolved to focus on whether Emisphere and Novo Nordisk were "co-inventors" of three patents used for the development of Rybelsus, rather than a focus on the disclosures in the STM Article alone.

102. In a series of emails, telephone calls and meetings between February 2020 and July 2020 among Emisphere, Novo Nordisk and their respective outside legal counsel, the parties disputed whether they should be considered "co-inventors" of certain patents for drug carrier technologies, including SNAC and its use in Novo's Rybelsus product. As noted, the co-inventorship issue had major ramifications on the aggregate amount of royalties owed to Emisphere under the Royalty Agreement and hence, on the determination of Emisphere's net present valuation.

103. As noted above, representatives of Emisphere and Novo met on February 20, 2020 at Quinn Emanuel's New York office to discuss the growing co-inventorship issues between the companies (*see supra* ¶ 87). Novo Nordisk also made its initial February 20 Offer to acquire Emisphere for $950 million at this meeting. Mr. Berdon of Quinn Emanuel, who was present at the meeting, sent a detailed email to Novo's General Counsel (Tomas Haagen) and CFO (Karsten Knudsen) on March 4, 2020 setting forth Emisphere's position on the co-inventorship issue. The Special Committee Defendants were copied on this email.

104. Mr. Berdon's email identified an "inventorship issue" with respect to "U.S. Patent Nos. 9,278,123, 10,086,047, and 10,278,923" that were "listed in the FDA Orange Book for Rybelsus®." The "Orange Book" is a colloquial name for the comprehensive list of drug products

and their related patents that have been approved by the FDA for public use. In his email, Mr. Berdon asserted that "[a]t a minimum, Emisphere scientists substantially contributed to the claims of the patents reciting oral dosage forms, specifying the amount of SNAC in, and the disintegration rate of, Emisphere's tablet formulation (Rybelsus®)." Berdon further asserted that Novo violated U.S. patent law in "failing to name Emisphere as co-inventors" of these patents.

105. Mr. Berdon expressly tied the patent co-inventorship issue to the royalty rates payable to Emisphere under the Royalty Agreement. He asserted that co-inventorship on the above patents meant the 3% royalty rate to be paid to Emisphere and Rachesky would ***not*** step down to 1% in 2027. Instead, Mr. Berdon argued that under the Royalty Agreement, "Emisphere's co-inventorship of these patents entitles Emisphere and MHR [Rachesky], collectively, to a royalty rate of 3% with respect to Rybelsus® ***through at least their expiry in 2034***."

106. This later royalty step-down date would result in five times more revenue for Emisphere (*i.e.*, 2.5% instead of 0.5%) for seven more years (*i.e.*, 2034 instead of 2027). The Special Committee Defendants, who were copied on the March 4 email, recognized this significant financial impact that the co-inventorship issue would have on Emisphere and pushed to extend the 3% royalty rate to 2034 as reflected in Mr. Berdon's email to Novo's General Counsel.

107. In an email from Novo Nordisk's CFO Karsten Knudsen to Defendant Weiser dated March 9, 2020, Novo disputed Emisphere's co-inventorship claim. Mr. Knudsen's email stated that "we can find no basis for your claim that an Emisphere employee should have been a co-inventor on Novo Nordisk patents." Mr. Knudsen further listed the three U.S. patent numbers for which Emisphere asserted co-inventorship and noted that they concerned "claim compositions specific to the compound semaglutide" and "a method for treating diabetes and/or obesity." As noted above, Mr. Knudsen previously stated to Emisphere that Novo Nordisk owned the

intellectual property of "formulations of semaglutide with SNAC" such as Rybelsus, as opposed to the intellectual property "solely related to SNAC[,]" which Novo conceded was owned by Emisphere.

108. Andrew Berdon at Quinn Emanuel challenged Novo's position in an email response to Mr. Knudsen on March 16, 2020. Mr. Berdon's email stated that:

> Candidly, I am puzzled by [your response], given the lack of any explanation of your conclusion and our investigation and review of contemporaneous documents reflecting Emisphere's research and its collaboration with Novo Nordisk. What information and documents from [Novo's investigation] led you to conclude that the solid oral compositions, amounts of SNAC, and disintegration rates used and claimed in the patents. . .were conceived solely by Novo scientists, without any contribution by Emisphere scientists?

Mr. Berdon also requested that Novo Nordisk provide the information and documents Novo reviewed to reach its conclusion on the co-inventorship issue "so we may understand and consider your position."

109. On March 17, 2020, Mr. Knudsen responded by reiterating Novo's position that it had not infringed on any Emisphere patents. His email refused to provide Emisphere with any documentary support for Novo's stance and simply reasserted that:

> As stated in our e-mail of 9 March, we have found no evidence to support a claim that Emisphere has contributed in any significant way to the inventions in the claims of these patents, and we are not prepared to engage in lengthy discovery discussions trying to prove the negative.

Mr. Knudsen further encouraged Defendant Weiser to carefully consider Novo Nordisk's February 20 Proposal to acquire Emisphere and the Diverted Royalties for $950 million, which Novo "believe[d] would be attractive to Emisphere taking into account the fundamental valuation of the company."

110. The Special Committee Defendants remained apprised of the status of the IP Dispute given its direct impact on the Company's valuation in the context of broader Merger

discussions with Novo Nordisk. At a meeting on April 8, 2020, the Special Committee was provided with "***proposed negotiation guidelines***" ***concerning "the ongoing intellectual property dispute***" between the companies. Upon considering those negotiation guidelines, Defendants determined to reject Novo's February 20 Proposal on April 13, 2020.

111. On April 16, 2020, David Berl, one of Emisphere's patent attorneys at the law firm of Williams & Connolly LLP ("Willams & Connolly") that was retained by Defendants in connection with the IP Dispute, emailed Mr. Knudsen to contest Novo Nordisk's claims. Mr. Berl stated that Emisphere:

> [W]ent above and beyond its contractual obligations to provide Novo with broad access to its expertise and experience regarding carrier technology in general and SNAC in particular. That partnership between Emisphere and Novo, including Emisphere's invention of formulations containing SNAC and semaglutide with desirable bioavailability and dissolution properties resulted in the Rybelsus product that Novo has brought to its patients . . . [a]s noted in my previous email, contemporaneous documents, ***including those drafted by Novo's own employees who participated in the partnership, recognize the contributions that Emisphere made to the inventions disclosed and claimed in the patents***.

Mr. Haagen responded to Mr. Berl in an email the next day and stated that Novo Nordisk was "prepared to have a video meeting with you to discuss the co-inventorship issue."

112. Defendants continued to emphasize the importance of the IP Dispute in the merger negotiations with Novo Nordisk given its material impact on Emisphere's valuation and the royalties payable under the Royalty Agreement.

113. For example, in an April 19, 2020 internal Company email with "FINAL Talking Points" for a transaction-related call with Novo, "after consultation with the SC [*i.e.*, the Special Committee] and Tim Rothwell[,]" Defendant Weiser wrote:

- "There is ***universal conviction*** on the part of Emisphere and its directors" that [Novo's February 20 Proposal] "***significantly undervalues the company, including the future royalty revenues from Novo***."

- "there are ***two major value drivers*** in any potential deal that deserve special attention in our discussions:
  - 1) ***Emisphere's IP rights*** and
  - 2) the revenue model for Rybelsus"

Accordingly, Weiser's talking points emphasized that the parties' "priority should be to share perspectives and factual information about these two topics" during Merger-related negotiations.

114. Weiser's talking points for Novo also stated that Emisphere had "spent considerable time and resources examining these issues and ***view them as extremely serious***." He reiterated that the "inventorship issues" and the Company's related "royalty rights" surrounding the IP Dispute were "***key value drivers to Emisphere***." He further wrote that Emisphere would pursue the IP Dispute and that Company counsel was "prepared to make a detailed presentation laying out our views as to inventorship issues, ***and the ensuing implications for our royalty rights***."

115. Defendant Weiser and the Special Committee Defendants also involved Jefferies in an effort to value the SNAC-related IP Dispute with Novo Nordisk. During an April 22, 2020 Special Committee meeting, Weiser told Jefferies it should contact Emisphere's intellectual property counsel David Berl at Williams & Connolly "to understand [Emisphere's] positions with respect to its co-inventorship claims against Novo Nordisk and the potential impact of such claims on [Emisphere's] valuation." Weiser then instructed Jefferies to communicate with Novo's financial advisor on the transaction, Evercore, to "discuss the valuation model underlying the valuation proposed by Novo Nordisk" in its February 20 Proposal to acquire Emisphere.

116. On April 21, 2020, Mr. Berl provided Mr. Haagen of Novo with a proposed meeting presentation and supporting materials in order to substantiate Emisphere's "co-inventor" position. Mr. Berl's April 21 email also made a reciprocal documentary request to Mr. Haagen to support Novo Nordisk's position in the IP Dispute. Specifically, Mr. Berl stated:

> We assume that, per Karsten [Knudsen's] conversation with Michael Weiser earlier this week, you will likewise share the documents and information referenced in your email to Michael of March 9, that led you to conclude that you could find ***no basis for a claim that an Emisphere employee should have been a coinventor***.

117. In a response email on April 29, 2020, Mr. Haagen agreed to an extension of the litigation standstill that Emisphere and Novo Nordisk had informally agreed upon "up to and including May 31, 2020," but refused to provide any documentary support for Novo's assertion that co-inventorship was unwarranted on the relevant patents. His email stated that "[w]e do not see it as incumbent on NN [Novo Nordisk] to prove that the inventorship with respect to these patents . . . is correct." Mr. Hagen further stated that while "we remain willing to review and discuss the basis for Emisphere's claim for co-inventorship, it will fall upon Emisphere to document the merits of these new claims."

118. Emisphere continued to actively pursue its "co-inventor" claims against Novo in May. On May 7, 2020, David Berl at Williams & Connolly held a call with Nicholas Groombridge, a patent attorney at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") to discuss the specific patents at the center of the IP Dispute. Paul Weiss represented Novo Nordisk in the IP Dispute. These attorneys engaged in a detailed discussion of the technical issues surrounding the three patents for which Emisphere asserted co-inventorship. During the meeting, Mr. Berl presented slides and additional documentary support for Emisphere's position.

119. On May 13, 2020, Mr. Groombridge sent a detailed summary email of his meeting with Williams & Connolly to Novo's General Counsel, Tomas Haagen. Mr. Groombridge's email stated that Williams & Connolly identified "three Orange Book patents as being the subject of Emisphere's inventorship claim: US 9,278,123; US 10,086,047; and US 10,278,923." These were the same patents identified in Quinn Emanuel's March 4, 2020 email to Mr. Haagen (*see supra* ¶¶ 103-104).

120. Mr. Groombridge's email noted that Williams & Connolly presented numerous slides and documents supporting Emisphere's co-inventorship on these patents. As reflected in Mr. Groombridge's email, Dan Berl of Williams & Connolly indicated at the meeting that "Emisphere had 'an enormous amount' of documents including presentations, communications, and lab notebooks" establishing Emisphere's role in creating and developing these patents. Mr. Groombridge also acknowledged that Emisphere's patent formulation records matched the formulation table for patent number 9,278,123, providing further evidence of Emisphere's involvement. Mr. Berl asserted at the meeting that the "claimed invention [of SNAC tablets using this patent number] was '***lifted root to branch***' ***from Emisphere***."

121. Berl also identified at least two specific Emisphere employees, Prateek Bhargava and Shingai Majuru, who had "contributed to the invention of the '123 patent" and the 10,086,047 patent. Through its counsel at Paul Weiss, Novo clearly understood that Emisphere had a concrete basis to assert co-inventorship on the three SNAC-related patents, which entitled the Company to substantial additional royalty revenues (*i.e.*, 2.5% v. 0.5% through 2034 instead of 2027).

122. Recognizing they had strong claims on both the patent "co-inventorship" issue and the STM Article's breach of the Royalty Agreement, Defendants instructed Williams & Connelly to draft a complaint to protect Emisphere's intellectual property interests through formal litigation. David Berl sent Defendant Weiser and others this draft complaint on May 31, 2020.

123. On June 1, 2020, Defendant Weiser sent an email to Novo's CFO, Karsten Knudsen, and its General Counsel, Tomas Haagen, memorializing the parties' agreement to another litigation standstill extension to allow for further discussions concerning the parties' IP Dispute. In an implicit acknowledgment of the substantial monetary value of Emisphere's

intellectual property rights at issue, Defendant Weiser also set forth the terms of a formal tolling agreement between Novo and Emisphere that would extend through June 15, 2020.

124. Weiser noted that the tolling agreement applied to potential claims Emisphere or Novo Nordisk might have "arising out of or relating in any way" to the amended and restated 2008 Development and License Agreement between them (*i.e.*, the "Royalty Agreement"), and "***to the publications*** [*i.e.*, the STM Article] ***that have been the subject of the parties' correspondence***" concerning the IP Dispute.

125. The Special Committee was further updated on the status of the IP Dispute between Emisphere and Novo Nordisk at meetings on June 3 and June 5, 2020. At the June 3 meeting, Defendant Weiser "review[ed] the status of the IP Dispute," and reported on a May 29, 2020 call he had with Novo to discuss the dispute. At the June 5, 2020 Special Committee meeting, Mr. Berl of Williams & Connolly also "reviewed the status of the IP Dispute," and provided his "assessment of the merits of [Emisphere's] positions" on the dispute. Defendants' Class Period statements to investors entirely omitted that the IP Dispute was repeatedly discussed by the Special Committee at its meetings, or that the dispute ***even existed***.

126. The impact of the IP Dispute on Merger negotiations was reinforced during a call on July 10, 2020 between Defendant Rothwell and Novo's CEO, Lars Jørgensen. As reflected in his notes for the call, Rothwell explained that in regard to the "inventorship" issue that would impact the length of Emisphere's royalty stream, he "looked at the issue [him]self" and "***believe strongly*** that we are right." Rothwell's notes underscored that he was a "patent lawyer [him]self" and therefore had "unique experience and ***expertise in this area and the ability to evaluate what lawyers on both sides have said***."

127. Based on his legal training as a patent attorney, Rothwell further confirmed to Jørgensen that it "is clear to me that we have good chance to prevail on the 2031 [inventorship] claim, which will entitle us to ***additional royalties through 2031 at the very least, and the 2034 claim may also be valid***." Rothwell then challenged Novo's February 20 Proposal to acquire Emisphere and the financial modelling assumptions Novo used to value Emisphere, including its assumption that Emisphere's 3% royalty rate would only apply until 2027, as opposed to 2031 or 2034. Specifically, Rothwell chastised Jørgensen that although Emisphere's "3% royalty could be in place until 2031 or 2034" that was "not reflected in the [Novo] model at all" and therefore Novo's offer "doesn't reflect – among other things – the ***value that resolving our disputes will have***," clearly indicating that the IP Dispute, and its impact on the length of the royalty stream was crucial to adequately valuing Emisphere.

128. Defendant Rothwell further warned Jørgensen that Emisphere was prepared to pursue litigation to protect its intellectual property rights and that such action would have negative financial consequences for Novo. Rothwell informed Jørgensen that he had "seen a draft of the Complaint that would initiate litigation, ***which is ready to be filed at a moment's notice***," and would expose Novo to "invasive US litigation discovery" that would "provide a roadmap for generics to invalidate your patents and come onto the market." Rothwell clearly understood the importance of the IP Dispute on deal negotiations with Novo and its impact on Emisphere's financial valuation. Rothwell's call notes reflected this understanding by stating that "***[a]s I see it, you'll have to pay a substantial sum of money to Emisphere to resolve this problem***, and resolving it before a public litigation rather than after preserves value of the [Rybelsus] product."

129. Defendant Rothwell understood that the IP Dispute was a key factor in assessing Emisphere's value. In his recently obtained deposition testimony taken in the Delaware Chancery

Action, Rothwell stated that his assertions above about the IP Dispute conveyed to Novo's CEO on July 10, 2020, were "***designed to improve our chances of getting a better deal for Emisphere and shareholders***." *In re Emisphere*, C.A. No. 2021-0025-JRS (Del. Ch.) (Sept. 13, 2024 Rothwell Depo. Tr. at 165:9-12). Despite knowing this, and as detailed further below, Rothwell and the other Defendants concealed all of the above material facts concerning the IP Dispute and its critical significance in accurately calculating Emisphere' s net present value for Emisphere shareholders during the Class Period. These material omissions prevented shareholders from accurately assessing the Merger and Emisphere's share price.

130. Following the Rothwell-Jørgensen call, Novo Nordisk made a revised proposal on July 17, 2020 to acquire Emisphere and the Diverted Royalties for $1.125 billion in cash, plus contingent value rights ("CVRs") worth $300 million based on net sales milestones of Rybelsus (the "July 17 Proposal"). Under the July 17 Proposal, the milestone payments to Emisphere would expire on December 31, 2031 if Novo's Rybelsus sales did not reach $8-10 billion in cumulative net sales by that date. Notably, Novo's offer letter also recognized that the IP Dispute was a material component of the Merger negotiations and had direct bearing on the Merger Consideration for Emisphere's public shareholders.

131. Specifically, Novo stated in its formal offer letter of July 20, 2020 that it viewed the July 17 Proposal to be "highly attractive to Emisphere's shareholders . . . as [t]he Upfront Payment [$1.125 billion in cash] ***de-risks the IP position***, both in terms of the SNAC technology and other potential future challenges."

132. Defendants rejected the July 17 Proposal as inadequate specifically because it undervalued Emisphere's strong position in the IP Dispute. Indeed, on July 22, 2020, Defendant Weiser reported to the Special Committee about a conversation he had with Novo's CFO, Karsten

Knudsen, in which Weiser stated that Emisphere was prepared to initiate litigation concerning the intellectual property rights surrounding Rybelsus unless Novo proposed a higher valuation for an Emisphere acquisition.

133. Emisphere continued to press the IP Dispute in order to exert additional leverage and extract higher merger consideration from Novo Nordisk. On July 24, 2020, Dan Berl, Emisphere's patent counsel at Williams & Connolly, emailed Tomas Haagen at Novo to inform him that Emisphere had filed two provisional patents on November 13, 2019 concerning the Company's intellectual property referenced in the STM Article, and was pursuing a third patent related to Emisphere's SNAC technology.

134. At a meeting on August 17, 2020, the Emisphere Board was also provided with and discussed an outline of Emisphere's proposed patent infringement claims against Novo Nordisk, as well as an outline of the claims in the complaint that the Company was prepared to file in the United States District Court for the Southern District of New York "in the event the parties were unable to reach a settlement" of the IP Dispute. At this point in time, the Company was prepared to pursue the intellectual property claims through litigation—demonstrating Defendants' clear understanding of the significant monetary value connected to the IP Dispute.

135. Entirely unbeknownst to Emisphere's unaffiliated shareholders, Defendant Rachesky assigned a $500 million "litigation premium" for the IP Dispute during the course of merger negotiations with Novo Nordisk in late July 2020. Representatives of Evercore and Jefferies held a telephone call on July 29, 2020 as the financial advisors for Novo Nordisk and the Emisphere Special Committee, respectively. Handwritten notes of the call from Francois Maisonrouge, Chairman of Evercore's Global Healthcare Group to Novo's CFO, Karsten

Knudsen, reflect that Defendant Rachesky and the MHR Defendants proposed an Emisphere acquisition price of $3.5 billion.

136. Rachesky's proposal was notably based on a 3% Emisphere royalty rate extending to 2034 (2.5% of which would go to Emisphere and 0.5% of which would go to Rachesky) given the Company's strong position in the IP Dispute. As reflected in the July 29 meeting notes, the $3.5 billion acquisition price also included a $500 million "litigation premium." Defendants did not disclose Rachesky's $3.5 billion proposal, the fact that he assigned a $500 million "***litigation premium***" to the IP Dispute, or that the IP Dispute even existed.

137. Defendants plainly understood the IP Dispute and the revenue streams it implicated were material to Emisphere's overall valuation. Moreover, Emisphere's Director of Finance, Philip Nikolayuk, internally acknowledged the "***high likelihood***" that Emisphere would prevail in a litigation concerning the IP Dispute, and that the Company's SNAC-related royalties of 2.5% "***would be extended until something like 2031 or beyond***" if that occurred. This view was seconded by Emisphere's outside counsel at Williams & Connolly who had taken concrete steps to prepare for litigation against Novo. Despite this internal recognition, Defendants ultimately presented to shareholders financial projections that assigned ***no value whatsoever*** to the IP Dispute (the "Management Projections"), and ***entirely omitted*** any reference to the Dispute and its clear impact on Merger negotiations during the Class Period.

## G. Emisphere's Financial Projections Are Adjusted Downward at the Behest of Defendants Weiser and Rothwell Without Shareholder Knowledge

138. Defendants Weiser and Rothwell manipulated Jefferies' valuation for Emisphere to ensure that a Novo Nordisk deal would close and they, together with Defendant Rachesky, would reap their enormous change-in-control benefits. This downward adjustment to Emisphere's financial projections was never disclosed to the Company's public shareholders.

139. As noted above, in connection with its initial February 2020 Proposal to acquire Emisphere and the Diverted Royalties for $950 million, Novo Nordisk prepared financial projections for Emisphere titled the "Project Emily" projections. Novo also provided a document to Emisphere titled "Project Emily" "Rybelsus Sales Curve February 2020," that set forth Novo's "Key Modelling Assumptions and Considerations" for the Rybelsus royalty rates payable under the Royalty Agreement. The document stated that a "3% royalty rate applied to Rybelsus sales till mid-2027; 1% royalty rate applied to Rybelsus sales from mid-2027 to 2039."

140. Novo Nordisk's "Project Emily" projections were based on analyst estimates and other external sources, rather than internal analysis by Novo or its financial advisors at Evercore. As stated in its "Key Modelling Assumptions and Considerations," Novo's Rybelsus sales estimates for 2020 through 2025, were based on the "[m]edian of Rybelsus sales estimates from 15 brokers covering Novo Nordisk." Novo's Rybelsus sales estimates from "2026 onwards" were "extrapolated using [the] implied annual growth rate from [the] EvaluatePharma database." This database was generated by Evaluate Ltd., a market research firm focused on the pharmaceutical industry.

141. Emisphere's internal financial projections were initially higher than these "Project Emily" projections from Novo Nordisk. In May 2020, the Special Committee was provided with separate Emisphere financial projections from Jefferies. In presentation slides titled "Project Eagle," Jefferies set forth: (i) the "Evercore Case" projections (as noted above, Evercore was Novo Nordisk's financial advisor on the Merger and these financial projections were based on Novo's "Project Emily" projections); (ii) the "Previous Case 2" projections; (iii) the "Case 1" projections; (iv) the "Case 2A" projections; and (v) the "Case 2B" projections. The Emisphere net present values ("NPVs") calculated under these May 2020 projections were as follows:

| Emisphere "Project Eagle" Financial Projections | Emisphere Net Present Value (NPV) |
|---|---|
| Evercore Case | $950 million |
| Case 1 | $1.332 billion |
| Previous Case 2 | $2.077 billion |
| Case 2A | $2.673 billion |
| Case 2B | $2.935 billion |

The Case 2A and 2B projections were never disclosed to Emisphere shareholders. Plainly, Jefferies' undisclosed Case 2A and 2B projections had Emisphere NPVs that were far greater than Novo Nordisk's ultimate acquisition price of $1.8 billion.

142. Jefferies included various "Key Valuation Metrics" to quantify the Emisphere NPVs under the projections. These included (i) "Peak Sales" of Rybelsus, (ii) "Cumulative Royalties" payable to Emisphere from 2020 to 2039 for such Rybelsus sales, (iii) the net present value of Emisphere's royalties ("Royalty NPV"), (iv) adjustments for Emisphere's operating expenses and working capital, and (v) the value of Emisphere's net operating losses.

143. Jefferies' "Project Eagle" presentation also included a line item titled "Royalty Step Down Timing" for Rybelsus royalties payable to Emisphere. Under this line item, the Evercore and Case 1 projections reflected a "June – 2027" step-down in Emisphere's royalty rate under the Royalty Agreement. The Case 2A and 2B projections reflected that a step-down in Emisphere's royalty rate would not occur until "May – 2034" – nearly seven years later than in the Evercore and Case 1 projections and in-line with Defendants' position in the IP Dispute:

| Emisphere "Project Eagle" Financial Projections | Royalty Step-Down Dates |
|---|---|
| Evercore Case & Case 1 | June 2027 |
| Case 2A | May 2034 |
| Case 2B | May 2034 |

The Case 2A and 2B projections also assumed that Rybelsus would receive FDA approval for the treatment of both obesity and NASH, as well as a favorable ruling for Emisphere in its SNAC-related IP Dispute with Novo Nordisk.

144. The Case 2A and 2B projections included higher cumulative and peak sales of Rybelsus and consequently, higher royalties for Emisphere than the Evercore Case projections. The Case 2A and 2B Projections also included a comparison of these valuation metrics, which is set forth below:

| Emisphere "Project Eagle" Financial Projections | Cumulative Rybelsus Sales Revenue (2020-2039) | "Peak" Rybelsus Sales Revenue | Emisphere's Cumulative Rybelsus Royalties (2020-2039) |
|---|---|---|---|
| Evercore Case | $85.378 billion | $7.026 billion | $1.313 billion |
| Case 2A | $206.947 billion | $15.690 billion | $5.112 billion |
| Case 2B | $231.472 billion | $17.685 billion | $5.703 billion |

***Thus, with the 2034 royalty step-down accounted for in the Case 2A and Case 2B projections there were additional Emisphere royalty revenues of between $3.79 to $4.39 billion***.

145. Jefferies circulated another "Project Eagle" presentation to Defendant Weiser on July 1, 2020 in response to their discussions on Emisphere's valuation. Jacopo Dragoni at Jefferies' Healthcare Investment Banking division sent Weiser this "Project Eagle" deck in a July

1 email with the subject line "Project Eagle – Latest Model Overview." Mr. Dragoni wrote that "[p]er your discussion with Dung [Nguyen, a Jefferies Managing Director], please see attached the latest model summary deck." He further noted for Weiser that "the **detailed (Case 2A/2B) pages are both showing a 2034 royalty switch date**" (emphasis in original). This 2034 royalty rate step-down date was consistent with Jefferies' May 2020 "Project Eagle" presentation, as well as a favorable ruling on the IP Dispute. As noted above, the extension of royalties to 2034 contributed an additional approximately $4 billion to Emisphere's expected revenues, which would obviously have a large effect on Emisphere's valuation.

146. The model sent on July 1 contained the same Emisphere NPVs as reflected in the May 2020 "Project Eagle" presentation, *i.e.*, (i) Evercore Case ($950 million); (ii) Case 1 ($1.332 billion); (iii) Previous Case 2 ($2.077 billion); (iv) Case 2A ($2.673 billion ); and (v) Case 2B ($2.935 billion). *See supra* ¶ 141. The June 2020 model also contained the same cumulative Rybelsus sales revenue figures for 2020 to 2039, *i.e.*, (i) Evercore Case ($85.378 billion); (ii) Case 2A ($206.947 billion); and (iii) Case 2B ($231.472 billion). *See supra* ¶ 144. The cumulative Rybelsus royalties for Emisphere from 2020 to 2039 were also the same, *i.e.*, (i) Evercore Case ($1.313 billion); (ii) Case 2A ($5.112 billion); and (iii) Case 2B ($5.703 billion). *Id.*

147. Following Novo Nordisk's July 17 Proposal to acquire Emisphere and the Diverted Royalties for $1.125 billion in cash, plus CVRs (contingent value rights) worth $300 million (*see supra* ¶ 130), Defendants Weiser and Rothwell worked with Jefferies to revise the above Emisphere financial projections detailed in the May and July 2020 "Project Eagle" presentation materials downward.

148. On July 25, 2020 James Wiltshire at Jefferies emailed Defendant Weiser regarding the "Eagle – Royalty Analysis." Mr. Wiltshire provided projections in response to a discussion

with Defendant Weiser that reflected a 3% Rybelsus royalty payment to Emisphere until 2027, 2031 and 2034. The analysis further reflected a 1% Rybelsus royalty after the projected royalty step-downs in 2027, 2031 and 2034. Each of these royalty scenarios were based on projected "peak" Rybelsus sales revenue of approximately $7 billion and cumulative Rybelsus sales of approximately $85 billion. As Mr. Wiltshire stated in his email, these sales figures "use[ed] the initial Novo revenue forecast" found in the Evercore Case projections, following Mr. Wilshire's discussion with Defendant Weiser.

149. Under this analysis, Emisphere's NPVs were considerably lower than the NPVs in the previously calculated Case 2A and Case 2B projections. Using a 25% tax rate and a 6% discount rate,[2] the Emisphere NPVs for each royalty step-down date were as follows: (i) $659 million (2027 royalty step-down); (ii) $888 million (2031 royalty step-down); and (iii) $1.004 billion (2034 royalty step-down).

150. In response to this analysis, Defendant Weiser requested that Jefferies provide "low, medium and high forecast models" for cumulative Rybelsus sales. Jefferies applied cumulative Rybelsus sales scenarios of $100 billion (low), $150 billion (medium), and $200 billion (high), resulting in the following figures that were emailed to Weiser on July 26:

---

[2] The discount rate is the interest rate used in a discounted cash flow ("DCF") valuation analysis to determine the present value of a company's future cash flows.

**From:** Charlie Niehaus <cniehaus1@jefferies.com>
**Sent:** Sunday, July 26, 2020 1:44 PM
**To:** Michael Weiser <[redacted]>; James Wiltshire <jwiltshire@jefferies.com>
**Cc:** Kevin Sheridan <ksheridan@jefferies.com>; Dung Nguyen <dnguyen@jefferies.com>; Jacopo Dragoni <jdragoni@jefferies.com>
**Subject:** RE: Eagle - Royalty Analysis

Michael,

Please see below for the additional analysis, running at $100bn, $150bn, and $200bn cumulative sales.

**$100bn Cumulative Sales:**

- **3% royalty to 2027, 1% thereafter**
- Cumulative royalties: $1,538m
- NPV at 25% tax rate, 6% discount rate: $726m
- **3% royalty to 2031, 1% thereafter**

- Cumulative royalties: $2,306m
- NPV at 25% tax rate, 6% discount rate: $1,049m
- **3% royalty to 2034, 1% thereafter**
- Cumulative royalties: $2,545m
- NPV at 25% tax rate, 6% discount rate: $1,133m

**$150bn Cumulative Sales:**

- **3% royalty to 2027, 1% thereafter**
- Cumulative royalties: $2,307m
- NPV at 25% tax rate, 6% discount rate: $1,088m
- **3% royalty to 2031, 1% thereafter**
- Cumulative royalties: $3,459m
- NPV at 25% tax rate, 6% discount rate: $1,573m
- **3% royalty to 2034, 1% thereafter**
- Cumulative royalties: $3,818m
- NPV at 25% tax rate, 6% discount rate: $1,699m

**$200bn Cumulative Sales:**

- **3% royalty to 2027, 1% thereafter**
- Cumulative royalties: $3,076m
- NPV at 25% tax rate, 6% discount rate: $1,451m
- **3% royalty to 2031, 1% thereafter**
- Cumulative royalties: $4,612m
- NPV at 25% tax rate, 6% discount rate: $2,098m
- **3% royalty to 2034, 1% thereafter**
- Cumulative royalties: $5,090m
- NPV at 25% tax rate, 6% discount rate: $2,266m

Let us know if you have any questions.

Best,
Charlie

Charlie Niehaus
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
T: +1 212.284.4617
C: +1 650.823.5215
cniehaus1@jefferies.com

The Emisphere NPVs resulting from these "low, medium and high forecast models" ranged from $726 million to $2.26 billion. Thus, following Defendant Weiser's request, the adjusted NPVs for each royalty step-down date (*i.e.*, 2027, 2031, and 2034) were lower than the NPVs in the Case

2A and Case 2B projections for Emisphere—even when using the higher cumulative Rybelsus sales figures.

151. Defendant Weiser forwarded Jefferies' analysis to Defendant Rothwell later in the day on July 26. Weiser's email explained that the 25% tax rate used in Jefferies' analysis was "a typical blended US rate (21% federal + state/local)." He further explained that the 6% discount rate used by Jefferies "represents the cost of capital from Novo's perspective and is in-line with other large cap pharmaceutical companies." Defendant Rothwell responded minutes later and expressed skepticism with the sales numbers Jefferies used in its NPV analysis, stating "I am not sure where Jefferies got their cumulative sales numbers but we need to justify them. ***The 150 and 200 [billion] seem a bit hard to justify*** . . ." This, despite the fact that Jefferies' Case 2A and 2B projections had modeled cumulative Rybelsus sales revenues of over $200 billion.

152. Between July 27-28, 2020, Defendants Weiser and Rothwell exchanged emails with Jefferies that included further revisions to the Emisphere financial projections. In the email exchanges, Weiser and Rothwell asked Jefferies to assess the impact of the generic entry of Rybelsus into the market.

153. In a July 27, 2020 email from James Wiltshire at Jefferies to Defendant Weiser, Jefferies provided an analysis titled "Eagle – Generic Impact." This analysis evaluated the impact of the market entry of generic versions of Rybelsus in 2030 and 2031 after the Rybelsus patent(s) expired. The "Eagle – Generic Impact" analysis used peak Rybelsus sales scenarios of $7-$10 billion with "85% generic erosion" and targeted an Emisphere NPV of $3 billion:

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Monday, July 27, 2020 2:45 PM
**To:** Michael Weiser <[redacted]
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** Eagle - Generic Impact

Michael,

As follow up to the call please see below for the implied generic impact at different peak sales levels. We've shown the impact for two cases, one assuming 4 years of lost exclusivity and one assuming 2.4 years (exact time between 2031 and 2034 patents).

**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**

- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(12.6% = $3b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(11.0% = $3b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(9.8% = $3b)*
- $10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(8.8% = $3b)*

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**

- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(21.2% = $3b)*

- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(18.6% = $3b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(16.5% = $3b)*
- $10.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $20.2b sales at risk *(14.8% = $3b)*

Thanks,

Jimmy

James P. Wiltshire
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
Tel: +1 646.805.5484
Cell: +1 646.769.8830
jwiltshire@jefferies.com

154. Shortly after this email was sent, Jefferies revised the "Generic Impact" models at the request of Defendants Rothwell and Weiser to calculate Novo Nordisk's sales of Rybelsus that were "at risk" when the relevant patent(s) expired and generic versions of the drug entered the market, this time targeting an Emisphere NPV of $2 billion:

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Monday, July 27, 2020 3:11 PM
**To:** Michael Weiser <[redacted]>; Timothy Rothwell <[redacted]>
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** RE: Eagle - Generic Impact

Thanks, revised with percentages relative to $2 billion below…

**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**

- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(8.4% = $2b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(7.4% = $2b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(6.5% = $2b)*
- $10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(5.9% = $2b)*

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**

- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(14.1% = $2b)*
- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(12.4% = $2b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(11.0% = $2b)*
- $10.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $20.2b sales at risk *(9.9% = $2b)*

155. Both of these models, done at the request of Defendants Weiser and Rothwell, used earlier generic entry dates for Rybelsus than the Case 2A and 2B projections (*i.e.*, 2030-2031 v. 2034).

156. Jefferies revised the models yet again at the request of Defendants Weiser and Rothwell. The 2030 and 2031 "Generic Entry" calculations remained the same, but were now under a heading titled "Litigation Premium," presumably to account for the IP Dispute between Emisphere and Novo Nordisk. The analysis also added a section titled "Revenue Performance" that assumed peak Rybelsus sales of $10-$11.5 billion and resulted in an Emisphere NPV of approximately $1.3 to $1.5 billion:

**I) Litigation Premium**

**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**

- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(8.4% = $2b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(7.4% = $2b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(6.5% = $2b)*
- **$10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(5.9% = $2b)***

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**

- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(14.1% = $2b)*
- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(12.4% = $2b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(11.0% = $2b)*
- **$10.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $20.2b sales at risk *(9.9% = $2b)***

**II) Revenue Performance**

- Assumes $10b peak sales
  - 7 years to peak
  - Royalty to 2031
  - 3% royalty to 2031
  - ~20% peak penetration
- **~$1.3b of NPV**
  - Increase to $1.5b of NPV with ~$11.5b peak sales,
    - (or potentially attribute incremental $200m to other products / technology value?)

This revised analysis used "peak sales" for Rybelsus that were far lower than the "peak sales" in the Case 2A and 2B projections (*i.e.*, $10-$11.5 billion v. $15.6 billion (Case 2A) and $17.6 billion (Case 2B)). *See supra* ¶ 144. This analysis also resulted in an Emisphere NPV of $1.3-$1.5 billion that was more aligned with the acquisition price under Novo Nordisk's July 17 Proposal (*i.e.*, $1.125 billion in cash, plus CVRs (contingent value rights) worth $300 million).

157. In response, Defendant Rothwell asked Jefferies to calculate cumulative royalties payable to Emisphere, applying a royalty rate step-down from 3% to 1% in 2031, and a royalty rate step-down from 3% to 1% in 2034. Both calculations used $10 billion in peak Rybelsus sales and resulted in "cumulative royalties" to Emisphere as follows:

At $10b peak sales:

- 3% to 2031, 1% to 2034: ***$2,618m cumulative royalties***
- 3% to 2034: ***$2,944 cumulative royalties***

Under this analysis, the cumulative royalties payable to Emisphere were considerably lower than the cumulative royalties calculated under the Case 2A (*i.e.*, $5.112 billion) and Case 2B projections (*i.e.*, $5.703 billion). *See supra* ¶ 144.

158. On July 28, 2020, Defendant Weiser sent another email to James Wiltshire and others at Jefferies with further directions that adjusted the Emisphere projections to be in line with Novo's then-current offer. Weiser stated that he "would like to focus on [] two 'buckets' with my edits and simplifications," *i.e.*, "**Bucket A (NPV of Royalty Stream**" and "**Bucket B (Litigation Premium)**." With respect to "**Bucket A**," Weiser's email posed the following question to Jefferies in all capitals with respect to Emisphere's applicable royalty rate following generic forms of Rybelsus entering the market after 2031: "WHAT HAPPENS TO THE NPV IF WE RAISE THE ROYALTY TO 2% FROM 2031 TO 2034 (SPLIT THE DIFFERENCE BETWEEN 1% TO 3%)." Weiser provided no contractual or other basis for the application of this 2% royalty rate. Nonetheless, Mr. Wiltshire responded that "[a]dding a 2% royalty from 2031 to 2034 would increase the NPV to ***just under $1.5 billion***":

From: James Wiltshire <jwiltshire@jefferies.com>
To: Michael Weiser <[redacted]>; Timothy Rothwell <[redacted]>
Cc: Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
Sent: Tue, 28 Jul 2020 12:28:53 -0400
Subject: RE: Eagle - Generic Impact

Adding a 2% royalty from 2031 to 2034 would increase the NPV to just under $1.5b.

James P. Wiltshire
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
Tel: +1 646.805.5484
Cell: +1 646.769.8830
jwiltshire@jefferies.com

**From:** Michael Weiser <[redacted]>
**Sent:** Tuesday, July 28, [redacted]
**To:** James Wiltshire <jwiltshire@jefferies.com>; Timothy Rothwell <[redacted]>
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** RE: Eagle - Generic Impact

I would like to focus on these two "buckets" with my edits and simplifications. I am free to discuss.

**Bucket A (NPV of Royalty Stream)**

- Assumes $10b peak sales
  - 7 years to peak
  - 3% royalty to 2031
  - ~20% peak penetration

- $1.3b of NPV
  - If we attribute incremental $200m to other pipeline products / technology value / SNAC and other carriers / NOL's

- TOTAL: 1.5b of NPV

QUESTION: WHAT HAPPENS TO THE NPV IF WE RAISE THE ROYALTY TO 2% FROM 2031 TO 2034. (SPLIT THE DIFFERENCE BETWEEN 1% AND 3%)

**Bucket B (Litigation Premium)**

- Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)
  - $10.0b peak sales
  - 2.4 years of exclusivity lost
  - 85% generic erosion = $20.2b sales at risk
  - *9.9% = $2b*

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Monday, July 27, 2020 7:03 PM
**To:** Timothy Rothwell <[redacted]>; Michael Weiser <[redacted]>
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>
**Subject:** RE: Eagle - Generic Impact

Tim, Michael – please see the revised below per your conversation with Dung…

**Litigation Premium**
**Assumes Generic Entry in 2030 - Sales from 2030 – 2034 (4 years)**

- $7.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $23.8b sales at risk *(8.4% = $2b)*
- $8.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $27.2b sales at risk *(7.4% = $2b)*
- $9.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $30.6b sales at risk *(6.5% = $2b)*
- **$10.0b peak sales * 4 years of exclusivity lost * 85% generic erosion = $34.0b sales at risk *(5.9% = $2b)***

**Assumes Generic Entry in 2031 Post Lost of Patent(s) - Sales from December 2031 – May 2034 (2.4 years)**

- $7.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $14.1b sales at risk *(14.1% = $2b)*
- $8.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $16.2b sales at risk *(12.4% = $2b)*
- $9.0b peak sales * 2.4 years of exclusivity lost * 85% generic erosion = $18.2b sales at risk *(11.0% = $2b)*

CONFIDENTIAL EMN-220-001769

This was once again more in line with the $1.425 billion purchase price for Emisphere offered under Novo's July 17 Proposal.

159. Despite Defendants Weiser's and Rothwell's efforts to modify Emisphere's financial projections downward to be more consistent with Novo Nordisk's July 17 Proposal, on July 29, 2020, the Special Committee rejected the July 17 Proposal. Nonetheless, the Special

Committee informed Novo Nordisk that it was prepared to continue negotiations on an acquisition of Emisphere.

160. On August 13 and August 21, 2020, Defendant Rothwell had discussions with Novo's CEO, Lars Jørgensen, regarding Novo Nordisk's July 17 Proposal. At the same time, Defendants Weiser and Rothwell continued to work with Jefferies to try to further adjust Emisphere's financial projections.

161. Defendants Weiser and Rothwell exchanged emails with Jefferies on August 13, 2020 reflecting additional modifications to Emisphere's NPV. James Wiltshire initiated this email exchange with a "new draft scenario and implied NPV" following a discussion he had with Weiser and Rothwell:

**From:** James Wiltshire <jwiltshire@jefferies.com>
**Sent:** Thursday, August 13, 2020 1:28 PM
**To:** Timothy Rothwell [redacted] Michael Weiser [redacted]
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>; Jacopo Dragoni <jdragoni@jefferies.com>; Charlie Niehaus <cniehaus1@jefferies.com>
**Subject:** Eagle - Discussion Points

Tim, Michael,

As discussed please see below for the new draft scenario and implied NPV. Let us know your thoughts.

- 3% royalty to 2031, then 2% to 2034
- **Peak sales: ~$15b**
- Cumulative sales (through 2034): ~$150b
- **Royalty NPV (25% tax rate, 6% discount rate): ~$2.0b**
- Cumulative sales reached:
  - $40b: Q1 2026
  - $50b: Q4 2026
  - $60b: Q4 2027

Regards,

Jimmy

James P. Wiltshire
Healthcare Investment Banking
Jefferies LLC
520 Madison Avenue
New York, NY 10022
Tel: +1 646.805.5484
Cell: +1 646.769.8830
jwiltshire@jefferies.com

162. Defendant Weiser responded shortly thereafter and suggested that Jefferies' use of $15b in peak Rybelsus sales was too high. He also directed Jefferies to lower its quarterly cumulative Rybelsus sales figures by $10 billion for each of Q1 2026, Q4 2026, and Q4 2027.

This would result in a decrease of the cumulative Rybelsus sales figures for these quarters totaling $30 billion (*i.e.*, $150 billion to $120 billion). These efforts by Defendants Weiser and Rothwell to adjust the Emisphere sales figures were never disclosed to shareholders.

**From:** Michael Weiser [redacted]
**Sent:** Thursday, August 13, 2020 1:42 PM
**To:** James Wiltshire <jwiltshire@jefferies.com>; Timothy Rothwell [redacted]
**Cc:** Dung Nguyen <dnguyen@jefferies.com>; Kevin Sheridan <ksheridan@jefferies.com>; Jacopo Dragoni <jdragoni@jefferies.com>; Charlie Niehaus <cniehaus1@jefferies.com>
**Subject:** RE: Eagle - Discussion Points

[External Message]

**Peak sales: ~$15b????**

**I thought we used 10b**

**Change the gates to 30b, 40b, 50b**

**MW**

### H. Novo Makes its "Best and Final" Offer and Defendants Use Management Projections that Do Not Account for the IP Dispute

163. On August 21, 2020, Mr. Jørgensen communicated to Defendant Rothwell that Novo Nordisk's purported "best and final" offer was an all-cash bid to acquire Emisphere and the Diverted Royalties for $1.8 billion.

164. Novo Nordisk reiterated its "best and final" offer in a written proposal to Emisphere on August 24, 2020 (the "August 24 Proposal"). Its offer letter stated that "Novo Nordisk is prepared to pay US$1.8 billion on a cash and debt free basis for 100% ownership of Emisphere and for the settlement and termination of royalty payments to MHR Fund Management LLC ('**MHR**')" (emphasis in original).

165. The letter further stated that the revised offer was subject to, among other things, "receipt of a customary undertaking from all major shareholders, including MHR to support the [Merger], including an agreement by MHR to deliver a written consent approving the merger with respect to all Company shares held by MHR on a fully diluted basis[.]" Novo Nordisk was therefore requiring Defendant Rachesky to commit his Emisphere shares in support of a merger.

Rachesky gladly complied in exchange for the undisclosed favorable tax structure he demanded for Novo's acquisition of the Diverted Royalties and the overvalued allocation of the Merger price that he received for the Diverted Royalties. *See infra* IV.I & J.

166. Following the August 24 Proposal, Defendants used Emisphere financial projections (the "Management Projections") that were consistent with the $1.8 billion acquisition price offered by Novo Nordisk. Certain components of Emisphere's Management Projections were the ***only projections disclosed to shareholders during the Class Period***. *See infra* ¶ 234.

167. Remarkably, the Management Projections used a royalty step-down date of August 2027, rather than 2034. The Management Projections also assumed lower peak Rybelsus sales percentages for diabetes, obesity and NASH than the Case 2A and Case 2B projections, and discounted the possibility of success ("PoS") for FDA approval of Rybelsus to treat obesity and NASH. The Management Projections did not attribute *any revenue* for an FDA approved Rybelsus treatment for obesity until 2024, despite Novo's announcement that it was soon initiating Phase III obesity trials for Rybelsus, and that this market is twice as large as that for Type 2 diabetes.

168. Notably, after Defendants received the August 24 Proposal, they stopped debating the IP Dispute and its projected positive impact on Emisphere's valuation in Merger negotiations. This occurred despite the fact that the companies and their outside counsel had been engaged in extensive, yet undisclosed negotiations on the patent "co-inventorship" issue since at least February 2020, which Defendants "***believe[d] strongly***" they were right on and would have a "***high likelihood***" of litigation success with.

169. Even as late as August 17, 2020, Emisphere and its outside counsel at Quinn Emanuel and Williams & Connolly were prepared to affirmatively bring suit in the Southern District of New York to protect the Company's patent rights. Emisphere shareholders were not

told of these steps to prepare for litigation, that Emisphere's royalty rate step-down could extend to 2031 or 2034 given the IP Dispute, or that Defendant Rachesky had proposed a ***$500 million*** "litigation premium" for the IP Dispute only three-and-a-half weeks earlier.

170. In contrast, the Management Projections presented to Emisphere shareholders did not account for the undisclosed IP Dispute and assumed that a full royalty rate step-down would occur in 2027. In a series of emails between October 5, 2020 and October 27, 2020, representatives of Jefferies, Defendant Rothwell, and Emisphere's Director of Finance, Phil Nikolayuk, discussed the Emisphere "Management Forecasts" that were ultimately presented to shareholders in the Proxy. Neither the emails nor the attached forecasts included any value for the IP Dispute.

171. For example, on October 5, 2020, Charlie Niehaus of Jefferies sent Mr. Nikolayuk and others a copy of the "Project Eagle | Management Forecasts." Mr. Niehaus's cover email stated the forecasts excluded the 0.5% royalty rate to be paid to Defendant Rachesky, but included Emisphere's royalty rate, defined as "([] 2.5% ***out to 2027*** and 0.5% thereafter)." The attached Emisphere "Management Forecasts" also included a slide with a row titled "Eagle Royalty Rate" that was similarly defined as "***2.5% through August 30, 2027, 0.5% thereafter***." This 2027 royalty rate step-down meant no value was assigned to the IP Dispute and its resulting extension of Emisphere's 2.5% royalty rate to 2031 or 2034. On October 9, 2020, Defendant Rothwell responded that "I am okay with the updated management case . . .," knowing that the "Management Forecasts" would be presented to Emisphere shareholders in the Proxy. Rothwell therefore agreed to conceal a major factor underscoring the true value of the Company from shareholders, *i.e.*, the IP Dispute.

172. As detailed further below, Defendants' Proxy made no reference to the IP Dispute at all, and included only the "Management Projections" for Emisphere, which did not reflect that

the Company's 2.5% royalty stream would last through 2034, thereby robbing investors of the ability to accurately analyze Emisphere's value or the Emisphere-Novo Merger. Accordingly, the "Management Projections" were simply not "an appropriate basis upon which to evaluate, the future financial performance of Emisphere" as falsely stated in the Proxy (*see infra* Section V.B.2).

### I. Defendant Rachesky and the MHR Defendants Negotiate an Overvalued Payout to the Detriment of Public Shareholders

173. During the course of their Merger negotiations with Novo Nordisk, the Special Committee simultaneously negotiated with Defendant Rachesky regarding how much of the Merger Consideration would be allocated to Rachesky and the MHR Defendants for the Diverted Royalties.

174. Emisphere communicated to Novo Nordisk that the allocation of the $1.8 billion in total Merger Consideration offered under the August 24 Proposal was critical to Emisphere's determination of whether the August 24 Proposal was fair to Company stockholders. Indeed, the Special Committee acknowledged at its meeting on August 26, 2020, that its determination of whether the August 24 Proposal was "in the best interest of Emisphere and its stockholders would ultimately depend on the amount of the aggregate consideration that would be allocated to the acquisition of Emisphere," as opposed to the acquisition of the Diverted Royalties.

175. From August 2020 through October 2020, Defendant Rachesky and the Special Committee negotiated how much of the $1.8 billion in Merger Consideration would be allocated to Rachesky and the MHR Defendants for Novo's concurrent acquisition of the Diverted Royalties (*i.e.*, the 0.5% of net sales for Rybelsus and any other licensed Novo product covered by the Royalty Agreement).

176. On August 21, 2020, Defendant Rachesky proposed to the Special Committee that the allocation of the total Merger Consideration for acquisition of the Diverted Royalties should

be based on the relative future cash flows to Emisphere and the MHR Defendants under the (i) Royalty Agreement and (ii) Diverted Royalty Agreement. Based on Rachesky's methodology, the Special Committee calculated that he and the MHR Defendants were proposing $531 million of the $1.8 billion in Merger Consideration for the Diverted Royalties, which represented 29.5% of the total Merger Consideration.

177. As detailed in the minutes of the Special Committee's August 23, 2020 meeting, the Special Committee received on August 21, 2020, "a memorandum from MHR proposing (among other things) that, on or before August 24, 2020 . . . the Committee and MHR come to an agreement regarding the allocation of the proceeds of any transaction with Novo Nordisk between [Emisphere's] capital stock, on the one hand, and MHR's direct royalty interest in *Rybelsus*, on the other hand . . ." (emphasis in original).

178. Defendant McInerney spoke with representatives of Jefferies after the Special Committee received MHR's memorandum regarding the Merger allocation. Jefferies recognized that the royalty step-down date was critical to both Emisphere's overall valuation in Merger negotiations, as well as the determination of an appropriate Merger allocation to Defendant Rachesky and the MHR Defendants. James Wiltshire of Jefferies' Healthcare Investment Banking Division expressly acknowledged this in an August 22, 2020 email to other Jefferies representatives when he wrote that "[t]he[] ***big driver is the royalty step down***. Once it goes to 1%, MHR's share goes from 20% to 50% of royalty stream."

179. Given this percentage increase for Defendant Rachesky, Mr. Wiltshire further predicted Rachesky would advocate for a royalty step-down date in 2027 instead of 2031 or 2034 so he could demand a higher allocation of Merger proceeds. In this regard, Mr. Wiltshire noted in

his August 22 email that "I bet he's going to now argue [the step-down] happens at 2027 instead of 2031 or 2034 (opposite how he's been positioning it for the past 4 months)."

180. Jefferies also conducted a valuation of the Diverted Royalties for Defendant McInerney in connection with the allocation negotiations between Emisphere and Defendant Rachesky. During the Class Period, Defendants omitted the material fact that Jefferies valued the 0.5% Diverted Royalty interest to be worth far less than the $450 million allocation Rachesky and the MHR Defendants received under the $1.8 billion Merger.

181. On August 25, 2020, Charlie Niehaus of Jefferies' Healthcare Investment Banking Division sent a presentation on its Diverted Royalties valuation to Defendant McInerney. The presentation reflected that under its DCF analysis, Jefferies calculated a Net Present Value of ***$223*** million for the Diverted Royalties:



*Preliminary & Confidential, Subject to Further Review and Revision*

**Illustrative Allocation by Stakeholder**

($mm)

**Key Assumptions**

- Rybelsus peak sales of ~$10 billion
- Nighthawk pays 3.0% royalty to 2031 and 1.0% to 2034
  - Of this amount, MHR directly receives 0.5% royalty with remainder going to Eagle
- MHR ownership of Eagle is 70% (on a fully diluted basis)
- Discount rate of 8.0%

**Need confirmation of ownership / Cap Table**

| | Eagle WholeCo(2)(3) | Direct 0.5% Royalty to MHR(2) |
|---|---|---|
| Aggregate Net Present Value ($mm)(1)(2)(3) | $1,251 | |
| Net Present Value ($mm) | $1,027 | $223 |
| Implied Allocation (%) | 82.1% | 17.9% |
| MHR Economic Interest (%) | [70% MHR / 30% other Eagle shareholders] | 100% MHR |
| Implied NPV ($mm) | $719 MHR / $308 other Eagle shareholders | $223 MHR |

| | Other Eagle Shareholders | MHR (Eagle Holdings + Direct) |
|---|---|---|
| Implied NPV ($mm) | $308 | $943 ($719 Eagle Holdings + $223 Direct) |
| Implied Total Proceeds (%) | 24.6% | 75.4% |
| At $1.8 billion aggregate transaction value... | | |
| Implied Total Proceeds ($mm) | $444 | $1,356 ($1,035 Eagle Holdings + $322 Direct) |

Source: Eagle management.
(1) Aggregate NPV equals the sum of WholeCo Eagle and the direct 0.5% royalty to MHR.
(2) Discounted cash flow analysis as of 9/30/20 with mid-year discounting rate. Assumes zero Net Debt.
(3) Inclusive of impact of NOL balance of ~$335 million as of 12/31/19 per Eagle management.

1

Emisphere

CONFIDENTIAL JEFF00014641

Rachesky was ultimately paid ***$227 million more*** under the Merger for Novo's acquisition of the Diverted Royalties.

182. The following day, the Special Committee Defendants (*i.e.*, McInerney and Draft) discussed the Jefferies valuation of the Diverted Royalties with Mr. Niehaus and James Wiltshire of the Healthcare Investment Banking Division at Jefferies. This conference call with the Special Committee Defendants led to a slightly revised valuation of the Diverted Royalties, which Jefferies sent to Defendant McInerney on August 27, 2020.

183. In the August 27 presentation, Jefferies again valued the 0.5% Diverted Royalty interest at ***$223 million***. The presentation stated that the valuation was as of September 30, 2020.

The presentation also notably calculated implied proceeds of ***$8.47*** per Emisphere share under Novo Nordisk's "best and final" August 24 Proposal to acquire Emisphere for $1.8 billion:




In contrast, Emisphere shareholders ultimately received $7.83 per share under the Merger. Neither the $223 million valuation, nor the $8.47 per share in Merger consideration that Jefferies calculated was disclosed to Emisphere shareholders during the Class Period.

184. Also undisclosed to Emisphere shareholders was the fact that on August 27, 2020, Defendant McInerney forwarded Jefferies' August 27 presentation to Defendant Rachesky. McInerney sent the Jefferies presentation to Defendant Rachesky despite the fact that the Special Committee had decided at its meeting on August 23, 2020 (a mere 4 days earlier) that "Jefferies'

financial analyses ***not be shared with MHR***," *i.e.*, Defendant Rachesky who was the counterparty to the allocation negotiations.

185. On August 27, 2020, the Special Committee responded to Defendant Rachesky's proposed $531 million allocation with a proposed payment of $357 million to Rachesky and the MHR Defendants for the Diverted Royalties. This proposed allocation was presumably based on Jefferies' August 27 presentation and represented 19.8% of the total Merger Consideration offered by Novo Nordisk.

186. On September 28, 2020, Defendant Rachesky made a counterproposal to the Special Committee regarding the Diverted Royalties. He proposed an allocation of $486 million for the Diverted Royalties out of the $1.8 billion in total Merger Consideration offered by Novo Nordisk. This represented 27% of the total Merger Consideration from Novo Nordisk.

187. On October 9, 2020, the Special Committee made a counterproposal of a $414 million allocation to Defendant Rachesky and the MHR Defendants for the Diverted Royalties. This represented 23% of the $1.8 billion in Merger Consideration offered by Novo Nordisk under the August 24 Proposal.

188. On October 21, 2020, Defendant Rachesky proposed an allocation of $450 million for the Diverted Royalties, representing 25% of the total Merger Consideration offered by Novo Nordisk under the August 24 Proposal. Later that day, the Special Committee agreed to this lucrative allocation for Defendant Rachesky and the MHR Defendants. The Special Committee agreed to this allocation despite the fact that it was ***$227 million more*** than Jefferies' undisclosed $223 million valuation of the Diverted Royalties as of September 30, 2020. Emisphere shareholders were entirely unaware that the $450 million allocation to Rachesky, which directly lowered their per share consideration, was ***over 100% above Jefferies' undisclosed valuation of***

***the Diverted Royalties***. Notably, this allocation also contradicted Emisphere and the MHR Defendants' prior legal fee-sharing agreement that only allocated Rachesky 17% of the fees associated with the IP Dispute, thereby implicitly valuing the Diverted Royalties at that amount.

189. Defendants' failure to disclose or value the IP Dispute had a direct and detrimental impact on the consideration paid to Emisphere's public shareholders under the Merger. As detailed above, the Royalty Agreement provided for an overall reduction in royalties payable to Emisphere from 2.5% to 1% of all net sales of a Novo-licensed product in a given country when the relevant patents for such product "***ha[ve] been solely invented by Novo Nordisk***." *See supra* ¶¶ 63-64. The Diverted Royalty Agreement further provided that Defendant Rachesky and the MHR Defendants would receive 0.5% of the overall royalty stream irrespective of when or if Emisphere's royalty interest was stepped down. *Id.*

190. Defendants understood that pursuing and prevailing on the IP Dispute would maintain the overall 3% royalty rate (*i.e.*, 2.5% to Emisphere and 0.5% to Rachesky) until at least 2031 or beyond. *See supra* ¶¶ 105-106. Nonetheless, Defendants accepted the position that the overall royalty stream would drop from 3% to 1% in 2027, of which 0.5% was payable to Defendant Rachesky and the MHR Defendants. This allowed Defendants to justify the $450 million allocation to Rachesky, which resulted in less overall consideration to Emisphere's unaffiliated public shareholders.

### J. Defendant Rachesky Insists on a Lucrative Tax Deal With Novo And Abandons Seeking Additional Consideration Paid to Emisphere Shareholders

191. At the same time that Emisphere and Novo Nordisk were negotiating the total Merger Consideration, and Defendant Rachesky and the Special Committee were negotiating the Diverted Royalty allocation, Rachesky was negotiating a separate side deal with Novo Nordisk

that would solely benefit him and his personal financial interests to the detriment of Emisphere's unaffiliated public shareholders.

192. Once Novo Nordisk made its purported "best and final" offer of $1.8 billion in the August 24 Proposal, Defendant Rachesky initiated negotiations with Novo Nordisk to ensure he received favorable tax treatment for his $450 million Diverted Royalty allocation. Rachesky's efforts to structure the sale of the Diverted Royalties to reap significant personal tax benefits to the detriment of Emisphere's public stockholders were never disclosed during the Class Period.

193. Following Novo Nordisk's August 24 Proposal, Janet Yeung, in-house counsel for the MHR Defendants, emailed Defendant Rothwell a set of talking points regarding MHR's required "structural elements" for Novo's acquisition of the Diverted Royalties. As part of these "structural elements," Ms. Yeung's August 24, 2020 email stated "MHR would [] require that any acquisition of its 50 basis points royalty fee be effected in a certain manner." As set forth in Ms. Yeung's email, the transaction structure that Defendant Rachesky required for Novo's acquisition of his 0.5% royalty stream was as follows:

1. ***MHR's rights to the royalty fee would be purchased by a Novo entity (the "Royalty Acquiror")*** that is neither Novo Nordisk AS, the current licensee under the License Agreement with Emisphere, nor the Novo entity that would be party to the proposed merger agreement with Emisphere;

2. The Royalty Acquiror would be an entity with positive net worth and that has been in existence for at least a year; and

3. Novo would agree to keep the Royalty Acquiror in ***existence for at least a year after the closing***, and likewise would agree that Novo Nordisk AS ***would continue to pay the Royalty Acquiror the 0.5% royalty fee for at least a one year period following closing of any acquisition from MHR.***

194. Thus, Defendant Rachesky demanded that the rights to the Diverted Royalties would be purchased by a separate Novo Nordisk entity, the "Royalty Acquiror," that would remain in existence for at least a year after the Merger closed. During that period, Novo Nordisk would

continue to pay the Royalty Acquiror the 0.5% royalty fee to Defendant Rachesky and the MHR Defendants under the Diverted Royalty Agreement.

195. The following morning, Defendant Rothwell emailed Novo Nordisk's CEO Lars Jørgensen with a verbatim recitation of the required transaction structure set forth in Ms. Yeung's August 24 email. Rothwell's August 25, 2020 email explained that "as a follow up to Karsten's [Novo CFO Karsten Knudsen] revised [August 24] offer, I wanted to draw your attention to an important matter which relates to MHR and ***certain structural elements that they require***."

196. Mr. Jørgensen responded later that day and agreed that Novo Nordisk "will evaluate" the tax-related transaction structure Defendant Rachesky demanded for Novo's acquisition of his royalty stream. Defendant Rothwell dutifully forwarded these emails to Defendant Rachesky and Ms. Yeung stating "[m]message delivered.. Tim R" to assure Rachesky that his tax savings deal structure was faithfully presented to Novo.

197. Unbeknownst to Emisphere's public shareholders, the Special Committee and Novo Nordisk continued to negotiate the terms of Defendant Rachesky's personal tax deal for his $450 million allocation. As noted in the minutes of the Special Committee meeting on September 2, 2020, in connection with Novo's August 24 Proposal, "representatives of Novo Nordisk and representatives of MHR have discussed ***the tax structure being requested by MHR in the proposed transaction*** and expressed a willingness to accommodate such request, subject to further analysis."

198. This structuring requirement was intended to provide Defendant Rachesky with significant tax savings on the $450 million paid to him and the MHR Defendants for the Diverted Royalties. Because Novo Nordisk would continue to pay the Diverted Royalties to a separate Novo entity for at least a year, the Diverted Royalties would more likely be subject to a maximum

long-term capital gains tax rate of only 23.8%. That is because under the structure, the Diverted Royalties would be deemed to be sold or exchanged after a year—a prerequisite to long-term capital gains treatment. In contrast, a direct and immediate payment for the Diverted Royalties from Novo Nordisk to Rachesky would more likely be treated as a royalty advance or a termination-of-royalty payment subject to a much higher maximum personal income tax rate of 40.8%.

199. Novo Nordisk was amenable to Defendant Rachesky's tax structure for the Diverted Royalties since it was not conditioned on additional merger consideration and resulted in (i) Rachesky's willingness to accept Novo's $1.8 billion "best and final" offer for the acquisition of Emisphere, and (ii) Defendants' willingness to forgo the Unaffiliated Vote Condition on the Merger. *See infra* IV.K. Vice Chancellor Cook came to the same conclusion in assessing this tax transaction. Specifically, he found "it is reasonably conceivable that Rachesky caused Emisphere to ***accept a lower overall price*** to obtain Novo Nordisk's agreement to Rachesky's desired tax structuring for the sale of the Rachesky Royalty Stream." *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 34-35).

200. In an October 22, 2020 email to Novo's CEO to memorialize the core Merger terms, Defendant Rachesky reiterated how critical the tax structure for the Diverted Royalties was to him. One of the nine core terms Rachesky enumerated was titled "Purchaser of MHR Royalty." Under this section of his email, Rachesky wrote that:

> we will need Novo to continue to pay the purchaser of the royalty interest all amounts owed under the Royalty Agreement for approximately a year after closing. ***These are important for us to obtain our desired tax treatment for the sale***.

201. The transaction structure demanded by Defendant Rachesky was ultimately agreed to and memorialized in the (i) MHR Purchase Agreement and (ii) an Assignment and Assumption

Agreement between Novo Nordisk and certain of the MHR Defendants that were both executed on November 5, 2020 and together governed the sale of the Diverted Royalties. The structure allowed for a significant reduction in the applicable tax rate for the $450 million allocation paid to Defendant Rachesky and the MHR Defendants for the Diverted Royalties.

202. Through the transaction structure, Defendant Rachesky was able to reduce his federal tax liability on the $450 million allocation from a maximum rate of 40.8% for ordinary income to a maximum rate of 23.8% for long-term capital gains on the sale of the Diverted Royalties. This represented tens of millions in tax savings for Defendant Rachesky and the MHR Defendants. By decreasing his tax burden, Defendant Rachesky increased the effective value of his $450 million allocation to approximately $526.6 million (based on a $76 million long-term capital gains tax benefit). Defendants' Class Period statements concerning Rachesky's $450 million allocation were materially misleading because they did not disclose this increase in effective value or Rachesky's required tax structure for the allocation.

203. Defendant Rachesky was incentivized to require this tax-related transaction structure rather than seek higher total Merger consideration or keep Emisphere as a standalone company. Specifically, he was concerned about the potential negative tax consequences if the long-term capital tax rate increased to 39.6% as expected in the new year. For example, in an email from Defendant Rachesky to MHR LLC's Chief Financial Officer, Rachesky wrote "***I think MHR will be hurt by the Biden tax changes***. How much should we be worried?" In another email to Defendant Weiser, Rachesky sent an article addressing proposed changes to the capital-gains tax and asked: "Have you seen this? We need to discuss."

204. Given this concern, Defendant Rachesky had a vested interest to lock-in the Merger with Novo Nordisk and his $450 million allocation for the Diverted Royalties at the then-current

long-term capital gains tax rate, rather than continuing to operate Emisphere as a standalone company or seek higher merger consideration for Emisphere shareholders and run the risk of a much higher tax rate. In fact, Defendant Rachesky stopped demanding any increase in the overall Merger Consideration from Novo Nordisk once his tax deal was agreed to.

205. In evaluating the same Rachesky tax structure, Vice Chancellor Cook held it was reasonable to conclude that "Rachesky was willing to accept ***less total transaction consideration*** in exchange for Novo Nordisk's agreement to this unique tax structuring, ***to the detriment of the minority stockholders***." *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 31).

206. Defendants Weiser and Rothwell were also incentivized to accept this structure rather than keep Emisphere as a standalone company or negotiate for higher consideration given their enormous RSU packages worth $7.8 million each upon a change-in-control of the Company, and given Defendant Rachesky's status as Emisphere's controlling shareholder. *See supra* ¶ 98.

207. As Vice Chancellor Cook found in reviewing the same facts, "it is reasonable to infer that Emisphere's negotiators favored obtaining the options that accrued solely to [Rachesky and the MHR Defendants] ***given their status as controllers***. Thus, it is reasonably conceivable that the proposed transaction structure was a component of these negotiations and that it was included ***to the detriment of a higher transaction price***." *Emisphere*, C.A. No. 2021-0025-NAC (Del. Ch.) (Trans. ID 70754015, at 32).

### K. Defendants Relinquish the Unaffiliated Vote Condition in Favor of the Merger

208. Once Defendant Rachesky secured his enormous $450 million allocation for the Diverted Royalties and the transaction structure that supported his preferred tax treatment, he and the other Defendants took steps to ensure the Emisphere shareholder vote would be in favor of the Merger as Novo required.

209. Without any additional consideration from Novo, Defendant Rachesky and the Special Committee agreed to forgo the Unaffiliated Vote Condition that required any acquisition be approved by a majority of Emisphere voting stock not owned or controlled by the MHR Defendants. They agreed to this despite the Emisphere Board resolution that required the Unaffiliated Vote Condition for any potential transaction involving Emisphere.

210. Specifically, the decision to waive the Unaffiliated Vote Condition directly contradicted the March 17, 2020 Board Resolutions that explicitly acknowledged it was in the "best interests of the Company and its stockholders" and specifically mandated that "the consummation of any Potential Transaction [with Novo Nordisk or others] shall be subject to the ***non-waivable*** condition that the Potential Transaction receive the approval of the Special Committee and the Unaffiliated Vote" of Emisphere's public shareholders.

211. As of December 31, 2019, Defendant Rachesky and the MHR Defendants held approximately 48% of Emisphere's outstanding common stock. Defendant Rachesky and the MHR Defendants also held enough convertible Emisphere notes to reach a majority vote of Emisphere common stock in favor of the Merger. Yet, Rachesky and the MHR Defendants needed to first convert certain of these notes into voting common stock in order to do so.

212. Rather than do so, Defendants accelerated the vesting of the one million RSU's that had been granted to Defendants Weiser and Rothwell, respectively, in March 2020. This allowed for these RSUs to be converted into Emisphere common stock before the November 13, 2020 record date (the "Record Date") for eligibility to vote on the Novo Nordisk Merger. With these steps, Defendants conveniently held approximately 50.5% of Emisphere's outstanding common stock before the Record Date.

213. To further ensure that the Merger would be approved and that Defendants would reap the enormous personal financial benefits from the transaction closing, Emisphere, Novo Nordisk, certain of the MHR Defendants and the Individual Defendants entered into support agreements on November 5, 2020 (the "Support Agreements"). Under the Support Agreements, the MHR Defendants and the Individual Defendants agreed to vote their 50.5% of the outstanding Emisphere common stock they collectively held in favor of the Merger.

**L. Defendants Issue the Materially False and Misleading Proxy**

214. Defendants issued the Emisphere Proxy on November 16, 2020. The Proxy, as well as Defendants' other public statements during the Class Period, misrepresented and omitted material information concerning the Merger as detailed below.

215. Among other things, the Proxy only disclosed the Management Projections (*i.e.*, revenue, EBIT, and unlevered free cash flows) with their limited assumptions that valued Emisphere below the other internal Company projections. The Proxy did not disclose any information concerning the IP Dispute, and its projected positive impact on Emisphere's valuation. Nor did the Proxy disclose the Case 2A and Case 2B projections for the Company, which had Emisphere NPVs of $2.673 billion and $2.935 billion, respectively—far greater than the $1.8 billion in total Merger Consideration offered by Novo Nordisk. The Proxy also plainly concealed the fact that the Management Projections were the result of Defendants Weiser's and Rothwell's concerted effort to revise Emisphere's valuation downward to justify the $1.8 billion in Merger Consideration offered by Novo Nordisk. Additionally, the Proxy omitted the material fact that Rachesky's $450 million allocation of the Merger price was $227 more that Jefferies' valuation of the Diverted Royalties.

216. On December 8, 2020, the Novo Nordisk Merger was approved and the transaction closed on the same day. Under the Merger Agreement, Novo Nordisk paid $1.35 billion to acquire

Emisphere. Under the MHR Purchase Agreement, Novo Nordisk also paid $450 million to Defendant Rachesky and the MHR Defendants to acquire the Diverted Royalties, making the total Merger price $1.8 billion. Emisphere shareholders received $7.83 per share in Merger Consideration in exchange for their Emisphere shares.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

217. Throughout the Class Period, Defendants issued or caused to be issued public statements that were false or misleading and omitted numerous material facts as detailed below.

### A. False and Misleading Statements or Omissions of Material Facts in the November 6, 2020 Merger Press Release

218. The Class Period begins on November 6, 2020, when Defendants first announced the Emisphere-Novo Nordisk Merger, making material misrepresentations and omissions of material facts concerning the transaction.

219. In the November 6 press release titled "Novo Nordisk to Acquire Emisphere Technologies for $1.35 Billion," Defendant Rothwell represented that:

> After a thorough analysis of strategic alternatives, the Emisphere Board and the Special Committee unanimously determined that a combination with Novo Nordisk is the ***best way to maximize value for our stockholders***.

220. This statement was false and misleading because it failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including that: (i) Emisphere was engaged in an extensive IP Dispute with Novo Nordisk that was integral to the Merger negotiations and a key driver of Emisphere's overall financial valuation, yet Defendants failed to account for its projected positive impact on Emisphere's valuation in the Management Projections used to justify the transaction; (ii) Jefferies had modeled internal financial projections, including the Case 2A and Case 2B projections which factored in the IP Dispute, demonstrating significantly higher valuations for the Company than the $1.8 billion

acquisition price presented to Emisphere shareholders; (iii) Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders; (iv) the $450 million Diverted Royalty allocation to Rachesky and the MHR Defendants was $227 million more than Jefferies' valuation of the Diverted Royalties; and (v) Defendant Rachesky manipulated the sale process to ensure he received enormous financial benefits from the Merger, including his insistence on a transaction structure that supported significant personal tax savings on the $450 million allocation for the Diverted Royalties to the detriment of a higher transaction price for unaffiliated public shareholders.

221. The November 6 press release, further represented that:

> The Board of Directors of Emisphere approved the merger, upon the unanimous recommendation of ***a Special Committee consisting entirely of independent and disinterested Emisphere directors***.

This statement was false and misleading because it omitted materials facts that contradicted the purported independence and disinterestedness of the Special Committee.

222. Contrary to the representation in the press release, Defendant McInerney—Chairman of the two-member Special Committee—had extensive personal and business relationships with Defendants Weiser that compromised his independence. As McInerney testified in the Delaware Chancery Action, he and Defendant Weiser were "colleagues" with "a long-standing personal and business relationship dating back to 1998." This included their work together starting in 1998 at Paramount BioCapital, a pharmaceutical development and investment firm. McInerney was a Managing Director and Weiser was the Director of Research at Paramount. In July 2020, McInerney also notably solicited an investment from Weiser in Corino, a business in which McInerney was a co-founder and board member.

223. This Corino solicitation occurred in the midst of Merger negotiations with Novo Nordisk. McInerney's role as Chairman of the Special Committee was therefore conflicted given his undisclosed effort to obtain Weiser's investment in Corino ***at the same time*** he was charged with independently evaluating the Emisphere-Novo Merger. McInerney knew Weiser substantially benefitted from the Merger through lucrative RSUs and other compensation triggered by the transaction. McInerney was therefore incentivized to approve the Merger so that Weiser would then investment in Corino.

224. The same is true with respect to Defendant McInerney's undisclosed conflicts of interest concerning Defendant Rachesky. Defendant McInerney also actively pursued a multi-million dollar investment in Corino from Defendant Rachesky while McInerney was negotiating and deciding to approve Rachesky's enormous personal allocation under the Merger for the Diverted Royalties. In turn, Rachesky enticed McInerney with a Corino investment during negotiations on the Diverted Royalty allocation. This severely undermined McInerney's independence as Chairman of the Special Committee contrary to the statement in the November 6 press release.

### B. False and Misleading Statements or Omissions of Material Facts in the November 16, 2020 Definitive Proxy

225. Emisphere issued the Proxy detailing the Merger and the background of the transaction on November 16, 2020. The Proxy was issued "[b]y order of the Board of Directors," *i.e.*, Defendants Rachesky, Weiser, Rothwell, Harkey, McInerney and Draft. The Proxy was also signed by Defendant Rothwell as Chairman of the Board and Co-CEO of Emisphere. The Emisphere Board also delegated the preparation of the Proxy to the Company's officers.

### 1. False and Misleading Statements or Omissions of Material Facts Concerning the Fairness of the Merger

226. The Proxy contained material misrepresentations concerning the Board and Special Committee's reasons for recommending the Merger. The first page of the Proxy represented that "the Emisphere board, acting upon the unanimous recommendation of the Special Committee, (i) determined that the merger agreement and the transactions contemplated thereby are ***fair to and in the best interests of Emisphere stockholders***. . ." The Proxy further stated that the Special Committee recommended the Merger as the "*[b]est alternative for [m]aximizing [s]tockholder [v]alue*" (emphasis in original) given, among other things, "the Special Committee's assessment of Emisphere's business, assets and prospects, its competitive position and historical and ***projected financial performance***, and the nature of the industry in which Emisphere operates[.]"

227. These statements were materially false and misleading given their wholesale omission of any reference to, or detail regarding, the existence of the higher Case 2A and 2B projections for Emisphere that supported NPV valuations for the Company of $2.673 billion and $2.935 billion, respectively. These undisclosed Emisphere valuations were as much as ***$1.135 billion more*** than the $1.8 billion Merger price offered by Novo Nordisk.

228. These statements made no mention of the critical IP Dispute between Emisphere and Novo ***whatsoever***. This, despite the fact that the IP Dispute actually caused the Merger to occur in the first place and was ***the key factor*** underlying the Company's valuation. In this regard, the Proxy entirely omitted that Defendants (i) had engaged since 2019 in extensive discussions with Novo's CEO, CFO and General Counsel with the assistance of outside counsel at Williams & Connolly, Quinn Emanuel, and Morgan Lewis to resolve the IP Dispute; (ii) knew Novo acknowledged fault for its unauthorized disclosure of Emisphere's intellectual property in the STM Article; (iii) viewed "Emisphere's IP rights" at issue in the IP Dispute as a "***major value driver***[]"

for the Company; (iv) "***believe[d] strongly***" they were correct on the IP Dispute and had a "***high likelihood***" of success in contemplated IP litigation against Novo; (v) had their outside counsel prepare a detailed complaint on the IP Dispute that was "***ready to be filed at a moment's notice***" in federal court; (vi) knew that prevailing on the IP Dispute would entitle Emisphere to the higher 2.5% "***royalties through 2031 at the very least***"; and (vii) had assigned a $500 million "***litigation premium***" to the IP Dispute.

229. The assertion that the Merger was the best way to maximize stockholder value given Emisphere's "***projected financial performance***" also wholly omitted that Defendants Rothwell and Weiser both believed that Emisphere's 2.5% royalty stream would last until at least 2031—even though that was not depicted in the Management Projections—and they had worked with Jefferies to adjust Emisphere's financial projections downward in order to justify the Merger Consideration paid to unaffiliated shareholders. As detailed herein, the above statements concealed that in July and August 2020, Weiser and Rothwell instructed Jefferies to lower its key estimates of Emisphere's projected "peak" and cumulative Rybelsus sales upon which the Company's royalty revenues were based. (¶¶ 138-162). These undisclosed actions by Weiser and Rothwell resulted in Emisphere NPV's in the $1.5 to $2 billion range, which were more closely aligned with Novo's $1.8 billion acquisition price but far lower than the $2.6 and $2.9 billion NPVs under the concealed Case 2A and 2B projections.

230. The Proxy's representation that the Merger was "fair" and in shareholders "best interests" was also materially false and misleading because it omitted that Jefferies had calculated a far lower value for the Diverted Royalties than the $450 million he was awarded under the Merger. As detailed herein, Jefferies valued the Diverted Royalties at $223 million as of September 2020. Accordingly, Rachesky and the MHR Defendants were allocated ***$227 million***

***more*** of Novo's $1.8 billion Merger price for the Diverted Royalties than Jefferies' undisclosed valuation of that asset. Far from "fair" as represented in the Proxy, Emisphere's unaffiliated shareholders received less per share consideration under the Merger given the overvalued $450 million allocation paid to Rachesky and the MHR Defendants.

231. Defendants could not have subjectively believed the Merger was "fair" and in the "best interests of Emisphere stockholders" given their knowledge of the undisclosed IP Dispute and its projected positive impact on Emisphere's valuation.

**2. False and Misleading Statements or Omissions of Material Facts Concerning the Company's Financial Projections**

232. Defendants made material misrepresentations and omissions of material facts in the Proxy concerning Emisphere's financial projections that were used to justify the purported fairness of the Merger Consideration offered to shareholders.

233. In a section of the Proxy titled "Opinion of the Special Committee's Financial Advisor," made statements concerning the Emisphere Management Projections and their use by Jefferies in preparing its Fairness Opinion on the Merger. This included the assertion that Jefferies was advised as follows:

> the financial forecasts and estimates relating to Emisphere that Jefferies was directed to utilize for purposes of its analyses and opinion ***were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of Emisphere management*** as to, and ***were an appropriate basis upon which to evaluate, the future financial performance of Emisphere*** and the other matters covered thereby.

234. The Proxy only included the following Management Projections:

**Summary of the Prospective Financial Information—Emisphere Stand-Alone**
*(in millions)*

| | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E | 2038E | 2039E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | 16.0 | 96.8 | 92.9 | 125.9 | 153.3 | 165.6 | 175.8 | 135.6 | 39.2 | 41.4 | 43.6 | 46.0 | 48.5 | 51.2 | 54.1 | 10.4 | 5.0 | 4.4 | 4.0 | 3.7 |
| EBIT(1) | 9.4 | 90.0 | 85.9 | 118.7 | 145.9 | 158.0 | 167.9 | 127.5 | 30.9 | 32.8 | 34.7 | 36.9 | 39.1 | 41.5 | 44.1 | 8.5 | 4.1 | 3.6 | 3.3 | 3.0 |
| Unlevered free cash flow(2) | 0.0 | 77.0 | 77.0 | 110.6 | 111.1 | 115.5 | 123.4 | 105.5 | 47.0 | 24.1 | 25.5 | 27.1 | 28.7 | 30.5 | 32.4 | 16.5 | 4.3 | 2.8 | 2.5 | 2.3 |

(1) EBIT is a non-GAAP financial measure defined as earnings before interest and taxes.
(2) Unlevered free cash flow is a non-GAAP financial measure defined as EBIT less taxes and less changes in net working capital.

235. The financial projection statements referenced in ¶¶ 233-234 were false and misleading when made because they failed to disclose material facts concerning the Merger, which were known to or recklessly disregarded by Defendants, including that: (i) the Management Projections depicted a royalty revenue step down in 2027 even though Defendants understood the IP Dispute meant Emisphere was entitled to increased revenues until "at least" 2031 and potentially through 2034; (ii) Jefferies had modeled the Case 2A and Case 2B financial projections that resulted in NPVs of ***$2.673 billion and $2.935 billion***, respectively, and supported higher merger consideration for shareholders than the $1.8 billion Merger price; and (iii) Defendants Rothwell and Weiser worked to adjust Emisphere's financial projections downward to justify the Merger Consideration paid to Emisphere shareholders.

236. Specifically, the Management Projections did not account for and omitted any facts concerning the SNAC-related IP Dispute and its projected positive impact on Emisphere's stated valuation. *See* ¶¶ 65-85, 101-137. In fact, Defendant Rothwell agreed with the "Management Forecasts" sent by Jefferies in October 2020 that showed Emisphere's 2.5% royalty rate lasting only to 2027, thereby assigning no value to the IP Dispute, despite Defendants' strongly held belief that Emisphere's royalty rights extended to 2031 or later. ¶¶ 170-171.

237. The Proxy's statements on the Management Projections also made no reference to the fact that in emails exchanged with Jefferies in July and August 2020 (i) Weiser instructed Jefferies to cut its July 2020 estimate of $231 billion in total Rybelsus sales to estimates ranging from $100 million to $200 billion in sales; (ii) Rothwell pushed only the "low" end of these Rybelsus sales projections for Emisphere's valuation; (iii) Weiser and Rothwell instructed Jefferies to use earlier dates for the introduction of generic drugs that would compete with Rybelsus (*i.e.*, 2030-2031 vs. 2034) and "peak sales" estimates for Rybelsus that were reduced by billions of dollars from the Case 2A and 2B projections; and (iv) Weiser and Rothwell later instructed Jefferies to further reduce "peak" Rybelsus sales estimates that cut cumulative Rybelsus sales for Q1 2026 through Q4 2027 by $30 billion. Collectively, these undisclosed manipulations by Defendants Weiser and Rothwell ***cut up to $1.13 billion off of Emisphere's NPV*** from the undisclosed Case 2A and 2B projections in order to make the Company's NPV more closely aligned to Novo's $1.8 billion Merger price.

238. Defendants made another material misstatement related to the IP Dispute in the Proxy section summarizing the "Financial Statements of Emisphere." In the portion of this summary titled "Notes to Financial Statements," Defendants identified the following as a "Related Party Transaction":

> In September 2019, the Company and MHR entered into an expense sharing agreement ***in connection with professional fees related to the GLP-1 License Agreement*** (See Note 17), whereby, MHR has agreed to pay 17% of such expenses.

239. This statement was materially false and misleading because it failed to disclose that the "expense sharing agreement" for "professional fees" was in fact an agreement between Emisphere, Rachesky and the MHR Defendants to share ***legal fees incurred in connection with the IP Dispute***. At its meeting on October 3, 2019, the Board approved this legal fee-sharing

agreement under which, "Emisphere would be responsible for 83% and MHR would be responsible for 17% of the costs incurred ***including legal fees payable to Quinn Emanuel***." *See* ¶ 83. Defendants Harkey, McInerney, Rachesky, Rothwell and Weiser were present at this meeting. Defendants' failure to disclose the true reason for the fee-sharing agreement further concealed the existence of the IP Dispute and its material impact on Emisphere's valuation.

### 3. False and Misleading Statements or Omissions Concerning the Diverted Royalty Allocation

240. Defendants made material misstatements and omissions in the Proxy concerning the $450 million allocation of the $1.8 billion Merger price paid to Defendant Rachesky for the Diverted Royalties.

241. In the "Background of the Merger" section of the Proxy, Defendants described the negotiations on Novo's August 24 Proposal to acquire Emisphere for $1.8 billion and the related Diverted Royalty allocation as follows:

> [On August 26, 2020], [t]he Special Committee then directed Mr. Rothwell to respond to Novo Nordisk that Emisphere would be willing to continue discussions on the terms outlined in the August 24 proposal, ***but that the allocation of the aggregate transaction consideration between Emisphere and MHR's royalty interest had not yet been determined*** and, therefore, any agreement with Novo Nordisk would be subject to such determination and a review of the final terms of the transaction agreements.

Defendants further explained their response to the August 24 Proposal as follows:

> On August 27, 2020, the Special Committee, after considering the terms of MHR's proposal for the allocation of the proposed aggregate transaction consideration, determined to counter with a proposal that ***the MHR royalty parties' royalty interest would be valued at approximately $357 million.*** This amount represented approximately 19.8% of Novo Nordisk's proposed aggregate transaction consideration to acquire Emisphere and the MHR royalty parties' royalty interest.

242. Both statements were false and misleading because they omitted the material fact that Jefferies had calculated a much lower value for the Diverted Royalties at the time. The

statements concealed that on August 25 and August 27, 2020, Jefferies had calculated an NPV of $223 million for the Diverted Royalties.

243. Defendants also described the ultimate agreement reached on the Diverted Royalty allocation, as follows:

> Also on October 21, 2020, following further discussions and negotiations, MHR and the Special Committee agreed on a purchase price for the MHR royalty parties' royalty interest of $450 million. . . . In agreeing to this purchase price for the MHR royalty parties' royalty interest, ***the Special Committee took into account, the relative values of the MHR royalty parties' royalty interest as compared to Emisphere's royalty interest under the Royalty Agreement***. . . .

244. Additionally, Defendants set forth the "significant factors" the Special Committee considered in its decision to recommend the Merger for Board approval. This included Defendants' statement in the Proxy that:

> the proposed allocation of consideration between the merger agreement and the MHR purchase agreement ***was fair, in light of the relative values of the MHR royalty parties' royalty interest*** as compared to Emisphere's royalty interest under the Royalty Agreement. . . .

245. The statements in ¶¶ 243-244 about the purported fairness of the $450 million allocation to Defendant Rachesky and the MHR Defendants given the "relative value[]" of the Diverted Royalties was materially false and misleading when made. Both statements failed to disclose that Jefferies valued the Diverted Royalties at ***$223 million*** as of September 30, 2020—less than one month prior to the Special Committee's agreement to the $450 allocation paid to Rachesky and the MHR Defendants. Accordingly, the statements omitted the material fact that the $450 million allocation to Rachesky and the MHR Defendants, which directly lowered the per share consideration paid to public shareholders under the Merger, was ***over 100% above Jefferies' undisclosed valuation of the Diverted Royalties***.

246. These statements were also materially false and misleading because they made no reference to the IP Dispute and its impact on the relative value of Defendant Rachesky's allocation as compared to Emisphere's extended royalty payments under the IP Dispute as detailed below. *See infra* Section VI.E.

247. Defendants could not have subjectively believed the $450 Diverted Royalty allocation to Rachesky and the MHR Defendants was "fair" knowing how overvalued it was relative to Jefferies' undisclosed internal calculations.

#### 4. False and Misleading Statements Concerning the MHR Purchase Agreement

248. The Proxy included material misrepresentations concerning the MHR Purchase Agreement and the transaction that it governed. A section of the Proxy titled "Structure of the Transaction," purported to describe the transaction under which Defendant Rachesky and the MHR Defendants would receive the $450 million allocation for Novo Nordisk's purchase of the Diverted Royalties as follows:

> Subject to the terms and conditions of the MHR purchase agreement, at the closing of the MHR purchase agreement, (i) the MHR royalty parties have agreed to sell, transfer, assign and deliver to the NNAS royalty party, and the NNAS royalty party has agreed to purchase from the MHR royalty parties, all of the right, title and interest of the MHR royalty parties in, to and under the purchased assets and (ii) the MHR royalty parties have agreed to assign to the NNAS royalty party, and the NNAS royalty party has agreed to assume from the MHR royalty parties, certain liabilities associated with the purchased assets.

249. Defendants also made a general reference to tax issues in connection with the MHR Purchase Agreement in a Proxy section titled "Withholding," which stated that:

> Each of the parties shall be entitled to deduct and withhold from amounts payable pursuant to the MHR purchase agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under any provision of federal, state, local or foreign tax law.

250. These descriptions of the Diverted Royalty acquisition in ¶¶ 248-249 were materially false and misleading when made because they wholly omitted material facts concerning the transaction, which were known to or recklessly disregarded by Defendants, including that (i) Defendant Rachesky insisted the transaction be structured to allow him to claim long-term capital gains on the $450 million allocation for the Diverted Royalties; (ii) Defendant Rachesky reaped millions in savings on his personal tax liability given this transaction structure that increased the effective value of the Diverted Royalty allocation to approximately $526.6 million; (iii) Defendant Rachesky stopped making demands for higher consideration to Emisphere shareholders once his tax structure was agreed upon with Novo, and (iv) Defendants consented to this transaction structure at the behest of Defendant Rachesky and at the expense of negotiating for higher consideration in the Merger given Rachesky and the MHR Defendants' status as controlling shareholders of Emisphere.

251. The Proxy's "Background of the Merger" section further omitted any details about Defendant Rachesky's insistence on a transaction structure for the Diverted Royalties that benefitted his personal tax position to the detriment of higher merger consideration for Emisphere's unaffiliated public shareholders.

252. In referencing Novo Nordisk's August 24 Proposal, the Proxy stated:

> On August 24, 2020, Novo Nordisk sent to Emisphere a further revised non-binding written proposal regarding a potential transaction (which we refer to as the "August 24 proposal"). Under the August 24, 2020 proposal, Novo Nordisk would acquire Emisphere on a cash-free and debt-free basis and would acquire the MHR royalty parties' [Defendant Rachesky and the MHR Defendants] interest in the [Diverted] Royalty Agreement for aggregate cash consideration of $1.8 billion. . . .
>
> On August 25, 2020, at the request of the Special Committee, ***Mr. Rothwell communicated to Novo Nordisk that the Special Committee was considering the August 24 proposal***.

253. The statements in ¶ 252 were materially false and misleading when made because they wholly omitted that on August 24, 2020, just after Novo Nordisk's August 24 Proposal was received, Janet Yeung, in-house counsel at MHR, emailed Defendant Rothwell the transaction structure Defendant Rachesky required for personal tax purposes before he would agree to sell the Diverted Royalties to Novo Nordisk. They further omitted that on August 25, 2020, Defendant Rothwell emailed Novo Nordisk's CEO a verbatim copy of the tax-related transaction structure demanded by Defendant Rachesky. Emisphere shareholders were entirely unaware that in the sale of the Diverted Royalties to Novo Nordisk, Defendant Rachesky was requiring a personal tax benefit that was included to the detriment of a higher transaction price.

254. The Proxy made further misstatements about the Merger negotiations and Defendant Rachesky's efforts to obtain significant personal tax benefits on his $450 million allocation in lieu of seeking higher Merger consideration for Emisphere's unaffiliated shareholders. In describing a Special Committee meeting on September 3, 2020, that Proxy stated:

> On September 2, 2020, the Special Committee held a telephonic meeting at which representatives of WilmerHale [legal advisor to the Special Committee] were present. At this meeting, the Special Committee further discussed the August 24 proposal ***and communications between representatives of Emisphere and Novo Nordisk since receipt*** [sic] ***the August 24 proposal.***

255. The statement in ¶ 254 was materially false and misleading because it made no reference to the fact that Defendant Rachesky and Novo Nordisk were at this time negotiating a transaction structure for Rachesky's $450 million allocation to provide him with significant personal tax benefits to the ultimate detriment of a higher merger price for Emisphere's unaffiliated shareholders under Novo's August 24 Proposal.

256. Nor did the statement disclose that Novo was receptive to this tax structure to benefit Defendant Rachesky. The statement entirely omitted, as reflected in the September 2

Special Committee meeting minutes, that in connection with Novo's August 24 Proposal, "representatives of Novo Nordisk and representatives of MHR have discussed ***the tax structure being requested by MHR in the proposed transaction*** and expressed a willingness to accommodate such request, subject to further analysis." Emisphere shareholders were completely in the dark about Defendant Rachesky's tax deal with Novo and how it would negatively impact their per share consideration under the Merger.

257. In referencing the late-stage negotiations between Defendants and Novo, the Proxy also stated that:

> On October 23, 2020, Dr. Rachesky and Mr. Jørgensen discussed proceeding on the basis of the proposed $1.8 billion aggregate transaction consideration and the removal of the Unaffiliated Vote Condition.

258. This statement was materially misleading because it entirely omitted that just one day prior, Defendant Rachesky emailed a list of core transaction terms to Mr. Jørgensen that included Rachesky's tax-driven transaction structure for Novo's acquisition of the Diverted Royalties. Defendant Rachesky reiterated to Jørgensen that this transaction structure was "important for us to obtain our desired tax treatment for the sale." The above statement in the Proxy failed to disclose that Rachesky and the MHR Defendants demanded this structure in order to lower Rachesky's personal tax burden at the expense of negotiating higher per share consideration for Emisphere shareholders.

### 5. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee's Independence

259. Like Emisphere's November 6 press release, the Proxy falsely claimed that the Special Committee was "independent and disinterested." The cover page of the Proxy stated that:

> The terms of the merger agreement were negotiated and considered by a special committee . . . comprised ***entirely of independent and disinterested*** members of the board of directors of Emisphere. . . .

The "Background of the Merger" section of the Proxy reiterated this claim as follows:

> [T]he Emisphere board established a special committee comprised ***entirely of independent and disinterested members of the Emisphere board*** to identify, evaluate and negotiate any [] potential transaction (which we refer to as the "Special Committee") and appointed Howard Draft and Timothy McInerney as the members of the Special Committee.

260. Defendants further represented that a basis for the Board's approval of the Merger was:

> the fact that the Special Committee is ***comprised only of independent and disinterested directors unaffiliated with MHR*** and, other than their interests described under "The Merger—Interests of Emisphere's Directors and Executive Officers in the Merger," ***the members of the Special Committee do not have material interests in the merger different from, or in addition to, those of Emisphere and its stockholders generally***.

261. The statements in ¶¶ 259-260 were false and misleading because they omitted material facts about Defendant McInerney that demonstrated his lack of independence from Defendants Weiser and Rachesky.

262. McInerney and Weiser are close personal friends. In recently obtained deposition testimony taken in the Delaware Chancery Court Action, Defendant McInerney testified that he and Defendant Weiser were "colleagues" with "a long-standing personal and business relationship dating back to 1998." *In re Emisphere*, C.A. No. 2021-0025-JRS (Del. Ch.) (Oct. 28, 2024 McInerney Depo. Tr. at 16:1-3). In fact, McInerney could not identify how many times he and Defendant Weiser had met outside of Emisphere Board meetings because there were too many to say with certainty. *Id*. at 16:5-16.

263. The business dealings between McInerney and Weiser were also extensive and long pre-dated McInerney's appointment to the Emisphere Board in 2012. Their initial business dealings started in 1998, when Weiser and McInerney worked together at Paramount BioCapital,

Inc., a company focused on investment in the biotechnology industry. McInerney was a Managing Director at Paramount at that time, while Weiser served as the Director of Research at the company.

264. Defendant McInerney also solicited investments from both Defendant Weiser and Rachesky in Exicure and Corino, with the Corino outreach occurring at the same time McInerney was working on behalf of the Special Committee. McInerney knew that both Weiser and Rachesky stood to receive enormous financial windfalls under the Merger. He was therefore incentivized to recommend and approve the Merger for the Board so that Weiser and Rachesky would make large investments in Corino. Accordingly, the Special Committee's Chairman and one-half of the Special Committee itself was in no way "independent" from Weiser and Rachesky or "disinterested" in the Merger. None of this was disclosed to Emisphere shareholders.

**6. Material Omissions Concerning the Emisphere Co-CEO Conflicts**

265. The Proxy omitted material facts demonstrating that Defendants Weiser and Rothwell harbored significant conflicts of interest given their close personal and business connections to Defendant Rachesky.

266. In describing the Merger background and other facts about the transaction, Defendants made no reference to the fact that (i) since 2006, Weiser and Rachesky had a substantial investment partnership in Actin Biomed LLC, a biotechnology investment company that Weiser was Co-CEO of; (ii) Rachesky made numerous investments in Actin that totaled approximately $40 million over time; (iii) Rachesky appointed Weiser to the Emisphere Board because of their work together on Actin; and (iv) Rachesky and Weiser had an ongoing investment partnership in Actin at the same time Weiser was negotiating the terms of the Merger and the $450

million Diverted Royalty allocation, both of which substantially enriched Rachesky and the MHR Defendants.

267. Defendants also omitted any detail of the close personal friendship between Rachesky and Weiser. This includes their routine social activities together, as well as Weiser's attendance at key Rachesky family events, such as his children's bar and bat mitzvahs and wedding, attendance at Rachesky's 65th birthday celebration and his mother's funeral. None of these prior and ongoing personal and business relationships between Weiser and Rachesky were disclosed by Defendants to Emisphere's unaffiliated shareholders.

268. Defendant Rothwell's conflicts were also omitted from the Proxy. Defendants said nothing about the fact that Rothwell discussed his lucrative Co-CEO compensation with Rachesky in advance of being appointed, or that he negotiated the terms of his lucrative RSU awards with the MHR Defendants' in-house counsel. Rachesky awarded Rothwell's generous compensation package before Rothwell negotiated the terms of the Merger and its enormous payout to Rachesky and the MHR Defendants. Emisphere's unaffiliated shareholders had no information about these conflicts during the Class Period.

## VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

269. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Emisphere during the Class Period and detailed in Section V above were materially false and misleading. Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1 through 268 as if fully set forth herein, including the allegations in Sections III and IV detailing Defendants' undisclosed conflicts of interest and fraudulent scheme, all of which are incorporated in this Section by reference and provide additional evidence of Defendants' scienter. In addition to the allegations set forth above, the particularized facts detailed

below when viewed holistically and in the light most favorable to Plaintiffs, establish a strong inference of Defendants' scienter.

### A. Defendants Concealed the Existence of the IP Dispute Despite Knowing it Had a Substantial Impact on Emisphere's Valuation

270. According to numerous internal documents, all Defendants were not only aware of the existence of the IP Dispute prior to the start of the Class Period, but also clearly understood that Emisphere's intellectual property rights were a "major value driver[]" that "deserve[d] special attention" in the valuation of the Company.

271. As early as November 2018, Defendant Weiser alerted Defendant Rothwell that he was "VERY CONCERNED" about the unauthorized disclosure of Emisphere's SNAC-related intellectual property in the STM Article, and that he "***strongly believe[d]*** that there is patentable material in this publication on SNAC alone." In response, Defendant Rothwell sent an email to Novo's CEO on April 26, 2019 detailing the ways in which the STM Article disclosed elements of Emisphere's SNAC drug carrier technology. In his email, which was forwarded to Defendant Weiser, Rothwell asserted that the unauthorized disclosures in the STM Article had "***significant economic implications***" for Emisphere and had "***risen to the Board level***" as a result. Accordingly, the Individual Defendants were aware of the IP Dispute and its impact on Emisphere's valuation.

272. Each of the Individual Defendants remained apprised and was actively involved in the affirmative steps taken to protect Emisphere's intellectual property at issue in the IP Dispute. This included the Board's (i) approval on June 18, 2019 to retain the Quinn Emanuel and Morgan Lewis law firms in connection with the IP Dispute; and (ii) approval of the legal fee-sharing agreement between the Company and Defendant Rachesky on October 3, 2019 that arose from the IP Dispute.

273. As the two members of the Special Committee, Defendants McInerney and Draft were plainly aware of the patent "co-inventorship" issue that was a critical part of the IP Dispute and understood its significant impact on Emisphere's royalty rate. Both were copied on Quinn Emanuel's March 4, 2020 email to Novo's General Counsel that asserted Novo violated U.S. patent law "in failing to name Emisphere as co-inventors" on three separate patents for Rybelsus, and that such co-inventorship entitled Emisphere to the higher 2.5% royalty rate "through at least the[] [patents'] expiry in 2034" instead of 2027.

274. The Director and Special Committee Defendants also received a March 2020 email exchange between Weiser and Novo Nordisk discussing the IP Dispute and specifically whether the intellectual property at issue "w[as] conceived solely by Novo scientists, without any contribution from Emisphere's scientist."

275. Additionally, Defendants Weiser, Rothwell, McInerny, and Draft each were copied on, and had personally participated in drafting, an April 19, 2020 email with "FINAL Talking Points for my [*i.e.*, Weiser's] call with Novo" declaring that Emisphere considered the IP Dispute to be a "***major value driver[] in any potential deal that deserve[s] special attention***" throughout Merger negotiations with Novo Nordisk. That same email further explained there was "***universal conviction on the part of Emisphere and its directors*** around th[e] view" that Emisphere's February 20 Proposal "undervalue[ed] the company, including future royalty revenue from Novo," and that "future royalty revenues from Novo" was a "***key value driver[] to Emisphere***[.]" In the email, these Defendants also explicitly acknowledged the materiality of the IP Dispute, stating: "***We have spent considerable time and resources examining these [IP] issues and view them as extremely serious***."

276. To this end, Defendants Weiser and Rothwell both reviewed a formal complaint from outside counsel in summer 2020 that they planned to file in the Southern District of New York to protect Emisphere's intellectual property rights. Defendant Rothwell also had a call with Novo's CEO on July 10, 2020 that further demonstrated his understanding of the material impact the IP Dispute had on Emisphere's valuation. On the call, Rothwell stated he "***believe[d] strongly that we are right***" on the IP Dispute given his training as a patent lawyer, which would entitle Emisphere to "***additional royalties through 2031 at the very least***," and possibly through 2034. Despite his understanding that the IP Dispute was a key factor in valuing the Company, Rothwell signed the Proxy that made no reference to the IP Dispute at all.

277. Defendant Rachesky also understood that the IP Dispute had a significant impact on Emisphere's value, yet knowingly omitted any reference to it during the Class Period. Rachesky assigned a $500 million value to the IP Dispute in his undisclosed counter-offer on July 29, 2020 to sell Emisphere to Novo for $3.5 billion. This undisclosed acquisition price proposed by Defendant Rachesky included a $500 million "***litigation premium***" for the IP Dispute.

278. Rather than disclosing the known existence, gravity, and monetary significance of the IP Dispute so that investors could sufficiently weigh all available options, Defendants knowingly, or recklessly, concealed the true facts about the IP Dispute and its material impact on Merger negotiations from investors. Defendants' material omission of these known facts concerning the IP Dispute is highly probative of scienter.

**B. Defendants Knew the Merger Consideration Was Considerably Lower than Other Contemporaneous Company Valuations**

279. Each of the Individual Defendants personally was aware of projected valuations of Emisphere significantly in excess of the $1.8 billion Merger price and knew or recklessly disregarded that those higher projections were concealed from the market.

280. Indeed, Defendants Weiser, Rothwell, McInerny and Draft were each provided and reviewed Jefferies' Case 2A and 2B projections of the Company at various times before the Class Period began and knew that those valuations were substantially higher than the eventual Merger Consideration because, among other things, they attributed monetary value to the IP Dispute and the extension of the 2.5% Royalty Stream to 2034.

281. In May 2020, for example, the Special Committee was provided with projections that included four separate valuation cases: the Evercore Case (based on projections that Novo Nordisk had created), Case 1, Case 2A, and Case 2B. Internal documents show that the Evercore Case and Case 1 projections assumed a royalty step-down from 3% to 1% in June 2027, and Cases 2A and 2B assumed the step-down would occur in May 2034, ***allowing Emisphere to benefit from a 2.5%, rather than a 0.5%, royalty stream for nearly seven additional years***. Accordingly, the Case 2A and 2B projections resulted in NPVs for Emisphere of $2.673 billion and $2.935 billion, respectively, which were dramatically higher than the $950 million and $1.332 billion valuations under the Evercore and Case 1 projections, as well as the $1.8 billion Merger price.

282. Then, on July 1, 2020, Weiser received the June 2020 Project Eagle deck and an explanation from Jefferies that the 2A and 2B projections "both show[ed] a 2034 royalty switch date." Weiser forwarded the summary to Rothwell, directing him to "[l]ook at page 3 [that set forth the detailed presentation of the Case 2A and 2B projections] for the easiest summary." Like the valuations provided to the Special Committee in May 2020, the June 2020 Project Eagle valuations projected NPVs of $2.673 billion and $2.935 billion for the Case 2A and 2B projections, respectively. In the end, Novo Nordisk's final offer of $1.8 billion was between ***$870 million to $1.135 billion less*** than the Case 2A and 2B valuations, respectively.

283. In addition to the Jefferies valuations, internal documents further demonstrate that Defendants, and particularly Rachesky, valued the Company significantly in excess of the ultimate Merger price. For example, Defendants McInerney, Draft and Weiser were informed during the Special Committee meeting held on July 29, 2020 that Defendant Rachesky and the MHR Defendants "would be prepared to consider supporting a possible transaction ***with a transaction value of at least $3.5 billion***." McInerney, Draft and Weiser took this valuation seriously as evidenced by the fact that they determined the $3.5 billion proposal should be conveyed to Novo Nordisk.

284. After Novo Nordisk rejected the $3.5 billion offer, Defendants McInerney and Draft communicated at the Special Committee meeting held on August 17, 2020 that Defendant Rachesky and the MHR Defendants "would support a transaction ***with a transaction value of at least $2.5 billion***" and again determined that this $2.5 billion proposal should be conveyed to Novo Nordisk by Defendant Rothwell. The August 17 meeting minutes reflect that the Special Committee Defendants wanted Rothwell to confirm with Novo's CEO that the Special Committee "would be prepared to continue discussions with Novo Nordisk regarding a transaction with a transaction value of at least $2.5 billion." Neither the $3.5 billion, nor the $2.5 billion counterproposals for acquiring Emisphere were disclosed to investors. Defendants decided instead to pursue a transaction that benefited them personally at the expense of unaffiliated public shareholders.

285. Despite each having received and reviewed projected valuations for Emisphere that vastly exceeded the eventual $1.8 billion Merger price, Defendants knowingly or recklessly failed to disclose to investors the existence of those significantly higher projections, let alone attempted

to explain why those markedly higher valuations were disregarded by Defendants during the Merger negotiations.

### C. Defendants Weisner and Rothwell Personally Directed Jefferies to Lower its Emisphere Financial Projections

286. Internal documents obtained to date clearly show that Defendants Weiser and Rothwell were directly involved in the Merger negotiations despite their acknowledged conflicts, and instructed Jefferies to adjust Emisphere's financial projections downward so they would be more in line with Novo Nordisk's offers. Indeed, Jefferies and Weiser exchanged emails on July 25, 2020 discussing three different projection scenarios, generating NPV outputs of (1) $659 million for a 2027 step-down; (2) $888 million for a 2031 step-down; and (3) $1.004 billion for a 2034 step-down. When Jefferies subsequently provided royalty scenarios reflecting $100, $150 and $200 billion in cumulative sales, Rothwell instructed Jefferies to employ the smallest possible scenario, claiming—without support—that "[t]he 150 and 200 seem a bit hard to justify." In addition, as the likely Merger price became clearer, Weiser and Rothwell interjected "Generic Erosion" assumptions into valuation analyses that assumed earlier patent loss for Rybelsus, causing the valuations to be adjusted downward.

287. In August 2020, Weiser and Rothwell again caused the projected NPVs to be further reduced. First, Weiser and Rothwell lowered the expected royalties in the out years and cut both peak sales and cumulative sales of Rybelsus, which resulted in standalone values of $1.137 billion under the "current tax system" and $824 million under "Biden's current plan."

288. Second, on August 13, 2020, Jefferies sent Weiser and Rothwell an email reflecting their discussions of a new draft scenario assuming a "3% royalty to 2031, then 2% to 2034," peak sales of "~$15b," and cumulative sales through 2034 of "~$150b," resulting in a "Royalty NPV" of "~$2.0b." Weiser immediately questioned Jefferies' use of peak sales of $15 billion, and

directed Jefferies to assume peak sales of $10 billion instead and to lower the "Cumulative sales reached" assumptions by $10 billion for Q1 2026, Q4 2026, and Q4 2027. This change would result in a $30 billion reduction in cumulative Rybelsus sales figures for these quarters and lower the cumulative Rybelsus sales through 2034 from $150 billion to $120 billion.

289. The undisclosed efforts by Defendants Weisner and Rothwell to dramatically lower the projected valuation of their own Company in order to justify the $1.8 billion Merger price is highly probative of scienter.

### D. Rachesky and the Special Committee Defendants Knew Jefferies' Valuation of the Diverted Royalties Was Far Lower than $450 Million

290. Defendants were aware that Jefferies calculated a value for the Diverted Royalties that was far lower than the $450 million ultimately paid to Defendant Rachesky for this asset.

291. In August 2020, Jefferies sent Defendant McInerney presentations that calculated a ***$223 million*** NPV for the Diverted Royalties. Based on this valuation, Jefferies further calculated implied per share proceeds of ***$8.47*** under Novo's final Merger price of $1.8 billion. Jefferies' discussed its valuation of the Diverted Royalties with Defendants McInerney and Draft on August 26, 2020. Defendant McInerney later shared Jefferies' valuation of the Diverted Royalties with Defendant Rachesky. McInerney's actions were contrary to the Special Committee's determination on August 23, 2020 to not share Jefferies' valuations with Rachesky, who was the counterparty to negotiations on the Diverted Royalty allocation.

292. Despite knowing Jefferies had assigned a $223 million NPV for the Diverted Royalties, the Special Committee Defendants agreed to allocate $450 million of the $1.8 billion Merger price to Rachesky and the MHR Defendants—***$227 more*** than Jefferies' undisclosed valuation of the Diverted Royalties.

293. The Special Committee Defendants were also aware that this overpayment to Rachesky and the MHR Defendants lowered the per share consideration paid to Emisphere shareholders. Rachesky and the Special Committee Defendants could not have subjectively believed the Merger was "fair" and in the "best interests of Emisphere stockholders" given their knowledge of Jefferies' far lower valuation of the Diverted Royalties and the overpayment for the Diverted Royalties to the detriment of Emisphere shareholders.

**E. Defendants Rachesky, Weiser, and Rothwell Were Incentivized to Conceal Material Facts About Emisphere's True Valuation to Ensure a Quick Closing**

294. Rachesky was motivated to close the Novo Nordisk deal as quickly as possible, even if that meant leaving money on the table. The Meger negotiations coincided with the 2020 presidential race. The Democratic candidate—then Vice-President Biden—promised that he would increase the federal tax rate on long-term capital gains to 39.6%, almost double the 20% rate in force at the time of the Merger. Because Rachesky was focused on monetizing his investment in the near term to avoid paying 39.6% in long-term capital gains, he was incentivized to accept an offer from Novo Nordisk even if it undervalued Emisphere so he could close the deal before a change in the tax structure.

295. Indeed, Emisphere's primary value driver was the IP Dispute with Novo. But pushing harder on the IP Dispute would take time and would certainly push the deal into the new presidential regime and could threaten the deal altogether. Using the Case 2A and 2B projections—which incorporated the value of the IP Dispute—but applying a 39.6% tax rate, Rachesky would have potentially walked away with a net profit of $1.17 billion to $1.18 billion. If the deal closed quickly at the $1.8 billion Merger price prior to any tax changes, Rachesky would walk away with $1.11 billion. Rachesky preferred to close the deal and get his money rather than keep Emisphere as a standalone company and litigate the IP Dispute, or seek a higher Merger price

from Novo or a third-party as doing so would prolong deal negotiations and run the risk of a higher long-term capital gains tax rate.

296. Rachesky also possessed ulterior motives regarding the timing of the Company's step-down in royalty rates from 3% to 1% at the heart of the IP Dispute. Although the IP Dispute was a key factor in valuing the Company, Rachesky was motivated to hide the IP Dispute so his $450 million allocation could be justified. While pushing the IP Dispute would have extended the Company's right to receive 3% royalties, doing so also would have resulted in Rachesky personally receiving a substantially lower allocation for the Diverted Royalties. Indeed, Rachesky would be paid 0.5% of the royalty stream irrespective of when the step-down from 3% to 1% went into effect for the Company. However, as long as Emisphere's royalty stream payment remained at 3%, Rachesky's 0.5% royalty would give him only 16.7% of the total royalty payment.

297. By contrast, once Emisphere's royalty payment stepped down to 1%, Rachesky's 0.5% royalty stream would result in him receiving 50% of the total royalty payment. Jefferies recognized this increase for Defendant Rachesky following its discussion with Defendant McInerney on August 22, 2020 concerning the Rachesky allocation. As Jefferies stated in an August 22, 2020 email, "[t]he[] ***big driver is the royalty step down***. Once it goes to 1%, MHR's share goes from 20% to 50% of royalty stream."

298. Under Emisphere's position in the IP Dispute, the 3% royalty stream would remain until 2034—meaning Rachesky would receive only 16.7% of the total payment for the next fourteen years. However, under Novo Nordisk's position that the step-down occurred in 2027, Rachesky would receive ***50***% of the payment for half that time (*i.e.*, 16.7% from 2020 until 2026 and 50% from 2027 until 2034). Accordingly, Rachesky did not want to disclose the IP Dispute

because it would expose his overvalued Diverted Royalty allocation and could cause shareholders to seek an injunction regarding his allocation or otherwise seek appraisal.

299. It was Rachesky's claim that he was entitled to ***half*** of the royalty proceeds from 2027 onward, that allowed the Special Committee to justify the allocation of 25% of the Merger Consideration, or $450 million, to him personally. Defendant Rachesky also knew his allocation for the Diverted Royalties was over $200 million higher than Jefferies' valuation sent to him by Defendant McInerney on August 27, 2020.

300. Defendants Rothwell and Weiser also had their own self-interested reasons to favor the Merger over Emisphere remaining independent. When Novo Nordisk first proposed entering into a potential transaction with Emisphere, they were merely outside directors. Only after the proposal did they halt the search for a new CEO and step in themselves as Co-CEOs, receiving a million RSUs each. Unless they remained Co-CEOs for over four years—which they did not intend to do—the only way they would obtain their multi-million dollar payouts for those RSUs was if they saw to it that the Company was sold. That is exactly what they did.

### F. Defendant McInerney Was Incentivized to Approve the Unfair Merger and Rachesky Allocation

301. Defendant McInerney, as Chairman of the two-member Special Committee, had an incentive to approve both the undervalued Merger and the overvalued Rachesky allocation given his close personal and business ties to Defendants Weiser and Rachesky.

302. This included McInerney's effort to solicit a substantial investment from Rachesky in Corino while ***simultaneously*** negotiating the Diverted Royalty allocation with Rachesky. From July through December 2020, McInerney sought Rachesky's investment in Corino, and was led to believe that such investment would be forthcoming. This incentivized McInerney to approve the

enormous $450 million allocation to Defendant Rachesky despite knowing it was over $200 million more than Jefferies' valuation for the Diverted Royalties.

303. McInerney sought a similar investment in Corino from Defendant Weiser at the same time McInerney was charged with deciding whether to recommend the Merger and its lucrative payout to Weiser. This served as further incentive for Defendant McInerney to recommend approval of the Merger that would award over $8 million in change-of-control compensation for Weiser as it would enable and encourage Weiser's investment in Corino. McInerney also sought additional investment from Weiser in Exicure, another biotechnology company that McInerney had an interest in. McInerney further acknowledged he and Weiser were "colleagues" with "a long-standing personal and business relationship dating back to 1998," when both served in senior executive positions at Paramount BioCapital, Inc. Together, McInerney's business dealings with Weiser in at least three companies besides Emisphere motivated McInerney to approve the Merger and Weiser's compensation thereunder.

### G. Defendants' Intentional Structuring of the Merger as a Freeze Out Transaction is Highly Probative of Scienter

304. Defendants' about-face regarding the need for minority shareholders to approve the Merger is further evidence of scienter. On March 17, 2020, soon after Novo Nordisk's original offer, Emisphere's Board created a Special Committee to negotiate the deal in recognition of the fact that Defendants Rachesky, Weiser and Rothwell each had unique financial interests which could motivate them to negotiate a Merger price that benefited them to the detriment of Emisphere's minority shareholders and therefore were conflicted. Nevertheless, Defendants McInerney and Draft, who comprised the Special Committee, knowingly or recklessly allowed Defendants Rachesky, Weiser and Rothwell to run the sale process and negotiate directly with Novo Nordisk representatives over the Merger price and terms.

305. During the same meeting, the Board resolved that any transaction must be subject to "the non-waivable" "Unaffiliated Vote Condition," *i.e.*, "approval by a majority of the voting power of the Company, or the tender of a majority of the shares of the company, in each case not owned or controlled by [Rachesky or the MHR Defendants]." This was intended to account for Defendants' self-interest. As the Merger negotiations proceeded, however, the Individual Defendants agreed to abandon the previously mandatory Unaffiliated Vote Condition without explanation and for zero additional consideration.

306. Rather than give minority shareholders control over whether the Merger should be consummated, Defendants did the exact opposite. Indeed, explicitly for the purpose of ensuring that Defendants Rachesky, Weiser and Rothwell controlled a ***majority*** of the outstanding voting shares of the Company, the Board, including each of the Individual Defendants, accelerated the vesting of one million RSUs previously granted to each of Rothwell and Weiser. This provided Rachesky, Weiser and Rothwell with a majority of the Company's voting shares necessary to effectuate the Merger.

307. Defendants' intentional freeze out of minority shareholders was finalized on November 5, 2020, when Defendants Rachesky, Weiser and Rothwell executed the Support Agreements requiring them to vote their 50.5% of the outstanding common stock in favor of the Merger. The fact that the Defendants intentionally structured the transaction in a way that precluded minority shareholders from voting down the Merger indicates that the Defendants knew or recklessly disregarded that the Company was being materially undervalued and is highly probative of scienter.

### H. Defendants Were Motivated to Misstate and Omit Material Facts to Avoid an Injunction of the Merger

308. Defendants were motivated to make the material misstatements and omissions of material facts alleged herein in order to prevent Emisphere's unaffiliated shareholders from moving to enjoin the Merger or exercising their appraisal rights under Section 262 of the Delaware General Corporation Law.

309. Defendants knew, or were reckless in not knowing, that the omission of the material facts detailed above concerning (i) the IP Dispute, Defendants' strong legal position in the Dispute, and its material impact on Emisphere's valuation; (ii) the Case 2A and 2B projections for Emisphere; (iii) Rothwell and Weiser's downward manipulation of Emisphere's financial projections to align them with Novo's $1.8 billion Merger price; (iv) the substantially overvalued $450 million allocation to Defendant Rachesky that directly lowered the amount allocated to Emisphere's unaffiliated shareholders; (v) Defendant Rachesky's insistence on a tax-related transaction structure for the Diverted Royalty allocation to the detriment of negotiating higher consideration for unaffiliated shareholders; and (vi) the disabling conflicts of interest held by Defendant McInerney as Chairman of the Special Committee and Co-CEOs Weiser and Rothwell, prevented Plaintiffs and the Class from seeking to enjoin the transaction to obtain higher Merger Consideration, a reallocation of the $450 million Diverted Royalty payment to Rachesky, or to pursue other appropriate legal remedies such as exercising their statutory appraisal rights to obtain fair value for their shares.

310. The materiality of the misstated and omitted facts made the threat of an injunction or an appraisal by Plaintiffs and the Class significant. Defendants were therefore motivated to make the misstatements and omissions alleged herein to avoid suits for injunction that could

postpone, restructure or crater the Merger entirely. Such motive is highly probative of Defendants' scienter.

**I. The Knowing or Reckless Conduct of the Individual Defendants is Imputed to Emisphere**

311. Emisphere acted with scienter because the scienter of its Co-CEO's, Weiser and Rothwell, and its Board of Directors, including Defendants Rachesky, McInerney, Harkey and Draft, is imputed to the Company that the Individual Defendants spoke on behalf of and controlled. The Individual Defendants each made and caused to be made materially false statements and omissions that misled investors, as detailed herein.

## VII. LOSS CAUSATION

312. During the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive Emisphere investors. Defendants' materially false and misleading statements as set forth above artificially depressed the market price of Emisphere's common stock below the price at which Emisphere common stock would have traded absent those material misrepresentations and omissions.

313. Had the market known the full truth about the Merger and Emisphere's financial and business prospects, Emisphere's stock would have been trading at higher prices during the Class Period, reflecting the Company's true financial performance and expected growth in royalty revenue from Novo Nordisk.

314. As detailed above, Emisphere was more valuable than the $1.8 billion Merger price paid by Novo. *First*, Defendants strongly believed they would prevail on the undisclosed IP Dispute, which would result in the higher 2.5% royalty revenues for Emisphere through 2031 and possibly 2034—equating to billions in additional proceeds for the Company. *Second,* the Special Committee's financial advisors at Jefferies calculated undisclosed Emisphere NPVs that were as

much as ***$1.135 billion greater*** than the Merger price. *Third*, Defendants Rothwell and Weiser worked with Jefferies to adjust these NPV's downward to align them with the $1.8 billion Merger price. *Finally*, Jefferies calculated a $223 million value for the Diverted Royalties, yet Defendant Rachesky was paid $450 million, thereby depriving Emisphere shareholders of $227 million in value for the Diverted Royalties under the Merger.

315. Emisphere's stock would have traded at higher prices during the Class Period had these and the other concealed facts noted above been disclosed to the market. Alternatively, investors would have known that Emisphere's value was considerably higher and would have sought appraisal of the shares or other similar remedies. Accordingly, Plaintiffs and the Class who sold their Emisphere shares during the Class Period would have obtained a higher price for their shares.

316. Defendants' materially false and misleading statements and omissions of material fact operated as a fraud or deceit on Plaintiffs and the Class, and induced Plaintiffs and the Class to sell Emisphere shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration. As a result of their sales of Emisphere common stock during the Class Period for less than actual value, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under Section 10(b) of the Exchange Act.

317. Given the artificial deflation of Emisphere's stock price caused by Defendants' material misstatements and omissions of material facts during the Class Period, the ***actual*** market value of Emisphere stock was higher than the $7.83 in Merger consideration received by Emisphere shareholders. Based on Defendants' misrepresentations, however, Emisphere's stock

price became tethered to the underpriced Merger consideration of $7.83 per share, as reflected in the following chart:




318. The inability of Plaintiffs and the Class to accurately assess Emisphere's true value further caused them to forfeit their right to dissent and seek appraisal of the fair value of their Emisphere common stock under Section 262 of the Delaware General Corporation Law, among other relief, and were damaged thereby. Alternatively, had Defendants accurately represented the Merger and Emisphere's true value during the Class Period, Plaintiffs and the Class could have sought an injunction of the Merger to negotiate higher merger consideration for shareholders.

## VIII. CLASS ACTION ALLEGATIONS

319. Plaintiffs bring this Action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Emisphere common stock during the Class Period. Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Emisphere, and their families and affiliates.

320. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. As of the Merger announcement on November 6, 2020, there were 170.9 million fully diluted shares of Emisphere common stock outstanding and 86,182,000 shares of common stock issued and outstanding as of the Merger Record Date on November 13, 2020. Upon information and belief, there are thousands of members of the Class.

321. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class members include:

i. Whether Defendants violated the Exchange Act;

ii. Whether Defendants misrepresented material facts;

iii. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

iv. Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

v. Whether the price of Emisphere common stock was artificially deflated during the Class Period;

vi. Whether Defendants' conduct caused the members of the Class to sustain damages; and

vii. The extent of damage sustained by Class members and the appropriate measure of damages.

322. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

323. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

324. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

325. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged false or misleading statements pled in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

326. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Emisphere and the other Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.

## X. PRESUMPTION OF RELIANCE

327. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose, and the omission of which rendered their Class Period statements materially misleading. Because this Action involves Defendants' failure to disclose information regarding Emisphere's business and financial projections, among other things, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions. Given the importance of

Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

328. In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Emisphere securities was open, efficient, and well developed for the following reasons, among others:

i. Emisphere stock met the requirements for listing, and was listed and actively traded at the time of the Merger on the Over-the-Counter Bulletin Board ("OTCBB"), an efficient and automated market for over-the-counter securities provided by the Financial Industry Regulatory Authority during the Class Period;

ii. The price of Emisphere common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

iii. Emisphere publicly communicated with investors via established market communication mechanisms, including through the dissemination of press releases on the national circuits of major newswire services; and

iv. Emisphere stock had an average weekly trading volume of 5.18% during the Class Period and a closing bid-ask spread of $0.01 - $0.02, both of which reflect an efficient market.

329. As a result of the foregoing, the market for Emisphere securities promptly digested current information regarding Emisphere from all publicly available sources and reflected such information in the price of Emisphere stock. Under these circumstances, all sellers of Emisphere common stock during the Class Period suffered similar injury through their sale of Emisphere common stock at artificially deflated prices, and the presumption of reliance applies.

330. Accordingly, Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Emisphere securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## COUNT I
## For Violations of Section 10(b) Of The Exchange Act And Rule 10b-5(a)-(c)
## (Against All Defendants)

331. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

332. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to sell Emisphere securities at artificially deflated prices.

333. Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Emisphere securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

334. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information about the Company's financial well-being, operations, and prospects, as well as material information concerning the Merger and the MHR Purchase Agreement.

335. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

336. In their roles as Co-CEO's of Emisphere during the Class Period, Defendants Weiser and Rothwell directly participated in the management of Emisphere's operations and, because of their positions at Emisphere, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Emisphere's press release and Proxy in connection with the Merger. The Proxy was in fact signed by Defendant Rothwell as Chairman of the Board and Co-CEO of Emisphere, as well as being ordered and issued by the entire Board, *i.e.*, each of the Individual Defendants.

337. Additionally, as members of Emisphere's Board of Directors responsible for issuing the Proxy, each of Defendants Rachesky, Weiser, Rothwell, McInerney, Harkey and Draft also were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements contained therein and likewise possessed the power and authority to control the contents of Emisphere's Proxy in connection with the Merger. Each of the Individual Defendants authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sale process leading up to the signing of the Merger Agreement. Thus, all Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

338. Defendants' omissions and false and misleading statements in the press release and Proxy issued during the Class Period are material in that a reasonable Emisphere shareholder would view a full and accurate disclosure as significantly altering the total mix of information made available in these documents and in other information reasonably available to Emisphere shareholders.

339. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent Emisphere's true financial condition and material information regarding the Merger and the MHR Purchase Agreement from the investing public and to support the artificially low prices of the Company's securities.

340. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

341. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

**COUNT II**
**For Violations of Section 20(a) Of The Exchange Act**
**(Against the Individual Defendants and MHR Defendants)**

342. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

343. During the Class Period, Defendants Weiser and Rothwell acted as controlling persons of Emisphere within the meaning of Section 20(a) of the Exchange Act.

344. By reason of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Emisphere's day-to-day operations during the Class Period, Defendants Weiser and Rothwell had the power to, and did, control and influence the decision making of the Company and the conduct of Emisphere's business, including the wrongful conduct complained of herein. Defendants Weiser and Rothwell were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiffs allege to be materially false and misleading. Moreover, Defendants Weiser and Rothwell had a duty to disseminate accurate

and truthful information regarding Emisphere's operations, and to correct any previously issued statements that had become untrue so that the market price of Emisphere securities would be based upon truthful and accurate information.

345. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Weiser and Rothwell had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations alleged herein. Defendants Weiser and Rothwell were also directly involved in providing and approving the false financial projections disseminated by Emisphere during the Class Period. Further, as detailed above, Defendants Weiser and Rothwell had direct involvement in the presentation and/or manipulation of financial projections included within the Company's Proxy. Defendants Harkey, McInerney and Draft also exercised control over Emisphere through their involvement in Merger negotiations, presence at Board and Special Committee meetings and authorization of the Proxy containing material misstatements and omissions of material facts. As a result of the foregoing, these Defendants, as a group and individually, were controlling persons of Emisphere within the meaning of Section 20(a) of the Exchange Act.

346. Defendant Rachesky and the MHR Defendants also exercised control over Emisphere as a director (Rachesky) and controlling shareholders of the Company during the Class Period. Defendant Rachesky was the founder and ultimate controller of the MHR Defendants, and certain of the MHR Defendants were signatories to the MHR Purchase Agreement. Defendant Rachesky used his significant stock ownership in the Company to control the sale process with Novo Nordisk, including to directly negotiate with Novo on the Merger, to negotiate a $450 million allocation for himself and the MHR Defendants for Novo's concurrent acquisition of the Diverted

Royalties, and to require a transaction structure for Novo's acquisition of the Diverted Royalties that ensured favorable personal tax treatment on this lucrative allocation. As a member of the Board, Defendant Rachesky also authorized Emisphere's Proxy and press release during the Class Period which contained materially false and misleading statements, as detailed herein.

347. The Special Committee Defendants exercised control over Emisphere as Board members who were authorized to engage in Merger negotiations with Novo Nordisk and its representatives, and empowered to make recommendations to the Board about the Merger. The Special Committee Defendants further exercised control over Emisphere by recommending the Merger to the Board and authorizing Emisphere's Proxy and press release during the Class Period which contained materially false and misleading statements, as detailed herein.

348. As a direct and proximate cause of the Individual Defendants' wrongful conduct as set forth herein, Plaintiffs and other members of the Class suffered damages in connection with their sales of Emisphere securities during the Class Period.

349. By virtue of their positions as controlling persons of Emisphere and as a result of their own aforementioned conduct, the Individual Defendants and the MHR Defendants, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows: (i) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; (ii) awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; (iii) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this Action, including attorneys' fees and expert fees;

(iv) awarding rescissory damages; and (v) awarding such equitable/injunctive or further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

Dated: May 28, 2025

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

By: */s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci
Jonathan H. Beemer (*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
Fax: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com

**SAXENA WHITE P.A.**
David J. Schwartz (*pro hac vice* forthcoming)
Sara DiLeo (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
dschwartz@saxenawhite.com
sdileo@saxaenwhite.com
jlamet@saxenawhite.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATION AND AUTHORIZATION**

I, Hilary L. Shane, as Managing Member of ODS Capital LLC ("ODS Capital"), hereby certify as to the claims asserted under the federal securities laws, that:

1. I am personally authorized to enter into and execute this certification on behalf of ODS Capital. I have reviewed a complaint prepared against Emisphere Technologies, Inc. ("Emisphere"), alleging violations of the federal securities laws, and authorize its filing.

2. ODS Capital did not purchase or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. ODS Capital is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. ODS Capital fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act of 1995, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. ODS Capital's transactions in Emisphere common stock during the Class Period are set forth in the attached Schedule A.

5. ODS Capital has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Altshares Event-Driven ETF v. Focus Fin. Partners, Inc.*, No. 1:23-cv-1466 (D. Del.).

6. ODS Capital has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending: *none*.

7. ODS Capital will not accept any payment for serving as a representative party on behalf of the Class beyond ODS Capital's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

5/22/2025
Executed this _____ day of May, 2025.

*ODS Capital LLC*

DocuSigned by:
Hilary
D89D94FA195948C...

Hilary L. Shane, Managing Member

**SCHEDULE A**
**ODS Capital LLC**
**Transactions in Emisphere Technologies, Inc.**

**Common Stock Purchases**

| Date | Shares | Price |
|---|---|---|
| 11/12/20 | 2,300 | $7.6435 |
| 11/12/20 | 200,000 | $7.6300 |
| 11/13/20 | 1,241,000 | $7.6400 |
| 11/13/20 | 400 | $7.6100 |
| 11/17/20 | 2,000 | $7.6500 |
| 11/18/20 | 250 | $7.6800 |
| 11/20/20 | 31,100 | $7.6879 |
| 11/20/20 | 200,000 | $7.7000 |
| 11/23/20 | 10,074 | $7.6450 |
| 11/24/20 | 19,246 | $7.6821 |
| 11/27/20 | 38,965 | $7.6951 |
| 12/01/20 | 32,300 | $7.7788 |
| 12/02/20 | 30,000 | $7.7800 |
| 12/08/20 | 5,000 | $7.8000 |
| 12/08/20 | 10,000 | $7.8000 |

**Common Stock Sales**

| Date | Shares | Price |
|---|---|---|
| 12/09/20 | 1,822,635 | Tendered |

# CERTIFICATION AND AUTHORIZATION

I, Hilary L. Shane, hereby certify as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint prepared against Emisphere Technologies, Inc. ("Emisphere"), alleging violations of the federal securities laws, and authorize its filing.

2. I did not purchase or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. I am willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. My transactions in Emisphere common stock during the Class Period are set forth in the attached Schedule A.

5. I have not sought to serve as a lead plaintiff and/or representative party in any class action under the federal securities laws filed during the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages,) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5/22/2025 day of May, 2025.

DocuSigned by:
Hilary
D89D94FA195948C...

Hilary L. Shane

**SCHEDULE A**

**Hilary L. Shane – IRA Account**

**Transactions in Emisphere Technologies, Inc.**

**Common Stock Purchases**

| Date | Shares | Price |
|---|---|---|
| 11/13/20 | 982 | $7.6400 |
| 11/13/20 | 29,018 | $7.6500 |
| 11/13/20 | 30,000 | $7.6500 |
| 11/16/20 | 100 | $7.6350 |
| 11/16/20 | 100 | $7.6400 |
| 11/16/20 | 1,000 | $7.6350 |
| 11/16/20 | 2,175 | $7.6300 |
| 11/16/20 | 7,377 | $7.6400 |
| 11/16/20 | 7,725 | $7.6400 |
| 11/16/20 | 8,900 | $7.6355 |

**Common Stock Sales**

| Date | Shares | Price |
|---|---|---|
| 12/09/20 | 87,377 | Tendered |

**CERTIFICATION AND AUTHORIZATION**

I, Hilary L. Shane, as Trustee for the Hilary L. Shane Revocable Trust ("HLS Trust"), hereby certify as to the claims asserted under the federal securities laws, that:

1. I am personally authorized to enter into and execute this certification on behalf of the HLS Trust. I have reviewed a complaint prepared against Emisphere Technologies, Inc. ("Emisphere"), alleging violations of the federal securities laws, and authorize its filing.

2. The HLS Trust did not purchase or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. The HLS Trust is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. The HLS Trust fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. The HLS Trust's transactions in Emisphere common stock during the Class Period are set forth in the attached Schedule A.

5. HLS Trust has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Altshares Event-Driven ETF v. EngageSmart, Inc.*, No. 1:24-cv-1083 (D. Del.).

6. HLS Trust has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending: *none*.

7. The HLS Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages,) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5/22/2025 day of May, 2025.

DocuSigned by:
Hilary
D89D94EA195948C...

Hilary L. Shane, *as Trustee for the Hilary L. Shane Revocable Trust*

**SCHEDULE A**
**Hilary L. Shane Revocable Trust**
**Transactions in Emisphere Technologies, Inc.**

**Common Stock Purchases**

| Date | Shares | Price |
|---|---|---|
| 11/12/20 | 100 | $7.6350 |
| 11/12/20 | 100 | $7.6350 |
| 11/12/20 | 100 | $7.5300 |
| 11/12/20 | 100 | $7.6050 |
| 11/12/20 | 100 | $7.6050 |
| 11/12/20 | 200 | $7.5800 |
| 11/12/20 | 400 | $7.6200 |
| 11/12/20 | 800 | $7.6200 |
| 11/12/20 | 900 | $7.6250 |
| 11/12/20 | 1,000 | $7.5200 |
| 11/12/20 | 1,000 | $7.6250 |
| 11/12/20 | 1,000 | $7.6100 |
| 11/12/20 | 1,100 | $7.6399 |
| 11/12/20 | 1,500 | $7.6300 |
| 11/12/20 | 2,000 | $7.5200 |
| 11/12/20 | 2,000 | $7.6100 |
| 11/12/20 | 2,100 | $7.6400 |
| 11/12/20 | 2,500 | $7.6300 |
| 11/12/20 | 2,900 | $7.6150 |
| 11/12/20 | 4,100 | $7.6499 |
| 11/12/20 | 4,449 | $7.6100 |
| 11/12/20 | 5,000 | $7.6200 |
| 11/12/20 | 5,000 | $7.5400 |
| 11/12/20 | 5,000 | $7.6500 |
| 11/12/20 | 5,000 | $7.6200 |
| 11/12/20 | 5,000 | $7.6200 |
| 11/12/20 | 5,900 | $7.6100 |
| 11/12/20 | 6,000 | $7.6100 |
| 11/12/20 | 6,000 | $7.5500 |
| 11/12/20 | 7,000 | $7.6100 |
| 11/12/20 | 7,000 | $7.6100 |
| 11/12/20 | 9,544 | $7.6300 |
| 11/12/20 | 9,800 | $7.6100 |
| 11/12/20 | 9,900 | $7.6100 |
| 11/12/20 | 10,000 | $7.6400 |
| 11/12/20 | 10,900 | $7.6400 |

**Common Stock Sales**

| Date | Shares | Price |
|---|---|---|
| 12/09/20 | 995,134 | Tendered |

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 11/12/20 | 12,000 | $7.6300 |
| 11/12/20 | 12,000 | $7.6500 |
| 11/12/20 | 16,000 | $7.6500 |
| 11/12/20 | 19,000 | $7.6400 |
| 11/12/20 | 30,000 | $7.6500 |
| 11/13/20 | 100 | $7.6100 |
| 11/13/20 | 700 | $7.6500 |
| 11/13/20 | 1,900 | $7.6300 |
| 11/13/20 | 2,100 | $7.6350 |
| 11/13/20 | 5,000 | $7.6300 |
| 11/13/20 | 9,900 | $7.6400 |
| 11/13/20 | 17,398 | $7.6300 |
| 11/13/20 | 18,000 | $7.6300 |
| 11/13/20 | 19,000 | $7.6400 |
| 11/13/20 | 30,000 | $7.6300 |
| 11/16/20 | 4,450 | $7.6200 |
| 11/16/20 | 7,000 | $7.6400 |
| 11/16/20 | 10,000 | $7.6400 |
| 11/17/20 | 200 | $7.6800 |
| 11/17/20 | 2,200 | $7.6800 |
| 11/17/20 | 5,000 | $7.6400 |
| 11/17/20 | 8,000 | $7.6700 |
| 11/17/20 | 8,000 | $7.6300 |
| 11/17/20 | 10,000 | $7.6500 |
| 11/17/20 | 13,800 | $7.7000 |
| 11/17/20 | 15,800 | $7.6900 |
| 11/18/20 | 2,500 | $7.6800 |
| 11/18/20 | 3,800 | $7.6400 |
| 11/18/20 | 6,000 | $7.6400 |
| 11/18/20 | 8,000 | $7.6500 |
| 11/18/20 | 9,700 | $7.6400 |
| 11/18/20 | 9,903 | $7.6400 |
| 11/18/20 | 12,800 | $7.6500 |
| 11/18/20 | 20,900 | $7.6600 |
| 11/18/20 | 23,000 | $7.6800 |
| 11/19/20 | 12,733 | $7.6300 |
| 11/20/20 | 100 | $7.6950 |
| 11/20/20 | 100 | $7.6999 |
| 11/20/20 | 600 | $7.6999 |
| 11/20/20 | 2,000 | $7.6350 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 11/20/20 | 5,800 | $7.6400 |
| 11/20/20 | 7,690 | $7.7000 |
| 11/20/20 | 7,723 | $7.6900 |
| 11/20/20 | 8,200 | $7.6700 |
| 11/20/20 | 22,210 | $7.6900 |
| 11/20/20 | 22,277 | $7.7000 |
| 11/20/20 | 29,400 | $7.7000 |
| 11/20/20 | 29,900 | $7.7000 |
| 11/23/20 | 1,700 | $7.6450 |
| 11/23/20 | 5,000 | $7.6800 |
| 11/23/20 | 28,300 | $7.6500 |
| 11/23/20 | 30,000 | $7.6500 |
| 11/24/20 | 16,222 | $7.6600 |
| 12/01/20 | 5,000 | $7.7900 |
| 12/02/20 | 5,000 | $7.7900 |
| 12/02/20 | 5,000 | $7.7800 |
| 12/03/20 | 2,000 | $7.7900 |
| 12/03/20 | 10,000 | $7.7800 |
| 12/03/20 | 10,000 | $7.7980 |
| 12/04/20 | 35 | $7.7800 |
| 12/04/20 | 2,900 | $7.7900 |
| 12/04/20 | 3,900 | $7.8000 |
| 12/04/20 | 4,700 | $7.8000 |
| 12/07/20 | 100 | $7.8050 |
| 12/07/20 | 100 | $7.7950 |
| 12/07/20 | 300 | $7.8090 |
| 12/07/20 | 1,000 | $7.7900 |
| 12/07/20 | 5,000 | $7.7900 |
| 12/07/20 | 7,900 | $7.8000 |
| 12/07/20 | 8,700 | $7.8100 |
| 12/07/20 | 9,600 | $7.8100 |
| 12/07/20 | 14,670 | $7.8000 |
| 12/07/20 | 15,330 | $7.8000 |
| 12/07/20 | 17,000 | $7.8000 |
| 12/07/20 | 20,300 | $7.8000 |
| 12/07/20 | 25,000 | $7.8000 |
| 12/08/20 | 100 | $7.8000 |
| 12/08/20 | 100 | $7.8050 |
| 12/08/20 | 10,900 | $7.8100 |
| 12/08/20 | 11,000 | $7.8100 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 12/08/20 | 29,900 | $7.8100 |
| 12/08/20 | 30,000 | $7.8100 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |

# CERTIFICATION AND AUTHORIZATION

I, Dann Griffiths, hereby certify as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint prepared against Emisphere Technologies, Inc. ("Emisphere"), alleging violations of the federal securities laws, and authorize its filing.

2. I did not purchase or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. I am willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. I fully understand the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. My transactions in Emisphere common stock during the Class Period are set forth in the attached Schedule A.

5. I have not sought to serve as a lead plaintiff and/or representative party in any class action under the federal securities laws filed during the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages,) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this 9th day of May, 2025.

Signed by:
Dann Griffiths
C09811D05503448...

Dann Griffiths

**SCHEDULE A**
**Dann Griffiths**
**Transactions in Emisphere Technologies, Inc.**

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| | | |

| Open Market Sale/Tender Transactions | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 11/12/20 | 1,000 | $7.6000 |
| 11/12/20 | 2,000 | $7.6500 |
| 11/12/20 | 2,000 | $7.6400 |
| 11/24/20 | 2,000 | $7.6700 |
| 11/25/20 | 1,000 | $7.7100 |
| 11/25/20 | 1,000 | $7.7100 |
| 11/25/20 | 1,000 | $7.7200 |
| 12/09/20 | 90,000 | **Tendered** |

# CERTIFICATION

I, Salvatore Muoio, on behalf of S. Muoio & Co. LLC, hereby certify, as to the claims asserted under the federal securities laws in the Second Amended Class Action Complaint (the "Complaint"), that:

1. I am the Managing Member of S. Muoio & Co. LLC, the general partner and investment advisor of SM Merger/Arbitrage, L.P. and investment manager of Associated Capital Group, Inc. (collectively, the "SM Funds") and have the authority to execute this certification on their behalf. I have reviewed the Complaint in this action and have authorized its filing by counsel.

2. The SM Funds did not acquire any of the securities that are the subject of this action at the direction of their counsel, or in order to participate in this action or any other litigation under the federal securities laws.

3. The SM Funds are willing to serve as lead plaintiff in this action and recognize their duties as such to act on behalf of class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

4. The SM Funds will not accept any payment for serving as representative parties on behalf of the class beyond their *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

5. The SM Funds have not served or sought to serve as a representative party for a class in any action filed under the federal securities laws within the three-year period prior to the date of this Certification.

6. The SM Funds' transactions during the relevant period in Emisphere Technologies, Inc. securities that are the subject of this action are reflected in Schedule A hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of May 2025.

SM Merger/Arbitrage, L.P. and Associated Capital Group, Inc.
By: Salvatore Muoio
General Partner to and Investment Advisor of SM Merger/Arbitrage, L.P. and Investment Manager of Associated Capital Group, Inc.

**Schedule A**

**Transactions November 6, 2020 - December 8, 2020 (Close of Merger)**
**Emisphere Technologies, Inc. Common Stock (CUSIP: 291345106)**

| Movant | Account | Trade Date | Transaction Type | Shares | Price | Transaction Total | Note |
|---|---|---|---|---|---|---|---|
| Associated Capital Group Inc. | 43001668 | 11/6/2020 | Purchase | 36,306 | $ 7.6234 | $ 276,966.69 | |
| Associated Capital Group Inc. | 43001668 | 11/9/2020 | Purchase | 13,694 | $ 7.5700 | $ 103,742.05 | |
| Associated Capital Group Inc. | 43001668 | 11/16/2020 | Purchase | 30,000 | $ 7.6400 | $ 229,360.00 | |
| Associated Capital Group Inc. | 43001668 | 11/17/2020 | Purchase | 4,495 | $ 7.6300 | $ 34,329.33 | |
| Associated Capital Group Inc. | 43001668 | 12/9/2020 | Sale - Close of Merger | 84,495 | $ 7.8300 | $ 661,595.85 | At stated Merger consideration of $7.83 per share |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/6/2020 | Purchase | 36,306 | $ 7.6234 | $ 276,966.69 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/9/2020 | Purchase | 13,694 | $ 7.5700 | $ 103,742.05 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/16/2020 | Purchase | 30,000 | $ 7.6400 | $ 229,360.00 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 11/17/2020 | Purchase | 4,495 | $ 7.6300 | $ 34,329.33 | |
| SM Merger/Arbitrage, L.P. | 43300206 | 12/9/2020 | Sale - Close of Merger | 84,495 | $ 7.8300 | $ 661,595.85 | At stated Merger consideration of $7.83 per share |