**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Emisphere Technologies, Inc. Securities Litigation | Civil Action No. 23-20898 (SDW) (AME) |
| | **OPINION** |
| | September 30, 2025 |

**WIGENTON**, District Judge.

Before this Court is Defendants'[1] Motion to Dismiss (D.E. 40 ("Motion")) Lead Plaintiffs'[2] Second Amended Class Action Complaint (D.E. 67 (the "SAC")) pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 78aa. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa. This Court considers this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated herein, Defendants' Motion is **GRANTED**, and the Second Amended Complaint is hereby **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

This action arises from the merger ("Merger") of Emisphere Technologies, Inc.

---

[1] Defendants are Emisphere Technologies, Inc., Mark H. Rachesky, Michael Weiser, Timothy Rothwell, Timothy McInerney, Howard Draft, John Harkey, MHR Fund Management LLC, MHR Holdings, LLC, MHR Capital Partners Master Account LP, MHR Capital Partners (100) LP, MHR Institutional Partners II LP, MHR Institutional Partners IIA LP, MHR Advisors LLC, MHRC LLC, MHR Institutional Advisors II LLC, and MHRC II LLC. When necessary, this Court will specify which Defendant or group of Defendants it is referring to.

[2] Lead Plaintiffs are SM Merger/Arbitrage, L.P., Associated Capital Group, Inc., ODS Capital LLC, the Hilary L. Shane Revocable Trust, Hilary L. Shane, and Dann Griffiths. *See* D.E. 7 (Order Granting Motion to Appoint Lead Plaintiff). While Mr. Griffiths was not originally so designated as a lead plaintiff, Defendants have not objected to his inclusion as a Lead Plaintiff in the Second Amended Complaint.

("Emisphere" or the "Company") and Novo Nordisk A/S ("Novo Nordisk or "Novo"), two pharmaceutical companies, in late 2020. The Lead Plaintiffs allege that Defendants acted fraudulently to artificially deflate the price of Emisphere common stock to ensure that the Merger could proceed, to the detriment of Lead Plaintiffs and to the personal benefit of Defendants. Lead Plaintiffs have been appointed to represent a proposed class (the "Class") consisting of themselves and other investors that sold Emisphere shares during the relevant time period, and bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-6(a)-(c).

### A. Factual History[3]

Defendant Mark Rachesky ("Rachesky") is the founder and President of MHR Fund Management LLC and held a controlling interest in a series of affiliated funds that owned Emisphere stock at the time of the merger (the "MHR Defendants"): MHR Holdings, LLC; MHR Capital Partners Master Account LP; MHR Capital Partners (100) LP; MHR Institutional Partners II LP; MHR Institutional Partners IIA LP; MHR Advisors LLC; MHRC LLC; MHR Institutional Advisors II LLC; and MHRC II LLC. (SAC ¶¶ 30, 33–42.) At the time the Merger closed, Rachesky and his investment funds owned approximately 70% of Emisphere's outstanding common stock. (*Id.* ¶ 30.) The SAC also alleges that, as of December 31, 2019, entities controlled by Rachesky owned 48% of Emisphere, and that on November 5, 2020, Defendants used restricted stock unit ("RSU") accelerations so that Rachesky, the MHR Defendants, Weiser, and Rothwell collectively held about 50.5% of the vote and then signed Support Agreements

---

[3] The facts set forth in this section are drawn from the Second Amended Complaint and are presumed true solely for purposes of this Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As the Second Amended Complaint consists of 349 paragraphs spanning 117 pages, this Court has endeavored to summarize the facts relevant to the Motion as succinctly as possible.

committing those shares in favor of the merger.  (*Id.* ¶¶ 211–13.)  The Director Defendants —
Michael Weiser, Timothy Rothwell, and John Harkey — served on Emisphere's Board during
the relevant period.  Weiser and Rothwell were appointed Co-CEOs in March 2020, and each
stood to receive change-in-control consideration through RSUs valued at approximately $7.8
million.  (*Id.* ¶¶ 44; 48.)

Emisphere is a pharmaceutical and drug delivery company whose key technology is the
proprietary Eligen® drug delivery technology, including the drug carrier known as monosodium
N-[8-(2-hydroxybenzolyl) amino] caprylate ("SNAC") oral drug-delivery platform, which was
the carrier for Novo Nordisk's Type-2 diabetes drug Rybelsus.  (*Id.* ¶¶ 29; 59.)  On June 21, 2008,
Emisphere and Novo Nordisk entered into a Royalty Agreement granting Novo rights to use
SNAC in exchange for an upfront payment, milestones, and running royalties.  (*Id.* ¶ 59.)  The
agreement gave Emisphere a right to terminate for material breach and contained robust
confidentiality/publication restrictions prohibiting publication of protected information without
approval.  (*Id.* ¶ 60–61.)  In December 2016, at Rachesky's direction as controlling shareholder,
0.5% of the royalty stream was diverted to the MHR Defendants (the "Diverted Royalties").  (*Id.*
¶¶ 31–32.)  In April 2019, Emisphere notified Novo that a Science Translational Medicine article
disclosed confidential SNAC information in violation of the Royalty Agreement (the "IP
Dispute").  (*Id.* ¶¶ 65–71.)  Novo later denied any breach and, by July 2019, asserted that it was
the sole inventor on certain patents, a position that, if accepted, would reduce the royalty rate
under amended terms.  (*Id.* ¶¶ 72, 76–82.)  Amid these discussions, in November 2019, Novo
floated the idea of an acquisition rather than litigating the IP Dispute, and on February 20, 2020
made an initial, non-binding $950 million proposal to acquire Emisphere and the Diverted
Royalties.  (*Id.* ¶¶ 86–90.)  The Board then formed a two-member Special Committee (Defendants

McInerney and Draft) on March 17, 2020, and adopted a non-waivable Unaffiliated Vote Condition requiring approval by unaffiliated stockholders. (*Id.* ¶¶ 88–91.) In April 2020, Emisphere rejected the $950 million proposal and involved Jefferies LLC to evaluate the IP Dispute's valuation impact with Emisphere's IP counsel. (*Id.* ¶¶ 110, 115–16.) On July 17, 2020, Novo made a revised offer of $1.125 billion (plus contingent value rights), which the Special Committee rejected on July 29 while continuing to negotiate. (*Id.* ¶¶ 130–32, 159.) During this time, the SAC alleges Weiser and Rothwell pushed downward adjustments to Jefferies' projections and other inputs to align with lower valuations, including reducing assumed peak Rybelsus sales and altering royalty-step assumptions; the internal "Case 2A/2B" models reflected much higher NPVs (approximately $2.673–$2.935 billion) than the figures later used to justify the deal. (*Id.* ¶¶ 138–62.) By August 21–24, 2020, Novo conveyed a purported "best and final" offer of $1.8 billion for Emisphere and the Diverted Royalties and required commitments from major shareholders, including MHR Fund Management LLC and Rachesky, to support the transaction. (*Id.* ¶¶ 163–65.) Following that proposal, Defendants used Management Projections that adopted earlier step-down/peak-sales assumptions and that, unlike the Jefferies Case 2A/2B models, did not account for the expected positive impact of the IP Dispute on valuation. (*Id.* ¶¶ 166–72.) As negotiations progressed into the fall of 2020, the SAC alleges Rachesky insisted on a separate tax-advantaged structure for his $450 million allocation for the Diverted Royalties, which he prioritized over obtaining higher overall consideration, and emails from the timeframe reflected concern about anticipated changes to capital-gains tax rates in the new year. (*Id.* ¶¶ 200–05.) The SAC alleges that Weiser and Rothwell were separately motivated by their RSU packages worth $7.8 million each upon a change-in-control of the Company. (*Id.* ¶¶ 98; 206.) On November 5, 2020, Rachesky's preferred structure was memorialized and the Support

Agreements were executed; that same day, Emisphere accelerated RSUs for Weiser and Rothwell, bringing the voting bloc committed to the Merger to about 50.5%. (*Id.* ¶¶ 201–13, 257.) The Unaffiliated Vote Condition was then removed, ensuring approval regardless of the minority stockholder vote. (*Id.* ¶¶ 208–13.) On November 6, 2020, Defendants announced the Merger in a press release. (*Id.* ¶¶ 218–21.) On November 16, 2020, Emisphere issued the Proxy Statement to stockholders. (*Id.* ¶ 225.) The SAC alleges the press release and Proxy omitted or misstated material facts concerning the IP Dispute, the use of Management Projections (as opposed to the higher Jefferies Case 2A/2B valuations), and tax-structuring that benefited Rachesky. (*Id.* ¶¶ 218–21, 248–68.) The Merger closed on December 8, 2020 with Emisphere shareholders receiving $7.83 per share in exchange for their shares. (*Id.* ¶ 216.)

### B. Procedural History

On October 4, 2023, S/M Merger Arbitrage, L.P. filed a Complaint against Howard Draft, Emisphere Technologies, Inc., Timothy McInterney, Mark Rachesky, Timothy Rothwell, and Michael Weiser. (D.E. 1.) On December 4, 2023, Lead Plaintiffs moved pursuant to 15 U.S.C. § 78u-4(b)(3)(B) for an order appointing them as lead plaintiffs and for approval of selection of counsel, which was granted on January 19, 2024. (D.E. 5; 7.) On April 22, 2024, Lead Plaintiffs filed an Amended Complaint, and Defendants subsequently moved to dismiss. (D.E. 21–22; 40.) While that motion to dismiss was pending and with Defendants' acquiescence, Lead Plaintiffs filed the Second Amended Complaint on May 28, 2025. Defendants filed the instant Motion on June 20, 2025, and the parties timely completed briefing. (D.E. 72; 73; 76.)

## II.  <u>LEGAL STANDARD</u>

Defendants move to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1),

because standing is a jurisdictional matter." *Ballentine v. United States*, Civ. No. 99-130, 2006 WL 3298270, at *1 (D.V.I. Sep. 21, 2006), *aff'd and adopted by* 486 F.3d 806, 808–10 (3d Cir. 2007); *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("The issue of standing is jurisdictional.")

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

In considering a motion to dismiss pursuant to Rule 12(b)(6), a district court must conduct a three-step analysis. First, it must "tak[e] note of the elements a plaintiff must plead to state a claim." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (alteration in original) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). Second, the court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Id.* (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). Third, the court assumes the veracity of all well-pleaded factual allegations, "constru[es] them in the light most favorable to the plaintiff, and draw[s] all reasonable inferences in the plaintiff's favor." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 328 (3d Cir. 2022). "If, after completing this process, the complaint alleges 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements of a claim, then it plausibly pleads a claim." *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 556).

6

Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.* Additionally, when alleging a securities fraud cause of action, a plaintiff "must satisfy the heightened pleading rules codified in the PSLRA." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009); Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). To satisfy this heightened pleading standard, the plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n. 12 (1976)). The latter requirement requires that the plaintiff "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

## III.    **DISCUSSION**

### A. **Article III Standing**

Because standing is a jurisdictional threshold, this Court will address the 12(b)(1) portion of the Motion first. *See Anand v. Indep. Blue Cross*, Civ. No. 20-6246, 2021 WL 3128690, at *4 (E.D. Pa. July 23, 2021), *aff'd in part, vacated in part, remanded*, Civ. No. 21-2679, 2022 WL 2339476 (3d Cir. June 29, 2022) ("When a Rule 12(b)(1) motion is brought with a Rule 12(b)(6) motion, the Rule 12(b)(1) motion must be considered first, since it is only after there is jurisdiction can the court rule on the merits.").

Article III of the United States Constitution limits the power of the federal judiciary to the adjudication of actual "cases" or "controversies." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969);

*see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982).  To enforce the "case" or "controversy" requirement, Article III requires that a litigant "have 'standing' to invoke the power of a federal court . . . ."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).    Standing, therefore, is a "threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  A plaintiff must satisfy a three-part test to establish standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  While Lead Plaintiffs must meet each of the three requirements above to establish standing, "the injury-in-fact element is often determinative."  *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009); *see also Spokeo*, 578 U.S. at 1547 (describing "injury-in-fact" as the "first and foremost" of the three elements).  Defendants primarily contend that Lead Plaintiffs cannot establish an injury-in-fact because they each purchased shares of Emisphere stock at the allegedly deflated prices and subsequently sold them at the higher Merger price for a profit.  At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" because courts "presume that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan*, 504 U.S. at 561.  But as the case proceeds, the plaintiff must come forward with evidence sufficient to prove each element of standing "with the manner and degree of evidence

required at the successive stages of the litigation." *Id.* In other words, deficiencies that do not defeat standing at the motion to dismiss stage may nonetheless preclude jurisdiction at summary judgment or trial if they remain unsubstantiated.

At this stage, this Court is mindful to delineate between two related but distinct arguments that are present in this Motion: (1) that Lead Plaintiffs have not alleged a particularized injury for standing purposes; and (2) that Lead Plaintiffs have not adequately pled loss causation for their securities fraud claims. *See Carpenters Pension Fund of Ill. v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1240 (11th Cir. 2023) (in the securities fraud context, pointing out that "[t]he district court appears to have equated a failure to adequately allege an element of a cause of action and thus a failure to state a claim with the nonexistence of a 'Case' or 'Controversy' for purposes of Article III standing"). As discussed in more detail below, Lead Plaintiffs have fatal pleading flaws as it relates to loss causation that necessitate dismissal of their claims, but "one must not confuse weakness on the merits with the absence of Article III standing." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (citation omitted); *see Warth v. Seldin*, 422 U.S. 490, 500 (1975) (standing "often turns on the nature and source of the claim asserted," but it "in no way depends on the merits" of the claim); *see also In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 444 (S.D.N.Y. 2019) ("[I]n confirming its Article III jurisdiction at the pleading stage, the Court's task is to evaluate the allegations of injury in fact in Plaintiffs' complaint, not to predict the viability of their ultimate claim for damages.")

Lead Plaintiffs essentially are alleging that they sold a security that was impacted by fraud for less than the security was worth. Courts have held that allegations that a plaintiff sold securities at a price below their intrinsic value due to fraud constitutes an injury-in-fact for standing purposes, even if the plaintiff has not "allege[d] a specific trade at a specific price manipulated to their

detriment." *In re Barclays*, 390 F. Supp. 3d at 445. Such financial losses are, for standing purposes, clearly redressable in the form of damages and could be fairly traceable to Defendants' actions if proven. Having decided that Lead Plaintiffs have standing on the basis of the alleged economic harm, this Court declines to address the parties' standing arguments related to Lead Plaintiffs' potential loss of state law remedies.

Accordingly, because Lead Plaintiffs satisfy Article III standing, Defendants' motion to dismiss on standing grounds under Rule 12(b)(1) is denied.[4]

### B.  Statute of Limitations

Defendants argue that Lead Plaintiffs' claims are barred by the relevant statute of limitations. Federal securities law claims "may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b).[5] A statute of limitations argument is an affirmative defense, and it is well-established that "a complaint need not anticipate or overcome affirmative defenses." *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014). Thus, in the Third Circuit, defendants may make statute of limitations arguments in a 12(b)(6) motion, but only "when the defense is 'apparent on the face of the complaint' and documents relied on in the complaint." *Bohus v. Restaurant.com, Inc.*, 784 F. 3d 918, 923 n.2 (3d Cir. 2015) (quoting *Schmidt*, 770 F.3d at 249); *see also Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).

---

[4] Although Article III standing and the sufficiency of the pleadings under Rule 12(b)(6) are distinct inquiries, the deficiencies discussed below in connection with the lack of economic loss underscore that the same factual issues could ultimately prove fatal to standing if the case were to proceed beyond the pleadings. *See Lujan*, 504 U.S. at 561 (1992)).

[5] "[C]ourts have consistently referred to the shorter time period as a statute of limitations and the longer period as a statute of repose." *In re Exxon Mobile Corp. Sec. Litig.*, 500 F.3d 189, 199 (3d Cir. 2007). Here, the Second Amended Complaint alleges and the parties do not appear to dispute that the alleged violations occurred within the past five years, meaning the statute of repose is not at issue. Accordingly, this Court will use the term "statute of limitations" throughout this section of the opinion to refer to the two-year limit.

The statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discovered the facts constituting the violation' — whichever comes first." *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec. Transactions, Inc.*, 730 F.3d 263, 276 n.6 (3d Cir. 2013) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)). A fact is "discovered" when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 275 (quoting *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)). In other words, "the statute of limitations, by virtue of the discovery rule, does not begin to run until the facts constituting every element could have been discovered." *Hull v. Glob. Dig. Sols.*, Inc., Civ. No. 16-5153, 2017 WL 6493148, at *9 (D.N.J. Dec. 19, 2017) (citing *Merck*, 559 U.S. at 653).

The Second Amended Complaint is generally silent regarding when or how Lead Plaintiffs discovered the facts constituting the alleged fraud. While this absence might raise questions about the timeliness of Lead Plaintiffs' claims, it does not affirmatively establish that Lead Plaintiffs did discover or should have discovered the violations more than two years before filing suit. Accordingly, the statute of limitations defense is not apparent on the face of the Amended Complaint and dismissal is inappropriate at the pleading stage. *See Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011) (holding that when "the pleading does not reveal when the limitations period began to run, . . . the statute of limitations cannot justify Rule 12 dismissal.")

Defendants ask this Court to delve into the details of various Delaware state court actions to decide when Lead Plaintiffs discovered or should have discovered the facts constituting the alleged violation. The Court may take judicial notice of public filings for the fact of their existence, but not for the truth of their contents. *See Radcliff v. Radcliff*, No. 20-3669, 2020 WL 7090687, at

*4 (D.N.J. Dec. 4, 2020) (concluding the Court may take judicial notice of state court filings "not for the truth of the facts recited therein, but for the existence of the" filings). Based on the briefing provided, there is no question that the overlap between those actions and the present one is substantial, and it may well be that, if the record in this case were to further develop, Defendants' limitations defense would prove to be dispositive. At this stage, however, the Court must resolve close questions in Lead Plaintiffs' favor. As the Third Circuit has observed, the applicability of the statute of limitations "will usually pose a question of fact for the jury, unless it can be resolved on summary judgment." *Adie v. Stewart*, Civ. No. 20-6200, 2020 WL 7488897, at *2 (D.N.J. Dec. 21, 2020) (*citing Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 604 (3d Cir. 2017)). Such determinations are simply better suited for resolution once parties have had the opportunity to better develop the evidentiary record. Accordingly, while Defendants' arguments are compelling and would warrant significant attention at summary judgment or trial, they do not provide a basis for dismissal at the pleading stage. Defendants' motion to dismiss on statute of limitations grounds is therefore denied.

### C.    Failure to State a Claim

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance" in violation of SEC rules. 15 U.S.C. § 78j(b). Rule 10b-5, in turn, prohibits (a) employing any device, scheme, or artifice to defraud; (b) making any untrue statement of a material fact or omitting to state a material fact necessary to make statements not misleading; or (c) engaging in any act, practice, or course of business that operates as a fraud or deceit. 17 C.F.R. § 240.10b-5. Claims brought under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims because they "make deceptive conduct actionable, as opposed to . . . deceptive statements," as in Rule 10b-

5(b). *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011).[6]  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Malack v. BDO Seidman, LLP*, 617 F.3d 743, 746 (3d Cir. 2010).  Section 20(a) of the Exchange Act creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, who has committed a Section 10(b) violation.  15 U.S.C. § 78t(a); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) ("Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b).")

    a.    *Economic Loss, Loss Causation, and Reliance*

To allege economic loss, Lead Plaintiffs "must demonstrate that, but for the actions of the wrongdoer, [they] would have been in an economically better position than [they] currently [are]." *Brashears v. 1717 Capital Mgmt.*, Civ. No. 02-1534, 2005 WL 2585247, at *4 (D. Del. Oct. 13, 2005).  Lead Plaintiffs have not sufficiently pled such a demonstration.  The Second Amended Complaint is verbose on the history of the Merger and alleges a convincing narrative that Defendants may have acted improperly and in their own interests, but fails to provide this Court with a semblance of whether the Lead Plaintiffs are in a worse economic position and, even assuming they are, how that worse-off position is even remotely related to the alleged misrepresentations contained in the Proxy and other statements.  Because this case involves allegations of artificially *deflated* prices as opposed to the "paradigmatic case involving a public issuer's falsely positive statement(s) or nondisclosure of negative information," this Court's

---

[6] The SAC does plead scheme liability claims.  However, the briefing focuses almost entirely on alleged misstatements and omissions.  In any event, because Plaintiffs cannot plausibly plead economic loss under the Court's below analysis, dismissal of the § 10(b) claim applies equally to all theories of liability.

analysis may not follow the traditional analysis that can be found in typical 10-b cases, and instead "requires tailoring to the idiosyncratic sequence of events pled here." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 663 F. Supp. 3d 334, 364 (S.D.N.Y. 2023).

Despite the lengthy and complicated allegations regarding Defendants' wrongdoing, the relevant factual allegations regarding Lead Plaintiffs' economic loss can be stated simply. Lead Plaintiffs contend that the alleged misrepresentations "artificially deflated the Company's stock price during the Class Period, causing the price of Emisphere common stock to fall as low as $7.50 per share on November 10, 2020," and that they later sold their shares into the Merger for $7.83 per share. (SAC ¶ 17.) The Second Amended Complaint attaches certifications and disclosures from each of Lead Plaintiffs that reveal when and at what price they purchased Emisphere stock. (*Id.* ¶ 28; pp. 122–138.) Associated Capital Group Inc. and SM Merger/Arbitrage, L.P. made identical trades, each making their first purchase of Emisphere stock on November 6, 2020 at $7.6234 per share before making several other purchases over the next couple of weeks at similar prices and tendering all of their shares "[a]t stated Merger consideration of $7.83 per share." (*Id.* at p. 138.) ODS Capital LLC made several purchases beginning on November 12, 2020 at $7.6435 and continuing at generally escalating prices over the next few weeks before tendering all of their shares at the Merger price. (*Id.* at p. 124.) Hilary L. Shane made an initial purchase in her IRA account on November 13, 2020 at $7.6400 per share, and made several other purchases at similar prices before tendering the shares at the Merger price. (*Id.* at p. 127.) The Hilary L. Shane Revocable Trust purchased Emisphere stock over 100 times right up to the day before the Merger closed, before tendering all of the shares at the Merger price. (*Id.* at pp. 130–33.) Dann Griffiths began selling his Emisphere stock on November 12 at $7.60 per share before tendering the remainder of his shares at the Merger price. (*Id.* at p. 136.) On these facts, Lead Plaintiffs cannot

plausibly allege "out-of-pocket" damages because they clearly profited from their trades.[7]  Instead, their theory is that they tendered their shares into the Merger for less than the *intrinsic* value of their shares.  But as the Third Circuit has cautioned, a §10(b) claim cannot proceed where "the fact of the loss, i.e. whether there was any lost opportunity at all, is wholly speculative." *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220 (3d Cir. 2002).  Here, Lead Plaintiffs' lost-opportunity theory would require multiple layers of speculation to show that they would have been better off "but for the actions of the wrongdoer."  *Brashears*, 2005 WL 2585247, at *15.  The first layer of speculation is that Lead Plaintiffs would have still purchased their shares at some unknown higher price absent the misrepresentations; next, that the Merger price itself would also have been higher; and lastly that the difference between the adjusted purchase and sale prices would reflect a compensable loss.  Such conjecture is insufficient.

Two recent decisions further confirm that these allegations fail to state an economic loss. In *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, the court dismissed nearly identical claims, where plaintiffs alleged that defendants suppressed information to depress share value before a going-private merger.  663 F. Supp. 3d at 364–74.  The court explained that plaintiffs' theory "relie[d] on a chain of inferences far too speculative and distended to support a plausible theory of loss and loss causation under § 10(b)."  *Id.* at 368.  Likewise, in *In re Focus Financial Partners Sec. Litig.*, a court in the District of Delaware dismissed claims by merger-arbitrage funds that, as here, purchased shares with full knowledge of the merger price and later tendered them for that exact consideration.  Civ. No. 23-1466, 2025 WL 961488 (D. Del. Mar. 31, 2025).  The court there

---

[7] Dann Griffiths appears to be the only Lead Plaintiff who purchased his stock before the Proxy and other statements.  Defendants correctly note that the Second Amended Complaint is both silent with regard to when and at what price Mr. Griffiths purchased his shares, and suggests that Emisphere's stock price prior to the Proxy was lower than the Merger consideration such that this plaintiff profited from the transaction rather than suffered any economic loss.  (SAC ¶ 317.)  To the extent certain alleged misstatements or omissions in the Proxy would not apply to this plaintiff's purchase, his claim still fails because it rests on speculative assertions of harm rather than a plausible allegation of realized economic loss.

held that plaintiffs "never actually incurred economic loss" because "they received Merger consideration above their purchase points," and that securities laws could not be used to suggest otherwise. *Id.* at *14. Both cases underscore why Lead Plaintiffs' theory here is untenable.

Lead Plaintiffs also argue they lost economic value by being deprived of the opportunity to pursue appraisal in Delaware. While the Second Amended Complaint touches only briefly on this theory, the parties discuss it in their briefing and cite *In re Shanda Games Ltd. Sec. Litig.*, which allowed appraisal-related securities claims to proceed. No. 22-3076, 2025 WL 365767 (2d Cir. Feb. 3, 2025). But appraisal is not the exclusive remedy under Delaware law, and Lead Plaintiffs remained able to participate in parallel Delaware litigation seeking damages for the alleged unfair merger price. Without opining on the merits of those state-law claims, their very existence underscores that alternative remedies remained available under state corporate law, meaning that the deprivation of appraisal rights cannot be considered economic loss here. *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 560 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004).

Ultimately, the deficiencies in alleging economic loss are inseparable from similar deficiencies in pleading loss causation and reliance. The securities laws require a logical chain between misrepresentation, market price, and actual financial harm. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Here, that chain breaks at every point. Without a cognizable economic loss, there can be no loss causation, and reliance presumptions cannot supply the missing injury. Lead Plaintiffs decided to purchase shares as part of a merger-arbitrage strategy, weighing the potential profit if the Merger closed at the announced deal price against the risk that there might be a last-minute delay or cancellation of the Merger. In making that cost-benefit determination, Lead Plaintiffs presumably relied on their expertise and publicly available information, including

the Proxy.  Before their investments, the best-case scenario possible for Lead Plaintiffs would have been that the Merger closed at the deal price that was promised in the Proxy.  There is no allegation, nor could there be, that any of the Lead Plaintiffs had any expectation that they even could be paid out at a price that was *higher* than the Merger price.  And Lead Plaintiffs' best-case scenario is precisely what ended up occurring: the Merger closed and Lead Plaintiffs received the exact profit per share that they were hoping for at the outset of their respective investments.  It would be a perverse reading of the securities laws, as well as potentially disruptive to the investing world at large, if this Court were to hold that investors who engage in merger-arbitrage and achieve the very return they sought at the outset could nevertheless transform that investment into a securities fraud claim.  The securities laws do not provide for additional windfalls, nor do they provide insurance against the inherent risks of arbitrage strategies.  What Lead Plaintiffs bargained for, analyzed the risk-reward ratio of, and in fact obtained here in the form of quick profits, is the opposite of economic loss.

For completeness, this Court notes that neither reliance presumption theory advanced by Plaintiffs alters this conclusion.  The fraud-on-the-market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), is ill-suited to a fixed-price merger because the key determinant of price is the announced deal consideration, not market efficiency.  Likewise, the *Affiliated Ute* presumption, limited to "cases seeking to predicate rule 10b-5 liability upon omissions—as opposed to affirmative misrepresentations," *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 202 (3d Cir. 1990), is inapplicable where Plaintiffs' allegations rest on affirmative statements in the Proxy.  In short, because Lead Plaintiffs fail to allege an economic loss, their §10(b) claim fails regardless of how reliance is framed.

b.      Scienter and "In Connection With" Elements

Since it has been determined that dismissal is warranted, a full analysis of each element of a 10(b) claim is not required.  However, this Court will address the scienter and "in connection with" elements as well, as they illustrate the broader disconnect between the allegations in the Second Amended Complaint and the requirements of a federal securities fraud claim.

The Second Amended Complaint fails to sufficiently assert facts giving rise to a strong inference of scienter in connection with the purchase or sale of a security.  Lead Plaintiffs' allegations raise serious concerns about Defendants' conduct in the lead-up to the Merger, and the Second Amended Complaint certainly alleges facts that establish financial motives for Defendants to accept Novo's offer, regardless of whether that offer was in Emisphere's and its investors' best interests.  Those financial motives and the actions taken to achieve them may have been an improper use of fiduciary power and may give rise to claims in a different context.  However, as the Supreme Court has cautioned, "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."  *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971).  While Lead Plaintiffs argue that Defendants acted with scienter by deliberately withholding the Jefferies projections to justify a merger that personally benefited them, the allegations do not support a strong inference of fraudulent intent *in connection with the sale of a security*.  This distinction is subtle but critical, and it ultimately underscores why this case does not fit within the securities fraud framework.

Here, the Merger was guaranteed to close regardless of what was disclosed in the Proxy because Defendants controlled 50.5% of the shares and the Unaffiliated Vote Condition had been waived.  Lead Plaintiffs themselves allege that, by November 5, 2020, the Merger was guaranteed to close and that there was nothing that they could do to stop it.  (SAC ¶ 307) ("Defendants'

intentional freeze out of minority shareholders was finalized on November 5, 2020, when Defendants Rachesky, Weiser and Rothwell executed the Support Agreements requiring them to vote their 50.5% of the outstanding common stock in favor of the Merger.")  Lead Plaintiffs further allege that "[t]he fact that the Defendants intentionally structured the transaction in a way that precluded minority shareholders from preventing its closing indicated that the Defendants knew or recklessly disregarded that the Company was being materially undervalued and is highly probative of scienter." (*Id.*)

This Court disagrees that the deal structure is highly probative of scienter with regard to the alleged misrepresentations.  Since the Merger's approval was not contingent on shareholder votes or any other variable impacted by the alleged misstatements, it is not clear to this Court, or at least is not clearly alleged in the Second Amended Complaint, why Defendants would be compelled to mislead investors at that stage aside from potentially covering up their earlier alleged wrongdoings, which does not relate to impacting the market price or generating any reliance on the Proxy.  As mentioned above, Lead Plaintiffs must plead with particularity facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2).  This means that the facts in the Second Amended Complaint must allow this Court to conclude that defendants "made a material misstatement with an intent to deceive--not merely innocently or negligently." *Merck & Co. v. Reynolds*, 559 U.S. 633, 649 (2010).  Since the Merger was a foregone conclusion, the alleged omissions and misrepresentations in the Proxy could not have been intended to induce reliance in a way that altered the market price.  Put another way, even accepting all of the allegations in the Second Amended Complaint as true, it is not clear to this Court why Defendants would have cared one way or another whether Lead Plaintiffs or anyone else bought or sold Emisphere stock once the Merger was agreed to and the Unaffiliated Vote Condition was

removed.  By that point, the Merger price was set and the transaction was all but finalized.  This lack of ongoing motive weakens any inference of scienter with regard to the alleged misrepresentations.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (holding that to establish scienter, the inference of fraudulent intent must be at least as compelling as any opposing inference).

Lead Plaintiffs attempt to salvage scienter by arguing that Defendants had a separate incentive to mislead: to avoid potential state court injunctions that could have blocked the Merger. Lead Plaintiffs argue in their opposition that Defendants "wanted to avoid potential suits for injunction that could delay or scuttle the deal entirely."  (Opp. Br., D.E. 73, at 41.)  This scienter theory could potentially have merit, but it is discussed more thoroughly in the briefing than it is actually alleged in the Second Amended Complaint.  Any allegation of scienter currently pled in the Second Amended Complaint remains speculative at best.

Accordingly, Lead Plaintiffs have failed to adequately plead scienter in connection to the alleged misrepresentations, and this deficiency further supports dismissal of their securities fraud claims.

    *c.*    *Section 20(a) Claims*

Section 20(a) "creates a cause of action against individuals who exercise control over a controlled person, including a corporation, that has committed a violation of Section 10(b)." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (internal quotation and citations omitted).  Because this Court finds that Lead Plaintiffs have failed to state a claim under Section 10(b), it logically follows that the Section 20(a) claims must be dismissed as a result.  *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) ("Because the Funds have failed to adequately plead a predicate section 10(b) violation, their section 20(a) claim must

be dismissed.")

      *d.     Dismissal With Prejudice*

Having determined that dismissal is warranted, the last consideration is whether the Second Amended Complaint should be dismissed with or without prejudice. Generally, dismissal should be without prejudice unless amendment would be inequitable or futile. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). Here, this Court concludes that further amendment would be futile as it relates to Lead Plaintiffs. Plaintiffs purchased their shares after the Proxy was issued, and their lack of economic loss is foreclosed by this Court's analysis above. Accordingly, dismissal of the Lead Plaintiffs' claims is with prejudice. This dismissal, however, is limited to the named Lead Plaintiffs and does not bind absent class members who were not parties to this action.

## IV.   **CONCLUSION**

For the reasons set forth above, Defendants' Motion is **GRANTED**, and the Second Amended Complaint is hereby **DISMISSED WITH PREJUDICE**. An appropriate order follows.


                                      */s/ Susan D. Wigenton*
                                  **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
        André M. Espinosa, U.S.M.J.